# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

IN RE: CAPITAL ONE CONSUMER )
DATA SECURITY BREACH LITIGATION )    MDL No. 1:19md2915 (AJT/JFA)
_____ )

This Document Relates to CONSUMER Cases
_____

## CAPITAL ONE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE REPRESENTATIVE CONSUMER CLASS ACTION COMPLAINT

**KING & SPALDING LLP**
David L. Balser (*pro hac vice*)
S. Stewart Haskins II (*pro hac vice*)
John C. Toro (*pro hac vice*)
Kevin J. O'Brien (VSB No. 78886)
Robert D. Griest (*pro hac vice*)
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: (404) 572-4600
Fax: (404) 572-5140
dbalser@kslaw.com
shaskins@kslaw.com
jtoro@kslaw.com
kobrien@kslaw.com
rgriest@kslaw.com

**TROUTMAN SANDERS LLP**
Robert A. Angle (VSB No. 37691)
Tim St. George (VSB No. 77349)
Jon S. Hubbard (VSB No. 71089)
Harrison Scott Kelly (VSB No. 80546)
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
robert.angle@troutman.com
timothy.st.george@troutman.com
jon.hubbard@troutman.com
scott.kelly@troutman.com

Mary C. Zinsner (VSB No. 31397)
401 9th Street, NW, Suite 1000
Washington, DC 20004
Telephone: (703) 734-4334
Facsimile: (703) 734-4340
mary.zinsner@troutman.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND & PROCEDURAL HISTORY ...........................................4

    A.    The Cyber Incident .................................................................................4
    B.    Plaintiffs .................................................................................................7
    C.    Procedural History .................................................................................8

MOTION TO DISMISS STANDARD ..............................................................................9

ARGUMENT ....................................................................................................................9

I.     PLAINTIFFS' CLAIMS ARE GOVERNED BY VIRGINIA LAW. ................................9

    A.    Plaintiffs' Cardholder Agreements Require the Application of Virginia Law to All of Plaintiffs' Claims—Contract and Tort. ..............................9
    B.    Virginia Law Controls Plaintiffs' Claims, Regardless of the Cardholder Agreements. ..........................................................................................11

II.    PLAINTIFFS' TORT CLAIMS MUST BE DISMISSED. ...............................................13

    A.    Plaintiffs Fail to Allege Legally Cognizable Harms Caused by Capital One. .......................................................................................................13

          1.    Plaintiffs' Alleged Harms Are Not Cognizable Under Virginia Law. ...........................................................................14
          2.    Plaintiffs Fail to Sufficiently Allege Proximate Causation for Their Tort Claims. ...........................................................20

    B.    Plaintiffs Cannot Establish a Duty in Tort to Support Their Negligence Claims. ..................................................................................................23

          1.    Plaintiffs' Negligence Claims Are Barred by Virginia's "Source of Duty" Rule and Economic Loss Doctrine. ...............................23
          2.    Virginia Law Does Not Recognize a Duty to Safeguard Personal Information. .......................................................................26
          3.    Plaintiffs Fail to Establish a Duty to Support Their Negligence *Per Se* Claim. .....................................................................29

    C.    Plaintiffs' "Breach of Confidence" Claim Must Be Dismissed. ...........32

III.   PLAINTIFFS' CONTRACT AND QUASI-CONTRACT CLAIMS MUST BE DISMISSED. ...................................................................................................33

    A.    Plaintiffs' Contract Claims Fail as a Matter of Law. ...........................33

|  |  | 1. | Capital One Had No Contractual Obligation to Safeguard Plaintiffs' PII..................................................................33 |
|  |  | 2. | Even if Capital One Had Contractual Obligations Under the Privacy Notice, Plaintiffs Have Not Alleged a Breach of Those Obligations. ...............................................................37 |
|  | B. | Plaintiffs' Unjust Enrichment and Implied Contract Claims Fail..........................38 |
|  | C. | Plaintiffs' Alleged Harms Are Not Compensable in Contract..............................40 |
|  |  | 1. | Lost Benefit of the Bargain...............................................41 |
|  |  | 2. | All Other Alleged Harms. .................................................41 |

IV.    PLAINTIFFS' STATUTORY CLAIMS MUST BE DISMISSED..................................42

A.    Plaintiffs' Cardholder Agreements Preclude Their Claims Under California, Florida, New York, Texas, and Washington Statutes..........................42

B.    Plaintiffs Fail to Plead the Elements of Their Consumer Protection Claims.........43

       1.    Plaintiffs Fail to Allege a Cognizable Injury. .............................................43

       2.    Capital One Is Exempt from Plaintiffs' FDUTPA Claim. .........................43

       3.    Plaintiffs Fail to Allege the Requisite Consumer Transaction..................44

       4.    Omissions Are Insufficient to Allege a Violation of Certain Statutes..........................................................................44

       5.    Plaintiffs Fail to Allege Fraud with Particularity......................................45

C.    Plaintiffs Fail to State a Claim Under the Data Breach Notification Statutes. ............................................................................45

       1.    There Is No Private Right of Action under the Virginia Breach Notice Statute.................................................................46

       2.    Plaintiffs Fail to Allege Plausible Violations of the Breach Notice Statutes.................................................................47

CONCLUSION.................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&E Supply Co. v. Nationwide Mut. Fire Ins. Co.*,
798 F.2d 669 (4th Cir. 1986) ................................................46

*Allen v. Aetna Cas. & Sur. Co.*,
281 S.E.2d 818 (Va. 1981)................................................36

*In re Anthem, Inc. Data Breach Litig.*,
162 F. Supp. 3d 953 (N.D. Cal. 2016) ................................33

*Antman v. Uber Techs., Inc.*,
No. 15-cv-1175-LB, 2018 WL 2151231 (N.D. Cal. May 10, 2018) ................................16, 22

*Appalachian Reg'l Healthcare v. Cunningham*,
806 S.E.2d 380 (Va. 2017)................................................11

*APV Crepaco, Inc. v. Alltransport Inc.*,
683 F. Supp. 1031 (E.D. Va. 1987) ................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................9, 21

*Atrium Unit Owners Ass'n v. King*,
585 S.E.2d 545 (Va. 2003)................................................20, 21

*Attias v. CareFirst, Inc.*,
365 F. Supp. 3d 1 (D.D.C. 2019) ................................41

*Augusta Mutual Insurance Company v. Mason*,
645 S.E.2d 290 (Va. 2007)................................................24

*Baba v. Hewlett-Packard Co.*,
No. C 09–05946 RS, 2010 WL 2486353 (N.D. Cal. June 16, 2010)................................44

*Bankers Tr. Co. v. Basciano*,
960 So. 2d 773 (Fla. Dist. Ct. App. 2007) ................................44

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ................................15, 17, 18

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................19

*Berry v. Am. Express Publ'g, Inc.*,
    54 Cal. Rptr. 3d 91 (Ct. App. 2007) ...................................................................44

*Berryman v. Merit Prop. Mgmt., Inc.*,
    62 Cal. Rptr. 3d 177 (Ct. App. 2007) .................................................................44

*In re Brinker Data Incident Litig.*,
    No. 3:18-cv-686-J-32-MCR, 2020 WL 691848 (M.D. Fla. Jan. 27, 2020) ...........32

*Brooks & Co. Gen. Contractors, Inc. v. Randy Robinson Contracting, Inc.*,
    513 S.E.2d 858 (Va. 1999) .................................................................................35

*Brown v. Ocwen Loan Servicing, LLC*,
    No. CIV. PJM 14-3454, 2015 WL 5008763 (D. Md. Aug. 20, 2015), *aff'd*,
    639 F. App'x 200 (4th Cir. 2016) .........................................................................6

*Buchanan v. Doe*,
    431 S.E.2d 289 (Va. 1993) .................................................................................12

*Buford v. Ocwen Loan Serv., LLC*,
    No. 2:18cv154, 2018 WL 6790656 (E.D. Va. Nov. 2, 2018) (R&R) .....................37

*Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc.*,
    No. 1:08CV1186, 2009 WL 742532 (E.D. Va. March 18, 2009) ..........................12

*Caudle v. Towers, Perrin, Forster & Crosby, Inc.*,
    580 F. Supp. 2d 273 (S.D.N.Y. 2008) ..................................................................15

*CGI Fed. Inc. v. FCi Fed., Inc.*,
    814 S.E.2d 183 (Va. 2018) .................................................................................39

*Chambliss v. Carefirst, Inc.*,
    189 F. Supp. 3d 564 (D. Md. 2016) .....................................................................41

*Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*,
    365 S.E.2d 751 (Va. 1988) .................................................................................26

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...........................................................................................18

*Cline v. Dunlora S., LLC*,
    726 S.E.2d 14 (Va. 2012) ...................................................................................28

*In re: Cmty. Health Sys., Inc.*,
    No. 15-CV-222, 2016 WL 4732630 (N.D. Ala. Sept. 12, 2016) ..........................47

*Cohen v. JP Morgan Chase & Co.*,
    498 F.3d 111 (2d Cir. 2007) ...............................................................................43

*Collett v. Cordovana*,
    772 S.E.2d 584 (Va. 2015)..........................................................................30

*Combs v. U.S. Bank Nat'l Assoc. for JP ALT 2008-SI*,
    No. 1:17-cv-545, 2017 WL 2805494 (E.D. Va. June 28, 2017)......................37, 38

*Commonwealth v. Peterson*,
    749 S.E.2d 307 (Va. 2013)......................................................................22, 23

*Corona v. Sony Pictures Entm't, Inc.*,
    No. 14-CV-09600, 2015 WL 3916744 (C.D. Cal. June 15, 2015)........................47

*Cyberlock Consulting, Inc. v. Info. Experts, Inc.*,
    876 F. Supp. 2d 672 (E.D. Va. 2012) ...........................................................10

*Deutsche Bank National Trust Company v. Buck*,
    No. 3:17CV833, 2019 WL 1440280 (E.D. Va. Mar. 29, 2019) ......................27, 28

*Diaz Vincente v. Obenauer*,
    736 F. Supp. 679 (E.D. Va. 1990) ...............................................................12

*Dodge v. Tr. of Randolph-Macon Woman's Coll.*,
    661 S.E.2d 801 (Va. 2008)......................................................................34, 36

*Equitable Trust Co. v. Bratwursthaus Mgmt. Corp.*,
    514 F.2d 565 (4th Cir. 1975) .....................................................................12

*Fero v. Excellus Health Plain, Inc.*,
    236 F. Supp. 3d 735 (W.D.N.Y. 2017).........................................................41

*Filak v. George*,
    594 S.E.2d 610 (Va. 2004).........................................................................25

*First Am. Title Ins. Co. v. W. Sur. Co.*,
    722 S.E.2d 637 (Va. 2012).........................................................................46

*Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd.*,
    No. 3:15cv72, 2015 WL 4937461 (E.D. Va. Aug. 18, 2015)...............................39

*Galaria v. Nationwide Mut. Ins. Co.*,
    663 F. App'x 384 (6th Cir. 2016) ................................................................17

*Giordano v. Atria Assisted Living, Va. Beach, LLC*,
    429 F. Supp. 2d 732 (E.D. Va. 2006) ..........................................................35

*Goad v. Celotex Corp.*,
    831 F.2d 508 (4th Cir. 1987) .....................................................................10

*Guardian Pharm. of E. NC, LLC v. Weber City Healthcare*,
No. 2:12cv37, 2013 WL 277771 (W.D. Va. Jan. 24, 2013) (R&R) .......................................12

*Hanover Ins. Co. v. Corrpro Comps., Inc.*,
312 F. Supp. 2d 816 (E.D. Va. 2004) .....................................................................................26

*Harbeck v. Smith*,
814 F. Supp. 2d 608 (E.D. Va. 2011) .....................................................................................15

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) .................................................................................................45

*Holiday Motor Corp. v. Walters*,
790 S.E.2d 447 (Va. 2016)......................................................................................................29

*Hutton v. National Board of Examiners in Optometry, Inc.*,
892 F.3d 613 (4th Cir. 2018) ........................................................................................ *passim*

*Insteel Indus., Inc. v. Costanza Contracting Co.*,
276 F. Supp. 2d 479 (E.D. Va. 2003) .....................................................................................10

*In re Interior Molded Doors Antitrust Litig.*,
Nos. 3:18-cv-718-JAG & 3:18-cv-850, 2019 WL 4478734 (E.D. Va. Sept. 18,
2019) ......................................................................................................................................45

*Jazayerli v. Renaissance Hous. Corp.*,
No. 187583, 2001 WL 541065 (Va. Cir. Ct. Mar. 12, 2001)..................................................31

*Jeld-Wen, Inc. v. Gamble by Gamble*,
501 S.E.2d 393 (Va. 1998)......................................................................................................29

*Kimbriel v. ABB, Inc.*,
No. 5:19-cv-215-BO, 2019 WL 4861168 (E.D.N.C. Oct. 1, 2019)........................................19

*Klaiber v. Freemason Assocs., Inc.*,
587 S.E.2d 555 (Va. 2003)......................................................................................................41

*Lachman v. Pa. Greyhound Lines*,
160 F.2d 496 (4th Cir. 1947) .................................................................................................12

*Larkman v. Dynalectron*,
831 F.2d 291, 1987 WL 38145 (4th Cir. 1987) ......................................................................36

*Long v. Abbruzzetti*,
487 S.E.2d 217 (Va. 1997)......................................................................................................42

*In re Lumber Liquidators Chinese-Mfg.'d Flooring Durability Mktg. & Sales
Practices Litig.*, No. 1:16md2743, 952 F.3d 471 (4 th Cir. 2020)...........................................45

*Lydick v. Erie Ins. Prop. & Cas. Co.*,
    778 F. App'x 271 (4th Cir. 2019) .......................................................................5

*M-CAM v. D'Agostino*,
    No. 3:05CV6, 2005 WL 2123400 (W.D. Va. Sep. 1, 2005)................................32

*Marefield Meadows, Inc. v. Lorenz*,
    427 S.E.2d 363 (Va. 1993)................................................................................19

*Marketic v. U.S. Bank Nat'l Ass'n*,
    436 F. Supp. 2d 842 (N.D. Tex. 2006) .............................................................44

*In re Marriott Int'l, Inc., Customer Data Security Breach Litig.*,
    No. 19-MD-2879, 2020 WL 869241 (D. Md. Feb. 21, 2020) .......................18, 19

*Meyer v. Sprint Spectrum L.P.*,
    200 P.3d 295 (Cal. 2009) ..................................................................................43

*Milton v. IIT Research Inst.*,
    138 F.3d 519 (4th Cir. 1998) ............................................................................12

*Morgan v. Wal-Mart Stores E., LP*,
    No. 3:10CV669-HEH, 2010 WL 4394096 (E.D. Va. Nov. 1, 2010)...................20

*Navar, Inc. v. Fed. Bus. Council*,
    784 S.E.2d 296 (Va. 2016)...............................................................................33

*Nedrich v. Jones*,
    429 S.E.2d 201 (Va. 1993)...............................................................................39

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) .........................................................................9, 41

*Nguyen v. Doak Homes, Inc.*,
    167 P.3d 1162 (Wash. Ct. App. 2007) ..............................................................44

*Northstar Aviation, LLC v. Alberto*,
    No. 1:18cv191, 2018 WL 10501629 (E.D. Va. Oct. 25, 2018) ..........................13

*Oelgoetz v. Appalachian Appraisal Servs., Inc.*,
    No. CL99-315, 2000 WL 33258816 (Va. Cir. Ct. Feb. 15, 2000)......................15

*Parker v. Carilion Clinic*,
    819 S.E.2d 809 (Va. 2018)..................................................................... *passim*

*Patton v. Experian Data Corp.*,
    No. 17-cv-1559, 2018 WL 6190349 (C.D. Cal. Jan. 23, 2018)..........................47

*Precision Pipeline, LLC v. Dominion Transmission, Inc.*,
  No. 3:16cv180, 2017 WL 1100903 (E.D. Va. Mar. 23, 2017) ................................................42

*Preferred Sys. Sols., Inc. v. GP Consulting, LLC*,
  732 S.E.2d 676 (Va. 2012).................................................................................................19

*Pyott-Boone Elecs., Inc. v. IRR Trust*,
  918 F. Supp. 2d 532 (W.D. Va. 2013) ..........................................................................10, 43

*Quillen v. Int'l Playtex, Inc.*,
  789 F.2d 1041 (4th Cir. 1986) ............................................................................................12

*Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*,
  507 S.E.2d 344 (Va. 1998).................................................................................................24

*Rosetta Stone, Ltd. v. Google, Inc.*,
  732 F. Supp. 2d 628 (E.D. Va. 2010) .................................................................................40

*Rossman v. Lazarus*,
  No. 1:08cv316 (JCC), 2008 WL 4181195 (E.D. Va. Sept. 3, 2008) .......................................32

*Rotonda Condo. Unit Owners Ass'n v. Rotonda Assocs.*,
  380 S.E.2d 876 (Va. 1989).................................................................................................26

*Run Them Sweet, LLC v. CPA Glob. Ltd.*,
  224 F. Supp. 3d 462 (E.D. Va. 2016) ............................................................................11, 43

*Rusnack v. Cardinal Bank, N.A.*,
  695 F. App'x 704 (4th Cir. 2017) ........................................................................................35

*Sanders v. UDR, Inc.*,
  No. 3:10-CV-459, 2010 WL 3927804 (E.D. Va. Oct. 4, 2010)..............................................31

*Schlimmer v. Poverty Hunt Club*,
  597 S.E.2d 43 (Va. 2004)...................................................................................................30

*Schmidt v. Household Fin. Corp., II*,
  661 S.E.2d 834 (Va. 2008).................................................................................................39

*Settlement Funding, LLC v. Von Neumann-Lillie*,
  645 S.E.2d 436 (Va. 2007).................................................................................................10

*Sols., Inc. v. Steinke*,
  No. 1:18-CV-1380, 2019 WL 5445291 (E.D. Va. Oct. 23, 2019)..........................................40

*Spectra-4, LLP v. Uniwest Commer. Realty, Inc.*,
  772 S.E.2d 290 (Va. 2015).................................................................................................39

*Star Patrol Enters., Inc. v. Saban Entm't. Inc.*,
　No. 95-56534, 1997 WL 683327 (9th Cir. Oct. 23, 1997) (unpublished) ..............................32

*Steele v. Goddard*,
　No. 10-12-00111-CV, 2013 WL 3013671 (Tex. App. June 13, 2013)....................................45

*Sunrise Continuing Care, LLC v. Wright*,
　671 S.E.2d 132 (Va. 2009)........................................................................................................40

*SunTrust Mortg., Inc. v. AIG United Guar. Corp.*,
　784 F. Supp. 2d 585 (E.D. Va. 2011) ......................................................................................34

*Tada v. Equifax Inc.*,
　1:17-cv-05004-TWT (N.D. Ga.)................................................................................................22

*Terry v. Irish Fleet, Inc.*,
　818 S.E.2d 788 (Va. 2018)........................................................................................................22

*Tidewater Marina Holdings, LC v. Premier Bank, Inc.*,
　No. CL12-89, 2015 WL 13801664 (Va. Cir. Ct. Aug. 7, 2015).............................................30

*Tingler v. Graystone Homes, Inc*.,
　834 S.E.2d 244 (Va. 2019)..................................................................................................23, 24

*VA Timberline, LLC v. Land Mgmt. Grp., Inc.*,
　471 F. Supp. 2d 630 (E.D. Va. 2006) ......................................................................................25

*Vansant & Gusler, Inc. v. Washington*,
　429 S.E.2d 31 (Va. 1993)..........................................................................................................46

*Welborn v. IRS*,
　218 F. Supp. 3d 64 (D.D.C. 2016) .....................................................................................18, 39

*Wilkins v. Sibley*,
　135 S.E.2d 765 (Va. 1964).........................................................................................................21

*Williamson v. Old Brogue, Inc.*,
　350 S.E.2d 621 (Va. 1986)..................................................................................................28, 29

*Willner v. Dimon*,
　No. 1:14-cv-1708, 2015 WL 12766135 (E.D. Va. May 11, 2015)....................................36, 37

*Wilson v. EverBank, N.A.*,
　77 F. Supp. 3d 1202 (S.D. Fla. 2015) ......................................................................................43

*WJLA-TV v. Levin*,
　564 S.E.2d 383 (Va. 2002)........................................................................................................32

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
    247 F.3d 1262 (11th Cir. 2001) ...................................................................15

*Yancey v. First Bank*,
    No. 6:16-cv-00028, 2016 WL 4126661 (W.D. Va. Aug. 2, 2016) ................................. *passim*

*Yuzefovsky v. St. John's Wood Apartments*,
    540 S.E.2d 134 (Va. 2001)...........................................................................26

*Zaklit v. Glob. Linguist Sols., LLC*,
    No. 1:14cv314, 2014 WL 3109804 (E.D. Va. July 8, 2014) ...........................................10, 11

*Zuberi v. Hirezi*,
    No. 1:16-cv-1077, 2017 WL 436278 (E.D. Va. Jan. 30, 2017)............................................31

**Statutes**

15 U.S.C. § 45 ..............................................................................................31

15 U.S.C. § 6801 ...........................................................................................32

Cal. Civ. Code § 1770 ....................................................................................44

Cal. Bus. & Prof'l Code § 17204 .......................................................................43

Fla. Stat. § 501.211 .......................................................................................44

Fla. Stat. § 501.212 .......................................................................................44

Tex. Bus. & Com. Code § 17.50 ........................................................................44

Va. Code § 1-200 ............................................................................................8

Va. Code § 18.2-186.6 .........................................................................47, 48, 49, 50

Va. Code § 59.1-9.12 ......................................................................................46

Va. Code § 8.4-403 ........................................................................................35

Wash. Rev. Code § 19.86.090...........................................................................44

Wash. Rev. Code § 19.255.010 ...............................................................48, 49, 50

## INTRODUCTION

On July 17, 2019, Capital One became aware that a criminal hacker may have stolen consumer data stored in its online cloud environment.  Capital One immediately investigated the suspected intrusion and, two days later, confirmed that a hacker had gained unauthorized access to—and stolen—data stored in Capital One's Amazon Web Services ("AWS") cloud environment. Capital One promptly took steps to fix the firewall configuration that the hacker had exploited and notified the FBI about the criminal activity.

For the next ten days, Capital One worked with the FBI to identify the hacker, aid in her arrest, and recover the stolen data.  On July 29, 2019, the DOJ announced that it had arrested the culprit—Paige A. Thompson, a former AWS systems engineer—and charged her with computer fraud and abuse.  That same day, Capital One publicly announced that Thompson had stolen certain personally identifying information ("PII") belonging to approximately 100 million current and former Capital One cardholders and applicants (the "Cyber Incident").  Although Capital One had—and *still* has—no reason to think that Thompson misused or disseminated the stolen PII before her arrest, it offered free credit monitoring and identity protection services to consumers whose information was impacted in the Cyber Incident.

The day after Capital One announced the Cyber Incident, plaintiffs began filing class action lawsuits.  Following the Judicial Panel on Multidistrict Litigation's creation of this MDL proceeding, Court-appointed Lead Plaintiffs' Counsel filed a Representative Consumer Class Action Complaint (the "Complaint") on behalf of ten Plaintiffs residing in California, Florida, New York, Texas, Virginia, and Washington.  Plaintiffs are all Capital One cardholders, and purport to assert claims on behalf of a national and numerous statewide classes against Capital One Financial

1

Corporation, Capital One, N.A., and Capital One Bank (USA), N.A. (collectively, "Capital One"), as well as Amazon.com, Inc. and AWS (together, "Amazon").

Plaintiffs assert claims for negligence, negligence *per se*, "breach of confidence," breach of contract, unjust enrichment, and violations of consumer-protection and data-breach-notification statutes, all of which are controlled by Virginia law under Plaintiffs' cardholder agreements. These claims are typical of those asserted in prior data breach cases. But one key fact separates this data breach from those that have been the subject of earlier MDL proceedings: ***The stolen data was recovered by the FBI, and Plaintiffs do not and cannot allege that the hacker misused their PII, distributed or sold their PII, or made their PII available for any other criminal to misuse before she was arrested***. That undisputed fact is fatal to Plaintiffs' claims for numerous reasons.

***First***, because the hacker did not misuse or disseminate the stolen PII before her arrest—and that data is now safely in the hands of law enforcement—Plaintiffs cannot even allege (much less prove) that they suffered an injury because of the Cyber Incident. Although the Complaint seeks recovery for injuries typically alleged in data breach cases—including a risk of future identity theft, mitigation expenses, and actual losses caused by identity theft—Plaintiffs have not pleaded necessary predicates to recover those damages: that any alleged misuse of their PII was caused by the Cyber Incident (as opposed to the many other potential reasons their PII could have been misused "after" the Cyber Incident) and that they suffer an imminent risk of future identity theft as a result of the Cyber Incident. Unable to assert these foundational elements, Plaintiffs fall back on allegations that the Cyber Incident injured them in intangible ways—by diminishing the "value of their PII" or denying them the benefit of some hypothetical "bargain" they supposedly struck with Capital One. Courts, however, have consistently held that allegations like these do *not*

plead a cognizable injury.  Plaintiffs' inability to assert that the Cyber Incident *injured* them dooms their claims.

*Second*, Plaintiffs' negligence claims fail because the Supreme Court of Virginia's decision in *Parker v. Carilion Clinic* and recent decisions of this Court hold that Virginia law does not recognize a common law duty to protect PII.  Regardless, Plaintiffs' negligence claims all arise from their contractual relationship with Capital One and are therefore independently barred—again, by well-established precedent from the Supreme Court of Virginia—by the "source of duty" rule.

*Third*, Plaintiffs' negligence *per se* claims fail because Virginia law does not permit a plaintiff to substitute a statutory duty for a common law duty that does not exist—exactly what Plaintiffs try here.  Additionally, the statutes on which Plaintiffs rely—including the Federal Trade Commission and Gramm-Leach-Bliley Acts—cannot support a negligence *per se* claim under Virginia law because those statutes were not "enacted for the public safety," but instead are designed to serve consumer-protection goals.

*Fourth*, Plaintiffs' "breach of confidence" claims fail both because that cause of action is not recognized in Virginia and because Capital One did not intentionally disclose Plaintiffs' PII *to* the hacker—the hacker stole it *from* Capital One.

*Fifth*, Plaintiffs' contract claims fail for numerous reasons, the foremost of which is that Capital One never made a contractually enforceable promise (express or implied) that it would use so-called "reasonable measures" to protect Plaintiffs' PII.  Nor do Plaintiffs plead that they suffered injuries that are redressable in contract.

*Sixth*, Plaintiffs' unjust enrichment claims must be dismissed because Virginia law is clear that a plaintiff may not pursue this theory in the face of an express contract like Plaintiffs' Capital

One cardholder agreements.  Courts, moreover, have consistently rejected the notion that stolen PII has a quantifiable value sufficient to permit recovery in unjust enrichment.

***Finally***, Plaintiffs' state statutory claims fail as a matter of law.  Plaintiffs' claims under the consumer-protection acts of California, Florida, New York, Texas, and Washington should be dismissed because Plaintiffs' cardholder agreements disclaim all States' laws but Virginia's.  Even if that were not a bar, Plaintiffs' consumer-protection claims fail because they variously: (i) fail to plead the misrepresentations on which these claims are based with particularity; (ii) fail to adequately plead that Capital One was under a duty to disclose allegedly omitted facts; (iii) sue under statutes that exempt banks like Capital One from their reach; and (iv) fail to allege the consumer transactions these statutes require.  Plaintiffs' claims under state data-breach-notification statutes fare no better.  Not only does the Virginia statute they invoke afford no private right of action, Plaintiffs admit that consumers promptly received notice just *ten days* after Capital One confirmed the hacker's intrusion and on the same day she was arrested, *i.e.*, as soon as Capital One could give notice without compromising the ongoing criminal investigation.  Regardless, no Plaintiff alleges that she was injured as a result of any alleged notice violation.

The Court should therefore dismiss Plaintiffs' Complaint for failure to state a claim.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.      The Cyber Incident[1]

On July 17, 2019, Capital One received an email through its responsible disclosure program raising the possibility that someone had stolen data stored in Capital One's Amazon Web Services ("AWS") cloud environment.  RC ¶¶ 64–65, Doc. 354.  Capital One promptly initiated an investigation and confirmed that it had been the victim of the Cyber Incident.  *Id.* ¶¶ 65, 75.  Capital

---

[1] Capital One accepts, as it must, the truth of the factual allegations in the Complaint for purposes of this Motion.

One immediately remediated the firewall configuration that permitted the hacker's intrusion and began working with federal law enforcement to facilitate the hacker's arrest. *Id*. ¶¶ 63, 73. The person accused of perpetrating the attack, former AWS systems engineer Paige Thompson, was arrested and indicted, and is being prosecuted by the U.S. Attorney's Office for the Western District of Washington. *Id*. ¶ 63.

Thompson gained unauthorized access to Capital One's AWS environment primarily by exploiting a Web Application Firewall ("WAF") that monitored traffic to and from Capital One's AWS cloud environment. *Id*. ¶¶ 65, 67. By exploiting the WAF, Thompson was able to retrieve role credentials from AWS's Instance Metadata Service ("IMS"). *Id*.; *see also id*. ¶ 48. The role Thompson obtained allowed her to access and exfiltrate data from a limited portion of the AWS Simple Storage Service ("S3") buckets in Capital One's AWS environment. *Id*. ¶ 67. Thompson ultimately stole approximately 1.75 terabytes of data on March 22–23, 2019. *Id*. ¶ 74.

On July 29, 2019, Capital One publicly announced the Cyber Incident. *Id*. ¶ 62. The press release issued by Capital One, which was filed with the SEC in a Form 8-K on July 29, 2019,[2] explained that the Incident potentially exposed certain information concerning approximately 100 million Capital One credit card customers and consumers who had applied for Capital One credit card products in the U.S. *See* Ex. 1, Capital One, Current Report (Form 8-K) (July 29, 2019) (the "Report"). The largest category of stolen information could not alone be used to commit identity theft, even if it were still accurate. This category included information concerning individuals who applied for credit cards from 2005 through early 2019, as of the time they applied, including names,

---

[2] Plaintiffs' Complaint refers extensively and cites to Capital One's July 29, 2019 Form 8-K (RC ¶¶ 1, 4, 62, 75, 86, 94 & nn.1, 3, 29, 41, 47, 52), and therefore the Court can consider that document in ruling on this Motion. *See Lydick v. Erie Ins. Prop. & Cas. Co.*, 778 F. App'x 271, 272 (4th Cir. 2019).

addresses, zip codes, phone numbers, email addresses, dates of birth, and self-reported income. *Id.* The Report also stated that portions of credit card customer data, including credit scores, credit limits, balances, payment history, contact information, fragments of transaction data for 23 days during 2016, 2017, and 2018, and approximately 140,000 SSNs[3] and 80,000 bank account numbers were stolen. *Id*. No credit card account numbers or log-in credentials were stolen. *Id.* The Report further stated that "[b]ased on our analysis to date, we believe it is unlikely that the information was used for fraud or disseminated by [the hacker]." *Id.*

Following Thompson's arrest on July 29, 2019, law enforcement authorities recovered Capital One's stolen data from Thompson's devices and learned that she was maintaining the stolen data in an encrypted format. *See United States v. Paige A. Thompson, a/k/a "erratic,"* Criminal Compl. ¶¶ 20, 27, No. 2:19-cr-00159-RSL (W.D. Wash. filed July 29, 2019).[4] Significantly, nowhere in the Complaint do Plaintiffs allege that Thompson distributed the data to any third party, that she posted the data for sale on the "dark web," or that she personally used any of the stolen data to carry out identity theft or fraud. In fact, all evidence available to date indicates that she did none of those things. In a brief filed in Thompson's criminal proceeding in the Western District of Washington, the Government stated:

> The Government notes that Thompson has represented that she neither sold, nor otherwise shared or disseminated any of the data that she stole (from Capital One or any other victim), and that the copy of the data that the Government recovered during the search of Thompson's residence is the only copy of the stolen data that she created. Although the Government is continuing its investigation, to date, the

---

[3] Subsequent analysis undertaken by Capital One has shown that significantly fewer SSNs were actually compromised.

[4] The Government's complaint against Ms. Thompson is cited in the Complaint and thus may be considered on this Motion. Further, "[a] court may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, No. CIV. PJM 14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir. 2016).

> Government *has not uncovered any evidence that would suggest Thompson's claim that she neither sold, nor otherwise disseminated, any of the data is untrue.*

*Thompson,* Doc. 49 at 6 (emphases added).   The Government has repeatedly made similar statements.[5]

### B.    Plaintiffs

Plaintiffs are nine consumers from six states (California, Florida, New York, Texas, Virginia, and Washington) who allege that certain of their personal information was compromised in the Cyber Incident.   *See* RC ¶¶ 18–27.[6]   Each Plaintiff alleges that he or she applied for and used a Capital One credit card (or cards), and in some cases, other Capital One services and products (such as checking and savings accounts).   *See id.*   Plaintiffs seek to represent a putative nationwide class of all individuals whose personal information was compromised in the Cyber Incident (*id.* ¶ 146), as well as statewide subclasses of affected individuals in California, Florida, New York, Texas, Virginia, and Washington (*id.* ¶ 148).

Plaintiffs allege that, as a result of the Cyber Incident, they suffered various harms including mitigation efforts or expenses (such as time and money spent placing credit freezes on their accounts, setting up credit alerts, and purchasing credit monitoring); diminution in the value of their personal information; and an increased risk of future identity theft or other fraud.   *See generally* RC ¶¶ 18–27, 142.   Plaintiffs also allege they "did not receive the benefit of their bargain" because if they had known the "truth" about Capital One's "data security practices," they

---

[5] *See, e.g., Thompson,* Doc. 44-1 at 14 ("[W]e believe and hope we have recovered all of the data in this case.  Ms. Thompson has represented that we have.  We have no evidence that that's not true, so if that is the case, *then there's not a risk of that same data being disseminated*.") (emphases added); *id.* at 15 ("And this is an unusual crime because Ms. Thompson may or may not have committed this for any financial profit.  There's no evidence that she sold any of the . . . data[.]").

[6] While the Complaint names ten Representative Plaintiffs, Plaintiff Folck voluntarily dismissed his claims on April 9, 2020.  Doc. 382.

would not have applied for Capital One credit cards or been willing to pay as much as they did for Capital One's services (the "lost benefit of the bargain"). *Id.* ¶ 145. Additionally, seven Plaintiffs—Behar, Gershen, Mohammed, Spacek, Sharp, Tada, and Zielicke—allege that they "experienced identity theft and fraud" (*id.* ¶¶ 20, 21, 23, 27) or identified unauthorized activity on their accounts, such as unauthorized charges or attempts to open new accounts (*id.* ¶¶ 19, 24, 26). Hedging against the widely-known fact of Thompson's arrest and the recovery of the stolen data, these Plaintiffs do not allege facts to support any causal link between the claimed misuses of their PII and the Cyber Incident, but instead only allege those misuses occurred "[a]fter" or "[s]ince the [Cyber Incident]" (*e.g.*, *id.* ¶¶ 19–20), which (at most) obliquely suggests a mere *correlation*. A chart detailing the injuries each Plaintiff alleges is attached as Appendix A.

### C.   Procedural History

The day after Capital One announced the Cyber Incident, plaintiffs across the country began filing putative class actions against Capital One. Approximately 260 plaintiffs filed sixty-one separate putative class actions, and the JPML consolidated those cases into this MDL. All of the complaints in this MDL assert claims based on the same principal allegation: that Capital One failed to adequately protect the PII stolen in the Cyber Incident.

On March 2, 2020, Plaintiffs filed their Complaint against Capital One and Amazon. It asserts the following seven causes of action on behalf of a putative nationwide class of "[a]ll persons in the United States whose PII was compromised in the Cyber Incident": (1) negligence; (2) negligence *per se*; (3) unjust enrichment; (4) declaratory judgment; (5) breach of confidence; (6) breach of contract; and (7) breach of implied contract. *Id.* ¶¶ 160–229. The Complaint also asserts claims on behalf of putative statewide subclasses (i) under state consumer protection statutes in California, Florida, New York, Texas, and Washington and (ii) under state data breach notification statutes in Virginia and Washington. *Id.* ¶¶ 230–310.

## MOTION TO DISMISS STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss, the Court must "accept[] all well-pled facts as true," but "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  The Court is not required to "'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Id.* at 253.  A motion to dismiss under Rule 12(b)(6) can only be denied when the well-pled facts "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Id.* at 256 (quoting *Iqbal*, 556 U.S. at 680).  But, where the well-pled facts "are 'merely consistent with' a defendant's liability," they "stop[] short of [that] line." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS ARE GOVERNED BY VIRGINIA LAW.

#### A.   Plaintiffs' Cardholder Agreements Require the Application of Virginia Law to All of Plaintiffs' Claims—Contract and Tort.

Each Plaintiff either is a current Capital One cardholder or was a cardholder at the time of the Cyber Incident in 2019.  *See* RC ¶¶ 18–27.  Plaintiffs received customer agreements ("Cardholder Agreements") when they opened their Capital One credit card accounts.  *See* Exs. 2–10, Plaintiffs' Cardholder Agreements.[7]  Each Cardholder Agreement contains an identical choice of law provision stating:

---

[7] The Court may consider Plaintiffs' Cardholder Agreements because they are referred to in the Complaint (RC ¶¶ 16 ("applicable terms"), 187 ("terms offered")), they are central to Plaintiffs' claims, and their authenticity cannot reasonably be disputed.  *See supra* note 2.

<u>The Law That Applies to Your Agreement</u>

We make decisions to grant credit and issue you a *Card* from our offices in Virginia. *This Agreement is governed by applicable federal law and by Virginia law.* If any part of this Agreement is unenforceable, the remaining parts will remain in effect.

Exs. 2–10 at 5 (emphasis added).  This provision requires the Court to apply Virginia law to all of

Plaintiffs' contract and tort claims.

Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the state in

which they sit.  *See Goad v. Celotex Corp.*, 831 F.2d 508, 510 (4th Cir. 1987).  Virginia state and

federal courts "favor[] contractual choice of law clauses."  *Zaklit v. Glob. Linguist Sols., LLC*, No.

1:14cv314, 2014 WL 3109804, at *10 (E.D. Va. July 8, 2014); *Settlement Funding, LLC v. Von*

*Neumann-Lillie*, 645 S.E.2d 436, 428 (Va. 2007) ("If a contract specifies that the substantive law

of another jurisdiction governs its interpretation or application, the parties' choice of substantive

law should be applied.").  The choice of law provision in the Cardholder Agreements thus

mandates the application of Virginia law to Plaintiffs' contract claims in Count 6 (breach of

contract) and Count 7 (breach of implied contract).

The same analysis applies to Plaintiffs' closely related tort claims in Counts 1 (negligence),

2 (negligence *per se*), 3 (unjust enrichment), and 5 (breach of confidence).  Although Virginia's

general choice of law rule for tort claims is *lex loci delicti* (or the law of the place of the wrong),

*Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003), the

parties' chosen law applies no matter where the alleged wrong is deemed to have occurred.  *See*

*Settlement Funding, LLC*, 645 S.E.2d at 428.

Moreover, "the scope of a choice-of-law provision should, absent a showing of intent

otherwise, be read to encompass all disputes that arise from or are related to an agreement."  *Pyott-*

*Boone Elecs., Inc. v. IRR Trust*, 918 F. Supp. 2d 532, 545 (W.D. Va. 2013); *see also Cyberlock*

*Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 677 n.3 (E.D. Va. 2012) ("Virginia

law favors contractual choice of law clauses" and they are generally found to "encompass contract-related tort claims."). This rule promotes certainty and uniformity by applying the law of a single agreed-upon jurisdiction to "a controversy having its origin in a single, contract-based relationship." *Zaklit*, 2014 WL 3109804, at *9. "To hold otherwise would not only defy common sense, but lead to the anomalous result of applying Virginia law to the breach-of-contract claim and[, *e.g.*,] California law to the essentially identical tort and unjust enrichment claims." *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 468 (E.D. Va. 2016).

In *Run Them Sweet*, Judge Ellis broadly applied a choice of law provision to tort claims that, like those here, bore a "very close factual relationship" to the contract. *Id.* at 467. He explained that "the phrase '*governed by*' in a choice-of-law provision, is a broad one signifying a relationship of absolute direction, control, and restraint, which reflect[ed] the parties' clear contemplation that the agreement [was] to be completely and absolutely controlled by the chosen law." *See id.* at 466 (citation omitted). The Cardholder Agreements are similarly "governed by" Virginia law, and the broad construction Judge Ellis applied in *Run Them Sweet* should also apply here. And because Plaintiffs' tort, contract, and quasi-contract claims all originate from Plaintiffs' contractual relationship with Capital One and are all premised on acts and omissions Capital One allegedly committed during the performance of that contract, Virginia law governs all of Plaintiffs' claims.[8]

**B.**   **Virginia Law Controls Plaintiffs' Claims, Regardless of the Cardholder Agreements.**

Even if the Cardholder Agreements did not require applying Virginia law to all of Plaintiffs' claims, Virginia's general choice of law principles would mandate that result.

---

[8] Even if some other law applied, "[i]n the absence of a showing to the contrary," the Court must "presume that foreign law . . . is the same as the law of the forum, which is Virginia in this case." *Appalachian Reg'l Healthcare v. Cunningham*, 806 S.E.2d 380, 383 n.6 (Va. 2017).

With respect to the contract claims, "Virginia adheres to the principle that the law of the place of performance governs questions arising in connection with the performance of a contract." *Equitable Trust Co. v. Bratwursthaus Mgmt. Corp.*, 514 F.2d 565, 567 (4th Cir. 1975); *see also Guardian Pharm. of E. NC, LLC v. Weber City Healthcare*, No. 2:12cv37, 2013 WL 277771, at *6 (W.D. Va. Jan. 24, 2013) (R&R) (finding "courts within the Fourth Circuit generally treat [quasi-contract] claims as arising out of contract").

For torts, "Virginia clearly selects the law of the place where *the wrongful act* occurred, even when that place differs from the place where the effects of injury are felt." *Milton v. IIT Research Inst.*, 138 F.3d 519, 522 (4th Cir. 1998) (emphasis added) (citing *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) and *McMillan v. McMillan*, 253 S.E.2d 662, 663–64 (Va. 1979));[9] *see also Diaz Vincente v. Obenauer*, 736 F. Supp. 679, 690 (E.D. Va. 1990) (where the "fraudulent acts occurred chiefly in Virginia[,] . . . Virginia law control[led]" the fraud claims). *But see Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc.*, No. 1:08CV1186 AJT/JFA, 2009 WL 742532, at *2 (E.D. Va. Mar. 18, 2009) (Trenga, J.) (stating law of state where injury occurred "likely applie[d] to" plaintiff's tort claims and noting defendant did not dispute such law's applicability because the laws did not differ materially).[10]

---

[9] There are two earlier, published Fourth Circuit decisions that found that the law of the place of the injury, not the place where the wrongful act occurred, applied under Virginia's choice of law rules. *See Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986); *Lachman v. Pa. Greyhound Lines*, 160 F.2d 496, 500 (4th Cir. 1947). But *Milton* was decided in 1998 and its holding was based on an intervening decision from the Supreme Court of Virginia—*Buchanan v. Doe*—in which the Supreme Court defined a "tort" as "any civil wrong or injury; a wrongful act," *id.* at 291. Relying on *Buchanan,* the panel in *Milton* concluded that the "place of the wrong" is where "the tortious conduct—the *legal injury*—occur[s]"—not necessarily the "place where the effects of injury are felt." *Milton*, 138 F.3d at 522. *Milton* is thus the controlling Fourth Circuit precedent on the application of Virginia's choice of law rules.

[10] In *Career Care Institute, Inc.,* this Court stated that the law of "the place where the injury was suffered" applies to tort claims under Virginia choice of law rules, relying on *Rahmani v. Resorts*

Here, Plaintiffs' contract and quasi-contract claims are premised on Capital One's alleged contractual obligation to implement security measures to protect their PII. That obligation would have been performed in Virginia because Capital One "makes decisions regarding . . . security measures [it uses] to protect its customers' PII" in Virginia. RC ¶¶ 7, 10–12. All of Plaintiffs' tort claims arise out of Capital One's alleged failure to implement security measures to protect their PII, which also would have occurred in Virginia. *See id.* ¶ 9 (alleging "decisions made by [Capital One] personnel or inaction by those individuals that led to . . . the [Cyber Incident]" occurred in Virginia). Virginia law thus applies to Plaintiffs' contract and tort claims.

Finally, courts treat unjust enrichment claims as arising in both tort and quasi-contract. *Northstar Aviation, LLC v. Alberto*, No. 1:18cv191, 2018 WL 10501629, at *2 (E.D. Va. Oct. 25, 2018) (collecting cases). Because Virginia law applies both to Plaintiffs' tort and contract claims, Virginia law also applies to Plaintiffs' unjust enrichment claims.[11]

## II.   PLAINTIFFS' TORT CLAIMS MUST BE DISMISSED.

### A.   Plaintiffs Fail to Allege Legally Cognizable Harms Caused by Capital One.

All of Plaintiffs' tort claims must be dismissed because they have not sufficiently alleged any legally cognizable *harms* that Capital One *proximately caused*.

---

*International Hotel, Inc. See Career Care Inst., Inc.*, 2009 WL 742532, at *2. In turn, *Rahmani* found that rule in the Fourth Circuit opinion *Johnson v. Oroweat Foods Co.*—which applied *Maryland's* choice of law rules and relied on cases discussing *Maryland* law. *See Rahmani*, 20 F. Supp. 2d 932, 937 (E.D. Va. 1998) (citing *Johnson*, 785 F.2d 503, 511 (4th Cir. 1986), which in turn cites *Frericks v. Gen. Motors Corp.*, 336 A.2d 118, 123 (Md. 1975), among others). *Rahmani* was thus an incorrect statement of Virginia law.

[11] If the Court concludes that Plaintiffs' tort, unjust enrichment, or implied contract claims are governed instead by the laws of Plaintiffs' respective States, Plaintiffs' claims still fail for the reasons set forth in this Memorandum, as demonstrated in the chart attached as Appendix B.

1.     Plaintiffs' Alleged Harms Are Not Cognizable Under Virginia Law.

Plaintiffs allege five types of harm that they contend are sufficient to support their tort claims.  All of the Plaintiffs allege that (1) they are subject to an increased risk of future identity theft due to the exposure of their personal information, (RC ¶¶ 18–27); (2) they incurred expenses or took efforts to mitigate the consequences of the Cyber Incident, (*id.*); (3) they have lost "the inherent value" of their stolen personal information, (*id.* ¶ 142); and (4) they "did not receive the benefit of their bargain with Capital One," (*id.* ¶ 145).  And several Plaintiffs also allege they experienced actual or attempted identity theft or fraud at some point "*after* the [Cyber Incident]." *Id*. ¶¶ 19-21, 23–24, 26–27 (emphasis added).  Each of these damages theories fails.

a.     *Increased risk of future identity theft*

All of the Plaintiffs allege that they are at risk of suffering identity theft and fraud in the future due to the compromise of their information in the Cyber Incident.  But this highly speculative "risk of future harm" cannot support a tort claim.  No Virginia court has recognized a risk of future fraud or identity theft stemming from a data breach as a legally cognizable injury.  And courts interpreting Virginia law in other contexts confirm that Virginia law would not recognize this speculative harm.

In *Ball v. Joy Technologies, Inc.*, for example, the Fourth Circuit applied Virginia law to reject a tort claim seeking recovery for medical monitoring expenses, reasoning the plaintiffs "ha[d] not demonstrated that they are suffering from a *present*, physical injury."  958 F.2d 36, 39 (4th Cir. 1991) (emphasis added) (noting plaintiffs' public policy arguments but finding that "such considerations are better left to the . . . legislature[ ] and [the Supreme Court of Virginia]"); *see also Oelgoetz v. Appalachian Appraisal Servs., Inc.*, No. CL99-315, 2000 WL 33258816, at *1 (Va. Cir. Ct. Feb. 15, 2000) (rejecting claim for negligent retention of a supervising employee where the plaintiff had not yet suffered any actual harm, reasoning that allowing the negligence

14

claim to proceed "would sanction speculation and would create a new rule of law allowing for anticipatory injury and damages in tort cases").[12]  As these authorities illustrate, courts applying Virginia law decline to allow tort claims premised on a mere risk of harm, and there is no support for Plaintiffs' attempt to recover for the speculative "injury" they allege here.

Recent decisions in the Fourth Circuit concerning Article III's much lower threshold "injury in fact" requirement are also instructive to whether Plaintiffs have sufficiently pleaded a cognizable tort injury.[13]  Under *Hutton v. National Board of Examiners in Optometry, Inc.*, 892 F.3d 613 (4th Cir. 2018), and *Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017), an increased risk of future identity theft is not sufficiently "imminent" to constitute an injury-in-fact unless the plaintiff's stolen information has *actually been misused*.  *Compare Hutton,* 892 F.3d at 622 (risk of future identity theft sufficiently imminent in light of actual misuses of PII plausibly caused by breach), *with Beck*, 848 F.3d at 274–75 (risk of future identity theft too speculative absent evidence stolen information had been misused).  Two Plaintiffs do not allege any misuse of their PII (Plaintiffs Hausauer and Ellish) and thus cannot sue for an increased risk of future identity theft.

Even the Plaintiffs who claim they suffered actual identity theft or fraud have failed to plausibly allege that the Cyber Incident proximately caused those harms.  As explained in Section II.A.2 below, they allege only that they suffered identity theft or fraud at some point "*after the*

---

[12] Although decisions from Virginia's trial courts are not binding, the Court may consider them as persuasive authority on issues of Virginia law.  *See, e.g.*, *Harbeck v. Smith*, 814 F. Supp. 2d 608, 624 (E.D. Va. 2011) (considering circuit court cases as persuasive authority).

[13] Because many of Plaintiffs' alleged harms fail to meet the minimal threshold for Article III standing, they certainly cannot clear the higher bar required to state a tort claim.  *See Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 280 (S.D.N.Y. 2008) (although plaintiff satisfied Article III standing, negligence claim failed because allegation of injury was insufficient); *see also Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1280 (11th Cir. 2001) ("[a] finding that a plaintiff has standing simply means that the plaintiff is entitled to 'walk through the courthouse door'").

[Cyber Incident]" (*see* RC ¶¶ 19–21, 23–24, 26–27), but do not—and cannot—allege that the Cyber Incident actually caused those harms.  *Cf. Hutton*, 892 F.3d at 622 (plaintiff plausibly alleged identity theft caused by breach where unsolicited credit card was applied for using plaintiff's maiden name from years earlier, which was the name associated with plaintiff's SSN in the breached database).  Accordingly, those Plaintiffs also cannot premise their tort claims on a "future risk of harm."

Additionally, six of the seven Plaintiffs who allege actual identity theft or fraud following the Cyber Incident (Gershen, Mohammed, Spacek, Sharp, Tada, and Zielicke) do not allege which elements of their PII were compromised.  *See* RC ¶¶ 19, 21, 23–24, 26–27.  As discussed above, only a small fraction of the approximately 100 million consumers impacted in the Cyber Incident had their SSNs and bank account information stolen.  The other roughly 99.8% of the affected population had less sensitive information impacted, including (1) credit card application data, such as name, address, zip code, phone number, email address, date of birth, and self-reported income; (2) portions of credit card customer data (e.g., credit scores, credit limits, balances, payment history, and contact information); and (3) fragments of transaction data from 23 days in 2016, 2017, and 2018.  *See* Ex. 1.  This type of information cannot alone be used to commit identity theft.  *See, e.g., Antman v. Uber Techs., Inc.*, No. 15-cv-1175-LB, 2018 WL 2151231, at *11 & n.56 (N.D. Cal. May 10, 2018) (risk of identity theft not sufficiently imminent to constitute injury where only plaintiff's name and driver's license number were compromised).  Since Capital One directly notified everyone whose SSN or bank account number was stolen, Plaintiffs would know whether they were part of that population.[14]  Nonetheless, these six Plaintiffs do not allege that

---

[14] *See* Letter titled "Update About the Capital One Data Security Incident," cited at RC ¶ 23 and attached as Ex. 11 (explaining that Capital One notified by mail all individuals whose SSN and/or bank account number(s) were impacted).

their SSNs or bank account numbers were stolen, and thus they fail to allege they are at an "imminent" risk of future identity theft or other fraud.

Plaintiffs' allegations of an imminent risk of future identity theft are also implausible because the hacker who perpetrated the Cyber Incident, Paige Thompson, has been apprehended, and federal law enforcement recovered all of the stolen data before Thompson could misuse it or disseminate it to any third parties—and Plaintiffs do not allege otherwise. Put succinctly, Plaintiffs' PII cannot be misused because it is in the custody of the federal government, so there is *no risk*—much less an "imminent" risk—that the stolen information could be used to commit identity theft in the future. Not a single data breach case has found the risk of identity theft sufficiently imminent to constitute a cognizable injury on such facts. To the contrary, in cases where plaintiffs were able to show an injury based on a future risk of identity theft, the stolen PII was *still in the hands of a nefarious actor* and could potentially be misused. *See, e.g.*, *Hutton*, 892 F.3d at 622 (risk of future identity theft was an injury where stolen PII had not been recovered); *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 387–89 (6th Cir. 2016) (plaintiffs suffered injury where the information was still "in the hands of ill-intentioned criminals"). *No Plaintiff* can therefore establish he suffered a sufficient injury based on a risk of future identity theft. At bottom, Plaintiffs are asking this Court to make radically new law for alleged "injuries" following a data breach; the Court should decline Plaintiffs' invitation.

### b.    *Mitigation efforts or expenses*

Plaintiffs similarly fail to allege a cognizable injury based on expenses incurred or time spent to mitigate the consequences of the Cyber Incident. Mitigation efforts may constitute a cognizable injury *only* where the risk of future identity theft is imminent or, at least, substantial. *Compare Beck*, 848 F.3d at 274 (mitigation measures not a cognizable injury where risk of future

identity theft was not imminent), *and Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (rejecting recovery for costs incurred as "a reasonable reaction" to a risk of harm because the harm the plaintiffs "s[ought] to avoid [was] not certainly impending"), *with Hutton*, 892 F.3d at 622 (mitigation efforts sufficient where the threat of future identity theft was imminent or substantial). And because, as explained above, Plaintiffs fail to allege a cognizable injury under Virginia law based on a "future risk of harm," their purported mitigation expenses and efforts also do not constitute a cognizable injury.

*c.   Diminution in value of PII*

Plaintiffs fail to allege that they suffered a cognizable injury based on the purported diminution of the value of their PII.   Courts "have routinely rejected the proposition that an individual's personal identifying information has an independent monetary value."  *Welborn v. IRS*, 218 F. Supp. 3d 64, 78 (D.D.C. 2016).  Moreover, no Virginia court has recognized this novel theory of "harm," much less found it sufficient to support a tort claim.  Even under the lower bar for Article III standing, no Fourth Circuit case has ever found that a diminution in value of PII constitutes a cognizable injury.  And while Plaintiffs will undoubtedly try to rely on the recent decision in the *Marriott* data breach litigation, *see In re Marriott Int'l, Inc., Customer Data Security Breach Litig.*, No. 19-MD-2879, 2020 WL 869241 (D. Md. Feb. 21, 2020), that case is neither on point nor controlling here.

First, *Marriott* is readily distinguishable.  There, the stolen data had not been recovered and, in some instances, had actually been misused.  *Id.* at *6.  No such misuse can be plausibly alleged here, and the stolen data is in the custody of law enforcement, so Plaintiffs' conclusory statement that they have somehow "los[t] the inherent value of their PII" (RC ¶ 142) is not "enough

18

to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Second, Judge Grimm's analysis runs afoul of the Fourth Circuit's holding in *Hutton* that "a mere compromise of personal information, without more," is not a cognizable injury. *Hutton*, 892 F.3d at 621.  At least one other district court in the Fourth Circuit has held that controlling Fourth Circuit law precludes a diminution in value theory for that very reason. *See Kimbriel v. ABB, Inc.*, No. 5:19-cv-215-BO, 2019 WL 4861168, at *3 (E.D.N.C. Oct. 1, 2019) ("All victims of security breaches suffer . . . a diminution of [PII's] value if and when the PII is sold on the black market . . . . Were it the case that these harms constituted injury-in-fact, all victims of data breaches would satisfy the injury requirement.  But this is foreclosed by [*Hutton* and *Beck*]."). Consequently, the alleged diminution in value of Plaintiffs' PII does not even constitute a cognizable injury for standing purposes.  It certainly does meet the higher bar required to state a claim in tort.

### d.   Lost "benefit of the bargain"

Plaintiffs cannot premise their tort claims on a "benefit of the bargain" theory of harm because such harm is squarely within the province of contract law, not tort.  As the Supreme Court of Virginia has stated, affording a party the benefit of the bargain is a remedy in contract law designed to put the nonbreaching party "in the same position, as far as money can do it, as he would have been in had the contract been performed." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 684–85 (Va. 2012); *see also Marefield Meadows, Inc. v. Lorenz*, 427 S.E.2d 363, 366 (Va. 1993) (characterizing contract damages as the "as yet unrealized benefit of the bargain").  And here, all of the Plaintiffs have (or, at the time of the Cyber Incident, had) a contract

19

with Capital One.  Accordingly, Plaintiffs must pursue their claims for purported "lost benefit of the bargain," if at all, in contract.

### e.    Actual misuse of PII

Seven Plaintiffs named in the Complaint (Tada, Behr, Zielick, Gershen, Mohammed, Spacek, and Sharp) allege that they suffered some form of identity theft or fraud "after the [Cyber Incident]."  *See* RC ¶¶ 19–21, 23–24, 26–27.  Putting aside the question whether Virginia law recognizes identity theft and fraud as cognizable tort injuries, Plaintiffs fail to plausibly allege that Capital One's actions caused those harms, as explained below.

### 2.    Plaintiffs Fail to Sufficiently Allege Proximate Causation for Their Tort Claims.

Under Virginia law, "[t]he proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred."  *Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003).  Plaintiffs bear the burden of "alleg[ing] facts tending to show that [Capital One's acts or omissions] proximately caused [their] injury."  *Morgan v. Wal-Mart Stores E., LP*, No. 3:10CV669-HEH, 2010 WL 4394096, at *3 (E.D. Va. Nov. 1, 2010).  Where the alleged causal link is "mere conjecture or speculation," the court can find that proximate cause is lacking as a matter of law.  *See APV Crepaco, Inc. v. Alltransport Inc.*, 683 F. Supp. 1031, 1034 (E.D. Va. 1987) (granting motion to dismiss where plaintiff's injuries were not "a natural and probable consequence of defendant's [conduct]" and speculative allegations of proximate cause did "not rise to the level of a question of fact for the trier of fact").  Here, the Plaintiffs who claim they suffered actual identity theft or fraud (and resulting harms like lowered credit scores) have not alleged that those harms were caused by the Cyber Incident.  Moreover, all of the Plaintiffs fail to adequately allege proximate causation because their alleged harms were caused (if at all) by the criminal acts of Paige Thompson, not Capital One.

20

*First*, the Plaintiffs who allege identity theft and fraud do *not* allege that the information stolen from Capital One was used to carry out that fraud. To the contrary, all they allege is that (1) their information was stolen in the Cyber Incident and (2) "*[a]fter* the [Cyber Incident]" they "experienced identity theft and fraud" (RC ¶¶ 20, 21, 23, 27) or identified unauthorized activity on their accounts (*id.* ¶¶ 19, 24, 26).[15] In contrast, Plaintiffs allege other purported harms occurred "***as a result of*** the [Cyber Incident]," including time and effort spent monitoring their accounts and purchasing credit monitoring. *See, e.g., id.* ¶ 18 (spent time and effort monitoring accounts "[a]s a result of the [Cyber Incident]"); *id.* ¶ 19 (purchased credit monitoring "due to the [Cyber Incident]"). This distinction is not mere semantics. Alleging that fraud or identity theft occurred at some point "*after*" the Cyber Incident does not plead causation at all, as it fail to establish that the required nexus "is a *probability* rather than a *mere possibility*." *Atrium Unit Owners Ass'n*, 585 S.E.2d at 548 (emphasis added); *see Wilkins v. Sibley*, 135 S.E.2d 765, 767 (Va. 1964) (mere "'possibility' of causal connection is not sufficient" to establish proximate causation).

Nor *can* Plaintiffs allege that the Cyber Incident proximately caused any acts of identity theft or fraud. Again, federal authorities arrested Thompson before she could disseminate the stolen data or use it for nefarious purposes, and Plaintiffs do not allege otherwise.

Finally, because six of the seven Plaintiffs who allege identity theft or fraud (Gershen, Zohaib, Spacek, Sharp, Tada, and Zielicke) fail to allege that their SSNs or bank account information was impacted, the Complaint suggests they had only less sensitive information stolen, like names, addresses, phone numbers, and dates of birth. *See* RC ¶¶ 19, 21, 23–24, 26–27. Yet

---

[15] Plaintiffs also recite that "[a]s a result of the [Cyber Incident], Plaintiff[s] and class members have suffered and/or will suffer" a host of purported harms, including actual identity theft and fraud. RC ¶ 142. This generalized pleading is plainly insufficient under the *Twombly/Iqbal* pleading standard, especially given that none of the named Plaintiffs has expressly alleged actual identity theft or fraud *as a result* of the Cyber Incident.

Plaintiffs fatally fail to allege how an identity thief could use such information to carry out fraud. *See Antman*, 2018 WL 2151231, at *10 (noting stolen bank account number, driver's license information, and name were not sufficient to commit alleged identity theft). In sum, the Plaintiffs who purport to have suffered fraud or identity theft have failed as a matter of law to sufficiently allege those harms were caused by the Capital One Cyber Incident as opposed to an endless number of other possible causes.[16]

*Second*, all of the Plaintiffs have failed to sufficiently allege proximate causation for their purported harms because those harms were caused by the criminal acts of Paige Thompson, not Capital One. The general rule under Virginia law is that "a person does not have a duty to . . . protect another from the criminal acts of a third person." *Commonwealth v. Peterson*, 749 S.E.2d 307, 311 (Va. 2013). The rationale is that under "ordinary circumstances," the "criminal behavior by third persons cannot reasonably be foreseen." *Terry v. Irish Fleet, Inc.*, 818 S.E.2d 788, 792 (Va. 2018); *see Peterson*, 749 S.E.2d at 312 ("In only rare circumstances has th[e Supreme Court of Virginia] determined that the duty to protect against harm from third party criminal acts exists.").

While there is an exception to this rule where a "special relationship" exists between the parties, no Virginia case has recognized a special relationship between a financial services company and its customers. *See Yancey v. First Bank*, No. 6:16-cv-00028, 2016 WL 4126661, at *3 (W.D. Va. Aug. 2, 2016) ("Virginia follows the majority rule that: 'the existence of the debtor-

---

[16] The numerous other possible causes of Plaintiffs' alleged harms are not merely hypothetical. For instance, Plaintiff Tada—who claims she suffered identity theft "[s]ince the [Cyber Incident]" but does *not* allege her SSN or bank account information were impacted (RC ¶ 19)—previously filed a putative class action complaint against Equifax Inc. following the 2017 Equifax data breach, alleging that her PII was stolen in that earlier breach and that she suffers from a risk of future harm as a result. *See Tada v. Equifax Inc.*, 1:17-cv-05004-TWT (N.D. Ga.), Doc. 1.

creditor relationship does not create a privilege or right of a fiduciary character.'"); *Peterson*, 749 S.E.2d at 311 (identifying limited instances of a "special relationship" under Virginia law, including "that of a common carrier/passenger, innkeeper/guest, and employer/employee," and "that of [a] business owner/invitee or landlord/tenant").

Even if the Court held that a special relationship existed between Plaintiffs and Capital One (and it should not), Capital One could be held liable for Paige Thompson's criminal acts only if they were so clearly foreseeable that there was "an *imminent probability* of injury" to Plaintiffs. *Peterson*, 749 S.E.2d at 312 (emphasis added). Plaintiffs' general allegations that Capital One knew "[b]anking repositories and databases are popular and well-known targets for cyberattacks" (RC ¶ 91) plainly fails to establish that any purported harm Thompson may have caused Plaintiffs was "imminently probable."

**B. Plaintiffs Cannot Establish a Duty in Tort to Support Their Negligence Claims.**

1.  <u>Plaintiffs' Negligence Claims Are Barred by Virginia's "Source of Duty" Rule and Economic Loss Doctrine.</u>

All Plaintiffs allege that they have (or, at least at the time of the Cyber Incident, had) contracts with Capital One and that Capital One breached its contractual duties by failing to safeguard their information. *See* RC ¶¶ 215–21; *see also* Exs. 2–10. Under Virginia's source of duty rule, Plaintiffs must look to a contract claim to recover for the injuries they plead.

Courts in Virginia exercise "caution against turning every [alleged] breach of contract into a tort" and dismiss tort claims between parties in contractual privity where those claims are "entwined with a breach of the contract and do not reasonably fall outside of the contractual relationship." *See Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 261 (Va. 2019) (dismissing negligence claim arising out of the construction of home where the parties had a related contract). The court must look to the "'gist' or 'gravamen' of the cause of action" to determine whether the

claim sounds primarily in contract or in tort.  *Id.* at 260; *see also Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998) ("In determining whether a cause of action sounds in contract or tort, the source of the duty violated must be ascertained.").

The Supreme Court of Virginia's decisions applying the source of duty rule are instructive. In *McDevitt*, a municipal corporation asserted tort claims against a private contractor that, in the course of constructing a stadium, submitted documents fraudulently attesting to its compliance with the parties' construction agreement.  *Id.* at 345.  Virginia's source of duty rule precluded the plaintiff's tort claims, the Court held, because those claims were "nothing more than allegations of negligent performance of contractual duties[, which] are . . . not actionable in tort."  *Id.* at 347. Likewise, in *Augusta Mutual Insurance Company v. Mason*, 645 S.E.2d 290 (Va. 2007), the Supreme Court of Virginia held that a plaintiff was barred from asserting tort claims against a defendant where, "[b]ut for the existence of" a contract between the parties, the defendant would not have owed any duty to the plaintiff.  *Id.* at 295.  And just last year in *Tingler*, the Supreme Court of Virginia stressed that "[n]o matter the alleged harm, tort liability cannot be imposed upon a contracting party for failing to do a contractual task when no common-law tort duty would have required him to do it anyway."  834 S.E.2d at 255.  In short, where a plaintiff's injury arises from the defendant's performance of a contract between the parties, the plaintiff must seek redress in the law of contracts, not torts.

Here, Plaintiffs themselves allege that their injuries arose out of Capital One's performance under the Cardholder Agreements.  Plaintiffs allege that they "applied for and used a Capital One credit card" and "provided [their] PII to Capital One in order to do so" (RC ¶¶ 18–27); that they had an express contract with Capital One (*id.* ¶ 215); that the contract imposed a duty on Capital One to safeguard their PII (*id.* ¶¶ 216–17); and that Capital One breached that contractual duty by

24

failing to protect their information (*id*. ¶ 220).  By Plaintiffs' own telling, their claims arise directly out of a contractual relationship, or are, at a minimum, "entwined" with their Cardholder Agreements.  *Tingler*, 834 S.E.2d at 261.  Plaintiffs' claims are thus barred by Virginia's source of duty rule.[17]

Virginia's closely related economic loss doctrine also bars Plaintiffs' tort claims because the injuries they allege fall squarely within the bounds of contract law.  *See Tingler*, 834 S.E.2d at 264 (Virginia's economic loss doctrine "serves as a remedy-specific application of the source-of-duty rule" under which "economic losses" arising out of a contractual arrangement may only be recovered in contract, not tort).  In Virginia, "[t]he controlling policy consideration underlying tort law is the safety of persons and property—the protection of persons and property from losses resulting from injury," while "[t]he controlling policy consideration underlying the law of contracts is the protection of expectations bargained for."  *VA Timberline, LLC v. Land Mgmt. Grp., Inc.*, 471 F. Supp. 2d 630, 633 (E.D. Va. 2006).  Here, Plaintiffs' alleged harms "involve economic loss and the protection of bargained-for expectations" (*see* RC ¶ 142), not "the safety of persons and property from injury."  *VA Timberline, LLC*, 471 F. Supp. 2d at 633; *see Filak v. George*, 594 S.E.2d 610, 613 (Va. 2004) ("[W]hen a plaintiff alleges and proves nothing more than disappointed economic expectations assumed only by agreement, the law of contracts, not the

---

[17] In addition to binding Virginia law, common sense also supports the conclusion that Plaintiffs' claims are subject to the source of duty rule.  A credit card company and its customers are not random actors brought together by happenstance, like drivers involved in an accident. They are contracting parties who only came in contact and undertook duties, if at all, because of their contractual relationship.

law of torts, provides the remedy for such economic losses."). The economic loss doctrine further confirms that Plaintiffs must pursue their claims, if at all, in contract.[18]

    2.    <u>Virginia Law Does Not Recognize a Duty to Safeguard Personal Information.</u>

"There can be no actionable negligence unless there is a legal duty, a violation of the duty, and a consequent injury." *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). To proceed on their negligence claim, "the factual allegations" in Plaintiffs' Complaint "must establish the existence of a duty of care," and the question "[w]hether such duty exists is 'a pure question of law.'" *Yuzefovsky v. St. John's Wood Apartments*, 540 S.E.2d 134, 139 (Va. 2001). Plaintiffs' negligence claims fail because Virginia law does not recognize a common law duty to safeguard personal information.

In its recent decision in *Parker v. Carilion Clinic*, 819 S.E.2d 809 (Va. 2018), the Supreme Court of Virginia expressly declined to recognize a common law duty to protect confidential information. There, the Court considered whether a medical clinic could be held liable in tort for failing to safeguard confidential patient information from unauthorized access by the clinic's employees. In arguing that such a duty exists, the plaintiff—whose personal information had been improperly accessed by the clinic's employees—argued that a line of cases imposing a duty on healthcare providers not to *disclose* patient information without authorization should be extended to also impose a duty to affirmatively *protect* patient information. *Id.* at 347–48. The Supreme Court of Virginia rejected that invitation, reasoning that no Virginia court "ha[d] ever imposed a

---

[18] To be clear, a plaintiff need not have a *viable* contract claim for the economic loss rule to kick in. The point is that "*[t]he law of contracts* provides the sole redress" for losses that "are purely the result of disappointed economic expectations." *Rotonda Condo. Unit Owners Ass'n v. Rotonda Assocs.*, 380 S.E.2d 876, 879 (Va. 1989) (emphasis added) (affirming dismissal of negligence claim for economic losses even though plaintiff lacked standing to sue in contract); *see also Hanover Ins. Co. v. Corrpro Comps., Inc.*, 312 F. Supp. 2d 816, 820–21 (E.D. Va. 2004) (dismissing negligence claim under economic loss doctrine and also dismissing contract claim).

tort duty on a healthcare provider to manage its confidential information systems so as to deter employees from willfully gaining unauthorized access to confidential medical information." *Id.* at 347. *Parker* squarely supports the conclusion that there is no common law duty to safeguard personal information under Virginia law.

Consistent with *Parker*, Judge Lauck recently dismissed a negligence claim in a data breach lawsuit for ***"fail[ure] to establish that Virginia law recognizes a common law duty to protect an individual's private information from an electronic data breach."*** *Deutsche Bank National Trust Company v. Buck,* No. 3:17CV833, 2019 WL 1440280, at *6 (E.D. Va. Mar. 29, 2019) (emphases added).

*Deutsche Bank* involved a real estate transaction where a third-party hacker diverted closing funds that were to be transferred by the closing firm to Altisource, which was acting as Deutsche Bank's escrow agent. Deutsche Bank filed a complaint against the closing firm, asserting claims for breach of contract and negligence for wiring the funds to the hacker instead of Altisource. In turn, the closing firm filed a third-party complaint against Altisource, alleging that it had caused fraudulent wire transfer instructions to be given to the closing firm, and seeking contribution and indemnity from Altisource in the event the closing firm was held liable to Deutsche Bank for the stolen funds.

The closing firm's complaint alleged that a criminal had hacked into Altisource's email accounts, stolen Deutsche Bank's financial information, and sent fraudulent wire instructions (which appeared to be legitimate) to the closing firm, enabling the hacker to intercept the funds. The closing firm's complaint alleged that Altisource owed a duty (i) to "use reasonable care in securing" confidential information on its servers; (ii) "to prevent hackers from pirating"

confidential information; and (iii) "to discover and remedy breaches of its information systems."
*Deutsche Bank*, No. 3:17CV833 (E.D. Va.), Doc. 6 ¶¶ 23, 25–26.

Altisource filed a motion to dismiss the closing firm's third-party complaint, arguing that
Virginia law does "not recognize[ ] a common law duty to protect data." *Id*., Doc. 13 at 9.  In
response, the closing firm contended that recent case law in this District had "la[id] the foundation
for the recognition of [a common law] duty" to "safeguard private information." *Id*., Doc. 16 at
21.  In ruling on the motion to dismiss, Judge Lauck recognized that the issues presented
"invoke[d] a developing area of law: whether or how to impose liability on a party whose
potentially negligent conduct flows from a data breach."  2019 WL 1440280, at *5.  Judge Lauck
granted Altisource's motion to dismiss and expressly held that Virginia law does not recognize a
common law duty to protect private information.  *Id*. at *7.

*Parker* and *Deutsche Bank* confirm that there is no duty to safeguard confidential
information under Virginia law, and that courts should not fashion such a duty in the first instance.
Indeed, the Supreme Court of Virginia routinely declines to recognize duties of care that did not
clearly exist at common law.  *See, e.g., Cline v. Dunlora S., LLC*, 726 S.E.2d 14, 18 (Va. 2012)
(declining to recognize duty of landowner to protect individuals on adjacent public highway from
natural conditions on landowner's property where "no such duty existed under relevant English
common law").  This judicial conservatism is grounded in Virginia's statutory mandate that "[t]he
common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and
Constitution of th[e] Commonwealth, shall continue in full force within the same, and be the rule
of decision, *except as altered by the General Assembly*."  Va. Code § 1-200 (emphasis added).
Based on that mandate, the Supreme Court of Virginia has declared that its job is to "apply the law
as it now exists," and that the power to fashion a new duty not recognized at common law lies in

28

"the legislative, not judicial, branch of government." *Williamson v. Old Brogue, Inc.*, 350 S.E.2d 621, 624 (Va. 1986). Of course, no duty to safeguard PII (or any historically analogous equivalent) existed at common law.

Unable to point to any relevant authority recognizing a duty to safeguard confidential information, Plaintiffs fall back on the theory that Capital One is liable in negligence because Plaintiffs' alleged harms were "foreseeable." *See* RC ¶ 163 (alleging Plaintiffs "were the foreseeable and probable victims of any inadequate security practices"). But Virginia law is clear that the mere foreseeability of harm does not give rise to a common law duty. *See Holiday Motor Corp. v. Walters*, 790 S.E.2d 447, 455 (Va. 2016) ("Foreseeability [of harm], it has been many times repeated, is not to be equated with duty."). To the contrary, "the purpose of making the finding of a legal duty [] a prerequisite to a finding of negligence . . . is to ***avoid*** the extension of liability for every conceivably foreseeable accident, without regard to common sense or good policy." *Jeld-Wen, Inc. v. Gamble by Gamble*, 501 S.E.2d 393, 397 (Va. 1998) (emphasis added).

Accordingly, Plaintiffs' negligence claims fail at the threshold because Virginia law does not recognize a common law duty to safeguard confidential information.

3.   Plaintiffs Fail to Establish a Duty to Support Their Negligence *Per Se* Claim.

Because Plaintiffs' negligence claim fails for lack of a common law duty, their negligence *per se* claim necessarily also fails. Virginia law holds that "[a] statute may define the standard of care to be exercised ***where there is an underlying common-law duty***, but the doctrine of negligence *per se* does not create a cause of action where none otherwise exists." *Williamson*, 350 S.E.2d at 624 (emphasis added). "The absence of an underlying common-law duty renders the presence of a statutory standard of care irrelevant." *Parker*, 819 S.E.2d at 824-25 (rejecting argument that HIPAA's confidentiality and nondisclosure requirements could support negligence *per se* claim based on clinic's alleged failure to safeguard patient information). Rather than

29

imposing a duty where one does not exist at common law, "[t]he effect of the doctrine of 'negligence *per se*,' when applicable, is that it establishes the second element of common-law negligence—breach of duty—by reference to a statutory standard rather than the common-law 'ordinary prudent person' standard." *Id*. at 825. Because Virginia does not recognize a common law duty to safeguard personal information, Plaintiff's negligence *per se* claim fails.

Even if Virginia law recognized a duty to safeguard personal information, Plaintiffs' negligence *per se* claim would still fail because the laws on which they base their claim were not "enacted for public safety" and thus cannot support a negligence *per se* claim. To sue for negligence *per se* in Virginia, a plaintiff must show that (1) "the defendant violated **a statute enacted for public safety**," (2) that he "belong[s] to the class of persons for whose benefit the statute was enacted," (3) "that the harm that occurred was of the type against which the statute was designed to protect," and (4) that "the statutory violation [was] a proximate cause of" his injury. *Collett v. Cordovana*, 772 S.E.2d 584, 589 (Va. 2015) (emphasis added).

A "statute enacted for public safety generally is designed to afford protection to the public against careless or reckless acts which may result in *bodily injury or property damage*." *Tidewater Marina Holdings, LC v. Premier Bank, Inc.*, No. CL12-89, 2015 WL 13801664, at *2 (Va. Cir. Ct. Aug. 7, 2015) (emphasis added). The phrase "public safety" has been interpreted narrowly, and the class of laws deemed to have been "enacted for public safety" has been limited to laws like gun regulations and building codes. *See Schlimmer v. Poverty Hunt Club*, 597 S.E.2d 43, 46 (Va. 2004) (classifying firearm regulations as public safety laws for negligence *per se* purposes). In contrast, laws regulating commerce are *not* enacted for public safety purposes. *See Zuberi v. Hirezi*, No. 1:16-cv-1077, 2017 WL 436278, at *6 (E.D. Va. Jan. 30, 2017) ("real estate licensing laws . . . enacted to protect the public from fraud and other dishonest conduct" are not public safety

laws); *Sanders v. UDR, Inc.*, No. 3:10-CV-459, 2010 WL 3927804, at *6 (E.D. Va. Oct. 4, 2010) (same, statute governing landlord-tenant contractual relations).

Even where a statute arguably implicates public safety, the statute cannot be used to support a negligence *per se* claim if the plaintiff seeks recovery for purely economic losses (as opposed to, *e.g.*, bodily harms). *See Zuberi*, 2017 WL 436278, at *5 (negligence *per se* claim fails where "the alleged harm is to [plaintiff's] economic interests as a purchaser of the Property, which is not the type of harm against which the statute was designed to protect."); *Jazayerli v. Renaissance Hous. Corp.*, No. 187583, 2001 WL 541065, at *2 (Va. Cir. Ct. Mar. 12, 2001) ("The protection of homeowners from economic loss is not the underlying purpose of the Uniform Statewide Building Code, rather it is the safety of the public. As a result, that statute may not serve as the basis for a Negligence Per Se claim when economic loss is the only injury asserted.").

Here, Plaintiffs' negligence *per se* claim fails under Virginia law. They base their claim on alleged violations of Section 5 of the FTC Act and the Gramm-Leach-Bliley Act ("GLBA") (RC ¶¶ 173–79), but neither of those laws was "enacted for public safety." Section 5 of the FTC Act was intended to prevent unfair and deceptive trade practices and foster competition. *See* 15 U.S.C. § 45 ("The [Federal Trade] Commission is hereby empowered and directed to prevent . . . unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."). The GLBA was designed to encourage financial institutions to "respect the privacy of [their] customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801. Independently, Plaintiffs' negligence *per se* claims plainly seek recovery for purely economic harm. *See* RC ¶ 180 (claiming damages relating to identity theft and fraud, including "monetary loss and economic harm" and

31

"mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes").  Plaintiffs' negligence *per se* claims therefore fail.

## C.    Plaintiffs' "Breach of Confidence" Claim Must Be Dismissed.

In Count 5, Plaintiffs assert a claim for "breach of confidence" based on the notion that their "relationship" with Capital One was "governed by terms and expectations" that their PII would be "collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties."  RC ¶ 206.  This claim fails because "there is no common law cause of action for such a breach of confidentiality under Virginia law."  *M-CAM v. D'Agostino*, No. 3:05CV6, 2005 WL 2123400, at *2 (W.D. Va. Sep. 1, 2005); *see also WJLA-TV v. Levin*, 564 S.E.2d 383, 394 n.5 (Va. 2002) (stating the only "species" of invasion of privacy cognizable in Virginia is misappropriation of name or likeness); *Rossman v. Lazarus*, No. 1:08cv316 (JCC), 2008 WL 4181195, at *9 (E.D. Va. Sept. 3, 2008) (bank owed no fiduciary duty to borrower because "[t]he banker-borrower relationship . . . does not, by itself, establish a fiduciary relationship" and the "relationship [was] entirely defined by contract").

Even those jurisdictions that recognize a "breach of confidence" cause of action require proof that the defendant *voluntarily* or *intentionally* revealed the confidential information.  *See, e.g.*, *In re Brinker Data Incident Litig.*, No. 3:18-cv-686-J-32-MCR, 2020 WL 691848, at *21 (M.D. Fla. Jan. 27, 2020*); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1002–03 (N.D. Cal. 2016); *see also Star Patrol Enters., Inc. v. Saban Entm't. Inc.*, No. 95-56534, 1997 WL 683327, at *2 (9th Cir. Oct. 23, 1997) (unpublished) ("[T]o establish a breach of confidence claim, the plaintiff must only allege that an idea was offered and received in confidence, and later disclosed without permission.").  So even if Virginia recognized this cause of action (and it does not), this claim fails for the independent reason that Plaintiffs allege that their information was *stolen from* Capital One, not that Capital One *intentionally disclosed* it.

32

III.   **PLAINTIFFS' CONTRACT AND QUASI-CONTRACT CLAIMS MUST BE DISMISSED.**

In Counts 3, 6, and 7, Plaintiffs assert claims for breach of express contract, breach of implied contract, and unjust enrichment against Capital One.  RC ¶¶ 181–95, 214–29.  But Plaintiffs' breach of express and implied contract claims fail because Capital One was under no contractual duty to protect Plaintiffs' PII and none of Plaintiffs' alleged harms is compensable in contract.  Further, because Plaintiffs *do* have a contract with Capital One—their Cardholder Agreements—they may not assert claims for implied contract or unjust enrichment.

A.   **Plaintiffs' Contract Claims Fail as a Matter of Law.**

Plaintiffs allege that Capital One breached contracts it made with Plaintiffs by "fail[ing] to use reasonable measures to protect th[eir] information."  RC ¶ 220.  But Capital One did not assume a contractual obligation to "use reasonable measures" to protect their PII.  *See, e.g.*, *Navar, Inc. v. Fed. Bus. Council,* 784 S.E.2d 296, 299 (Va. 2016) (essential element of a contract claim is a "legally enforceable obligation" to perform the alleged duty).  And even if Capital One had assumed a contractual duty concerning cybersecurity, Plaintiffs do not adequately allege that Capital One breached that duty.  Plaintiffs' contract claims must be dismissed.

1.   Capital One Had No Contractual Obligation to Safeguard Plaintiffs' PII.

Although Plaintiffs allege that they "applied for and used" Capital One credit cards (RC ¶¶ 18–27), Plaintiffs fail to mention that the Cardholder Agreements "contain[] the terms of [their] agreement[s] with Capital One" (Exs. 2–10 at 1).  There is not a single term in the Cardholder Agreements that requires Capital One to protect Plaintiffs' PII or to implement any information security measures, policies, or procedures, much less "adequate" or "reasonable" ones.  *See generally id.*  A party cannot breach a contract by failing to perform a duty not found in the contract.  *See, e.g.*, *Dodge v. Tr. of Randolph-Macon Woman's Coll.*, 661 S.E.2d 801, 803 (Va.

2008) (dismissing breach of contract claim where the court "reviewed the documents and [could] find no such promise" to perform the alleged obligation).  For this reason alone, Plaintiffs fail to plead a claim for breach of the Cardholder Agreements.

Trying to escape this result, Plaintiffs claim that the Privacy and Opt-Out Notice (the "Privacy Notice") on Capital One's website constitutes a contract between the parties that was "formed . . . when Plaintiffs . . . provided PII to Capital One subject to the [Privacy] Notice."  RC ¶ 218; *see also* Ex. 12, Privacy Notice.  Plaintiffs allege that under that "agreement," Capital One "promise[d] to . . . 'use security measures that comply with federal law'" to "'protect [Plaintiffs'] personal information.'"  *Id.* ¶¶ 215, 217.  For one, Plaintiffs do not allege when they entered into their Cardholder Agreements or what the Privacy Notice said at that time.  Putting those pleading defects aside, the Privacy Notice is not an enforceable contract for at least three reasons.

*First*, the only time Plaintiffs allegedly "provided PII to Capital One" is when they enrolled in their Capital One accounts.  RC ¶¶ 18–27.  But the Cardholder Agreement, not the Privacy Notice, is the contract they entered into when they "open[ed] [their] credit card accounts" with Capital One, and the Cardholder Agreements plainly state that *they* "contain the terms of [Plaintiffs'] agreement[s] with Capital One."  Exs. 2–10 at 1.  "Where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself."  *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 784 F. Supp. 2d 585, 592 (E.D. Va. 2011) (quoting *Globe Co. v. Bank of Boston*, 140 S.E.2d 629, 633 (Va. 1965)).  Plaintiffs do not allege that the Cardholder Agreements and the Privacy Notice are integrated, and as noted, the Cardholder Agreements plainly impose no duty on Capital One to protect Plaintiffs' PII or to use information security measures that "comply with federal law."

*Second*, the Privacy Notice is not an independently enforceable agreement between the parties. As a preliminary matter, "[c]ontracts must be supported by consideration." *Rusnack v. Cardinal Bank, N.A.*, 695 F. App'x 704, 712 (4th Cir. 2017) (citing *Greenwood Assocs., Inc. v. Crestar Bank*, 448 S.E.2d 399, 402 (Va. 1994)). Plaintiffs do not allege that they provided any consideration for the Privacy Notice, and the only time they provided their PII to Capital One was when they applied for credit cards. If consideration at all, that PII would have only been consideration for the Cardholder Agreements, not the Privacy Notice. Nor can Capital One's alleged promise to "use security measures that comply with federal law" (RC ¶ 217) constitute consideration. As Plaintiffs allege in the Complaint, Capital One is *already* required to "comply with federal law." *See id.* ¶¶ 102–24. Under Virginia law, "a promise to perform a pre-existing legal duty *is not* adequate consideration to form a contract." *Rusnack*, 695 F. App'x at 712 (emphasis added) (holding bank's promise to perform duty imposed by Virginia Code § 8.4-403 was insufficient consideration and, thus, "did not form" a contract).

Further, Plaintiffs do not allege there was any meeting of the minds, as required. *See Giordano v. Atria Assisted Living, Va. Beach, LLC*, 429 F. Supp. 2d 732, 736 (E.D. Va. 2006). Here, not one Plaintiff alleges that he or she read the Privacy Notice, was aware of the Privacy Notice, or agreed to its terms when applying for Capital One services. *See* RC ¶¶ 18–27; *Giordano*, 429 F. Supp. 2d at 736 (no "mutual assent" absent showing party "was aware of the terms, conditions and requirements the contract contained"); *see also Brooks & Co. Gen. Contractors, Inc. v. Randy Robinson Contracting, Inc.*, 513 S.E.2d 858 (Va. 1999) (performance did not render putative contract enforceable where there was no meeting of the minds).

*Third*, even if it were part of the Cardholder Agreements or a separate contract, the Privacy Notice is not enforceable because it contains only broad statements about corporate policy

35

provided for informational purposes to help individuals "understand what [Capital One] do[es] [with their personal information]." Ex. 12 at 1. The full text of the portion of the Privacy Notice Plaintiffs rely on is as follows:

> To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.

*Id.* at 2; RC ¶ 217. Under Virginia law, an enforceable contract must "spell out the essential *commitments* and *agreements*." *Dodge*, 661 S.E.2d at 803 (emphasis added) (quoting *Progressive Constr. Co. v. Thumm*, 161 S.E.2d 687, 691 (Va. 1968)); *see Willner v. Dimon*, No. 1:14-cv-1708 (AJT/MSN), 2015 WL 12766135, at *4 (E.D. Va. May 11, 2015) (holding statements on a website must be "clear, definite, and explicit, and leave[] nothing open for negotiation" to be contractually enforceable); *see also Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981) ("[T]here must be mutual assent . . . to terms reasonably certain . . . in order to have an enforceable contract.").

The above language of the Privacy Notice contains no language indicating that it is a contractual commitment or promise. To the contrary, it simply informs the reader *what* Capital One does *to* protect PII, but it does not say *that* Capital One *will* or *shall* protect PII. Contrast this with the Cardholder Agreements, which state what Capital One "will" and "may" do and what Plaintiffs "may only" or "must" do. *See*, *e.g.*, Exs. 2–10 at 1. Because the Privacy Notice contains nothing more than general representations to the public concerning Capital One's practices concerning personal information, it is not a contractually enforceable agreement. *See Willner*, 2015 WL 12766135, at *4 (statements on Chase Bank's website too indefinite to constitute contractual obligation); *Larkman v. Dynalectron*, 831 F.2d 291, 1987 WL 38145, at *2 (4th Cir. 1987) (holding general statement in defendant's employment handbook that "employees may at

their option continue employment after age 65 to age 70" did not obligate defendant to permit plaintiff to remain employed until the age of 70).[19]

Because neither the Cardholder Agreements nor the Privacy Notice created a contractual obligation for Capital One to protect Plaintiffs' PII, Plaintiffs' contract claims must be dismissed.

2.   Even if Capital One Had Contractual Obligations Under the Privacy Notice, Plaintiffs Have Not Alleged a Breach of Those Obligations.

Assuming that the Privacy Notice imposed some contractual obligations on Capital One, those obligations would not include any general duty to "use reasonable measures" to protect consumer PII or to ensure that its security measures "comply with" the FTC Act, the GLBA, or any related regulations. *See* RC ¶¶ 98, 102–24, 220 (alleging Capital One breached purported promise to "use security measures that comply with federal law" by violating the FTC Act or the GLBA). If Capital One had any duty under the Privacy Notice, it was at most a duty to "use security measures" that "include computer safeguards and secured files and buildings." Ex. 12 at 2. And Plaintiffs have not alleged any breach of that obligation, let alone a plausible one.

*First*, while contracting parties can specify that contractual obligations be performed according to statutory or regulatory requirements, "the relevant [statutory or regulatory] provision . . . must be sufficiently specific" to be enforceable in contract. *Combs v. U.S. Bank Nat'l Assoc. for JP ALT 2008-SI*, No. 1:17-cv-545, 2017 WL 2805494, at *4 (E.D. Va. June 28, 2017). Importantly, courts have rejected plaintiffs' attempts to contractually enforce statutory or regulatory requirements where, as here, the contracts referred to "all applicable law" or the like. *See Buford v. Ocwen Loan Serv., LLC*, No. 2:18cv154, 2018 WL 6790656, at *7 (E.D. Va. Nov.

---

[19] To the extent Plaintiffs rely on any other statements on Capital One's website (*see* RC ¶¶ 99–100 & nn.56–57), their contract claims likewise fail because those statements do not spell out any definite "commitments or agreements" Capital One made to ensure the protection of Plaintiffs' PII. *See generally* Exs. 13–14; *see also Willner*, 2015 WL 12766135, at *4 (statements on Chase Bank's website too indefinite to constitute enforceable contract).

2, 2018) (R&R) (holding such terms are "not specific enough to incorporate [the statutes the defendant allegedly violated] into the deed of trust such that plaintiffs have a private right of action based on violations of those statutes"), *adopted*, 2018 WL 6617646 (E.D. Va. Dec. 18, 2018); *Combs*, 2017 WL 2805494, at *1, 5 (contractual reference to "Applicable Law" was too indefinite for plaintiff to enforce RESPA regulations even though "Applicable Law" was defined as "applicable federal . . . regulations . . . and administrative rules and orders"). Thus, even if the Privacy Notice were otherwise contractually enforceable, its reference to "federal law" does not permit Plaintiffs to sue to enforce the GLBA, the FTC Act, or any related rules or regulations.

*Second*, if the Privacy Notice contained contractual obligations, it would not require Capital One to implement "adequate security systems" or any particular policies, practices, or training. It would require nothing more than that Capital One "use security measures" that "include computer safeguards and secured files and buildings." Ex. 12 at 2. And Plaintiffs do not and cannot allege that Capital One failed to use *any* "security measures," "computer safeguards" or "secured files and buildings." In fact, Plaintiffs admit that Capital One had such security measures in place when the Cyber Incident occurred. *See* RC ¶¶ 48, 50, 56, 58. Consequently, even assuming the Privacy Notice contained contractual obligations, Plaintiffs fail to allege that Capital One breached them.

### B. Plaintiffs' Unjust Enrichment and Implied Contract Claims Fail.

Plaintiffs' unjust enrichment and implied contract claims (Counts 3 and 7) fare no better than their express contract claims.

*First*, because Plaintiffs have *express contracts* that govern their relationship with Capital One (*i.e.*, their Cardholder Agreements), Plaintiffs may not assert unjust enrichment or implied contract claims. *See CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018) (express contract barred unjust enrichment claim even though contract did not impose legally enforceable

obligation plaintiff claimed); *Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) (express contract precluded implied contract claim even where express contract claim failed); *see also Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd.*, No. 3:15cv72, 2015 WL 4937461, at *4 (E.D. Va. Aug. 18, 2015) ("A condition precedent to the assertion of a [claim for unjust enrichment] is that no express contract exists between the parties.").

*Second*, and independently, Plaintiffs fail to plausibly allege the existence of any valid implied contract. Like an express contract, an implied-in-fact contract exists only when the typical requirements to form a contract are present, such as mutually flowing consideration and mutual assent. *See Spectra-4, LLP v. Uniwest Commer. Realty, Inc.*, 772 S.E.2d 290, 295 (Va. 2015); *see also Nedrich*, 429 S.E.2d at 207 (quantum meruit claim fails even if defendant received a benefit where defendant did not promise to pay plaintiff for the benefit). Plaintiffs fail to allege any facts from which the Court could infer that Capital One and Plaintiffs impliedly agreed that Capital One would assume a duty to "safeguard and protect the[ir] PII." *See* RC ¶ 224. Plaintiffs' allegation in Count 7 that some "implied contract" exists is nothing more than a bare legal conclusion entitled to no weight.

Plaintiffs likewise fail to plausibly allege the elements of unjust enrichment: "(1) [the plaintiff] conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). For one, the PII Plaintiffs provided to Capital One does not constitute a "benefit": "[C]ourts have routinely rejected the proposition that an individual's [PII] has an independent monetary value." *Welborn v. IRS*, 218 F. Supp. 3d 64, 78 (D.D.C. 2016). Moreover, Capital One compensated Plaintiffs for any benefit it received from their PII by using that information to

determine whether (and on what terms) to extend Plaintiffs credit—terms that each Plaintiff found acceptable when they "applied for and used" their Capital One credit cards. *See* RC ¶¶ 18–27, 133, 223. Plaintiffs allege no facts suggesting that Capital One promised to pay, or reasonably should have expected to pay, Plaintiffs anything else for their PII. *See Rosetta Stone, Ltd. v. Google, Inc.*, 732 F. Supp. 2d 628, 631–32 (E.D. Va. 2010) (unjust enrichment claim failed absent allegations that "imply that the defendant promised to pay the plaintiff for the benefit received"). Nor could Plaintiffs plausibly allege such facts, because the Cardholder Agreements impose no duty on Capital One to pay for Plaintiffs' PII.[20]

### C.    Plaintiffs' Alleged Harms Are Not Compensable in Contract.

Plaintiffs' contract and implied contract claims fail for the additional reason that none of their alleged injuries is compensable in contract. "As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained" as a result of the breach. *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 136 (Va. 2009); *see also id.* ("[D]amages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim."); *P5 Sols., Inc. v. Steinke*, No. 1:18-CV-1380, 2019 WL 5445291, at *2 (E.D. Va. Oct. 23, 2019) (same). Here, only one of Plaintiffs' alleged injuries—loss of the benefit of their bargain— is even conceivably a contract loss. But Plaintiffs allege no facts to make that injury anything more than speculative. Plaintiffs' other alleged injuries are downstream, consequential injuries that are not compensable on the facts alleged.

---

[20] The Cardholder Agreements also specifically identify any charges or fees Plaintiffs might have paid to Capital One, and none is for data security. Thus, Plaintiffs' assertion that they "overpaid" for data security they did not receive (*see, e.g.*, RC ¶ 171) is also insufficient to state a plausible unjust enrichment claim.

1.   Lost Benefit of the Bargain.

Plaintiffs claim, without further elaboration, that "they did not get the benefit of the bargain for which they paid."  RC ¶¶ 221–29.  But no Plaintiff alleges *what* he or she paid Capital One in exchange for data security; in fact, no Plaintiffs allege with any specificity that they paid Capital One *anything*.  The term "benefit of the bargain" is a label covering many different possible measures of damages that could be appropriate in a given case.  *See*, *e.g.*, *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 560 (Va. 2003) (listing measures of damages to restore "the benefit of the bargain").  The Complaint's use of that term is thus precisely the kind of bare "legal conclusion[] . . . devoid of further factual enhancement" that is not entitled to weight on a motion to dismiss under Rule 12(b)(6).  *Nemet Chevrolet, Ltd*, 591 F.3d at 255.

Plaintiffs' claims would fail even if they could fix these pleading defects.  Numerous courts faced with similar allegations have held that such "overpayment" damages are not cognizable in data breach cases, failing to even qualify as an Article III "injury in fact."  *See*, *e.g.*, *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 12 (D.D.C. 2019) ("[P]laintiffs here broadly allege that some indeterminate amount of their health insurance premiums went towards providing data security" which "fail[s] to state a claim for actual damages under their benefit-of-the-bargain theory."); *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 572 (D. Md. 2016) (rejecting theory where data breach did not "diminish[] the value of the health insurance [plaintiffs] purchased" and "the prices [plaintiffs] paid for health insurance [did not] include[] a sum to be used for data security"); *Fero v. Excellus Health Plain, Inc.*, 236 F. Supp. 3d 735, 754–55 (W.D.N.Y. 2017) (listing cases).

2.   All Other Alleged Harms.

The remaining harms Plaintiffs identify are (i) increased risk of identity theft; (ii) mitigation efforts or expenses; (iii) diminution in value of their PII; and (iv) actual misuse of their PII.  None of these alleged harms "flow naturally or ordinarily" from Capital One's alleged breach

41

of a purported contractual duty to "use reasonable measures" to protect Plaintiffs' PII.  *See Long v. Abbruzzetti*, 487 S.E.2d 217, 219 (Va. 1997).  After all, even assuming Capital One breached its alleged duty to safeguard Plaintiffs' PII, these harms occurred *only* because Thompson—a third-party criminal actor—intervened and exploited Capital One's purported contractual breach.  If Plaintiffs' alleged harms occurred at all, they "occur[red] from the intervention of special circumstances"—namely, the unauthorized intrusion into Capital One's cloud environment and theft of data.  Accordingly, these consequential harms are not compensable unless "the special circumstances" that brought them about "were within the contemplation of *all contracting parties* at the time the contract was made."  *Id.* (emphasis added).  But Plaintiffs allege *no* plausible facts showing if or when they or Capital One contemplated events like the Cyber Incident, or even when Plaintiffs' and Capital One's contracts were made.  As such, they cannot recover their alleged consequential damages in contract or quasi contract.  Plaintiffs' contract and implied contract claims (Counts 6 and 7) must, therefore, be dismissed.

## IV.    PLAINTIFFS' STATUTORY CLAIMS MUST BE DISMISSED.

### A.    Plaintiffs' Cardholder Agreements Preclude Their Claims Under California, Florida, New York, Texas, and Washington Statutes.

Plaintiffs assert statutory claims under the laws of California, Florida, New York, Texas, and Washington in Counts 8–12 and 14–15.  RC ¶¶ 230–85, 294–310.  As discussed, when Plaintiffs entered their Cardholder Agreements with Capital One, the parties agreed that Virginia law would "govern" any claims arising from their relationship.  As a result, Plaintiffs are barred from asserting claims under the laws of foreign states.  *See*, *e.g.*, *Precision Pipeline, LLC v. Dominion Transmission, Inc.*, No. 3:16cv180, 2017 WL 1100903, at *4 (E.D. Va. Mar. 23, 2017) ("Since Pennsylvania law does not apply to these performance issues, the Court will not consider Precision's [Pennsylvania statutory] claims[.]"); *Run Them Sweet, LLC*, 224 F. Supp. 3d at 468

(dismissing California statutory consumer protection claim because contractual choice of law provision called for application of Virginia law); *Pyott-Boone Elecs. Inc.*, 918 F. Supp. 2d at 547 (dismissing Virginia statutory claim where choice of law clause called for Delaware law).

**B.      Plaintiffs Fail to Plead the Elements of Their Consumer Protection Claims.**

Even if Plaintiffs were not barred from asserting claims arising under the consumer protection statutes of California, Florida, New York, Texas, and Washington, the Representative Complaint fails to plead a plausible claim for relief under any of those statutes.

1.      <u>Plaintiffs Fail to Allege a Cognizable Injury.</u>

All of the consumer protection statutes under which Plaintiffs assert claims require a plaintiff to establish an actual injury or damages.[21]  But as fully detailed above (*see supra* at 14–20), Plaintiffs have alleged neither.

2.      <u>Capital One Is Exempt from Plaintiffs' FDUTPA Claim.</u>

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count 10) exempts nationally-chartered banks like Capital One from its reach.   *See* Fla. Stat. § 501.212(4)(c) (exempting from statute "[b]anks, credit unions, and savings and loan associations regulated by federal agencies"); *see also, e.g.*, *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1221 (S.D. Fla. 2015) (dismissing FDUTPA claim against bank because bank "cannot be subject to the

---

[21] *See Meyer v. Sprint Spectrum L.P.*, 200 P.3d 295, 299 (Cal. 2009) ("[T]o bring a [California] CLRA action, not only must a consumer be exposed to an unlawful practice, but some kind of damage must result."); Cal. Bus. & Prof'l Code § 17204 (requiring an "injury in fact and . . . lost money or property" to bring suit under California Unfair Competition Law); Fla. Stat. § 501.211 (requiring a plaintiff to "suffer[] a loss" to recover "actual damages" to bring a claim under FDUTPA); *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) ("the plaintiff must have sustained injury" to bring a claim under New York General Business Law); Tex. Bus. & Com. Code § 17.50(a) (requiring a consumer to suffer "economic damages or damages for mental anguish" to bring a claim under Texas DTPA); Wash. Rev. Code § 19.86.090 (requiring that a person be "injured in his or her business or property" to sue under Washington Consumer Protection Act).

FDUTPA"); *Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 779 (Fla. Dist. Ct. App. 2007) (reversing FDUTPA judgment against bank because "FDUTPA does not apply to banks").  The FDUTPA claims against Capital One therefore must be dismissed.

### 3.   Plaintiffs Fail to Allege the Requisite Consumer Transaction.

The California Consumer Legal Remedies Act ("CLRA") (Count 9) and the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") (Count 12) apply only to certain consumer transactions.  *See, e.g.*, Cal. Civ. Code § 1770 (applying only to certain consumer "transaction[s]"); Tex. Bus. & Com. Code § 17.50 (conferring cause of action on an aggrieved "consumer").  Loans or extensions of credit do not qualify as consumer transactions under these statutes, and therefore cannot form the basis of claims under them.  *See Berry v. Am. Express Publ'g, Inc.*, 54 Cal. Rptr. 3d 91, 97 (Ct. App. 2007) (issuance of a credit card is not a "transaction" for purposes of the CLRA); *Marketic v. U.S. Bank Nat'l Ass'n*, 436 F. Supp. 2d 842, 855 (N.D. Tex. 2006) ("merely obtaining a loan or an extension of credit does not qualify one as a 'consumer' [under the DTPA]").  Because the only transactions alleged in the Representative Complaint are that Plaintiffs "applied for and used a Capital One credit card" (RC ¶¶ 18–27), the CLRA and DTPA claims must be dismissed.

### 4.   Omissions Are Insufficient to Allege a Violation of Certain Statutes.

Absent an independent legal duty to disclose information, liability under the California, Texas, and Washington statutes (Counts 8, 9, 12, and 15) cannot be based on an alleged omission.[22]

---

[22] *See Baba v. Hewlett-Packard Co.*, No. C 09–05946 RS, 2010 WL 2486353, at *5 (N.D. Cal. June 16, 2010) (dismissing a CLRA claim because "[plaintiff's] generalized allegations are insufficient to meet Rule 9(b)'s pleading requirements and cannot impute a duty to disclose on [defendant]"); *Berryman v. Merit Prop. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 188 (Ct. App. 2007) ("Absent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL."); *Steele v. Goddard*, No. 10-12-00111-CV, 2013 WL 3013671, at *7 (Tex. App. June 13, 2013) ("the mere nondisclosure of material information is not enough to establish an actionable DTPA claim") (collecting cases); *Nguyen v. Doak Homes, Inc.*, 167 P.3d 1162, 1166-67 (Wash.

Plaintiffs do not allege or identify any applicable duty to disclose on the part of Capital One. Accordingly, to the extent their California, Texas, and Washington claims are based on omissions of fact (*see, e.g.*, RC ¶¶ 235(f)–(g), 247, 273(f)–(g), 305(f)–(g)), the claims must be dismissed.

    5.    Plaintiffs Fail to Allege Fraud with Particularity.

To the extent Plaintiffs' claims under the California, Florida, New York, Texas, and Washington consumer protection statutes (Counts 8–12, 15) sound in fraud, they must be dismissed because Plaintiffs fail to plead the circumstances of such fraud with particularity.  *See* Fed. R. Civ. P. 9(b); *In re Lumber Liquidators Chinese-Mfg.'d Flooring Durability Mktg. & Sales Practices Litig.*, No. 1:16md2743, 2017 WL 2911681, at *6 (E.D. Va. July 7, 2017) (concluding certain claims under consumer protection statutes were subject to Rule 9(b)); *In re Interior Molded Doors Antitrust Litig.*, Nos. 3:18-cv-718-JAG & 3:18-cv-850, 2019 WL 4478734, at *17–18 (E.D. Va. Sept. 18, 2019) (same).  Plaintiffs' boilerplate allegations that Capital One "misrepresent[ed]" that it would protect consumers' PII and "omitt[ed], suppress[ed], and conceal[ed]" that it had not (*e.g.*, RC ¶ 235) are plainly insufficient.  *See*, *e.g.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (Rule 9(b) requires "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby").

    **C.    Plaintiffs Fail to State a Claim Under the Data Breach Notification Statutes.**

Plaintiffs' claims under the Virginia Personal Breach Notification Act (Count 13) and the Washington Data Breach Notice Act (Count 14) (collectively, the "Breach Notice Statutes") must also be dismissed.

---

Ct. App. 2007) (affirming dismissal of WCPA claim where plaintiff "has not identified any basis for her claim that [defendant] failed to comply with an obligation to disclose to her any material defects about the house").

1.      There Is No Private Right of Action under the Virginia Breach Notice Statute.

Plaintiffs' claims under the Virginia Breach Notice Statute fail because that statute does not afford a private cause of action.  Rather, it authorizes only the state attorney general to enforce the statute and seek penalties.  When, as here, "a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." *First Am. Title Ins. Co. v. W. Sur. Co.*, 722 S.E.2d 637, 640 (Va. 2012) (concluding statute's administrative penalties provision "provides a remedy for violations of the statute" that excludes a private right of action); *Vansant & Gusler, Inc. v. Washington*, 429 S.E.2d 31, 33 (Va. 1993) (in such circumstances, "a private right of action cannot be implied").  When the General Assembly *has* chosen to create a private right of action, on the other hand, its intent is unmistakably clear. *See, e.g.*, Va. Code § 59.1-9.12 ("Any person injured . . . may recover the actual damages sustained."); *id.* § 59.1-68.3 ("Any person who suffers loss as the result of a violation . . . shall be entitled to bring an individual action to recover damages.").  Language like this is absent from the Virginia Breach Notice Statute.

While the Virginia Breach Notice Statute states that the attorney general's right to seek penalties does not "limit an individual from recovering direct economic damages from a violation of this section," *id.* § 18.2-186.6(I), Virginia courts long have held that such language is insufficient to *create* a private right of action.  Rather, such language merely *preserves* a plaintiff's right to recover damages for a violation under whatever causes of action are otherwise available. *See Vansant & Gusler, Inc.*, 429 S.E.2d at 34; *A&E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 674 & n.5 (4th Cir. 1986) (statutory language clarifying that imposition of administrative penalties would not "relieve or absolve any person . . . from any liability" was insufficient to create a private right of action).  Here, Plaintiffs' claims fail because the Virginia

Breach Notice Statute does not authorize a private right of action,[23] and Plaintiffs identify no other statute, case, or regulation that does.

2.   <u>Plaintiffs Fail to Allege Plausible Violations of the Breach Notice Statutes.</u>

Independently, the Washington and Virginia Plaintiffs' claims under the Breach Notice Statutes fail because they have not plausibly alleged that Capital One violated them.

      *a.*    *Plaintiffs fail to allege their "personal information" was compromised in the Cyber Incident, as required.*

The Virginia Breach Notice Statute requires that a data breach victim give notice to "any resident of the Commonwealth" whose "personal information" is compromised in a data breach. Va. Code § 18.2-186.6(B).  The statute narrowly defines "personal information" as

> the first name or first initial and last name in combination with and linked to any one or more of the following data elements that relate to a resident of the Commonwealth, when the data elements are neither encrypted nor redacted:
>
> 1.  Social security number;
>
> 2.  Driver's license number or state identification card number issued in lieu of a driver's license number;
>
> 3.  Financial account number, or credit card or debit card number, in combination with any required security code, access code, or password that would permit access to a resident's financial accounts;
>
> 4.  Passport number; or
>
> 5.  Military identification number.

---

[23] Three courts have said otherwise, but none addressed the relevant Virginia caselaw presented here or conducted more than a superficial review of the statute. *See Patton v. Experian Data Corp.*, No. 17-cv-1559, 2018 WL 6190349, at *11 (C.D. Cal. Jan. 23, 2018) (assuming in dicta the statute implies a private right of action); *In re: Cmty. Health Sys., Inc.*, No. 15-CV-222, 2016 WL 4732630, at *29 (N.D. Ala. Sept. 12, 2016) (assuming statute implied a private right of action because the defendant "failed to provide the court with meaningful information to address" the argument, "such as the relevant texts of the statutes and relevant case law"); *Corona v. Sony Pictures Entm't, Inc.*, No. 14-CV-09600, 2015 WL 3916744, at *8 (C.D. Cal. June 15, 2015) (stating, with no analysis or citation to relevant Virginia law, the statute implies a private right of action).

*Id.* § 18.2-186.6(A).   Washington's Breach Notice Statute similarly defines the "personal information" that, if compromised, entitles an "resident of [Washington]" to notice.   *See* Wash. Rev. Code § 19.255.010(1), (5) (2019).

Plaintiff Spacek, a Virginia resident, asserts a claim under the Virginia Breach Notice Statute, yet he does not allege that his statutorily-defined "personal information" was compromised in the Cyber Incident.   *See* RC ¶ 26 (failing to identify what information of his was impacted); *compare id.* ¶ 20 (Plaintiff Behar alleging her name and Social Security number were impacted). Likewise, Plaintiff Sharp of Washington asserts a claim under her state's Breach Notice Statute but fails to allege which, if any, of her information was impacted.   *See id.* ¶ 27.   Because Plaintiffs Spacek and Sharp—the only current Plaintiffs from Virginia and Washington, respectively—have not alleged they were even entitled to statutory notice, their claims under the Breach Notice Statutes must be dismissed.

> *b.*     *No Plaintiff plausibly alleges that Capital One's direct or substitute notice of the Cyber Incident violated the Breach Notice Statutes.*

The Breach Notice Statutes require that notice be given "without unreasonable delay," Va. Code § 18.2-186.6(B), or "immediately," so long as doing so "will not compromise" a law enforcement investigation, Wash. Rev. Code § 19.255.010(2), (3).   Plaintiff Spacek alleges he received direct notice of the Cyber Incident from Capital One "in or around Summer 2019" (RC ¶ 26), which is plainly insufficient to show an "unreasonable delay" because Capital One *learned of* the Cyber Incident in Summer 2019.   And Plaintiff Sharp's allegation that she received an update from Capital One about the Cyber Incident "after an inquiry" (RC ¶ 27) omits the foundational facts necessary to conclude that she was entitled to statutory notice in the first place.   Thus, neither Plaintiff plausibly alleges they received notice after an unreasonable delay or otherwise outside of the statutorily permitted time frames.

Moreover, Plaintiffs admit that Capital One publicly announced the Cyber Incident through a general press release, on July 29, 2019—just twelve days after Plaintiffs allege it discovered the incident. *See* RC ¶¶ 64, 86 & n.47. Plaintiffs have not plausibly alleged that this widely disseminated public announcement failed to provide timely and sufficient notice under the Breach Notice Statutes. *See* Va. Code § 18.2-186.6(A) (describing permissible "[s]ubstitute notice" that includes "[n]otice to major statewide media"); Wash Rev. Code § 19.255.010(8)(c), (13)(a) & (16) (similar). And it is undisputed that Capital One provided this substitute notice the same day Thompson was arrested, *i.e.*, when it was "determine[d] that the notification w[ould] no longer impede" or "compromise" the [FBI's] "investigation." Va. Code § 18.2-186.6(B); Wash. Rev. Code § 19.255.010(2), (3). Accordingly, Capital One's substitute notice independently precludes Plaintiffs' claims for untimely notice.[24]

> ### c.   *No Plaintiff plausibly alleges "damages" as the result of a violation of a Breach Notice Statute.*

Even if these two Plaintiffs had pleaded violations of the Breach Notice Statutes, they could at most recover "economic damages *from a violation of*" those Statutes. Va. Code § 18.2-186.6(I) (emphasis added); *see also* Wash. Rev. Code § 19.255.010(13)(a) (permitting damages if consumer is "injured *by a violation*" of the statute (emphasis added)). Yet, neither Plaintiff alleges any cognizable damages resulting from untimely notice or a defect in the form of Capital One's notice (as distinct from damages flowing from the Cyber Incident itself). Plaintiff Spacek's alleged

---

[24] Nor have Plaintiffs alleged that Capital One failed to comply with the notice regimes created by its regulators such that it was even required to comply with the Breach Notice Statutes' default notice requirements. *See* Va. Code § 18.2-186.6(G) (stating an "entity that is subject to Title V of the Gramm-Leach-Bliley Act" complies if it "maintains procedures for notification of a breach . . . in accordance with the provisions of the [GLBA]" or the "guidelines established by the entity's primary or functional state or federal regulator"); Wash. Rev. Code § 19.255.010(11) (2019) (stating entities regulated by the OCC are "*deemed* to have complied with" the statute by providing notice of a breach pursuant to "interagency guidelines").

"unauthorized charges on his accounts" could not have resulted "from a violation" of the Virginia Breach Notice Statute, as the charges were made "shortly []*after*" he *received notice* from Capital One.  RC ¶ 26.  Further, Plaintiff Sharp fails to allege that she suffered *any* damages from "a violation" of the Washington statute.  Plaintiffs' claims under the Breach Notice Statutes must be dismissed.

## CONCLUSION

For these reasons, the Representative Complaint should be dismissed with prejudice.

Respectfully submitted, this 10th day of April, 2020.

/s/_____
David L. Balser (*pro hac vice*)
S. Stewart Haskins II (*pro hac vice*)
John C. Toro (*pro hac vice*)
Kevin J. O'Brien (VSB No. 78886)
Robert D. Griest (*pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: (404) 572-4600
Fax: (404) 572-5140
dbalser@kslaw.com
shaskins@kslaw.com
jtoro@kslaw.com
kobrien@kslaw.com
rgriest@kslaw.com


Robert A. Angle (VSB No. 37691)
Tim St. George (VSB No. 77349)
Jon S. Hubbard (VSB No. 71089)
Harrison Scott Kelly (VSB No. 80546)
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
robert.angle@troutman.com
timothy.st.george@troutman.com

jon.hubbard@troutman.com
scott.kelly@troutman.com

Mary C. Zinsner (VSB No. 31397)
**TROUTMAN SANDERS LLP**
401 9th Street, NW, Suite 1000
Washington, DC 20004
Telephone: (703) 734-4334
Facsimile: (703) 734-4340
mary.zinsner@troutman.com

*Counsel for Capital One*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2020, I caused the foregoing document to be filed with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/_____
David L. Balser

*Counsel for Capital One*