1

                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION

IN RE: CAPITAL ONE CUSTOMER    .    Civil Action No. 1:19md2915
DATA SECURITY BREACH           .
LITIGATION,                    .    Alexandria, Virginia
                               .    May 15, 2020
                               .    10:45 a.m.
                               .
. . . . . . . . . .


                  TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE JOHN F. ANDERSON
                  UNITED STATES MAGISTRATE JUDGE
                       (via ZoomGov)


<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:              NORMAN E. SIEGEL, ESQ.
                                 JILLIAN R. DENT, ESQ.
                                 Stueve Siegel Hanson LLP
                                 460 Nichols Road, Suite 200
                                 Kansas City, MO 64112

FOR CAPITAL ONE DEFENDANTS:      JOHN C. TORO, ESQ.
                                 King & Spalding LLP
                                 1180 Peachtree Street, N.E.
                                 Atlanta, GA 30309-3521
                                   and
                                 ROBERT A. ANGLE, ESQ.
                                 Troutman Sanders LLP
                                 1001 Haxall Point
                                 P.O. Box 1122
                                 Richmond, VA 23219

TRANSCRIBER:                     ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Third Floor
                                 401 Courthouse Square
                                 Alexandria, VA 22314
                                 (703)299-8595


                       (Pages 1 - 32)


(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

2

P R O C E E D I N G S

1

2          THE COURT:  Well, good morning, counsel.

3          A VOICE:  Good morning, Your Honor.

4          MS. DENT:  Good morning.

5          A VOICE:  Good morning.

6          THE COURT:  Thank you.  We'll go ahead and have the

7    clerk call the case.

8          THE CLERK:  In re: Capital One Customer Data Security

9    Breach Litigation, Civil Action No. 19md2915.

10         THE COURT:  And who do we have for the plaintiff?

11         MR. SIEGEL:  Good morning, Your Honor.  This is

12   Norman Siegel, co-lead counsel for the plaintiffs, and with me

13   is my colleague, Jillian Dent, who will handle the arguments

14   this morning.

15         I was mentioning to Ms. Garnett that we had a

16   thunderstorm pass through, so hopefully the WiFi holds up here,

17   but I think we'll be okay, but Ms. Dent will handle the hearing

18   unless we have a technical issue on her end.

19         THE COURT:  Okay.  Thank you.

20         And who do we have for the defendant?

21         MR. ANGLE:  Good morning, Your Honor.  Robert Angle

22   of Troutman Sanders on behalf of Capital One.  Along with me is

23   John Toro from King & Spalding.  I'll be arguing today.

24         MR. TORO:  Good morning.

25         THE COURT:  Well, I wish we could be doing this in

1    person, but under the circumstances, we can't, and I think this

2    is an issue that's significant enough that it be decided sooner

3    rather than later, and it's, it's one that I thought I wanted

4    to give the parties the opportunity to say things to me orally

5    that they can expand upon the things that are in their briefs.

6           Just to let you know, I have reviewed all of the

7    pleadings, reviewed all of the exhibits.  I have read all of

8    the cases that are available to me on the work product issue.

9    I just mention that I think the parties have cited two separate

10   cases in which they're decisions that are not available by

11   Westlaw.  They are other data breach cases.  I haven't gone to

12   track them down through PACER or anything like that, and in the

13   future, that if ever you're going to cite cases that we only

14   have the civil action number and docket number, it probably

15   makes sense to attach those as exhibits to the pleadings.

16          I also just want to note at the beginning that the

17   opposition that was filed to this motion was not filed under

18   seal, so my understanding is that everything that is in that

19   opposition and the exhibits are in the public record, and the

20   parties need to be aware that going forward, I'm not going to

21   allow things to be filed under seal that are already in the

22   public record.  So just make sure that we, we understand that.

23          I know I've got a pending motion to seal on the reply

24   brief.  I haven't gone back to double-check things like that,

25   but when the, like, Capital One's motion to support or response

4

1    to the motion to seal, you need to make sure that you're being

2    consistent in not filing pleadings in the public record and

3    then asking the Court to seal other pleadings that contain the

4    same information or same types of information.

5           Okay.  So with all that said, I'll go ahead and let

6    Ms. Dent, weather permitting, have you start in on your arguing

7    on the, the motion to compel.

8           MS. DENT:  Thank you, Your Honor.  Can you hear me

9    okay?

10          THE COURT:  Yes, I can.  Thank you.

11          MS. DENT:  Great.  So the inescapable facts here

12   foreclose any claim of work product privilege.  The facts show

13   that Capital One contracted with Mandiant to provide data

14   breach response services since 2015.  Capital One considered

15   having Mandiant on retainer to be a business critical expense.

16   The agreement was that if we have a breach, Mandiant will

17   provide response service, including identifying all of which

18   occurred and how Capital One could fix it.

19          Now, when the data breach at issue in this case was

20   discovered in July of 2019, Mandiant provided the exact

21   services and report it had been contracted for to provide since

22   2015 and as recently as January 2019.

23          THE COURT:  Well, wasn't there an addendum that

24   expanded, whether it really expanded or just more detailed the

25   information that Mandiant was going to give?  I know that there

5

1    was the initial agreement that was done between Debevoise and

2    Mandiant that had the same, basically the same exact language

3    as the statement of work that Capital One had, but there was, I

4    think, several days later an expanded, more detailed scope of

5    work.

6              Doesn't that come into play a little bit in this

7    case?

8              MS. DENT:  No, Your Honor.  The, the addendum added

9    on an additional service for red team testing, but that did not

10   fundamentally change the scope of services that were provided

11   by Mandiant nor the deliverables that were at issue in this

12   case.  So that was an additional technical service that was

13   provided, the red team exercises, but it didn't fundamentally

14   change what's at issue here, which is that these services and

15   deliverables had been previously contracted for by Capital One

16   many months prior to any litigation ever being anticipated.

17             And then Capital One brings in outside counsel and

18   essentially papers over the same agreement Capital One already

19   had with Mandiant, but now Mandiant is supposed to supply those

20   same services and deliverables to Debevoise in the first

21   instance.

22             And we have the exact same facts that were at issue

23   in *Dominion*, a case decided in this court several months ago

24   that also involved Mandiant and data breach and an attempt to

25   shroud the factual investigation with privilege.  And in

1    *Dominion*, you know, the court found that the actual description

2    of the services promised in the post-breach statement of work

3    was almost identical to the services promised in the pre-breach

4    statement of work.

5              And that's at issue here too.  You know, the, the

6    services are essentially verbatim, the deliverables are the

7    same, and the court there found that the addition of the

8    language referencing that they were supposed to do that at the

9    direction of counsel did not fundamentally alter the services

10   that were supposed to be provided and that it appeared designed

11   to help shield the material from disclosure rather than alter

12   the business purposes of the work.

13             And in *Dominion*, like here, defendants have done

14   little to show that Mandiant changed the nature of its

15   investigation at the instruction of counsel or that Mandiant's

16   scope of work and purpose became different due to the

17   litigation.

18             So plaintiff argued that the facts here clearly show

19   that the Mandiant report is not work product.  And we have

20   additional arguments as well in that, you know, Capital One has

21   not carried its burden to show that waiver has not occurred

22   here.  Capital One shared it with 32 non-lawyer employees, 4

23   regulators, 1 outside auditor, provides little explanation as

24   to why it was provided to those, and then it also has placed at

25   issue two critical conclusions from the Mandiant report:  that

1    the issue was fixed immediately and that there was no -- that

2    Paige Thompson was the sole intruder.

3            THE COURT:  Well, what --

4            MS. DENT:  So --

5            THE COURT:  And Capital One says there's no evidence

6    that you've presented that those were conclusions from the

7    Mandiant report.  What's your response to that?

8            MS. DENT:  Our response to that, well, we put, we put

9    in in our reply brief two, two pieces of evidence that we have

10   so far that show that these are conclusions from the Mandiant

11   report.  So the, the public representation that they fixed the

12   issue immediately, we submitted in Exhibit 18, I believe it

13   was, that Mandiant essentially sent an e-mail to Capital One

14   regarding the press release, advising presumably on this issue,

15   and then secondly --

16           THE COURT:  The press release doesn't say we acquired

17   a third-party independent person to come in and certify that

18   this breach in our security has been fixed, been tested and

19   been fixed, right?  It doesn't say Mandiant -- we, we have

20   hired an independent third party, Mandiant, a well-recognized

21   entity in this field, to take this, and they have certified

22   that it's been fixed.

23           MS. DENT:  You're correct, Your Honor.  They, they

24   did say that they fixed it immediately, and they have

25   represented in discovery that they have engaged in the

8

1    remediation required to fix the issues in the breach, and

2    Mandiant's report, we know, provides remediation

3    recommendation, and so therefore, plaintiffs argue that they

4    have placed at least these two issues that are addressed in the

5    Mandiant report at issue, so -- and, and we believe that, that

6    the Court can decide on the first, the first prong of this

7    argument, which is that it's simply not work product, but, you

8    know, to the extent that, you know, Your Honor reaches this

9    question about issue waiver and things that plaintiffs have not

10   proffered in that, we would certainly request that you deny

11   without prejudice, because discovery will be continuing, and we

12   believe that it likely will be placed at issue if, if Your

13   Honor thinks that this is not enough.

14        THE COURT:  What, what about the need to have it and

15   the inability to get this information from other sources, your

16   argument on that?

17        MS. DENT:  Well, again, Your Honor, I think that Your

18   Honor does not need to reach that because I think this is

19   clearly not work product for the reasons mentioned, that

20   Mandiant was hired for a business purpose, used for a range of

21   non-litigation purposes.

22        However, this is certainly not opinion work product,

23   as defendants have argued.  It does not have, you know, of

24   course, we haven't reviewed it, but there's no evidence in the

25   record that it, that it reflects counsel's impressions or

1   advice concerning the litigation.  This is a highly technical

2   report.

3         And therefore, if it qualifies as work product at

4   all, then essential work product, and plaintiffs argue that

5   they have a substantial need for it, this is a highly forensic

6   report.  Mandiant had access to Capital One's infrastructure

7   through its employees, and it would pose an undue burden for

8   plaintiffs to, to get a substantial equivalent of this highly

9   technical and forensic report.

10       THE COURT:  You've already asked -- I mean, in

11   essence, if you look at your document requests and other

12   information, you've pretty much asked for the same information

13   that I assume Mandiant was given.  The idea -- there may be

14   some question as to, you know, it being live information

15   versus, you know, static information, but your document

16   requests in this case are very broad.  It would, in essence, if

17   responded to fully and completely, would provide you, in

18   essence, the same type information that Mandiant had access to.

19       So I'm trying to understand how while it would be a

20   lot of work, as I'm sure it was for Mandiant to do this and to

21   do the analysis and understanding, why, why that becomes

22   something that should -- if, in fact, I find that it is work

23   product, and I certainly haven't made a final decision one way

24   or the other, but if I have to get to this tertiary issue, I'm

25   just trying to better understand why you would say that the

1    information that Capital One will be providing to you in

2    discovery, once you put that aside, saying that they would be

3    providing that information to you in discovery, why that

4    wouldn't be sufficient and why we would have to go through and

5    require them to produce something to you in the circumstances.

6            MS. DENT:  Well, Your Honor, plaintiff would agree

7    that we have, we have issued broad requests for the technical

8    issues, because you're right, if we don't get the Mandiant

9    report, we need to prove our case; however, I would argue that

10   having access to e-mails and logs, if they exist, is different

11   than, than being able to actually analyze the technical

12   infrastructure at the company, I mean, having access to examine

13   those, those things that Mandiant had access to, that, you

14   know, Capital One would not allow plaintiff, you know, to come

15   into the company and analyze.

16           So we would argue that we do have a substantial need,

17   especially with respect to the fact that Mandiant made

18   remediation recommendations and Capital One had represented

19   they had fixed it and that plaintiff's personal information

20   still resides at Capital One, and it is very important that we

21   are able to evaluate what was recommended to Capital One and

22   whether it applied those recommendations to protect the data.

23           However, we do not believe that the Court needs to

24   reach the third issue because the facts clearly show that the

25   Mandiant report is not work product.

1          THE COURT:  Help me better understand the -- we talk

2     about the Mandiant report and whether the report itself would

3     need to be produced.  Your motion makes them provide other

4     things other than just the Mandiant report but doesn't go into

5     much detail as to those kinds of all the correspondence and

6     communications and things like that that would underlie the

7     report itself, and obviously, the -- Capital One has come in

8     and said, you know, that's an issue that is not really ripe for

9     decision at this point, that you haven't focused on certain,

10    you know, pieces of information, haven't dealt -- haven't gone

11    through enough detail so the Court can make a decision as to

12    those other related documents other than just the Mandiant

13    report.

14          MS. DENT:  Your Honor, if, if the Mandiant report is

15    not privileged, then plaintiffs are questioning communication,

16    I believe we said in our motion, between Mandiant and Capital

17    One and then gone to Capital One employees wherein they discuss

18    the Mandiant report's analysis, conclusions, reproduced points

19    from the Mandiant report, plaintiffs believe that, you know, if

20    the Mandiant report itself is not privileged, then, then

21    Capital One cannot withhold e-mails where they reproduce, for

22    example, the conclusions of the Mandiant report or discuss the

23    Mandiant report.

24          Now, that's not to say --

25          THE COURT:  That's not consistent with your, with

1    your acknowledgement that you're not asking for Debevoise's

2    report to the board, and you've acknowledged that Debevoise

3    apparently attacked the Mandiant report to the board when it

4    provided its report and its legal advice.  You stated in your

5    papers that you're not seeking that because you understand that

6    that would be a provision, you know, providing legal advice.

7            So the idea that everything that has to do with the

8    Mandiant report should now be turned over, I'm having a hard

9    time understanding how you're being consistent with that.

10           MS. DENT:  So we, we are not asking for everything

11   related to the Mandiant report to be turned over, only that

12   Capital One cannot withhold or redact with privilege

13   reproductions of the conclusions and the recommendations of the

14   Mandiant report.

15           So I think, for example, we say that we request

16   communications between Mandiant and Capital One employees

17   regarding Mandiant's factual conclusions and remediation

18   recommendations.

19           So that doesn't say if they're, they're discussing,

20   for example, legal advice from Debevoise, of course, Capital

21   One can withhold that as privilege and assert privilege over

22   it, and this motion would not reach those sorts of items.

23           We just want -- we're just asking for an order that,

24   that is typically in the sense that if the Mandiant report is

25   being discussed, its conclusions are being discussed or

1   reproduced within documents that are not otherwise privileged,

2   for example, if Debevoise was communicating it to the board,

3   that's different than two Capital One employees saying, hey,

4   Mandiant said this.  We need to execute that.

5           THE COURT:  Anything else?

6           MS. DENT:  Nothing else, Your Honor.

7           THE COURT:  Well, Mr. Angle, I hope the weather in

8   Richmond is no thunderstorms riding through Richmond.  So I'll

9   give you an opportunity to respond.

10          MR. ANGLE:  Thank you, Your Honor.  And I hope I'm

11  being heard.

12          THE COURT:  Yes.

13          MR. ANGLE:  Okay.  Technology is sometimes iffy.

14          Thank you for taking the time to hear us out this

15  morning.  This is an important issue.  And the starting point

16  for us is is the Mandiant report subject to work product, and

17  there are two essential tests associated with that:  first, was

18  it prepared because of litigation; and second, would it have

19  been prepared in substantially the same form but for

20  litigation; and the answer to both of those questions is that

21  it was prepared because of litigation and would not have been

22  prepared in the same form if the litigation had not occurred.

23          Let's take those steps separately.  First, the facts

24  here really aren't in much dispute about the development of the

25  Mandiant report.  There's no dispute that upon learning of the

1   cyber event, Capital One reasonably expected massive litigation

2   to ensue.

3           Capital One immediately hired legal counsel,

4   Debevoise & Plimpton, and then Debevoise & Plimpton immediately

5   hired Mandiant, one of the preeminent experts in the field,

6   which is why we see them showing up in other cases, and engaged

7   them to serve as independent counsel to the outside legal

8   counsel.

9           THE COURT:  Well, let me ask just a couple questions

10   on that point.  When was Mandiant first informed of this data

11   breach?

12           MR. ANGLE:  I don't know when they were first

13   informed of it, and you may be going to the fact that, as you

14   raised with plaintiff's counsel, that there was a prior

15   relationship between Mandiant and Capital One.  There

16   absolutely was.  They had a contract.  There's no dispute about

17   that.

18           What is distinguishing, though, between this and

19   *Dominion Dental* and the *Premera* case is that Capital One did

20   not engage Mandiant to start conducting any sort of

21   investigation or providing any cyber-related services because

22   of the breach before reaching out to legal counsel.  They, they

23   did not execute on the contract they had with them.  Instead,

24   they hired legal counsel, and legal counsel then engaged

25   Mandiant, and --

1          THE COURT:  I'm looking at the e-mail where Mandiant

2     reaches out to Capital One to say, you know, we've got to fly

3     some people in, you know.  Is it okay for us to start

4     onboarding people?  So there are direct communications with

5     Capital One relating to onboarding and getting this kind of

6     work done in late July.

7          MR. ANGLE:  Undoubtedly, things were happening almost

8     simultaneously in many different ways, but what Capital One was

9     very deliberate about was avoiding engaging Mandiant directly

10     to perform those tests.

11          Don't get me wrong, Capital One also performed

12     another -- a number of different investigations and, you know,

13     analyses getting to the root cause of this, and those reports

14     were largely produced in discovery, but this report, the

15     Mandiant report, Capital One allowed Debevoise to engage

16     separately, and that's important.  Any, any legal relationship,

17     if you're brought in to serve as outside counsel in something

18     major like this, you want to have your own expert do their

19     analysis outside of any biases or agendas that, you know,

20     Capital One employees might have here.

21          You need -- you know, you need the straight skinny.

22     You need that sort of analysis so that you can advise properly

23     before on how it needs to respond legally to them, and that's

24     what happened here.

25          And the -- we talked earlier about the engagement

16

1    letter.  What's significant here is there was a totally

2    separate engagement letter between Debevoise and Capital -- and

3    Mandiant that was separate from the Capital One relationship

4    that --

5         THE COURT:  Well, separate but not really.  I mean,

6    you look at that first engagement letter, it is -- the language

7    is the same three areas that they are to be doing their

8    investigation.  It adopts all the meat of the statement of work

9    or the other issues that are in the preexisting agreement

10   between Capital One and Mandiant.

11        So, you know, it is certainly not a separate

12   stand-alone agreement.  It doesn't reference the preexisting

13   agreement with Capital One.

14        MR. ANGLE:  Sure, but -- that's completely true, Your

15   Honor.  There's one critical difference, however, and that is

16   that the Mandiant engagement letter specifically requires that

17   it is at the direction of counsel and all reports from Mandiant

18   will be to counsel, not to Capital One, and that separates it

19   here.

20        I mean, it almost raises -- I mean, it seems to raise

21   form over substance to say that Debevoise would have had to go

22   out and find some other expert and engage them.  If they had

23   retained Verizon, which was the investigator in the *Target*

24   case, would we be having this conversation?  Probably not at

25   all.

17

1          And it's merely because of that prior relationship

2     that Mandiant had with Capital One that we're even having this

3     discussion, and Capital One and Debevoise did what they could

4     to create that separation, and Mandiant reported to Debevoise.

5     That's what they were engaged to do, the experts to their

6     outside counsel.

7          I think that's pretty clear, really separate, much

8     like the *Experian* case.  Experian, Mandiant also had a prior

9     relationship with Experian, but when the court was analyzing

10    it, it made clear Experian learning of the data breach reached

11    out to Jones Day, hired Jones Day.  Jones Day turned around and

12    hired Mandiant.  And that was sufficiently distinctive to break

13    that continuation.

14         This is not a situation like Delta -- *Dominion Delta*

15    or *Premera*, where an ongoing investigation is occurring, and

16    after the fact, Capital One sort of inserted Debevoise and

17    said, okay, now Debevoise is involved, and now we're going to

18    call it work product.  There was nothing that was happening

19    from an investigatory perspective prior to Debevoise getting

20    involved.

21         And that's why also the form of the report would not

22    be the same but for the litigation, because it would be

23    prepared for outside counsel for very specific purposes.

24         THE COURT:  Well, it was being provided -- it was

25    being prepared for them to educate them on the technical issues

18

1    and the steps that needed to be taken to remediate it, and

2    obviously, you know, the -- there are a number of references of

3    Capital One understanding what was done, the recommendation in

4    the Mandiant report.

5         And this, you know, this is a very significant issue,

6    and I think Judge Payne's decision in the, the *RLI Insurance*

7    *Company* case -- insurance case is a significant one, one that,

8    you know, I read pretty closely, and it's whether Capital One

9    would not have had Mandiant perform the investigation and

10   provide a report like this.

11        And if you look at Blevins's declaration, in, you

12   know, paragraph, I think it's 5 of his declaration talks about

13   one purpose of the MSA and the associated statements of work

14   was to ensure that Capital One could quickly respond to a

15   cybersecurity incident should one occur.  As a financial

16   institution that stores financial and other sensitive

17   information, it is critical that Capital One be positioned to

18   immediately respond to any potential compromise of the security

19   of its systems.

20        That rings of a business purpose, and, you know,

21   we've got -- we are a financial institution.  We have certain

22   regulations, requirements.  We have to be prepared for business

23   reasons to jump on this when an issue happens.  That's why we

24   had Mandiant on board to do these three things, and they

25   outline what the three things are.  An unfortunate event

1    happens, and Mandiant comes in and does those three things.

2            I'm struggling with the idea of why Mandiant wouldn't

3    have been doing this work to make this analysis even if in the

4    idea that there wasn't litigation, and I fully gather -- I

5    understand the point that when this happened, everybody knew

6    that there was going to be a litigation once this became

7    public.  I don't think there's much dispute about that.

8            But the question that I'm struggling with is whether

9    Mandiant would have really done this work even if litigation

10   wasn't known to be on the horizon, because Capital One, as

11   Mr. Blevins has said, we've got, you know, we have these

12   obligations.  We have these responsibilities.  We've got to do

13   this, and that's why we have Mandiant on call to do it.

14           MR. ANGLE:  Okay, Your Honor.  Well, I agree with

15   you, Capital One does have an obligation to be prepared for

16   such incidences, and it hired Mandiant to be prepared to

17   respond, and there may be a, a situation where there is an

18   intrusion that doesn't result in exfiltration of personal data,

19   and so there's no reason to expect litigation, and there's a

20   need to address it but it's not the same level of where we are

21   today.  Mandiant probably would have been right on the spot and

22   done the work.

23           This breach, however, was of a much more serious

24   breach.  We knew that there was exfiltration of personal data,

25   and so our -- Capital One's first step was to engage legal

20

1    counsel, and their first step was to hire outside experts to

2    help them understand what happened.

3         The fact that they chose Mandiant is a coincidence --

4    not a coincidence literally, but they were on, on -- they

5    engaged Mandiant separately to perform the work for them.  We

6    essentially washed our hands of it, not literally but, you

7    know, here's an expert.  You use them.  They will report

8    directly to you and give you the straight scoop on what

9    happened here.

10        If, if Debevoise had chosen Verizon, like I said, to

11   do this service, I guess we wouldn't be having this

12   conversation, but I'm not sure how else Capital One could

13   take the -- could break the link with Mandiant if it didn't use

14   them to actually perform the services of a contract in this

15   case, instead gave it legal counsel for them to use it, and

16   then Capital One conducted its own investigation as well, as I

17   mentioned, which would be part of discovery.

18             THE COURT:  Okay.  Let's talk about a little bit the

19   waiver argument now.

20             MR. ANGLE:  Certainly.

21             THE COURT:  There are two questions, maybe three, I

22   guess, that I need to make sure I understand.  I take it from

23   your discovery responses that the Mandiant report has not been

24   turned over or given to the U.S. Attorney's Office in

25   Washington.

1          MR. ANGLE:  That's correct, Your Honor.

2          THE COURT:  So it hasn't been part of the criminal

3   investigation of Paige Thompson.

4          MR. ANGLE:  No, Your Honor.

5          THE COURT:  What about portions of the Mandiant

6   report?  There's some, I guess, concern that when you talk

7   about these people got the Mandiant report, whether other

8   people may have gotten sections or portions of the Mandiant

9   report.  What's, what's your response to that?

10         MR. ANGLE:  Your Honor, once Capital One -- once

11  Debevoise got the Mandiant report, it shared it, of course,

12  with in-house counsel to serve the legal purpose for which it

13  was intended, and at that point, they recognized the

14  sensitivity around this report and so charged a senior Capital

15  One in-house counsel with basically providing access and

16  tracking access of this report, which is how we know who got

17  it, and we know that there were, I think its 32 non-in-house

18  counsel in Capital One who got it, 4 regulators, and an

19  auditor.

20         I -- my understanding, like, for example, the

21  auditor, they only got access to parts of the report, just

22  enough that they could confirm that none of the financial

23  systems of Capital One had been affected in a way that could

24  upset the financial results of the company, and so I didn't --

25  (inaudible) with my assumption is that the in-house counsel who

1  was recording who got access was recording partial access as

2  well.

3          That's a question I can follow up on.  I don't -- I

4  just can't promise that nobody else got even a portion, but the

5  purpose was to track very closely who got access to any of it.

6          THE COURT:  Well, you know, 32 is, is the number that

7  one can argue is small or large.  It only takes one.  So, I

8  mean, the idea that, you know, if there was one disclosure, you

9  could constitute waiver at that point.  So I'm not -- I don't

10  get a lot of comfort in that, you know, 32 people got it and,

11  you know, that that shouldn't be looked at as okay.  There can

12  be a waiver with one disclosure.

13          MR. ANGLE:  Well, Your --

14          THE COURT:  I understand, you know, where we are on

15  who got it, why they got it, what, what understanding it was

16  when it was provided to them as far as sensitivity goes and not

17  expanding it any further.

18          MR. ANGLE:  Well -- are you done?  Sorry.

19          THE COURT:  Thank you.

20          MR. ANGLE:  Your Honor, in the attorney -- you know,

21  work product privilege is different than attorney-client

22  privilege, as I know you know well, and so waiver is not like

23  if you just disclose it to a single person.  The test is

24  there's a filing of voluntary disclosure that would be

25  inconsistent with the maintenance of secrecy from the

1   disclosing party's adversary.

2          Clearly, the disclosure here was inconsistent with --

3   or was consistent with maintaining the secrecy from the party's

4   adversary.  It was disclosed in-house very limitedly.

5          Of the 32 people that we're talking about in Capital

6   One, most of the -- well, let me think -- all of them are

7   either high-level executives or, you know, business leaders

8   with a significant need to have access to this information.  So

9   it was, it was not disclosed broadly.  I think the entire cyber

10  organization was 600-plus people.  I think it was disclosed to,

11  you know, a handful of those, you know, and, of course,

12  executives above that.

13         In terms of the regulators, if the federal regulators

14  request access to the report, they need to be given the report.

15  And the Financial Services and Regulatory Relief Act of 2006,

16  which we pled in our papers, provides that that does not result

17  in a waiver.  And as we know from other context, our

18  communications with our regulators are privileged, and that

19  privilege belongs to the regulator.

20         But -- so to the extent that that was communicated

21  with the regulators, that was not inconsistent with the

22  maintenance of secrecy from the disclosing party's adversary.

23         And then finally, our auditor, again, auditors often

24  require significant documents that they'll send it to.  *The*

25  *Deloitte* case that's cited in our papers points out very

1   clearly that is not an adversarial relationship in any manner

2   and does not result in a waiver.  So that the disclosure here

3   was very strictly limited and certainly to prevent it from, you

4   know, being disclosed in any way to our -- to the plaintiffs,

5   consistent with maintaining its, you know, its protection.

6           THE COURT:  What about the substantial need for the

7   information report?

8           MR. ANGLE:  Your Honor, that's, I think, the easiest

9   question.  The plaintiffs have come forward with really nothing

10  to show a substantial need here.

11          As you've pointed out, they have made requests that

12  will -- are going to give them all of the information they

13  seek, both from a document production perspective, they're

14  going to be given tens of thousands if not hundreds of

15  thousands of documents directed at this very event, which is

16  really a relatively discrete event, something that occurred

17  over a period of three months.  So we're not talking, you

18  know -- it's a lot of documents were directed at one little

19  thing.  They've got 30(b)(6) deposition topics directed at this

20  very issue.

21          In addition, I know they're going to get documents

22  such as Exhibit 5 to our papers, which are the eight-page,

23  single-spaced discussion of the timeline and identification of

24  certain technical problems with it.  They're going to get the

25  dossier of material that was provided to the FBI.  They're

1  going to get documents related to the investigation performed

2  by the chief information security officer, the CISO, Michael

3  Johnson, right after the event occurred.

4         The plaintiffs are going to get tens of thousands of

5  documents directly related to this.  If at the end --

6         THE COURT:  When are they going to get these

7  documents?  I mean, the idea that they haven't gotten them

8  already is a little concerning.  I mean, these are very

9  significant documents.  You know, when I, when I talk about a

10 rolling production, it wasn't, you know, a we're going to give

11 dribs and drabs, and then we're going to give a lot of things

12 at the end.

13        Why haven't they gotten these documents yet?

14        MR. ANGLE:  Your Honor, we are working as quickly as

15 we can, as Mr. Balser discussed in the hearing the other day,

16 and I can't tell you when these specific documents will get

17 out.  I do understand your frustration and the need to get them

18 out quickly, and I will, I will do what I can to push the

19 troops along and front-load these.

20        THE COURT:  All right.  What about -- let me hear

21 your response to anything other than the report itself really

22 is premature for having a decision made today.

23        MR. ANGLE:  You're absolutely right, Your Honor.  I

24 don't know how we can get to it.  I mean, this -- the

25 privileged issue is a fact-based determination on a

1    document-by-document basis, and we haven't had any identified

2    to even start talking about.  So we're several steps premature.

3            Once the, the Court rules on the Mandiant report, I

4    think that will inform how the parties will react to the

5    subsequent documents.  And then, of course, pursuant to local

6    rules, we'll need a meet and confer.  My guess is based on your

7    ruling with respect to the Mandiant report, we will reach

8    agreement on most of those, and if we can't, we will be back in

9    front of Your Honor to resolve the specific disputes as to any

10   given documents.

11           THE COURT:  Okay.

12           MR. ANGLE:  Thank you, Your Honor.

13           THE COURT:  Thank you, Mr. Angle.

14           Ms. Dent, what would you like to add before --

15           MS. DENT:  I think just a couple final points, Your

16   Honor.  First, the *National Union*'s "because of" test asks

17   what's the driving force behind the creation of the document

18   and then whether the document would have been prepared in

19   substantially the same form irrespective of litigation, and

20   they cannot meet the second factor here.

21           The Mandiant report is a highly technical report.  It

22   was previously contracted for, and they have shown nothing that

23   the form changed due to this litigation other than that the

24   report was handed to Debevoise first rather than Capital One,

25   and I think that that's a critical point, Your Honor, that puts

1    this directly in line with, for example, *Dominion*.

2            And, you know, for example, I think *Experian* is very

3    different because in *Experian*, we didn't have a pre-breach

4    statement of work contracting for breach response.  And

5    *Experian* shows, you know, Debevoise could have hired another

6    vendor, such as Verizon, CrowdStrike, PwC -- well, it hired PwC

7    for a different issue, but they could have hired a different

8    vendor, and they could have allowed Mandiant to conduct the

9    investigation they were contracted for, as opposed to inserting

10   themselves in order to try to seek the Mandiant recommendation

11   undercover.

12           THE COURT:  Experian has the same business reasons.

13   They're also subject to regulations and other things.  So, I

14   mean, they would have had a significant business reason to have

15   this -- their breach investigated, corrected, and an analysis

16   done of it.

17           So, I mean, the idea that, you know, there wasn't

18   this preexisting situation, I'm not so sure how I understand

19   that makes that big of a difference in this situation.

20   Obviously, it falls into the Delta Dental -- the --

21           MS. DENT:  *Dominion*.

22           THE COURT:  -- *Dominion Dental* case a little bit just

23   because of the same facts and everything, but the situation is

24   wouldn't this report have been prepared no matter what?

25           And in *Experian*, I think the answer probably is, you

1   know, to some extent, a report similar to that, Experian is a

2   big company, big data breach, big issues, a lot of publicity,

3   probably Congressional investigations coming down the line, a

4   number of different reasons for business purposes that they

5   would have had that report done, but the court there found that

6   it was work product, right?

7        MS. DENT:  Right, but if you look at the facts in

8   *Experian*, there wasn't -- their preexisting relationship with

9   Experian which had been, I think, there before would not

10  provide incident response in a report.  There wasn't the same

11  factor here, where, where Experian had Verizon on retainer to

12  provide the very report that's at issue.

13       I mean, here we've got a statement of work that

14  details that there will be a final technical report before

15  litigation was ever anticipated, and that's what Mandiant comes

16  in and produces, the exact same thing.  And so I, I think, you

17  know, there, there isn't any evidence here that the report

18  would have been prepared in a different format on the basis of

19  litigation.

20       And then also, a couple of -- just one or two other

21  points, Your Honor.  With respect to, to the waiver, the fact

22  that it was shared so widely within the company with the

23  regulators, with the auditor, that it was consulted with SOC

24  compliance for SEC filings, it shows that the Mandiant report

25  there was used for a range of non-litigation purposes, which is

1  one of the other factors considered in the *Dominion* decision,

2  and goes to the driving force element of the "because of" test,

3  that Mandiant's investigation was needed for business purposes,

4  and the driving force behind it was for business purposes, and

5  they used the report for business purposes.

6        THE COURT:  All right.  Mr. Angle, let me ask you one

7  follow-up question just a little bit based on what Ms. Dent

8  said that I neglected to ask before.  If the Mandiant report

9  really was for litigation purposes only and you had these other

10  numerous investigations going forward that were to be the basis

11  of Capital One making its other decisions, why was the Mandiant

12  report used in any other respect for the auditor's information

13  if, you know, Capital One was doing their own independent

14  analysis and investigation or for other reporting requirements?

15        Why, why was there any sense that we could call up

16  Mandiant, get Mandiant's information, we should do this, you

17  know, let's check with Mandiant before we do something?

18        MR. ANGLE:  Certainly, Your Honor.  The answer to

19  that is because -- well, first of all, the Mandiant report was

20  provided, you know, provided to Debevoise.  Debevoise used it

21  for its legal purpose with in-house counsel, and then it was

22  disclosed also to others for potentially business purposes, as

23  Ms. Dent (inaudible).

24        Here, the reason that other companies are looking for

25  that report is because, frankly, Mandiant is the best or one of

30

1    the best, and so once a regulator heard that there was a

2    Mandiant report, they were going to ask for it.  It's an

3    independent analysis, not one of -- an in-house analysis done

4    by Capital One.

5           So it got -- to the extent it was requested, it was

6    provided because we had an obligation to, but, you know,

7    because it was Mandiant, it was of a different type, but that

8    was not why it was prepared.

9           THE COURT:  But in -- you -- your own internal people

10   were asking for it for Sarbanes-Oxley compliance and other

11   things, as opposed to turning to their own investigation that

12   you say was significant and, you know, complete.

13          So why, why would Capital One employees be seeking

14   the Mandiant report or the conclusions of -- and even the

15   auditor to some extent -- if this was going to be a, you know,

16   stand-alone, not for any business purposes, or not primarily

17   for business purposes?  Why, why would these other

18   individuals -- and I understand the regulators, if they hear

19   you, you know, you have an independent report, whether they

20   should know that you did or didn't is another issue, but, you

21   know, giving it to them is one thing, but looking internally,

22   asking for this information, getting that information, and then

23   using that information, isn't that really business related?

24          MR. ANGLE:  Your Honor, it is business related, but

25   that does not defeat the privilege, the work product privilege

1    that arises from its actual purpose, which is a litigation

2    purpose.

3         And I think the internal people, just like the

4    external people, recognized the name Mandiant and asked to have

5    access to that report for that reason, but that's not why it

6    was prepared in the first place.  It was prepared for

7    litigation purpose.  It served that litigation purpose with

8    Debevoise and Capital One's in-house counsel (inaudible).  It

9    was a very select few (inaudible).

10        THE COURT:  Okay.  Well, Ms. Dent, I'll give you the

11   last second if you need a second or two just because I, I know

12   it's your motion.

13        MS. DENT:  I guess, Your Honor, we would just say

14   that, you know, this was previously contracted for, as I

15   previously said, in that they paid it out of the retainer which

16   they had already paid, and then they distributed it widely --

17        THE COURT:  I'm pretty sure that (inaudible) talked a

18   lot more than a hundred thousand dollars (inaudible), so it, it

19   may have taken -- and I know that they repositioned money and

20   things like that, but I suspect that hundred thousand dollars

21   was burned up pretty quickly.

22        All right.  Well, I mean, this is an issue that I

23   think I have to write a decision on, not one I can rule from

24   the bench on, say for the reasons stated from the bench.  So

25   I'm going to work and try and get this out as soon as I can,

32

1    hopefully at some point next week if things go as planned.

2    Okay?

3              MR. ANGLE:  Thank you, Your Honor.

4              A VOICE:  Thank you, Your Honor.

5              MS. DENT:  Thank you, Your Honor.

6              MR. ANGLE:  Have a good weekend.

7              THE COURT:  You too.  Thank you.

8              A VOICE:  Bye-bye.

9              THE COURT:  Bye-bye.

10                       (Which were all the proceedings

11                        had at this time.)

12

13                    CERTIFICATE OF THE TRANSCRIBER

14        I certify that the foregoing is a correct transcript from

15    the official electronic sound recording of the proceedings in

16    the above-entitled matter.

17

18                              _____
                                          /s/
19                                Anneliese J. Thomson

20

21

22

23

24

25