IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| IN RE: CAPITAL ONE CONSUMER DATA SECURITY BREACH LITIGATION | ) ) ) | MDL No. 1:19md2915 (AJT/JFA) |
| This Document Relates ONLY to the following Case: | ) ) ) ) | |
| | ) | Case No. 1:19-cv-1454 (AJT/JFA) |
| ANDREW BRODERICK, JACQUELINE BURKE, SUSAN CORLEY, LYNN FIELDS, KIMBERLY HERNANDEZ, KRISTINA MENTONE, MARK MILLER, MORDECHAI NEMES, RYAN OLSEN, DEBRA POTZGO, SHAWN SPEARS, JANETT STOUT, COLE STUDEBAKER, JONATHAN WONG, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -against | ) ) | |
| CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE BANK (USA) N.A., AMAZON.COM, INC., AND AMAZON WEB SERVICES, INC. | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

In this civil case, brought under the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. §§ 1961-68, Plaintiffs' Class Action Complaint [Doc. 84-1][1] ("Complaint" or

"Compl.") alleges that Capital One Financial Corporation and Capital One Bank (USA) N.A.

("Capital One") and Amazon.com, Inc. and Amazon Web Services, Inc. ( "Amazon")

---

[1] This action, filed directly in this Court, is part of the nationwide multi-district litigation consolidated before this Court.  Unless indicated otherwise, all docket references are to master MDL case (1:19md2915).

(collectively, the "Defendants") participated in a civil RICO enterprise that inflicted on Capital One customers a cognizable RICO injury in the form of higher credit card interest rates and lower-than-bargained-for benefits and rewards. Currently pending before the Court are the Motions to Dismiss separately filed by Capital One and Amazon [Docs. 392, 393] (the "Motions"), in which Defendants contend that the Plaintiffs have failed to state a claim upon which relief may be granted under either 18 U.S.C. § 1962(c) or § 1962(d).

For the reasons discussed below, the Plaintiffs have failed to adequately allege RICO standing or the existence of a RICO enterprise. The Motions are therefore **GRANTED**, and this action is **DISMISSED**.[2]

## I. BACKGROUND

The following facts, taken from the Complaint, are assumed true for purposes of this Order. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007).

In 2015, Capital One, a financial services company, announced that it would migrate all of its data and applications onto the Amazon Web Services ("AWS") cloud. Compl. ¶ 13. To do so, Capital One transferred customer data from its own data centers and into Amazon's AWS cloud. By doing so, Capital One's objective was, first, to reduce the number of data centers it operates and the cost associated with those data centers, and, second, to "leverage [its] data using the machine learning tools and computation power that AWS provided." *Id*. ¶¶ 178, 211-14.

---

[2] The Complaint initially asserted claims for (1) fraud by misrepresentation, (2) fraud by concealment, (3) unjust enrichment, and (4) violations of various state consumer protection statutes. *See* Compl. ¶¶ 325-424. Following the filing of the Corrected Representative Consumer Class Act Complaint [Doc. 354], and in their response to the Motions, Plaintiffs abandoned all claims except their RICO claims and all theories of RICO injury except for the overpayment of interest, fees, and other charges and the reduced level of credit card rewards. As a result, Plaintiffs have effectively eliminated from its purported class those Plaintiffs who applied for, but did not receive, a Capital One credit card. *See* Compl. ¶¶ 45, 47, 53, 55. Therefore, Counts 3, 4, 5, 6, 7, 8, 9, and 10 of the Complaint are dismissed.

Well known in this regard, however, were the AWS cloud's vulnerabilities to unauthorized access, also known as a Server Side Request Forgery ("SSRF") attack, which Amazon had refused to fix despite being the subject at major security conferences throughout the world. *Id.* ¶¶ 136-39, 143-52.  According to Plaintiffs, Capital One, aware of this issue, nevertheless chose to place and aggregate its most sensitive consumer information on these susceptible servers and behind AWS's flawed firewall. *Id.* ¶¶ 160-77.  To make matter worse, Capital One, through a system called Identity Access Management ("IAM"), permitted broad access through its internal servers to an aggregated "data lake" of information, in which Plaintiffs' personal information was stored. *Id.* ¶ 230.

In light these vulnerabilities, Capital One needed a mechanism to ensure that individuals and systems *outside of* Capital One's internal servers could not query the sensitive information located on the data lake.  Toward that end, Capital One, with Amazon, agreed to build a special, open-source software called Cloud Custodian. *Id.* ¶¶ 152-54, 179.  This jointly-developed software operates as a "rules engine," permitting Capital One to set specific policies within AWS that would apply in real-time to the various servers that accessed the data lake. *Id.* ¶ 189.  Importantly, this software would, among other things, automatically scan Capital One's internal systems to ensure that all of the servers and permissions were set according to defined policies. *Id.*  This Cloud Custodian software, however, did not adequately protect against hackers obtaining unfettered access to historical customer information through their manipulation of the IAM. *Id.* ¶¶ 211-222.  In fact, the Cloud Custodian was "a sham designed to convince credit card users that their information was safe on the AWS cloud." *Id.* ¶ 253.

Plaintiffs' core allegation is that Capital One stored fifteen years of its customer information in a centralized location that was broadly accessible by the applications Capital One

developed, *Id.* ¶¶ 165-67, 230; and that despite knowing of Cloud Custodian's vulnerabilities, Capital One and Amazon jointly misrepresented to the public the level of security provided by Cloud Custodian, including on a jointly maintained website hosted on Amazon's domain, in promotional videos and podcasts, and on the stage of Amazon's re:Invent developers conference, claiming that Cloud Custodian had adequately dealt with the risks posed by AWS's vulnerabilities and the misconfigured IAM roles. *Id.* ¶¶ 180-210.  These security related statements generally fall into three categories and together serve as the alleged predicate acts for purposes of imposing RICO liability:[3]

1. statements Capital One made to consumers that describe Capital One's commitment to data security or how Capital One collects and safeguards consumer data (the "Consumer Statements"), Compl. ¶¶ 80, 88-94, 96-97, 240, 254, 274;

2. statements directed to industry or technical audiences concerning Cloud Custodian or the AWS cloud environment (the "Technical Statements"), *id.* ¶¶ 168, 174, 183, 189, 191, 196, 216-17, 264-67; and

3. certain statements made to Capital One shareholders regarding Capital One's information security program and its use of cloud computing (the "Shareholder Statements"), *id.* ¶¶ 95, 177, 220-21.

Specifically, Defendants systematically made false and misleading statements and omissions to Capital One customers and the public about (a) compliance with industry standards, regulations, and industry standards; (b) protection of highly sensitive information, such as social security numbers, by restricting the use of that data to "authorized business purposes"; (c) "experts" who had performed tests on Capital One's systems; (d) the ability of Capital One's

---

[3] The alleged misrepresentations are set forth in **Appendix A**, attached hereto.

AWS environment to manage open access to "large amounts of data" at scale; (e) Capital One and Amazon's implementation of an effective "cloud risk framework" with Cloud Custodian that would enforce access rules and IAM role configurations at scale; (f) Capital One and Amazon's construction of  "guardrails" that ensured that developers rapidly building Capital One's applications would not do "silly things like have their database publicly accessible"; (g) the power of their machine-learning technology in joint promotional materials, while omitting the risks of aggregating massive amounts of historical data needed to train machine-learning and AI models; and (h) Capital One and Amazon's "eliminat[ing] the need to manage hundreds of thousands of scripts and policies" and designing software that would ensure "real-time compliance and cost management at scale.  Compl. ¶¶ 11, 89, 94, 99, 167-68, 191-92, 217, 264.

In those statements directed to, and most likely viewed by, Plaintiffs, found in the privacy policy and notices published by Capital One, Capital One represented that "Capital One supports information privacy protection," *id.* ¶ 88, that Capital One assures applicants that "[w]e're committed to protecting your personal and financial information" and that "[y]our security is a top priority," *id.* ¶ 80, and that Capital One maintains "electronic safeguards," such as passwords and encryption, "to protect consumer information," *id.* ¶¶ 91, 274.  Included in these assurances was a "Technology Guarantee" that Capital One has "buil[t] information security into our systems and networks using internationally recognized security standards, regulations, and industry-based best practices.'" *Id.* ¶¶ 96-97.

Capital One's customers would not have applied for (or maintained) accounts with Capital One had they known the "truth" that "[t]heir sensitive personal data was being pooled in a giant 'data lake' on the world's most notoriously insecure public cloud … while at risk of theft via a well-known, unfixed [SSRF] attack vector." *Id.* ¶¶ 3, 35.  And ultimately, this lack of

information pertaining to the adequacy of the data protection distorted the "price" Plaintiffs paid for the Capital One services they received.  That distorted "price" is reflected in an interest rate on unpaid credit card balances that is higher than what Plaintiffs would have otherwise paid had they known of the vulnerabilities behind Defendants' data security measures and also in the lower-than-bargained for rewards or benefits Plaintiffs received. These "damages" constitute "out-of-pocket" losses, experienced as a result of a broader RICO enterprise Defendants structured around Defendants' false and misleading statements. *See id*. ¶¶ 46, 49-50, 54, 56.

Based on these allegations, Plaintiffs assert claims in violation of 18 U.S.C. § 1962(c) (Count 1) (RICO violation) and § 1962(d) (Count 2) (RICO Conspiracy).  *Id*. ¶¶ 325-356.

## II.    LEGAL STANDARD

A claim should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true" and construing the complaint liberally in favor of the plaintiff, "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief."  Fed. R. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In making that determination, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  However, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face").  For purposes of this analysis, a claim has "facial plausibility when the pleaded factual content allows the court to draw the

6

reasonable inference that the defendant is liable for the misconduct alleged." *Castillo-Gomez v. Convenience Car Care Ctr.*, 2014 U.S. Dist. LEXIS 97354, at *2 (E.D. Va. July 15, 2014).  As such, "[t]he issue in resolving such a motion is not whether the non-movant will ultimately prevail, but whether the non-movant is entitled to offer evidence in support of [its] claims." *Id*.

## III.   ANALYSIS

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  The statute also makes it "unlawful for any person to conspire to violate" § 1962(c).  18 U.S.C. § 1962(d).

In addition to criminal penalties for racketeering activities, *see* 18 U.S.C. § 1963, RICO created a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter . . . ."  18 U.S.C. § 1964(c).  To recover, "a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2015).  A plaintiff must also establish standing by proving "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006) (quoting 18 U.S.C. § 1964(c)).

### A.  RICO Violation

1.   <u>Pattern of Racketeering Activity</u>

To plead a claim under § 1962(c), a plaintiff must adequately allege that Defendants engaged in (1) racketeering activity and (2) a pattern of such activity. "Racketeering activity" is defined as any one of several indictable offenses, including mail fraud and wire fraud.  18 U.S.C. § 1961(1)(B).  And a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity.'" *US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (alteration in original) (quoting 18 U.S.C. § 1961(5)).  To constitute a "pattern," the plaintiff must adequately allege "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity."  *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (explaining what a plaintiff in a RICO case must show to prove a pattern of racketeering activity)).  Predicate acts are related when there exists a "relationship between the predicates," or the predicates carry "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Id.*  And "[t]o constitute or threaten continued [racketeering] activity, racketeering acts may either be close-ended, i.e., a closed period of repeated conduct, or open-ended, i.e., naturally projecting into the future with a threat of repetition."  *Id.*

Because "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice," *International Data Bank v Zepkin*, 812 F.2d 149,154-55 (4th Cir. 1987), courts closely scrutinize RICO liability claims based on a "pattern of racketeering activity" predicated only on mail and wire fraud.  *See, e.g.*, *Kimberlin v. Nat'l Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *13 (D. Md. Mar. 17, 2015).  For that reason, neither a long-

standing fraud nor a fraud with a large impact necessarily involves a RICO pattern of racketeering activity; rather, the fraud must constitute "a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J. Inc.*, 492 U.S. at 242.  For that reason, civil RICO liability is "reserved. . . for 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being[,]'" that is, *not* for "garden-variety fraud claims better prosecuted under state law," but rather for "cases involving a more serious scope of activity." *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684  (4th Cir. 1989)).  Thus, to distinguish between a "garden-variety" fraud and a RICO-qualifying fraud, a court looks to what predicate acts are alleged, the frequency of those acts, the number of victims involved, and whether the predicate acts reflect a threat of continued or ongoing criminal activity.  *Id.* at 238; *see also SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 614-615 (E.D. Va. 2005).  Ultimately, what constitutes a "RICO pattern is . . . a matter of criminal dimension and degree." *Zepkin*, 812 F.2d at 155.

The entirety of Plaintiffs' alleged predicate acts, and the "pattern of racketeering" based on those predicate acts, consist of the indictable offenses of mail and wire fraud.[4]  As such, the alleged scheme in this case has aspects that have caused other courts to conclude that a "pattern of racketeering" does not exist.[5]  In that regard, aspects of the alleged scheme are characteristic

---

[4] To plead the criminal offense of mail or wire fraud, a plaintiff must adequately allege (1) a scheme disclosing intent to defraud; and (2) the use of the mails or interstate wires in furtherance of the scheme. *See Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996).  A "scheme to defraud" exists where a party makes material misrepresentations, fails to disclose material information, or conceals material facts. *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012).  In addition, the mail and wire fraud statutes require a specific intent to defraud. *Gillion*, 704 F.3d at 297. Where mail and wire fraud are asserted as the predicate acts for a civil RICO claim, Plaintiffs must "state with particularity the circumstances constituting fraud" in compliance with Fed. R. Civ. P. 9(b).

[5] There is also a substantial question whether the alleged misrepresentations are in fact actionable misstatements or are simply accurate factual statements or non-actionable opinion, "mere puffery" or unfulfilled promises. *See Cty. of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1039 (N.D. Cal. 2011) (non-quantifiable puffery statements are not actionable under mail fraud statute).  Similarly, there is a substantial issue whether the Complaint

of a "single fraudulent scheme": the fraudulent goal was singular in nature, lacked conduct pervading across multiple industries or services, and directed in substance against the Plaintiffs a single misrepresentation concerning its data security—most notably, a "Technology Guarantee."[6]  Compl. ¶¶ 96-97.  On the other hand, there are aspects of this alleged scheme that have caused courts to find the requisite pattern, including the sheer number of "victims" as well as different classes of victims—*viz*., credit card consumers, shareholders, and commercial customers.  *See, e.g.*, *Brandenburg v. Seidel*, 859 F.2d 1179, 1185-86 (4th Cir. 1988) (a pattern is reflected in a single scheme that was not limited in scope, was directed at the "virtually limitless" investing public, and had no limiting goal).

As in *Brandenburg*, the pattern issue in this case is a "close one," but given the Fourth Circuit's pronouncements in *Brandenburg*, the Court cannot conclude that Plaintiffs' allegations concerning a "pattern of racketeering activity" fail as a matter of law.  As alleged, the predicate acts spanned a period of nearly four years and were directed at millions of potential consumers, as well as others.  As in *Brandenburg*, these predicate acts can be characterized as part of a single scheme, but "it was not a scheme that is easily treated as one limited in scope to the accomplishment of a single discrete objective." *Id*. at 1186.  It had "no limiting goal whose accomplishment would bring the criminal activity it spawned to an end" and it "threatened to

---

has adequately alleged facts from which required specific intent to defraud can be inferred. Given the Complaint's inadequacies in other respects, the Court has assumed, without deciding, that Plaintiffs have alleged facts sufficient to support in sufficient number for a "pattern" the criminal offense of mail and wire fraud.

[6] *See, e.g., Zepkin*, at 154 (no pattern where the scheme involved one allegedly misleading prospectus.); *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (no pattern where the defendants' "single goal" was to fraudulently inflate the value of and then sell their controlling interest in a company); *Al-Abood*, 217 F.3d at 238 (no pattern where fraudulent conduct was "not sufficiently outside the heartland of fraud cases to warrant RICO treatment" even though it involved  three discrete schemes and extended across several years.); *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (no pattern "[g]iven the unity and narrow focus of the scheme," even though existing for years.); *cf. H.J. Inc*., 492 U.S. at 233 (finding RICO pattern where scheme spanned six years and "employed a variety of stratagems including cash payments to commissioners, offers of future employment, meals, parties, and airline, sporting, and entertainment tickets").

continue unabated, driven by the possibility of repeated economic gain, until the defendants were caught." *Id.* "Such a scheme - though 'single'- is arguably of the type whose very scope and persistence poses a special threat to social well-being[.]" *Id.*

For the foregoing reasons, the Court finds that Plaintiffs have, at this stage, plausibly alleged a RICO pattern.

      2.   <u>RICO Standing</u>

The existence of a RICO pattern "does not also establish that its intended victims were injured, nor beyond that, that any injury suffered by them was sufficiently caused by the acts to create RICO liability." *Brandenburg*, 859 F.2d at 1185, 1187 ("This follows because indictable acts of mail or wire fraud may be proven without any proof of detrimental reliance by, hence of injury to, the intended victims") (citing *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 481-82 (5th Cir. 1986)).  The Court must therefore consider whether Plaintiffs have sufficiently alleged RICO standing—that is, a RICO injury and causation.  *Id. at* 1187 (concluding that Plaintiffs' plausibly alleging a RICO pattern based on predicate acts of mail and wire fraud does not, in itself, establish RICO standing, including, in particular, "by reason of" causation).

A party has standing to recover under RICO "by reason of" a violation of § 1962 "to the extent that he has been injured in his business or property by the conduct constituting the violation." *Sedima v. Imrex, Co*., 473 U.S. 479, 496 (1985) (discussing § 1964(c)).  As discussed below, Plaintiffs have failed to allege facts from which it can reasonably inferred that they have suffered a cognizable RICO "injury" or that any injury they allege was "by reason of" the alleged RICO violation.

(a) RICO Injury

A "showing of [RICO] injury requires proof of a concrete financial loss, and not mere injury to a valuable intangible property interest." *In re Avandia Mktg.*, 804 F.3d 633, 638 (3d Cir. 2015) (internal quotation omitted).  This requirement "can be satisfied by allegations and proof of actual monetary loss, *i.e.*, an out-of-pocket loss." *Id.*  However, "[i]njury to mere expectancy interests or to an 'intangible property interest'" is not concrete enough to constitute a loss to business or property and is therefore not sufficient to confer RICO standing. *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998).[7]  Important in this regard is that a RICO injury requires a level of injury beyond the "injury in fact" sufficient to confer Article III standing. *See DeMauro v. DeMauro*, 115 F.3d 94, 96 (1st Cir. 1997) ("There is plainly a case or controversy under Article III; but the statutory precondition of injury to business or property must also be met.").

Plaintiffs contend that their claimed overpayment of interest rates on unpaid balances and other fees and/or their receipt of lower-than-bargained-for card-based rewards or benefits constitute a cognizable RICO injury.  *See* [Doc. 428] at 21-22 (citing cases).  In short, Plaintiffs allege that they overpaid for an inferior product in light of Capital One's inferior data security. In opposition, Defendants contend that these "out-of-pocket" losses do not constitute a RICO injury since they are "mere expectancy" interests, are unconnected to the core services bargained-for and purchased by Plaintiffs from Capital One (*i.e.*, the extension of credit on

---

[7] This "out-of-pocket" measure of damages (the difference between the price paid and a product's actual worth) contrasts with the "benefit of the bargain" damages (the difference between the value of a product as represented and its actual worth), recoverable in many jurisdictions for common law fraud. *See generally*, Restatement (Second) of Torts, § 549 (Measure of Damages for Fraudulent Misrepresentations) (collecting cases); *see also* 13 A.L.R.3d 875 (Comment Note: "Out of Pocket" or "Benefit of Bargain" as proper rule of damages for fraudulent representations inducing contract for the transfer of property) (discussing these two conflicting rules of damages in fraud actions).

defined contractual terms), and cannot be quantified for the purposes of determining Plaintiffs' "overpayment" for the credit card services actually received.  [Doc. 462] at 13-20.  The Court agrees.

Plaintiffs have failed to adequately allege facts that make plausible that they have suffered the kind of concrete loss required for a cognizable RICO injury.  Rather, the injury they allege is indistinguishable from the kind of injury courts have consistently found insufficient to sustain a RICO claim.  For example, in *Maio v. Aetna*, the Third Circuit confronted in substance the same theory of injury Plaintiffs claim here. There, the Third Circuit considered whether a plaintiff had suffered a cognizable injury based on defendants' alleged fraudulent advertising about the quality and features of an HMO plan and the difference in value between the "health care product" Aetna represented it would provide and the product Aetna "actually delivered." 221 F.3d 472, 488 (3d Cir. 2000).  In rejecting that theory, the Third Circuit explained that such a theory of RICO injury failed "as a matter of simple logic" since the plaintiffs could not show "that they actually received something 'inferior' and 'worth less' absent individualized allegations concerning the quantity and quality of health care benefits Aetna provided under its HMO plan."  *Id*. at 492-93.  For this reason, a RICO plaintiff's alleged overpayment cannot establish a RICO injury "absent proof of some level of inferior treatment under [the core service bargained-for]."  *Id*. at 493.  *See also Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc) ("[A] showing of 'injury' requires proof of concrete financial loss, and not mere 'injury to a valuable intangible property interest.'") (citation omitted)); *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1235 (D. Colo. 2010) ("Where the value of property sold is not as high as represented, but is at least what the Plaintiff paid for it, they have not lost money on the property and therefore have not suffered an injury to business or property sufficient to sue

under RICO."); *Line v. Astro Mfg. Co.*, 993 F. Supp. 1033, 1037 (E.D. Ky. 1998) (finding no RICO injury where plaintiff "did not suffer any injury to business or property because he paid no more than fair market value for a manufactured home without a sprinkler system [that had been represented].") (citing *Heinold v. Perlstein*, 651 F. Supp. 1410 (E.D. Pa. 1987)).

Like the Plaintiffs in *Maio* with respect to the healthcare they received, the Plaintiffs here have failed to allege facts that make plausible that Defendants' alleged misrepresentations actually affected the value of the credit card services Plaintiffs actually received or contracted for. For example, Plaintiffs cannot point to anything in their Cardholder Agreements that suggest in any way that the charged fees or interest was in exchange for, or in any way related to, data security. *See* [Doc. 395-4] at 3 (cardholder agreement dealing with "interest charges" and "fees"). Such facts "are necessary to provide the factual basis for [plaintiff's] otherwise conclusory allegation that they have been injured in their 'property' because they overpaid for [an] inferior . . . product. *Maio*, 221 F.3d at 494 (citing *Briehl v. General Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999)). Plaintiffs declare that they paid a higher interest rate on unpaid balances because of the Defendants' misrepresentations, but there are no non-conclusory allegations that the line of credit Plaintiffs received (and the contractual terms under which they received that credit) was less favorable than what they would have received absent the alleged misrepresentations. *See also In re Bridgestone/Firestone Inc.*, 155 F. Supp. 2d 1069, 1092 (S.D. Ind. 2001) ("Like the HMO enrollees in *Maio* who alleged they had overpaid for an inferior product, Plaintiffs here have not suffered cognizable RICO injury by virtue of their purchases of the Tires or Explorers, absent particularized allegations of the inferior performance of those products. The actual failure of the Tires or Explorers, like the failure of the HMO plans to

provide the quality care advertised, is a contingency upon which Plaintiffs' economic damages are dependent.").

The lack of a RICO injury in this case is underscored by a comparison to those injuries that courts *have* found to be a sufficient RICO injury to "business or property," specifically the payment of some specific, quantifiable premium above the amount they would have paid had they known of the true value of services. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods Liab. Litig.*, 349 F. Supp. 3d 881, 904 (N.D. Cal. 2018) (a premium for a vehicle with low emission and paid inflated financing fees for the class vehicles); *Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 580 (D. Md. 2014) (a payment in excess of the actual market value for a misrepresented former rental vehicle); *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013) ("marked-up and unnecessary fees" charged by banks on top of the regular mortgage payments); *Stitt v. Citibank*, N.A., 942 F. Supp. 2d 944, 954 (N.D. Cal. 2013) ("overcharged" marked-up fees for mortgage loan servicing).  Indeed, this case is practically indistinguishable from a recent decision in *In re Duramax Diesel Litigation,* 298 F. Supp. 3d 1037 (E.D. Mich. 2018).

In *In re Duramax Diesel Litigation*, plaintiffs alleged that they had overpaid for GM vehicles that included Duramax diesel engines based on GM's representations that cars with Duramax engines were more environmentally-friendly than cars without.  298 F. Supp. 3d.at 1049-50.  The district court recognized that plaintiff had asserted a cognizable RICO injury based on its allegation that it had paid a discernable premium ($9,000) for a Duramax vehicle over the cost of a "comparable gas car." *Id*.  It rejected, however, plaintiff's claim that it had stated a cognizable RICO injury based on its allegation that "had Plaintiffs and Class members known of the higher emissions at the time they purchased or leased their Polluting Vehicles, they

would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles that they did." *Id*. at 1071.  The district court reasoned that any RICO injury based on that theory was "hopelessly speculative" given that "[c]onsumers weigh many factors in choosing a vehicle." *Id*. at 1049.

As the plaintiffs in *Duramax*, Plaintiffs here allege that had they known the truth regarding Capital One's data security, "they would not have paid interest and fees to Capital One, and they would not have applied for a Capital One credit card." Compl. ¶ 35.  But, in the absence of any discernable premium paid by Plaintiffs for the promised level of security, it is "hopelessly speculative" to claim that the value of the credit cards services received were less than what they would have otherwise been had Defendants correctly represented issues regarding its data security. *See In re Taxable Municipal Bond Sec. Litig.,* 51 F.3d 518, 523 (5th Cir. 1995) (holding that plaintiffs lacked standing under RICO because his damages claim "would have required extensive speculation and would not simply entail a calculation of present, actual damages"); *see also Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989) ("[T]here was no realistic evidence presented as to a reasonable value or estimate of lost profits or of the 'bargain' based on analogy, experience, or practice.").

Plaintiffs argue that their alleged injury is not disqualifyingly speculative because it is plausible that the market forces of supply-and-demand would permit this Court to determine, albeit at a later stage of this litigation, the "premium" in interest rates Plaintiffs paid for their credit card services based on Defendants' misrepresentations regarding Capital One's data security.  But Plaintiffs allege nothing in their Complaint that would hold out hope for identifying through the amorphous matrix of "market forces" the amount of actual, concrete injury Plaintiffs experienced as a result of any alleged misrepresentations concerning data

security, any more than a RICO injury can be derived based on the inscrutable dynamics of consumer choice.  For example, Plaintiffs do not allege that the claimed "premium" can be determined by some established market or market index, or Capital One's own borrowing costs, or even by comparing the amount of interest charged and the benefits awarded before and after the creation of Cloud Custodian and the alleged related misrepresentations.  In sum, Plaintiffs received the services they bargained-for (credit services) and have failed to allege facts that make plausible that they suffered a calculable loss, through some "overpayment" or paid premium for a represented level of data security.

For the above reasons, Plaintiffs have failed to assert any cognizable RICO injury.

(b)  Causation

For similar reasons, Plaintiffs have failed to adequately allege Plaintiffs' alleged injury was caused "by reason of " Defendants' alleged RICO violation.

A defendant who commits an act of racketeering is "not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured."  *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984).  Instead, RICO "by reason of" causation requires proof that the defendant's alleged RICO violation was both the "but for" and the "proximate cause" of the plaintiff's injury. *Holmes v. Sec. Inv'r Prot. Corp. (SIPC)*, 503 U.S. 258, 265-68 (1992).  In other words, a plaintiff must allege facts from which it can be reasonably inferred not only that its injury would not have occurred absent the § 1962 violation (but-for causation), but also that there is a "*direct relation* between the injury asserted and the injurious conduct alleged" (proximate cause or loss causation).  *Holmes*, 503 U.S. at 268 (emphasis added); *see also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 171-72 (2d Cir. 1999) (a plaintiff must allege that misrepresentations both caused

them to invest, *viz.*, "transaction causation," and caused them economic loss, *viz.,* "loss causation"). A "direct relation" means that the injury occurred at the first step in the causal chain. *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010) (rejecting theory of causation that required moving "well beyond the first step"); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask [therefore] is whether the alleged violation led *directly* to the plaintiff's injuries.") (emphasis added).

To show "but-for"/cause-in-fact causation (transaction causation), Plaintiffs must show that they actually relied on the alleged misrepresentations. But the Complaint fails to allege any such reliance, even in a conclusory fashion.[8] And Plaintiffs conclusory allegations that credit card consumers would not have applied for (or maintained) accounts with Capital One had they known the "truth" with respect to handling and security of their personal data does not satisfy that requirement. *See* Compl. ¶¶ 3, 35. In any event, even if Plaintiffs' Complaint sufficiently alleged transaction causation, as in *Brandenburg*, "[s]uch a cause-in-fact-connection, standing alone, does not suffice to establish liability." *Brandenburg*, 859 F.2d at 1189. Rather, "by

---

[8] Plaintiffs contend that reliance in this case is not required based on *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49 (2008). In *Bridge*, the Supreme Court recognized that "by reason of" causation under RICO does not require in all circumstances that a plaintiff personally rely on a defendant's fraudulent statements. *Id.* at 642-44. But the Court made clear its decision was rooted in the fact that *someone* had relied on the fraud that caused the Plaintiffs' injuries (in that case, the county authority that was conducting property auctions). *Id.* at 658. And courts have subsequently required reliance, whether direct or indirect, to sustain a RICO claim. *See Ray*, 836 F.3d at 1350 (assessing whether plaintiffs' allegations sufficiently alleges reliance on the alleged fraudulent conduct); *Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 88 F. Supp. 3d 543, 548 (E.D. Va. 2015); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 524 (D.N.J. 2011) (no proximate cause where plaintiffs only "allege[d] in conclusory fashion that physicians relied on" such misrepresentations); *see also Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317, n.12 (11th Cir. 2007) (dismissing RICO claim where complaint generally alleged reliance "without specifying the content or manner in which the statements misled"). Accordingly, where, as here, Plaintiffs allege a two-party or two-step fraud theory—*i.e.*, Parties A (Capital One and Amazon) misled Party B (Plaintiffs)—reliance by Party B on Parties A's misrepresentations is necessary.

reason of" requires loss causation, which, as discussed above, must be not only a foreseeable but a *direct*, *first-step* consequence of the alleged predicate RICO acts.  *See id*. at 1189.[9]

Plaintiffs have not alleged facts from which it can reasonably be inferred that there exists this direct, first-step connection between the represented level of data security and the interest rates charged or benefits awarded to cardholders.  Instead, Plaintiffs simply declare that Defendants' alleged scheme caused an artificially-inflated interest rate by operation of supply-and-demand.[10]  But even were that somehow true, Plaintiffs fail to allege any facts from which to reasonably infer that such a sustained out-of-pocket injury was "the *direct* result of [Defendants'] claimed fraudulent misrepresentations."[11]  In fact, Plaintiffs' allegations effectively concede that the promised level of data security is not a factor in setting interest rates and card benefits.  For example, Plaintiffs acknowledge that Capital One engages in an extensive application and

---

[9] In *Brandenburg*, the Fourth Circuit recognized that this element of directness imbues into the loss causation element an enhanced inquiry within the RICO context:

> Civil RICO is of course a statutory tort remedy - simply one with particularly drastic remedies. Causation principles generally applicable to tort liability must be considered applicable. These require not only cause-in-fact, but "legal" or "proximate" cause as well, a latter involving a policy rather than a purely factual determination: "whether the conduct has been so significant and important cause that the defendant should be held responsible."

859 F.2d at 1189 (internal citations omitted); *see also Holmes,* 503 U.S. at 269-70 (explaining that the direct-injury rule that supports RICO causation is based on three policy considerations: first, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors;" second, if plaintiffs are "removed at different levels of injury from the violative acts," courts would be forced to "adopt complicated rules apportioning damages . . . to obviate the risk of multiple recoveries;" and third, the directly-injured victims of a racketeering scheme, where they exist, "can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely").

[10] *See* [Doc. 607] (May 27 Transcript) ("Tr.") at 169:18-23 ([Plaintiffs' counsel]: "If the omitted information of the fraudulent scheme was disclosed, the price at which a willing buyer and a willing seller would have entered into an interest deal would have been lower because demand would have been lower. Either the price would have been lower, or they wouldn't have sold it.").

[11] *See* Tr. at 166:2-7; 167:8-10 ("The Court: But is there any evidence that you allege that the actual factors used to set someone's interest rate included the representations they were making as to the data security that you claim were fraudulent?  [Plaintiffs' counsel]: Well, no Your Honor . . . It's a two-sided transaction . . . apart from the materiality [of the statements and omissions], we have no other way of alleging that without proof."). Similarly, Plaintiffs have failed to allege facts that would make plausible that somehow the level of credit card rewards are tied to and traceable from representations concerning data security.

underwriting process in support of its pricing to "(1) gauge risk; (2) set limits, fees, and interest; and (3) determine the type and overall level of rewards to both attract cardholders and incentivize maximum card use[,]" Compl. ¶ 7, and for that purpose considers multiple factors such as an applicant's credit report, employment, income, living expenses, and "spending habits" in calibrating interest rates and rewards. *Id.* ¶¶ 64, 66-67, 215.  As Plaintiffs have also summarized, "Capital One issues credit cards and extends credit to its customers by calculating the risk of extending credit," and as such is able "to precisely quantify the amount of interest it should charge a customer given their individual risk of default."  [Doc. 428] at 8-9 (citing Compl. ¶¶ 61, 68, 74).  Noticeably absent is any alleged connection between the interest rates and benefits received, which are derived from risk of default attributed to an individual*,* and data security, a factor that is extrinsic to individual customers.  And even if one could discern from the facts alleged some association between the promised level of data security and credit card interest rates and benefits, that relationship is simply too attenuated and indirect to satisfy the *directness* element of the demanding "by reason of" causation requirement.  *See Slay's Restoration LLC v. Wright*, 884 F.3d 489, 494 (4th Cir. 2018) (rejecting RICO causation after emphasizing that "a court facing a RICO claim should not focus on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was "the intended consequence[] of [that] behavior," but rather on "the directness of the relationship between the conduct and the harm.") (emphasis in original); *see also First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 772 (2d Cir. 1994) (finding lack of connection between misrepresentations about a loan and a loss associated with that loan where the "alleged injury was insufficiently close in time to the alleged misrepresentations" and the injury could have been caused by several other factors).  Stated simply, Plaintiffs' allegations do not account for the

myriad of intervening and independent factors that possibly could, and likely would, impact the interest rate Capital One charges or benefits and rewards it provides.

This lack of causation is underscored by the Fourth Circuit's analysis in *Brandenburg*.  In *Brandenburg*, depositors in the insolvent First Maryland Savings and Loan Association ("First Maryland") pursued civil RICO claims against the former officers of a savings and loan association, the Maryland Savings-Share Insurance Corporation ("MSSIC"), and the MSSIC's affiliates alleging, *inter alia*, that these defendants made a series of fraudulent misrepresentations about the security of deposits at First Maryland and other MSSIC-insured savings and loans in order to induce the public to deposit money in those institutions.  859 F.2d at 1183.  In support of their theory of RICO causation, plaintiffs alleged that the defendants' misrepresentations "induced them to deposit money in First Maryland" and "caused a huge influx of deposits into MSSIC's member institutions, stretching MSSIC's insurance commitments far beyond their limits and resulting in MSSIC's inability to meet its insurance obligations to the plaintiffs when the run [on First Maryland Bank] occurred."  *Id.* at 1188.  The Fourth Circuit concluded, however, that, at most, plaintiffs had only alleged a "cause-in-fact connection between any fraudulent misrepresentations made by the [] defendants and plaintiffs' later loss of interest income on their First Maryland deposits[]" and that the "alleged misrepresentations charged to the defendants were not so significant and important a cause of the plaintiffs' loss of income on their deposits and accounts" to satisfy RICO's "by reason of causation."  *Id.* at 1189.  Rather, the Fourth Circuit noted, the "two most immediate causes were the alleged depredations of the insured institution's management, and the MSSIC defendants' negligent or reckless failure to prevent those depredations," neither of which qualified as RICO predicate acts and both of which more directly caused a run on the bank, its financial ruin, and plaintiffs' losses.  *Id.*

Here, as in *Brandenburg*, Plaintiffs' causation theory "rests on an assumption of actual reliance by the named plaintiffs (and the entire class) upon the [D]efendants' advertising [regarding the adequacy of the data security] . . ." and the presumed central importance of that data security to the "price" paid, notwithstanding the more obvious factors relevant to the interest and benefits applicable to Capital One's credit card services. *Id.* at 1190. Indeed, the alleged causal connection in this case is substantially more attenuated than in *Brandenburg*, where the misrepresentations regarding the safety of plaintiffs' deposits had a more direct, but still inadequate, connection to the ultimate loss alleged.

For the above reasons, Plaintiffs have failed to adequately allege that they have standing to bring a RICO claim.

### 3.   RICO Enterprise

Even assuming Plaintiffs have standing to bring suit under RICO, Plaintiffs have failed to allege facts that make plausible that Capital One and Amazon participated in a RICO enterprise.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Such an "enterprise" requires "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (emphasis added) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). It must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. And importantly, a plaintiff must show that the "defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just [their] own [individual] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

22

Here, Plaintiffs allege that Amazon and Capital One associated in a way that formed a RICO enterprise for the "common purpose [of] monetize[ing] the personal information of bank customers."  Compl. ¶ 337.  Plaintiffs allege that Defendants pursued this common purpose by representing to potential customers that the cloud, on which Plaintiffs personal information was stored, was (and is) more secure than it actually was (and is)—specifically, through the "joint development and marketing of the Cloud Custodian system." *Id*. ¶ 184.  But such allegations fail to allege facts from which it can reasonably be inferred that there exists an "enterprise that operates or functions in a way *distinct from* the defendants themselves."  *Myers v. Lee*, No. 1:10-cv-131, 2010 WL 3745632, at *4 (E.D. Va. Sept. 21, 2010).

Courts recognize that an association-in-fact enterprise "need not have a hierarchical structure or a chain of command; [and] decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948.  Nonetheless, the Complaint does not plausibly allege that Defendants joined forces to operate in a way that was distinct from their own individual corporate structures and outside of their regular business operations.  Rather, the only reasonable inference that can be drawn from the Plaintiffs' factual allegations is that the two companies acted to advance their own particular interests while operating within their own established businesses: on the one hand, Capital One sought to migrate its data to the AWS cloud to reduce its costs and to capture the "machine learning tools and computation power that AWS provided" and thereby "glean insights about its current and prospective customers," which was possible through the mass aggregation of individuals' data, *id*. ¶¶ 165, 178; on the other hand, Amazon sought out Capital One as a customer because of the fees that Capital One would pay to it and because attracting a customer as large and established as Capital One might help it market cloud services to other large companies, *id*. ¶ 210.

23

Nor do Plaintiffs' allegations concerning Defendants' joint development and marketing of the Cloud Custodian plausibly reflect a RICO "enterprise" that operated separate and apart form their own corporate structure and interests. And in that regard, the Complaint does not allege facts reflecting a relationship between Capital One and Amazon that went beyond the cooperation and coordination inherent in every type of commercial relationship involved in the type of project involved here.  Rather, the Complaint alleges a relationship between Amazon and Capital One that is indistinguishable from the type of arms-length, inter-corporate relationship that courts have routinely found insufficient to establish a RICO enterprise.  *See, e.g.*, *Gomez v. Guthy-Renker, LLC*, No. 14-cv-1425, 2015 WL 4270042, at *9 (C.D. Cal. July 13, 2015) (no RICO enterprise in supplier-customer relationship because "the entities are actually pursuing their individual economic interests, rather than any shared purpose"); *see also Crichton v. Golden Rule Ins. Co.*, No. 06-cv-264-GPM, 2006 WL 2349961, at *7 (S.D. Ill. Aug. 11, 2006) ("An arms-length business relationship between distinct entities is not sufficient to show operation or management of an enterprise."); *Arzuaga-Collazo v. Oriental Fed. Sav. Bank*, 913 F.2d 5, 6 (1st Cir. 1990) ("Since the complaint does not charge that [defendants] conducted or participated in the conduct of some other, allegedly unlawful, enterprise, the complaint does not state a RICO claim.").

In support of their position, Plaintiffs cite to *Bible v. United Student Aid Funds, Inc*., 799 F.3d 633 (7th Cir. 2015) for the proposition that an "unusual degree of economic interdependence" can convert an otherwise simple supplier-customer relationship into an association-in-fact enterprise; to *Navient Sols., LLC v. Law Offices of Jeffrey Lohman*, No. 1:19-cv-461, 2020 U.S. Dist. LEXIS 65648, 2020 WL 1867939 (E.D. Va. Apr. 14, 2020) to argue that Capital One's and Amazon's "mutual false statements about the security of Cloud Custodian"

are enough to show an enterprise between the two companies; and to *Gibbs v. Haynes Investments, LLC*, 368 F. Supp. 3d 901 (E.D. Va. 2019) in support of their claim that Defendants' joint involvement in developing and marketing Cloud Custodian is sufficient to make plausible the required association-in-fact enterprise, just as the defendants' joint marketing scheme to collect on usurious loans in *Gibbs* was sufficient. [Doc. 428] at 35-36.  But all of these cases are distinguishable.

In *Bible*, the Seventh Circuit held that a relationship went beyond the run-of-the-mill commercial relationship because of the companies did not "operate as completely separate entities in managing" the student loan collection and rehabilitation process at issue in that case. *Bible*, 799 F.3d at 655-56.  In *Naviant,* a group of defendants allegedly devised a scheme to recruit unwitting consumers seeking student debt relief to manufacture fraudulent claims against the student loan provider.  *Navient*, 2020 WL 1867939, at *1-2, 8.  Likewise, in *Gibbs,* an association-in-fact RICO enterprise was found to plausibly exist when several entities, jointly controlled by a single individual, worked together to "market[], initiate[], and collect [on] usurious loans.  368 F. Supp. 3d at 933.

Nothing about the Defendants' alleged relationships or activities or the Cloud Custodian software they jointly developed and marketed suggests an association-in-fact operating outside of their respective, distinct corporate organizations, akin to the relationships and activities in *Bible*, *Naviant*, or *Gibbs*.  There are no alleged facts, as there was in those cases, that would allow the reasonable inference that with respect to Cloud Custodian or otherwise Capital One and Amazon were centrally controlled or did not operate as two completely distinct corporate entities.  In fact, Plaintiffs effectively allege that Capital One simply decided on its own, without any involvement or control by Amazon, to select for its own commercial advantage, as was the

trend among banks in recent years, one of several pre-existing public clouds for the migration of its customer data. *See* Compl. ¶¶ 102, 104, 160-162. *See also United Food & Commer. Worker Unions & Emplrs. Midwest Health Bens. Fund v. Walgreen Co.,* 719 F.3d 849, 854-855 (7th Cir. 2015) (declining to find a RICO enterprise where complaint failed to allege that officials from either company involved themselves in the business affairs of the other and instead, the more plausible inference was that two companies acted together, albeit cooperatively, to advance their own business interests); *Crichton*, 576 F.3d at 399-400 (plaintiff could not show that defendant conducted the affairs of an association-in-fact enterprise by describing a "garden variety" marketing arrangement between defendant and its supposed partner in the enterprise). And while there was joint marketing in certain respects, there are no facts alleged from which it can reasonably be inferred that such marketing was conducted outside of or separate from the regular established management structures of their respective corporate organizations.

For the foregoing reasons, the Complaint fails to allege a RICO enterprise.

## B.  RICO Conspiracy

Plaintiffs have also asserted claims under § 1962(d) for RICO conspiracy.  Compl. ¶¶ 351-56.  To state a cause of action for conspiracy to violate RICO under 18 U.S.C. § 1962(d), a plaintiff must plausibly allege a violation of a substantive RICO offense.  *GE*, 247 F.3d at 551 ("Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim fails as well.").  Thus, a RICO conspiracy "necessarily must fail if the substantive claims are themselves deficient."  *Field v. GMAC LLC*, 660 F. Supp. 2d 679, 688 (E.D. Va. 2008) (internal quotations and citation omitted); *see also Jaguar Cars v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 260 (3d Cir. 1995) ("The viability of a plaintiff's § 1962(d) claim depends on the legal sufficiency of its § 1962(c) claim.").

As discussed above, Plaintiffs have failed to state a claim for relief under § 1962(c). Therefore, as a matter of law, Plaintiffs have also failed to state a claim for conspiracy under 18 U.S.C. § 1962(d).

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

ORDERED that the Defendants' Motions be, and the same hereby are, **GRANTED**; and this action is **DISMISSED**.

The Clerk is directed to forward copies of this Order to all counsel of record.

                                        /s/
                             Anthony J. Trenga
                             United States District Judge

Alexandria, Virginia
July 10 , 2020