# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| IN RE: CAPITAL ONE CONSUMER | ) |  |
| DATA SECURITY BREACH LITIGATION | ) | MDL No. 1:19md2915 (AJT/JFA) |
| _____ | ) |  |

This Document Relates to CONSUMER Cases

_____

## CAPITAL ONE'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
## PRODUCTION OF PRICEWATERHOUSECOOPERS REPORT

**KING & SPALDING LLP**

David L. Balser (*pro hac vice*)
S. Stewart Haskins II (*pro hac vice*)
John C. Toro (*pro hac vice*)
Kevin J. O'Brien (VSB No. 78886)
Robert D. Griest (*pro hac vice*)
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel.: (404) 572-4600
Fax: (404) 572-5140
dbalser@kslaw.com
shaskins@kslaw.com
jtoro@kslaw.com
kobrien@kslaw.com
rgriest@kslaw.com

**TROUTMAN PEPPER
HAMILTON SANDERS LLP**

Robert A. Angle (VSB No. 37691)
Tim St. George (VSB No. 77349)
Jon S. Hubbard (VSB No. 71089)
Harrison Scott Kelly (VSB No. 80546)
1001 Haxall Point
Richmond, VA 23219
Tel.: (804) 697-1200
Fax: (804) 697-1339
robert.angle@troutman.com
timothy.st.george@troutman.com
jon.hubbard@troutman.com
scott.kelly@troutman.com

Mary C. Zinsner (VSB No. 31397)
401 9th Street, NW, Suite 1000
Washington, DC 20004
Tel.: (202) 274-1932
Fax: (202) 274-2994
mary.zinsner@troutman.com

*Counsel for Capital One*

## **INTRODUCTION**

Given the significance of the data breach at the center of this case (the "Cyber Incident")—and the immediate litigation and regulatory attention aimed at Capital One as a result of it—Capital One's General Counsel and Board of Directors (the "Board") retained PricewaterhouseCoopers ("PwC") to provide a comprehensive, independent opinion regarding the root causes of the Cyber Incident (the "Root Cause Analysis" or "RCA").  Capital One retained PwC as a non-testifying expert for two reasons: (1) to aid the Board in discharging its duties to supervise and direct Capital One's legal response to the Cyber Incident and (2) to assist Capital One's counsel in advising the Board in connection with the litigation and regulatory inquiries that followed.  The PwC RCA is thus protected by Federal Rule of Civil Procedure 26(b)(4)(D) and the work product doctrine.

Plaintiffs' contention that Capital One has improperly "attempted to shroud" the RCA is unfounded.  Capital One has provided Plaintiffs with extensive discovery on the Cyber Incident, including its own internally led root cause analysis, its internal post-incident investigation, its remediation plans, and third-party evaluations like the Mandiant Report.  In addition, Capital One has produced tens of thousands of documents that relate to these analyses or reflect other evaluations (*e.g.*, internal audits and risk assessments).  Despite these voluminous productions—and Plaintiffs' receipt of the vast majority of the documents underlying PwC's RCA—Plaintiffs now seek the protected RCA as well.  Plaintiffs' motion should be denied.

*First*, Capital One's Board and General Counsel engaged PwC as a non-testifying expert under Rule 26(b)(4)(D) in order to assist the company in defending against the already-pending litigation and to prepare for anticipated regulatory enforcement activity.  Plaintiffs' primary argument—that the RCA was conducted for "business purposes," not because of litigation—is belied by the record.  And Plaintiffs overlook that a document prepared for litigation may also be used for secondary business purposes—here, to "map" PwC's root cause findings onto Capital

One's remediation plan—without losing its protected status. PwC's work is therefore shielded from disclosure unless Plaintiffs make a "very high" showing of "exceptional circumstances" under Rule 26(b)(4)(D). But Plaintiffs do not even try to make that showing. In fact, they ignore Rule 26(b)(4)(D)—even though Capital One plainly invoked its protections in a meet-and-confer letter dated July 24, 2020.

*Second*, for similar reasons, the PwC RCA is protected by the work product doctrine, and Plaintiffs have made no effort to demonstrate that they have a "substantial need" for the RCA or that they cannot obtain its substantial equivalent without "undue hardship."

*Finally*, Plaintiffs are wrong that Capital One waived protection of the report. The waiver doctrine does not apply to the protections afforded by Rule 26(b)(4)(D). Even if it did, Capital One has waived neither those protections nor those under the work product doctrine.

## FACTUAL BACKGROUND

### A. The Announcement of the Cyber Incident Spurred a Flurry of Litigation and the Need for An Independent Assessment of the Incident's Root Causes.

On July 29, 2019, Capital One announced the Cyber Incident. The very next day, the first putative consumer class action lawsuit arising from it was filed against the company. *See* Dkt. 1, *Baird v. Capital One Fin. Corp.*, No. 1:19-cv-979-LMB-JFA (E.D. Va. filed July 30, 2019). By mid-September, Capital One faced sixty lawsuits. *See In re Capital One Customer Data Sec. Breach Litig.*, 396 F. Supp. 3d 1364, 1364 (J.P.M.L. 2019); Declaration of Matt Cooper ("Cooper Decl.") ¶¶ 3, 7. By October, these lawsuits were consolidated into this multidistrict litigation. The lawsuits filed against Capital One also included shareholder litigation. *See* Dkt. 1, *Minsky v. Capital One Fin. Corp.*, No. 1:19-cv-01472-AJT-JFA (E.D. Va. filed Oct. 2, 2019) (alleging

securities fraud).   In addition, Capital One faced increasing regulatory scrutiny and possible Congressional inquiry.[1]  Cooper Decl. ¶ 7; Declaration of Polly Klane ("Klane Decl.") ¶ 4.

Upon confirming the Cyber Incident had occurred, Capital One immediately initiated several investigations into the Incident and its causes, conducted both internally and by third parties retained by the company.  *See* Dkt. 416-13, at 21-22 (filed under seal) (describing various investigations conducted following the Cyber Incident).   Under different circumstances, these investigations would have remained largely—if not entirely—internal.   If a minor cybersecurity incident occurs, for example, Capital One analyzes the root causes itself, without retaining third-party experts.   Declaration of John Finneran ("Finneran Decl.") ¶ 7; Klane Decl. ¶ 5.

But because the Cyber Incident implicated information relating to millions of individuals, Capital One faced substantial litigation and regulatory enforcement risks related to it.   *Id.*  As a result, Capital One's Board and General Counsel determined that the company needed to take the additional step of hiring a third-party expert to provide a comprehensive, independent opinion of the root causes that led to the Cyber Incident.   Finneran Decl. ¶ 7; Klane Decl. ¶¶ 4-5.   This independent review would be used to assist the Board in discharging its fiduciary oversight duties, including its duty to steer the company's response to the sprawling litigation that had been filed following the Cyber Incident.   Finneran Decl. ¶ 4; Klane Decl. ¶ 4.   PwC's independent expert opinion was also necessary to assist Capital One's Legal Department (the "Legal Department") in providing the Board with legal advice relating to the pending litigation and possible regulatory enforcement actions.   Cooper Decl. ¶ 8, Klane Decl. ¶ 4.   Absent the litigation and risk of regulatory enforcement actions arising from the Cyber Incident, Capital One would not have

---

[1] *See, e.g.*, Letter from U.S. Senate Comm. on Banking, Housing & Urban Affairs to Richard D. Fairbank, Chairman & CEO, Capital One Fin. Corp. (Sept. 11, 2019), https://www.brown.senate.gov/imo/media/doc/2019-09-11%20Banking%20letter.pdf.

engaged a third-party expert to conduct an independent root cause analysis at all.  Cooper Decl. ¶ 14; Finneran Decl. ¶ 7; Klane Decl. ¶ 5.

## B. PwC Was Retained to Conduct, and Ultimately Conducted, a Protected Assessment of the Cyber Incident's Root Causes in Anticipation of Litigation.

At the direction of the Board and its Risk Committee, Capital One interviewed several expert consultants and ultimately selected PwC to conduct an "assessment of the technical and non-technical root causes" of the Cyber Incident.  Pls.' Motion to Compel Br. ("Mot.") Ex. 2 at -003; Cooper Decl. ¶ 5.  PwC was chosen because of its experience in the financial services industry, its expertise analyzing the causes of cybersecurity incidents, and its knowledge of current industry practices.  *Id.*  PwC was retained as a consulting expert; it was not retained to testify in this matter and will not be designated as an expert witness under Fed. R. Civ. 26(b)(4).  *Id.* ¶ 11.

PwC was retained for the RCA by Matt Cooper—Capital One's General Counsel—and by the Board, acting through John Finneran, Capital One's prior General Counsel who currently serves as Capital One's Corporate Secretary.  Mot. Ex. 2 at -003; Cooper Decl. ¶ 4; Finneran Decl. ¶ 3.  The Statement of Work ("SOW") provides that the RCA was intended "to assist Capital One's Legal Department . . . with its provision of legal advice to the Board and the Risk Committee and in anticipation of litigation."  *See* Mot. Ex. 2 at -003.   PwC understood that it was retained in connection with then-pending litigation and anticipated regulatory enforcement actions.  *See* Declaration of Dietmar Daniel Serbee ("Serbee Decl.") ¶ 4; *see also* Mot. Ex. 2 at -003-004.  PwC also expressly agreed "to assist Capital One in preserving the confidentiality of the information received or provided in connection with" the RCA so that Capital One could maintain claims of privilege or protection over the RCA.  *Id.* at -003.

After the SOW was executed, PwC worked independently in arriving at its conclusions regarding the root causes of the Cyber Incident.  Cooper Decl. ¶ 10; Finneran Decl. ¶ 9.  This

independence was critical to ensuring that the Board and Legal Department received PwC's unvarnished opinions, which they needed to properly supervise Capital One's post-Cyber Incident litigation strategy, prepare for any regulatory enforcement actions, and mitigate the litigation, enforcement, and liability risks the company was facing.   *See* Cooper Decl. ¶ 16; Finneran Decl. ¶ 4.  Cooper, Finneran, and Peter Raskind (a Capital One director and chair of the Risk Committee) monitored PwC's work on the RCA as it progressed.   Cooper Decl. ¶ 9; Finneran Decl. ¶ 14. Additionally, PwC periodically updated Cooper, Finneran, Raskind, and other members of the Board and Legal Department about the status of the RCA work and the direction its analysis was taking.  Cooper Decl. ¶ 15; Finneran Decl. ¶ 14.

In conducting the RCA, PwC followed the formalities typical of a protected engagement. Serbee Decl. ¶ 4.  Specifically, (i) Capital One's counsel participated in all of PwC's interviews of Capital One personnel and in all meetings and communications between PwC and the Board; (ii) the individuals PwC interviewed were advised that the RCA was being conducted at the direction of counsel and that conversations with PwC were protected; and (iii) PwC's final work product was marked privileged and confidential.   Klane Decl. ¶ 8; Serbee Decl. ¶ 4.   Aside from the interviews it conducted, PwC's interactions with Capital One's management and cybersecurity organization were administrative in nature.   Klane Decl. ¶ 11; Serbee Decl. ¶ 5.   Only PwC, the Legal Department (and, on occasion, Capital One's Human Resources Department) participated in the interviews PwC conducted.  Klane Decl. ¶ 8.

PwC had also performed work for Capital One prior to the Cyber Incident and had a pre-existing Master Services Agreement ("MSA") with the company, but PwC had never previously performed a root cause analysis of a cybersecurity incident for Capital One; nor did Capital One and PwC have an engagement in place to perform such services in the future.  *See generally* Ex.

5

1, MSA; Cooper Decl. ¶ 6; Serbee Decl. ¶ 13.  Additionally, following the Cyber Incident, Capital One retained PwC to work on two other engagements, both of which were separate from and unrelated to the RCA.  Finneran Decl. ¶¶ 10-11; Serbee Decl. ¶¶ 7-8.  As part of these other engagements, PwC provided project management assistance to Capital One so that the company could effectively coordinate and track various remediation efforts in response to the Cyber Incident.  Finneran Decl. ¶ 10; Serbee Decl. ¶ 7.  This work was distinct from the RCA in that it was forward-looking and focused on changes that were being made in response to the Cyber Incident.   Finneran Decl. ¶ 11; Serbee Decl. ¶ 7.   In contrast, the RCA was backward-looking, focusing on the causes of the Cyber Incident.  Finneran Decl. ¶ 11; Serbee Decl. ¶ 6.  The two other PwC engagements were not privileged or work product protected; nor were they conducted for legal purposes.  Finneran Decl. ¶ 12; *see also* Ex. 2, Enterprise Command Center SOW; Ex. 3, Project Management Office SOW.  As such, the relevant SOWs were not signed by the company's General Counsel, and attorneys from Capital One's in-house legal department were not directly involved in those other engagements, unlike the RCA.

### C.  The Board and General Counsel Used (and Continue to Use) the PwC RCA to Guide Strategy for Defending Against Litigation and Regulatory Enforcement Activity.

Upon concluding its RCA, PwC delivered a report to the Board and Legal Department outlining its independent opinions regarding the Cyber Incident's technical and non-technical root causes.  Finneran Decl. ¶ 15; Klane Decl. ¶ 12; Serbee Decl. ¶ 12.  PwC also made presentations to the Board and its Risk Committee.  Finneran Decl. ¶ 15; Serbee Decl. ¶ 12.  The report and associated presentations informed the Board of PwC's opinions as to the key circumstances that gave rise to the Cyber Incident so that the Board could effectively supervise the company's litigation defense strategy and address the risk of regulatory enforcement actions, including the proceedings filed by the OCC and FRB that resulted in consent orders announced on August 5,

2020.  Cooper Decl. ¶ 16; Finneran Decl. ¶ 17; *see also* Mot. at 12 n.3.  The RCA report has been used, and will continue to be used, by Cooper and others in the Legal Department for providing legal advice to the Board and the company in connection with the pending litigation and consideration of any potential resolution.  Cooper Decl. ¶ 17; Klane Decl. ¶ 19.

Access to PwC's RCA report has been and continues to be tightly controlled within Capital One.  *Id.* ¶ 13.  The Legal Department controls access to the report, and access has been limited to the smallest number of people who have a need to know the opinions in the report.  *Id.* ¶¶ 13-14.  The report has been provided to four main categories of individuals: (1) Capital One's Board of Directors and Executive Committee; (2) its Legal Department; (3) senior employees with enterprise-wide control or governance functions (including audit, compliance, and risk management); and (4) select individuals in Capital One's technology, cybersecurity, and HR organizations.  *Id.* ¶¶ 15-16.

The Board of Directors, Executive Committee, Legal Department employees, and employees working in enterprise-wide control or governance functions needed access to the RCA to coordinate Capital One's response to the Cyber Incident, including its response to related litigation and regulatory activity.  *Id.* ¶ 15.  The technology, cybersecurity, and HR staff who received the report were involved with Capital One's remediation efforts and needed access to the report to assist with "mapping" PwC's findings to Capital One's remediation action plan.  Cooper Decl. ¶ 16; Klane Decl. ¶ 16.  Such mapping was designed to enhance the thoroughness of Capital One's remediation efforts and further reduce litigation risk.  *Id.*  The majority of individuals receiving access to the RCA report have only been given "view" access to it and have not been permitted to print or further distribute it.  *Id.* ¶ 14.  All recipients of the RCA report were instructed to maintain its confidentiality.  *See id.*

As required by law, Capital One provided PwC's RCA report to the supervisory staff of certain of its U.S. and Canadian regulators at their express request.  *Id.* ¶ 18; Declaration of Gwynne Williams ("Williams Decl.") ¶¶ 7-8.[2]  Capital One also permitted its auditor, Ernst & Young ("EY"), to review the report as needed to perform its third-party audit functions, but did not provide EY with its own copy of the report.  Klane Decl. ¶ 18.

### D. Capital One Has Provided Plaintiffs With Extensive Discovery On the Cyber Incident.

While Capital One has withheld PwC's RCA, it has provided Plaintiffs with extensive discovery on the circumstances of the Cyber Incident and its technical and non-technical root causes.  First, Capital One has produced the vast majority of documents made available to PwC in conducting its RCA and did not withhold any such documents solely on the basis that they were reviewed by PwC.  *See* Ex. 4, July 24, 2020 Letter from D. Balser to N. Siegel, at 2.  Second, Capital One has provided Plaintiffs with technical analyses performed by third parties, such as the Mandiant Report and iDiscovery Solutions' assessment regarding the scope and impact of the Cyber Incident.  Third, Capital One has produced several internal analyses regarding the root causes and impacts of the Cyber Incident, including: (i) Capital One's internal root cause analysis (referred to as "Management's Root Cause Analysis") (*see* Mot. Ex, 6); (ii) the "Project Star Post-Incident Report," which reflects Capital One's internal investigation of the Incident; and (iii) Capital One's internal analysis of the personal identifying information ("PII") impacted in the

---

[2] Specifically, Capital One provided the RCA to the Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("FRB"), Federal Deposit Insurance Corporation ("FDIC"), and the Canadian Office of the Superintendent of Financial Institutions ("OSFI").  *See* Klane Decl. ¶ 18.  Capital One previously advised Plaintiffs that it had provided the RCA report to the CFPB. Mot. Ex. 3 at 1.  Upon further analysis, Capital One has determined that the RCA report was not actually shared with the CFPB.  Williams Decl. ¶ 8.

Incident.  In addition to these reports, Capital One has produced tens of thousands of documents relating to them or reflecting other evaluations, such as internal audits and risk assessments.

Beyond these backward-looking analyses related to the Cyber Incident, Capital One has also produced documents regarding the company's forward-looking remediation activity, including: (i) draft and final versions of Capital One's "Preliminary Cyber Event Action Plan," which relates to contemplated remedial actions; (ii) draft and final versions of Capital One's "Final Cyber Event Action Plan";[3] and (iii) Capital One's "Final Expanded Action Plan."

Finally, Plaintiffs have already taken six 30(b)(6) depositions of Capital One on twenty-nine topics, including topics concerning when and how the Cyber Incident occurred, how information was compromised, and remediation plans or reports related to the Incident.  *See generally* Dkt. 435-8 (filed under seal).  Plaintiffs will also take a seventh 30(b)(6) deposition on the scope, methods, and results of the company's investigations following the Cyber Incident.  In addition, Plaintiffs will have the opportunity to depose current and former Capital One employees and question them about the root causes of the Cyber Incident.

## ARGUMENT

Capital One's Board and General Counsel retained PwC to serve as a non-testifying expert and provide an independent root cause analysis to guide the company's response to litigation and anticipated regulatory enforcement activity.  As such, PwC's work on the RCA is protected by Fed. R. Civ. P. 26(b)(4)(D).  Moreover, because this work was done at the direction of counsel and

---

[3] Plaintiffs incorrectly assert that Capital One originally withheld its Cyber Event Action Plan as privileged because it was based on PwC's findings and recommendations. *See* Mot. at 8.  The Final Cyber Event Action Plan was originally withheld because it was being reviewed by the regulators for bank examiner privileged information. That document was produced to Plaintiffs in Capital One's August 4, 2020 production that followed the regulators' review per the schedule and process established by this Court.

in anticipation of litigation, it is also protected by the work product doctrine under Fed. R. Civ. P.

26(b)(3)(A).  Plaintiffs do not even try to show the exceptional circumstances required to overcome

Rule 26(b)(4)(D) or the substantial need or undue hardship required to overcome work product

protection.   In fact, Plaintiffs do not address the heightened protections afforded by Rule

26(b)(4)(D) at all, despite being advised that Capital One was withholding the RCA on that basis.

*See* Ex. 4, at 2.  Finally, the protections under Rule 26(b)(4)(D) are not waivable and, regardless,

Capital One has not waived such protections or those under the work product doctrine.[4]

## I.      RULE 26(b)(4)(D) SHIELDS THE RCA FROM DISCOVERY.

Rule 26(b)(4)(D) provides that:

> a party may not, by interrogatories or deposition, discover facts
> known or opinions held by an expert who has been retained or
> specially employed by another party in anticipation of litigation or
> to prepare for trial and who is not expected to be called as a witness
> at trial.

Fed. R. Civ. P. 26(b)(4)(D).  Under Rule 26(b)(4)(D), "[f]acts or opinions known 'by an expert

who was retained … in anticipation of litigation or to prepare for trial and who is not expected to

be called as a witness at trial' may not ordinarily be discovered."  *MeadWestvaco Corp. v. Rexam,*

*PLC*, No. 1:10-cv-511 GBL/TRJ, 2011 WL 2938456, at *6 (E.D. Va. July 18, 2011) (quoting Fed.

R. Civ. P. 26(b)(4)(D)).[5]  This Rule is "designed to promote fairness by precluding unreasonable

access to an opposing party's diligent trial preparation."  *Venturino v. Rich's Better Grease Serv.,*

*Inc.*, 873 F.2d 1441 (table), 1989 WL 27250, at *3 (4th Cir. April 12, 1989).

---

[4]   Defendants do not claim that the RCA is protected from disclosure by the attorney-client privilege.

[5]   Although Rule 26(b)(4)(D) suggests that it applies only to discovery in the form of "interrogatories or deposition[s]," courts apply the Rule to document discovery as well.  *See Disidore v. Mail Contractors of Am., Inc.*, 196 F.R.D. 410, 418 (D. Kan. 2000) (collecting cases); *see also MeadWestvaco*, 2011 WL 2938456, at *6 (testing results protected under Rule).

The rationale underlying the Rule is that "with non-testifying experts, there is no need to obtain discovery for effective cross examination," and a party should be "prevent[ed] . . . from building his case on the diligent preparation of his adversary." *In re Shell Oil Refinery*, 132 F.R.D. 437, 440 (E.D. La. 1990); *see also Vanguard Sav. & Loan Ass'n v. Banks,* No. Civ. A. 93-4627, 1995 WL 71293, at *2 (E.D. Pa. Feb. 17, 1995) ("[I]t would be inherently unfair for one party to retain an expert, finance his investigation, and then be forced to turn his facts and opinions over to the opponent." (citations omitted)); *Hartford Fire Ins. Co. v. Pure Air On The Lake Ltd. P'ship,* 154 F.R.D. 202, 207 (N.D. Ind. 1993) (similar). "The rule also protects an important interest in allowing counsel to obtain the expert advice they need … without fear that every consultation with an expert may yield grist for the adversary's mill." *Precision of New Hampton v. Tri Component Prods. Corp.,* No. C12-200, 2013 WL 2444047, *3 (N.D. Iowa June 5, 2013). "[P]arties should be encouraged to consult experts to formulate their own cases, to discard those experts for any reason, and to place them beyond the reach of an opposing party, *if they have never indicated an intention to use the expert at trial.*" *Weisbrot v. Schwimmer*, No. CIV A 97-2711(FLW), 2007 WL 2683642, at *5 (D.N.J. Sept. 7, 2007*); see also Genesco, Inc. v. VISA, U.S.A., Inc.*, 302 F.R.D. 168, 181, 190 (M.D. Tenn. 2014) (finding Rule 26(b)(4)(D) protected work by cyber security firm engaged by Genesco's General Counsel "to assist … in rendering legal advice to Genesco in anticipation of litigation and/or other legal or regulatory proceedings" arising out of data breach).

For these reasons, the Rule is nearly sacrosanct and can only be overcome by a "showing of exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D). Here, Rule 26(b)(4)(D) protects PwC's work for Capital One because (i) it was performed in "anticipation of litigation," (ii) PwC has been designated by Capital One as a non-testifying expert, and (iii) Plaintiffs have

not, and cannot, make the "very high" showing of "exceptional circumstances" to overcome the protections of Rule 26(b)(4)(D).  *See MeadWestvaco*, 2011 WL 2938456, at *6.

**A.  PwC's RCA Was Created in Anticipation of Litigation.**

To determine whether a document was prepared in anticipation of litigation, the Fourth Circuit applies the "because of" test.  Under this test, a court must ask if the document was "prepared *because of* the prospect of litigation" at a time when "the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation."  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992).  Because materials that would have otherwise been generated in the "ordinary course of business" do not satisfy the "because of" test, courts additionally ask whether the document would have been "prepared in substantially similar form but for the prospect of that litigation."  *See RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 748 (E.D. Va. 2007).

While there is no "hard and fast rule" to determine whether a document was prepared because of litigation, courts in this circuit consider a range of factors, including (1) the nature of the documents, (2) the nature of the litigation, (3) the relationship between the parties, (4) other facts peculiar to the case, (5) the involvement of counsel, and (6) the time when the document is created.  *Lewis v. Richland Cty. Recreation Comm'n*, No. 3:16-cv-2884, 2018 WL 4596119, at *6 (D.S.C. Sept. 25, 2018).  Applying these factors, there can be no doubt that PwC was retained— and that the RCA was created—in anticipation of litigation.

The driving force behind preparation of the RCA was the already-filed consumer and securities litigations and the threat of regulatory enforcement actions.  Such regulatory inquiries and potential enforcement actions were based on the same Cyber Incident that gave rise to the pending litigation, further confirming that PwC's work was "in anticipation of litigation."  *See In re PolyMedica Corp. Sec. Litig.*, 235 F.R.D. 28, 31-32 (D. Mass 2006) (finding that PwC's work,

whether for the present litigation or closely related litigation with the SEC, was in anticipation of litigation). The RCA was commissioned by Capital One's General Counsel and Corporate Secretary on behalf of the Board and its Risk Committee to provide a comprehensive, independent assessment of the factors that led to the Cyber Incident. Finneran Decl. ¶¶ 3-4; Klane Decl. ¶ 4. The purposes of the RCA were two-fold: (1) to enable the Board to discharge its duties of overseeing and directing the company's legal response to the Cyber Incident; and (2) to inform Capital One's Legal Department so that it could more effectively advise the Board and help the company prepare for the onslaught of litigation and regulatory activity that followed the Cyber Incident. Cooper Decl. ¶¶ 8, 16-17; Finneran Decl. ¶ 4; Klane Decl. ¶ 4.

These purposes align with corporate directors' duties following a significant event like the Cyber Incident. Specifically, corporate directors have a duty to monitor and control corporate litigation—a duty that flows from directors' general "managerial decision making" powers, which are derived from 8 Del. C. § 141(a).[6] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (noting that directors' managerial powers encompass decision-making with respect to litigation). More broadly, corporate directors are charged with monitoring enterprise risk and compliance with applicable law. *See generally Stone v. Ritter*, 911 A.2d 362 (Del. 2006).

Guidance from the OCC also charges "bank management" with developing "timely and informative reports to help the board of directors remain fully informed of litigation and other legal matters," particularly since "[p]ending or potential litigation . . . can disrupt bank operations, potentially reduce a bank's earnings and capital, and result in the loss of corporate focus and forgone business opportunities." *See* Ex. 5, OCC, *Comptroller's Handbook: Litigation and Other*

---

[6] Capital One is incorporated in Delaware. *See, e.g.*, Restatement (Second) Conflict of Laws § 302(2) & comment (a) (law of the state of incorporation governs internal affairs of a corporation).

*Legal Matters* at 1 (v. 1.1 Dec. 28, 2018) (excerpted).[7]  After the Cyber Incident, one of the greatest risks facing Capital One was the litigation and regulatory activity that was expected to (and did) result from it. Cooper Decl. ¶¶ 3, 7-8; Finneran Decl. ¶¶ 6-7; *see also* Klane Decl. ¶ 5.  Addressing that risk was thus one of the Board's most important oversight functions, and PwC's RCA was commissioned to aid in the Board's performance of that function.  Cooper Decl. ¶ 8; Finneran Decl. ¶¶ 4, 6.

The RCA was prepared because of litigation and under the direction of counsel.  As stated in the SOW, PwC was retained by Capital One "on behalf' and "at the direction of the Board, and [Capital One's] General Counsel."  Mot. Ex. 2 at -003.  PwC was charged with "perform[ing] an objective root cause analysis of the Incident and … assist[ing] Capital One's Legal Department … with its provision of legal advice to the Board and the Risk Committee *and in anticipation of litigation*."  *Id.* (emphases added).  Indeed, by the time the SOW was executed on September 18, 2019, litigation was well underway—sixty putative consumer class actions and one securities fraud class action were pending against Capital One, and regulatory enforcement actions appeared increasingly likely given the intense regulatory scrutiny concerning the Cyber Incident.  PwC thus acknowledged that it would undertake the RCA "at Counsel's direction and under Counsel's supervision," consistent with the protected nature of PwC's work.  *Id.* at -004.

Not only did PwC's RCA focus on the Cyber Incident at the center of this litigation, but the involvement of Capital One's counsel and the very purpose of PwC's work confirm that litigation was its "driving force."  *Nat'l Union*, 967 F.2d at 984.  Capital One's General Counsel and Corporate Secretary defined the scope and nature of PwC's work.  Cooper Decl. ¶ 9; Finneran

---

[7] Available at https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/litigation-other-legal-matters/pub-ch-litigation.pdf (last visited Aug. 13, 2020).

Decl. ¶ 8.  Once PwC commenced its RCA, Capital One's counsel participated in each interview PwC conducted, and witnesses were informed that the RCA was conducted at the direction of counsel and that their conversations with PwC were privileged.  Klane Decl ¶ 8; Serbee Decl. ¶ 4. Moreover, the RCA was maintained as its own workstream, separate from Capital One's internal root cause analysis.  *See* Finneran Decl. ¶ 13; Serbee Decl. ¶¶ 7-8.  Finally, PwC regularly reported to Finneran (acting as a representative of the Board) and Cooper (the General Counsel), but PwC worked as an independent expert and had only limited interactions with Capital One's business personnel—*e.g.*, in interviews facilitated by the Legal Department or for administrative purposes. Cooper Decl. ¶ 10; Finneran Decl. ¶¶ 9, 14; Klane Decl. ¶ 11; Serbee Decl. ¶ 5.

After PwC concluded its RCA work, it delivered the report to the Board and Legal Department and gave presentations to the Board and its Risk Committee.  Cooper Decl. ¶ 15; Finneran Decl. ¶ 15; Klane Decl ¶ 12; Serbee Decl. ¶ 12.  PwC's report has been used and will continue to be used by the Board in supervising the company's legal strategy for the pending litigation and regulatory activity and by Cooper in his role advising the Board as General Counsel. Cooper Decl. ¶¶ 16-17; Finneran Decl. ¶ 17; Klane Decl. ¶ 19.  Access to the report was limited and all recipients were logged.  Klane Decl. ¶¶ 13-14.  Ultimately, just 154 of Capital One's approximately 50,000 employees—or 0.3%—received access to the final RCA report, and they were granted access only after the Legal Department confirmed that each employee (i) had a specific, legitimate need for the report (i.e., due to their roles in the Legal Department, risk management, or audit groups, or so that they could map PwC's findings to Capital One's remediation plan), and (ii) had agreed to maintain its confidentiality.  *Id.* ¶¶ 13-14.  Most employees received only "read" access to the report, thus preventing any copying, printing, or distribution of it.  *Id.* ¶ 14.

## B.  The RCA Was Not Conducted in the Ordinary Course of Business.

If there were no litigation or threat of regulatory enforcement action, Capital One would not have engaged PwC to perform an independent root cause analysis at all.  For minor security incidents not expected to result in litigation, Capital One's standard practice is to handle any investigation or root cause analysis *internally*.  Finneran Decl. ¶ 7; Klane Decl. ¶ 5.  But the Cyber Incident implicated nearly 100 million U.S. consumers and triggered substantial litigation and regulatory activity.  *Id.*  Under these circumstances, Capital One took the additional step—outside of its ordinary operating procedures—to engage an external expert to conduct an independent assessment.  Finneran Decl. ¶ 7; Klane Decl. ¶ 5.  The RCA thus would *not* have been "prepared in substantially similar form but for the prospect of that litigation."  *RLI*, 477 F. Supp. 2d at 748.

### 1.   PwC's Independent, Protected RCA is Distinct from Other Post-Breach Reviews.

Unlike PwC's RCA, ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  *See* Mot. Ex. 6 at -072-073.

Capital One does not claim protection over Management's Root Cause Analysis and has produced both the final report and documents relating to it.  In contrast, Capital One commissioned the PwC RCA because the Board needed a comprehensive, independent root cause analysis—distinct from Management's own assessment—to assist it in discharging its fiduciary oversight duties, including its duties to oversee and direct the company's response to pending litigation and regulatory activity.  Cooper Decl. ¶ 8; Finneran Decl. ¶ 4; Klane Decl. ¶ 4.

The existence of a separate, ordinary-course root cause analysis strongly supports a finding that the PwC RCA is protected. *See, e.g.*, *In re: Bard Ivc Filters Prod. Liab. Litig.*, MDL No. 2641, 2016 WL 537587, at *1, *3 (D. Ariz. Feb. 11, 2016) (holding a "broad risk assessment" conducted by a medical expert was protected because it was "a more extensive and detailed analysis than

16

Bard normally created"); *Laney v. Schneider Nat'l Carriers, Inc.*, 2010 WL 1490181, at *1 (N.D. Okla. Apr. 12, 2010) (similar); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522 (PAM/JJK), 2015 WL 6777384, at *2 (D. Minn. Oct. 23, 2015) ("[F]ollowing the data breach, there was a two-track investigation," one of which was "ordinary-course" and the other of which was intended to "provide Target with legal advice … in litigation."). On the other hand, where a company creates only one root cause analysis (and it is the company's typical practice to do so following an incident), courts have declined to find that the analysis was prepared because of litigation. *See, e.g.*, *Chevron Midstream Pipelines LLC v. Settoon Towing LLC*, No. CIV.A. 13-2809, 2015 WL 65357, at *9 (E.D. La. Jan. 5, 2015). Here, as in *Bard*, the RCA was more comprehensive than Management's Root Cause analysis and was motivated by the litigation and regulatory activity facing Capital one.[8]

### 2. Capital One's Secondary Use of the RCA for Business Purposes Does Not Alter its Protected Status.

Plaintiffs' primary argument against protection is that Capital One used the PwC RCA for business and remedial purposes rather than for litigation purposes. *See* Mot. at 1, 5-9. The record belies Plaintiffs' contention—the driving force behind the PwC RCA was always to provide the Board and Legal Department with a comprehensive and independent analysis that would be used to inform the Company's legal strategy in the wake of the Cyber Incident. *See supra* pps. 3-8.

Although the PwC RCA was also used for the purpose of "mapping" PwC's findings onto Capital One's remedial action plans (Cooper Decl. ¶ 16; Klane Decl. ¶ 16), that does not change

---

[8] While several of the cases cited in this and the following paragraphs consider work product protection rather than the distinct protections afforded by Rule 26(b)(4)(D), the operative question here and in those cases is whether the document would have been created in substantially the same form in the ordinary course of business. As a result, the analysis in such cases applies here. *See, e.g.*, *Klee v. Whirlpool Corp.*, 251 F.R.D. 507, 512-13 & n.3 (S.D. Cal. 2006) (applying the Ninth Circuit's "because of" test to a claim for protection under Rule 26(b)(4)(D)).

the conclusion that the RCA was prepared in anticipation of litigation.  For one, Capital One's "mapping" exercise is related to litigation, particularly given that injunctive relief is normally requested in data breach cases (as is true here).  Plaintiffs themselves stress that Capital One's remedial efforts are "critical to the litigation because Plaintiffs are seeking injunctive relief."  *See* Mot. at 8 n.1.  Setting that aside, Plaintiffs' argument misses the mark because the RCA *is not a remediation plan*.  It is a backward-looking assessment of the root causes of the Cyber Incident.  *See* Finneran Decl. ¶ 11; Serbee Decl. ¶ 6.

Just as importantly, a document created in anticipation of litigation *does not* lose protection merely because it serves parallel business purposes as well.  *See U.S. v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010) ("[M]aterial generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status."); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2019 WL 6122012, at *4 (E.D. Va. July 16, 2019) (same); *Hermsdorfer v. Am. Motors Corp.*, 96 F.R.D. 13, 15 (W.D.N.Y. 1982) (fact that expert was employed for dual purpose of preparing for litigation and improving product at issue does not change Rule 26's protections for non-testifying experts).

The Ninth Circuit considered facts similar to those here in *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 910 (9th Cir. 2004).  In that case, the government sought documents prepared by an environmental consultant that were created both in anticipation of potential litigation with the EPA *and* for the non-litigation purposes of remediating contaminated sites and determining compliance with an environmental consent order.  357 F.3d at 908.  The documents at issue were prepared by an expert retained by counsel to assist in investigating and to consult on cleanup efforts at the contaminated sites.  *Id.* at 904.  In rejecting the government's argument that the documents were not prepared for litigation, the court held:

> We conclude that the withheld documents, notwithstanding their dual purpose character, fall within the ambit of the work product doctrine. The documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole.

*Id.* at 909-10.

Similarly, in *Bard*, which involved deaths related to a medical device, the plaintiffs argued that a medical expert report prepared because of litigation was not entitled to protection because it was also used by the company for business purposes to create internal "health hazard evaluations" and "remedial action plans" required by regulatory obligations and internal policy. *See Bard*, 2016 WL 537587, at *3-*4. While the Court acknowledged that the report was used for some business purposes, it still reasoned that "use of the Report to create internal [health hazard evaluations] and [remedial action plans] does not deprive the Report of work product protection. To the contrary, the 'because of' test is *directed at documents that serve both litigation and business purposes*." *Id.* at *4 (emphasis added). *See also U.S. Inspection Servs., Inc. v. NL Engineered Sols., LLC*, 268 F.R.D. 614, 620 (N.D. Cal. 2010) (finding that non-testifying consultant's technical analysis, which was prepared for use both in litigation over defective product and in advising company about recalling product, was protected because "the recall and ensuing litigation are factually and legally intertwined").

The reasoning of these cases applies with equal force here. That Capital One used the RCA's findings to validate its remediation plans does not remove the RCA from the "anticipation of litigation" paradigm. To the contrary, any secondary "business purpose" of the PwC RCA would serve to reduce Capital One's legal risk and is thus so "profoundly interconnected" with its litigation purposes that the two cannot be separated—and cannot strip the RCA of work product protection. *See Grand Jury Subpoena*, 357 F.3d at 908.

19

3.   Capital One's Pre-Existing Relationship with PwC is Irrelevant Here.

Plaintiffs' reference to Capital One's pre-existing relationship with PwC (*see* Mot. at 6) is unavailing.  While Capital One has a long-standing relationship with PwC—governed by an MSA—the MSA only provides an overarching framework under which Capital One may engage PwC to perform specific services, the scope of which would be set forth in a SOW specific to the engagement.  *See* Ex. 1 at -084-085, § 2.1.  Moreover, in contrast to Capital One's contractual relationship with Mandiant, PwC had no pre-existing agreement to perform any form of a root cause analysis for Capital One.  Cooper Decl. ¶ 6; *see also* Dkt. 490, Order Compelling Production of the Mandiant Report, at 7 (reasoning that Capital One "had a pre-existing SOW with Mandiant to perform essentially the same services that were performed in preparing the subject report").  In fact, PwC has *never* performed a root cause analysis in response to a cybersecurity incident for Capital One.  Cooper Decl. ¶ 6; Serbee Decl. ¶ 13.  In light of these undisputed facts, Plaintiffs' passing reference to PwC's pre-existing relationship with Capital One should be disregarded.

In addition, PwC provided program management services to Capital One in other post-Cyber Incident engagements, such as consulting on the formation and functioning of Capital One's Enterprise Command Center (*see* Ex. 2) and assisting Capital One with setting up a Program Management Office for coordinating and tracking technology-based remediation activities Capital One engaged in following the Cyber Incident (*see* Ex. 3).  Each of these engagements was governed by its own SOW, and neither engagement was conducted for legal purposes in anticipation of litigation.  *See* Exs. 2-3.  Thus, neither the MSA nor any of the other post-breach PwC work-streams has any relevance to the specific RCA engagement here.

**C.  Capital One Has Designated PwC as a Non-Testifying Expert.**

From the outset, Capital One retained PwC to serve as a non-testifying expert and to conduct an independent root cause analysis to assist the Board and General Counsel in overseeing

the pending litigation and anticipated regulatory enforcement actions.   Cooper Decl. ¶¶ 8, 11; Finneran Decl. ¶ 4; Serbee Decl. ¶ 3.   PwC was not hired to testify in this matter and has not been designated as a witness; it instead served as a non-testifying consulting expert.   Cooper Decl. ¶ 11. These facts alone entitle the RCA to protection under Rule 26(b)(4)(D).   *See Quinn Const., Inc. v. Skanska USA Bldg., Inc.*, 263 F.R.D. 190, 193 (E.D. Pa. 2009) ("[B]ecause Warner was retained to provide pre-litigation advice and has not been disclosed as a testifying expert … the Warner Report is the opinion of a non-testifying expert, protected from disclosure under Fed. R. Civ. P. 26(b)(4)(B).");[9] *PolyMedica*, 235 F.R.D. at 31 (Rule 26(b)(4)(D) protection attached where PwC was retained in anticipation of potential litigation with the SEC); *Ross v. Burlington N. R.R. Co.,* 136 F.R.D. 638, 639 (N.D. Ill. 1991) (party's designation of non-testifying witness controls).

Until a party designates an expert as one who will testify, Rule 26 precludes discovery of that expert absent a showing of exceptional circumstances.   *See Hartford*, 154 F.R.D. at 207 n. 8 ("Until such time as Pure Air affirmatively has to identify a testifying expert, they are entitled to assert that Packer will not be a witness … [and] operate within the spirit of [Rule] 26(b)(4)(B)."). Here, Capital One's designation of PwC as a non-testifying expert, before any expert disclosure deadline, is more than sufficient to protect the RCA from discovery under Rule 26(B)(4)(D).

### D.  Plaintiffs Have Not Shown Exceptional Circumstances.

Because PwC was engaged in anticipation of litigation and Capital One has designated PwC as a non-testifying expert, "the only question" for this Court "is whether [Plaintiffs] can meet the requirements set forth in Rule [26(b)(4)(D)]"—that is, by making a showing of "exceptional circumstances."   *Vanguard*, 1995 WL 71293, at *2.   This is a "very high" standard, as this Court has recognized.   *MeadWestvaco Corp.,* 2011 WL 2938456, at *6; *see also* Wright & Miller, 8A

---

[9] The *Quinn* decision refers to Rule 26(b)(4)(B), which was renumbered in 2010 to be Rule 26(b)(4)(D).   *See* Fed. R. Civ. P. 26(B)(4) advisory committee's note, 2010 am.

Fed. Prac. & Proc. Civ. § 2032 (3d ed. 2010) (recognizing that a party "seeking discovery from non testifying retained experts faces a heavy burden").  Plaintiffs make no effort to show exceptional circumstances here.  Having failed to make any such arguments in their opening brief, Plaintiffs cannot do so for the first time on reply.  *See Hamed v. Saul*, 432 F. Supp. 3d 610, 613 (E.D. Va. 2020) ("The Fourth Circuit has made clear that ordinarily it is improper to consider arguments raised for the first time in a reply brief.").

Nor could Plaintiffs show that exceptional circumstances exist here.  Courts have identified two situations in which "exceptional circumstances" may exist:

> (1) "where the object or condition observed by the non-testifying expert is no longer observable by an expert of the party seeking discovery" for reasons such as physical deterioration; and,

> (2) where the costs of "replicat[ing] expert discovery on a contested issue … would be judicially prohibitive."

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 175 F.R.D. 34, 44 (S.D.N.Y. 1997).  Neither situation is present here.

First, this is not a case where evidence of the event at issue has changed in some way and was only observable by the non-testifying expert, such as in an auto accident case.  Rather, by the time PwC was engaged, the Cyber Incident had occurred and ended more than six months earlier.  Thus, the information made available to PwC was historical and fixed—rather than contemporaneous and changing—and is the same information that has been provided to Plaintiffs in discovery.  At bottom, the Cyber Incident was a discrete event, and Plaintiffs have been provided with more than ample documents and information—including the expert analysis of Mandiant and Capital One's own root cause analyses—about how and why it happened.

Second, Plaintiffs cannot reasonably claim that the costs of replicating a root cause analysis would be prohibitive.  To the contrary, Plaintiffs have Capital One's discovery responses, hundreds

of thousands of documents, and deposition testimony from 30(b)(6) witnesses and numerous current and former employees.  In addition to all of this underlying information—which includes the same basic facts underlying the PwC RCA—Plaintiffs also have technical analyses from Mandiant and Capital One's own cyber organization providing roadmaps to guide any expert Plaintiffs employ.  In data breach cases such as this, plaintiffs routinely hire and pay for cybersecurity experts, and Plaintiffs cannot plausibly contend they lack the resources to retain their own expert in this case.  *See Emp'r's Reinsurance Corp. v. Clarendon Nat'l Ins. Co.*, 213 F.R.D. 422, 431 (D. Kan. 2003) ("[Plaintiff] is not entitled to piggyback on the efforts of [defendant's] attorneys to establish [its] damages.").  *See also* Dkt. 135 at 3–4 (touting the financial resources of Lead Plaintiffs' Counsel); Dkt. 136 at 4 (same); Dkt. 140 at 2 (same).  Thus, Plaintiffs cannot show any "exceptional circumstances" that would warrant overriding the protections offered by Rule 26(b)(4)(D).  Plaintiffs' motion should be denied on this basis alone.

## II.      THE RCA IS PROTECTED WORK PRODUCT.

### A.  PwC's RCA Was Created in Anticipation of Litigation.

The test for determining whether the PwC RCA was prepared in anticipation of litigation— *i.e.*, the "because of" test, *Nat'l Union*, 967 F.2d at 984—is the same under Rule 26(b)(3)(A) as under Rule 26(b)(4)(D).  As discussed above, PwC's work and its RCA report were undoubtedly prepared because of litigation, including the more than sixty putative class actions that were pending at the time PwC was engaged, as well as anticipated regulatory enforcement actions.  And the RCA would not even have been commissioned—much less prepared in "substantially similar form"—absent litigation.  In addition to the protections offered by Rule 26(b)(4)(D), then, PwC's RCA work is also protected by the work product doctrine under Rule 26(b)(3)(A).

**B. Plaintiffs Have Not Shown the Substantial Need or Undue Hardship Required to Overcome Work Product Protection.**

To overcome the work product protection applicable to PwC's RCA, Plaintiffs must show that they have a "substantial need for the materials to prepare [their] case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i). Plaintiffs do not even try to argue substantial need or undue hardship in their opening brief and may not do so on reply. *See Hamed*, 432 F. Supp. 3d at 613. Moreover, the RCA contains PwC's opinions and interpretations of the factors *it believes* caused the Cyber Incident. *See* Serbee Decl. ¶ 6. As a result, it is core opinion work product that "enjoys a nearly absolute immunity." *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017); *see also* Fed. R. Civ. P. 26(b)(3)(B) (noting that under all circumstances, courts "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative").

**III. CAPITAL ONE HAS NOT WAIVED ANY PROTECTION AFFORDED BY RULE 26.**

Plaintiffs incorrectly argue that Capital One waived work product protection by disclosing the RCA report to its supervisory regulators, its auditor, and certain internal employees with a particular need to access the report. *See* Mot. at 10-13. As an initial matter, the protections under Rule 26(b)(4)(D) are not subject to waiver. Moreover, Capital One's limited disclosures were in no way a waiver of the protections under Rule 26(b)(4)(D) or the work product doctrine.

**A. Rule 26(b)(4)(D)'s Protections for Non-Testifying Expert Are Not Waivable.**

Courts have recognized that the waiver doctrine applicable in the work product context does not apply to the protections afforded by Rule 26(b)(4)(D). *See Ludwig v. Pilkington N. Am., Inc.*, No. 03 C 1086, 2003 WL 22242224, at *3 (N.D. Ill. Sept. 29, 2003) ("[W]here information enjoys protection under [Rule 26(b)(4)(D)], that protection is not subject to waiver."); *Vanguard*, 1995 WL 71293, at *2. This is so because the Rule is not merely an outgrowth of the work product

doctrine but "protects discovery of information held by non-testifying experts for reasons entirely independent of the work product doctrine." *Coastal Towing, Inc. v. Novarco, Ltd.*, No. CIV. A. 98-492, 1999 WL 970357, at *2 (E.D. La. Oct. 21, 1999) (collecting cases). This is true even when the non-testifying expert's report is provided to the other side. *Genesco*, 302 F.R.D. at 195 ("Assuming a waiver [of the attorney-client privilege] based on disclosure of the Stroz report [to VISA], the limitation on the non-testifying expert consultant would still bar the Stroz discovery, as that protection arises under Rule 26(b)(4)(D) that serves different purposes and does not permit waiver."). As the Court explained in *Vanguard*, Rule 26(b)(4)(D):

> protects discovery of information held by non-testifying experts for reasons entirely independent of the work product doctrine. Therefore, [the] claim that [a party] waived its work product privilege is wholly irrelevant and totally unpersuasive…. [I]t is immaterial that [the party] may have voluntarily disclosed the [] report to third parties. Rather, the only question is whether the plaintiff can meet the requirements set forth in Rule 26(b)(4)([D]).

1995 WL 71293, at *2; *see also Precision*, 2013 WL 2444047, at *6 ("It appears dubious that the waiver doctrine applies" under rule 26(b)(4)(D)).[10]

Moreover, a contrary rule would be the height of unfairness. Here, it would allow Plaintiffs to take PwC's extensive work—that Capital One paid for in order to better address its litigation risks—and turn it into a sword for Plaintiffs to use against Capital One. Such a result would turn Rule 26(b)(4)(D) on its head.

---

[10] Although some courts have disagreed that waiver is inapplicable to Rule 26(b)(4)(D), *see, e.g.*, *White v. Electrolux N. Am., Inc.*, No. 13 C 1617, 2014 WL 1365424, at *2 (N.D. Ill. Apr. 7, 2014), there is no support for this position in the text of the Rule. The protections of Rule 26(b)(4)(D) are distinct from work product protection and are grounded in the doctrine of "unfairness." *See* Fed. R. Civ. P. 26, advisory committee's note, 1970 am. Given the "unfairness" rationale for the Rule, waiver doctrine makes little sense. The party relying on a non-testifying expert is not using that expert as a sword, so the other party has no need for the non-testifying expert's work.

**B.  Capital One's Limited Disclosures of the PwC RCA Report Did Not Effect a Waiver of Any Protections Under Rule 26.**

"The Fourth Circuit has clearly held that for a waiver to occur, the disclosure must be made freely and with the knowledge that [the] document is being passed to a party with adverse interests." *Sheets v. Ins. Co. of N. Am.*, No. 4:04-cv-00058, 2005 WL 3006670, at *2 (W.D. Va. Nov. 8, 2005) (citing *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981)); *see also FEC v. Christian Coal.*, 178 F.R.D. 61, 77 (E.D. Va. 1998) (asking whether the recipient of work product was the party's "litigation adversary").  Capital One's limited disclosure of the PwC RCA to its regulators, its auditor, and select company employees was not a waiver.

1.  Regulatory Disclosures Cannot Waive Protection over the RCA as a Matter of Law.

First, Capital One disclosed the RCA report to its banking regulators because they requested it (*see* Williams Decl. ¶¶ 7-8) and because Capital One has a legal obligation to respond to those requests, *see* 12 U.S.C. §§ 248, 481, 1820, 1844 (setting forth the statutory examination powers of the FRB, OCC, and FDIC, respectively); Canadian Bank Act, S.C. 1991, c. 46, s. 613(2) (OSFI "has a right of access to any records . . . held by or on behalf of an authorized foreign bank"). Just as they did in seeking to compel production of the Mandiant Report, Plaintiffs ignore that Congress created an express anti-waiver statute in the Financial Services and Regulatory Relief Act of 2006 ("FSRRA").  Under the FSRRA, Capital One's disclosures to its federal regulators or to any "foreign banking authority" may "not be construed as waiving" work product protection over the PwC RCA report.  *See* 12 U.S.C. § 1828(x) (stating that disclosure of "any information to the [CFPB], [or] any Federal banking agency … or foreign banking authority for any purpose in the course of any supervisory or regulatory process   … ***shall not*** be construed as waiving, destroying, or otherwise affecting any privileges such person may claim with respect to such information" (emphases added)); *see also Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d

221, 231 (4th Cir. 2011) (referring to work product protection as a "qualified privilege"); Confidential Treatment of Privileged Information, 77 Fed. Reg. 39620 (July 5, 2012) (regulation implementing 12 U.S.C. § 1828(x) "govern[s] any claim . . . that a person has waived any applicable privilege, including the privilege for attorney work product"). Given the plain language of the FSRRA, courts have readily applied the FSRRA to find no waiver of work product protections. *See Ak. Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *4 (S.D.N.Y. Nov. 16, 2016) (disclosure of work product to banking regulator would not waive protection in light of the explicit directive in § 1828(x)(1)); *United States v. Heine*, No. 3:15-cr-238-SI-2, 2016 WL 1270907, at *11 (D. Or. Mar. 31, 2016) (section 1828(x)(1) protected bank's disclosures of work product to FDIC during FDIC investigation of bank). The waiver analysis with respect to Capital One's regulators begins and ends with the FSRRA.

Second, Plaintiffs unavailingly try to shoe-horn Capital One's disclosure of the report to its banking regulators into the ordinary waiver analysis by arguing that these regulators were "in adverse positions" to Capital One. *See* Mot. at 11. The protections set out in the FSRRA override any judicially created standard for assessing waiver. And the FSRRA prevents disclosures of protected material made "for any purpose in the course of *any supervisory or regulatory process*" from effecting a waiver. 12 U.S.C. § 1828(x) (emphasis added). Because Capital One provided the RCA to its banking regulators during the course of those agencies' supervisory and regulatory processes (Williams Decl. ¶ 9), those disclosures "shall not . . . waiv[e], destroy[], or otherwise affect[]" the work production protection over the RCA, 12 U.S.C. § 1828(x).

Plaintiffs note that the FRB and the OCC recently fined and issued cease and desist orders to Capital One (Mot. at 12 & n.3), but they do not explain how that renders the FSRRA's anti-waiver provision inapplicable. Nor could they. As agency guidance explains, investigations and

enforcement actions, including the issuance of cease and desist orders and the imposition of civil monetary penalties under 12 U.S.C. 1818(b) and (i), are part of the agencies' "supervisory actions." *See* Ex. 6, OCC, *Comptroller's Handbook: Large Bank Supervision* at 22 (v. 1.1, Sept. 2019) (excerpted) ("The OCC uses various supervisory actions, including . . . *enforcement actions* to address banks' deficiencies." (emphasis added)); Ex. 7, FRB, *BHC Supervision Manual* § 1070.1.3 (Feb. 2020) (excerpted) (identifying "enforcement actions" as a way of communicating "supervisory findings" to a bank and describing "Formal Corrective Actions" as "formal supervisory actions"); *id.* §§ 2110.0, 2110.0.2.1 (Jan. 2013) (describing "cease and desist orders" as part of the FRB's "formal supervisory actions").[11]  Thus, the enforcement actions the OCC and FRB instituted against Capital One are "supervisory actions" and fall directly within those agencies' "supervisory or regulatory" processes within the meaning of the FSRRA.  Even if the FRB or OCC may have been "adverse" to Capital One, disclosure of the RCA to them did not effect a waiver under the plain terms of the FSRRA.

Third, even if the ordinary waiver analysis did apply, disclosure to the banking regulators would not effect a waiver because it was not voluntary.  *See Sheets*, 2005 WL 3006670, at *2 (disclosure must be made "freely").  Pursuant to agency guidance, these regulators interpret their statutory authority to examine banks as giving them plenary access to a bank's books and records. *See, e.g.*, Ex. 8, OCC, *Comptroller's Handbook: Bank Supervision Process* at 131 (v. 1.1 Sept. 2019) (excerpted); *BHC Supervision Manual* § 1040.0.1.1 (July 2012) ("[T]he [FRB]'s supervisory staff . . . may review *all* books and records of a banking organization that is subject to

---

[11]  Available at https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/large-bank-supervision/pub-ch-large-bank-supervision.pdf (last visited Aug. 13, 2020); https://www.federalreserve.gov/publications/files/bhc.pdf (last visited Aug. 13, 2020).

[FRB] supervision.").[12]  Capital One's banking regulators may assess penalties against Capital One *solely* for refusing to provide requested information.  *See* 12 U.S.C. §§ 164, 481, 1847 (authorizing the imposition of penalties for failing to comply with an OCC or FRB examiner's request for information); *see also* Admin. Monetary Penalties (OSFI) Regulations, SOR/2005-267, s. 3(1) & Sched. at Item 65 (authorizing imposition of penalties for failure to provide requested information to OSFI in violation of Bank Act ).  Therefore, even if the FRSSA's anti-waiver provision did not apply (and it most certainly does), any disclosures to the banking regulators did not waive work-product protection over the RCA because they were mandatory and compulsory.

    2.   Disclosure of the RCA to EY Did Not Effect a Waiver.

As the D.C. Circuit succinctly explained, waiver in the work product context occurs only when disclosure to a third party "is inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Deloitte*, 610 F.3d at 140.  Applying that standard, the D.C. Circuit drew a clear distinction between disclosure of work product to an independent auditor and disclosure to a litigation adversary: "[e]ven the threat of litigation between an independent auditor and its client can compromise the auditors' independence and necessitate withdrawal." *Id.*  Nor is there any risk that EY would provide the PwC RCA report to Capital One's litigation adversaries because "as an independent auditor, [it] has an obligation to refrain from disclosing confidential client information." *Id.* at 142 (citing AICPA Code of Prof'l Conduct Rule 301.01); *see also Int'l Design Concepts, Inc. v. Saks, Inc.*, No. 05-cv-4754 (PKC), 2006 WL 1564684, at *3 (S.D.N.Y. June 6, 2006) (no waiver where outside counsel's investigative findings were shared with independent auditor); *Frank Betz Assocs., Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533, 535

---

[12] Available at https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf (last visited Aug. 13, 2020).

(D.S.C. 2005) (work product shared with outside auditor still protected); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441 (S.D.N.Y. 2004) (similar).  Accordingly, disclosing the PwC RCA report to EY did not waive work product protection.[13]

### 3. Internal Disclosures Did Not Waive Work-Product Protection.

Capital One shared the PwC RCA report with only 154 of its approximately 50,000 employees, and distribution of the report was tightly controlled—limiting most to "read only" access—and logged by Capital One's Legal Department.  *See* Klane Decl. ¶ 15.  Moreover, access was strictly limited to board members, executives, in-house counsel, or employees working in enterprise-wide control or governance functions, all of whom were involved in managing Capital One's response to the Cyber Incident.  *Id.* ¶¶ 13-15.  Additionally, certain technology, cybersecurity, and HR staff, who were involved in post-Incident remediation efforts, received the report.  *Id.* ¶ 16.  Each of those recipients was under an obligation to maintain the PwC report in confidence.  *See id.* ¶¶ 13-14.  Regardless, the pertinent inquiry is whether the report was disclosed to Capital One's "litigation adversary," *FEC*, 178 F.R.D. at 77, and none of Capital One's employees were Capital One's adversaries in litigation arising out of the Cyber Incident.  *See, e.g.*, *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, 2019 WL 1864198, at *3 (D.N.J. Apr. 25, 2019) ("Plaintiff's employees … were not plaintiff's adversaries and therefore no waiver occurred."); *In re Weatherford*, 2013 WL 12185082, at *5 (similar).

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' motion to compel.

---

[13] Again, Plaintiffs rely solely on *Medinol, Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113 (S.D.N.Y. 2002), which "has been almost uniformly rejected as adopting far too restrictive of a view regarding the circumstances under which a waiver can occur."  *In re Weatherford Int'l Secs. Litig.*, 2013 WL 12185082, at *5 (S.D.N.Y. Nov. 19, 2013).

Dated: August 14, 2020

Respectfully submitted,

/s/
David L. Balser (*pro hac vice*)
S. Stewart Haskins II (*pro hac vice*)
John C. Toro (*pro hac vice*)
Kevin J. O'Brien (VSB No. 78886)
Robert D. Griest (*pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Tel.: (404) 572-4600
Fax: (404) 572-5140
dbalser@kslaw.com
shaskins@kslaw.com
jtoro@kslaw.com
kobrien@kslaw.com
rgriest@kslaw.com

Robert A. Angle (VSB No. 37691)
Tim St. George (VSB No. 77349)
Jon S. Hubbard (VSB No. 71089)
Harrison Scott Kelly (VSB No. 80546)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Tel.: (804) 697-1200
Fax:  (804) 697-1339
robert.angle@troutman.com
timothy.st.george@troutman.com
jon.hubbard@troutman.com
scott.kelly@troutman.com

Mary C. Zinsner (VSB No. 31397)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
401 9th Street, NW, Suite 1000
Washington, DC 20004
Tel.: (202) 274-1932
Fax: (202) 274-2994
mary.zinsner@troutman.com

*Counsel for Capital One Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2020, I caused the foregoing document to be filed with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

<u>/s/</u>
David L. Balser
*Counsel for Capital One*