1

1          UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF VIRGINIA
2                ALEXANDRIA DIVISION

3   IN RE: CAPITAL ONE CUSTOMER    .    Civil Action No. 1:19md2915
    DATA SECURITY BREACH           .
4   LITIGATION,                    .    Alexandria, Virginia
                                   .    August 14, 2020
5                                  .    11:05 a.m.
                                   .
6   .  .  .  .  .  .  .  .  .  .   .

7              TRANSCRIPT OF MOTION HEARING
       BEFORE THE HONORABLE JOHN F. ANDERSON
8             UNITED STATES MAGISTRATE JUDGE
            (Via ZoomGov Video Conference)

9
    APPEARANCES:
10
    FOR THE PLAINTIFFS:          NORMAN E. SIEGEL, ESQ.
11                               Stueve Siegel Hanson LLP
                                 460 Nichols Road, Suite 200
12                               Kansas City, MO 64112
                                   and
13                               JOHN A. YANCHUNIS, SR., ESQ.
                                 Morgan & Morgan
14                               Complex Litigation Group
                                 201 North Franklin Street
15                               7th Floor
                                 Tampa, FL 33602
16

17   FOR CAPITAL ONE DEFENDANTS:   S. STEWART HASKINS, II, ESQ.
                                   JOHN C. TORO, ESQ.
18                                 King & Spalding LLP
                                   1180 Peachtree Street, N.E.
19                                 Atlanta, GA 30309-3521
                                     and
20                                 ROBERT A. ANGLE, ESQ.
                                   Troutman Pepper Hamilton
21                                 Sanders LLP
                                   1001 Haxall Point, 15th Floor
22                                 P.O. Box 1122
                                   Richmond, VA 23219
23
                    (APPEARANCES CONT'D. ON PAGE 2)
24
                         (Pages 1 - 32)
25
          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
 1    APPEARANCES:  (Cont'd.)

 2    FOR AMAZON DEFENDANTS:        TYLER G. NEWBY, ESQ.
                                    Fenwick & West LLP
 3                                  555 California Street, 12th Floor
                                    San Francisco, CA 94104
 4                                    and
                                    ROBERT R. VIETH, ESQ.
 5                                  Hirschler Fleischer, P.C.
                                    8270 Greensboro Drive, Suite 700
 6                                  Tysons, VA 22102

 7    OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                                    U.S. District Court, Third Floor
 8                                  401 Courthouse Square
                                    Alexandria, VA 22314
 9                                  (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              A VOICE:   I can't -- can anyone hear Judge Anderson?

3              A VOICE:  We can't hear the Court.

4              THE COURT:  Hopefully, now I'm back.  Okay.  I'm

5    going to have the clerk call the case, please.

6              THE CLERK:  Certainly.  In re Capital One Customer

7    Data Security Breach Litigation, Civil Action No. 19md2915.

8              THE COURT:  And who do I have for the plaintiffs?

9              MR. YANCHUNIS:  Good morning, Your Honor.  John

10   Yanchunis.

11             MR. SIEGEL:  And Norman Siegel.

12             THE COURT:  Who's going to argue?

13             MR. YANCHUNIS:  Your Honor, I am, John Yanchunis.

14             THE COURT:  Okay.  Thank you.

15             And who do I have for Amazon?

16             MR. NEWBY:  Your Honor, good morning.  Tyler Newby of

17   Fenwick & West, and with me is Robert Vieth.

18             THE COURT REPORTER:  Excuse me, Your Honor.  I cannot

19   hear.

20             THE COURT:  We're getting some feedback.  See if we

21   can -- is that better?

22             THE COURT REPORTER:  Yes.

23             THE CLERK:  Yes.

24             THE COURT:  Well, I'm hearing things twice.

25             A VOICE:  This often happens if somebody has dialed

4

1   in and has a computer connection.

2          THE COURT:  All right.  Well, it sounds like we may

3   have gotten it resolved now, so I think it's working okay.

4          So I've got -- and who's here for Capital One?

5          MR. HASKINS:  Good morning, Your Honor.  Stewart

6   Haskins with King & Spalding on behalf of the Capital One

7   defendants.  I also have John Toro with King & Spalding as

8   well.

9          MR. ANGLE:  And Robert Angle on behalf of Capital as

10  well, Troutman Pepper.

11         THE COURT:  Thank you.

12         All right.  Well, I've read the various materials

13  that the parties have submitted in support of this motion to

14  compel, and I'm curious, I just need to get a little bit better

15  understanding.  Typically on a motion to compel, I have a

16  discovery request and a, you know, response if one is fighting

17  over it.  This is sort of just a broad-based we want text

18  messages.

19         And as I understand it, we have Amazon has designated

20  55 custodians that they have agreed to produce documents from.

21  They have now searched nine of those custodians for text

22  messages between them and Capital One, and your request has

23  various parts to it, which means that they have to go back and,

24  I assume from what you're saying, even though it's not

25  specific, is --

5

1          THE COURT REPORTER:  I'm sorry, Your Honor --

2          THE COURT:  -- every discovery request -- again,

3    we're getting a little bit of feedback, I think.

4          We have everybody else on mute, so this is going to

5    be the best we can do, I think, under the circumstances as I

6    can tell.

7          So, you know, we've got three different areas that I

8    think -- first, going back, I guess you're requesting that they

9    have to go back and for the entire 55 custodians, go back and

10   search their text messages for all discovery requests that have

11   been submitted to Amazon, and that would include not only texts

12   with Capital One employees but texts among themselves having to

13   do with any responsive material, and then texts with other

14   customers, it kind of had broken it down into those three

15   different areas, where they have done at least part of item

16   No. 1; that is, of the 55, you've gotten at least 9 that

17   they've produced the texts that they had with Capital One.

18         So again, help me understand what it really is that

19   you're asking for and why we, we should require them to go in

20   and do that type of undertaking in this case.  You've got to be

21   off mute now.

22         Well, again, you're still on mute.

23         MR. SIEGEL:  John, you're on mute.

24         MR. YANCHUNIS:  Okay.  Sorry.

25         THE COURT:  Okay.

6

1          MR. YANCHUNIS:  Thank you, Your Honor.

2          THE COURT:  Start from the beginning.

3          MR. YANCHUNIS:  I have many challenges, one of which

4   is technical challenges.

5          You know, I think you addressed perhaps something

6   that could have been presented for you, and I apologize for

7   this.  We served a first request for production of documents

8   which is pretty lengthy, and in the description of, or

9   definition of both "communications" and "documents" would have

10  encompassed the very type of document which we seek now:  text

11  messages.

12         A number of responses to those requests indicated

13  that production would occur.  It wasn't until I took the

14  deposition of Mr. Schuster, who was a 30(b)(6) witness, on

15  June 11, that to my surprise, and perhaps this is generational,

16  that the communication of the breach between the chief

17  information security officer of Capital One and the chief

18  information security officer of AWS was via text, and if you

19  have the deposition in front of you, you would see a colloquy

20  where I'm actually challenging why didn't they simply pick up

21  the phone?  Because this was a significant cybersecurity

22  incident involving the theft of almost 100 million personal

23  identification information of customers of Capital One.

24         So it wasn't until that time that I realized that

25  those text messages had never been produced as they had for

1    Capital One.  Capital One made a production of text messages

2    with its employees, at least I believe that to be the case, and

3    I think I've even attached one of them for your review, one

4    between employees.

5            So in response -- and the motion lays this out --

6    Mr. Newby and I engaged in a communication about production,

7    and I'm not sure how the production or, or the search occurred,

8    whether it was simply a communication to the nine individuals

9    that we identified as witnesses to say:  Search your text

10   messages and see if you can find any communications where you

11   were talking to somebody about any of the issues in this suit

12   and a Capital One employee, and the day before he filed the

13   motion, they indicated Mr. Bentzen was one that they had

14   identified.

15           So the request for this information was out there,

16   but this is not something new.  It was new to us that it wasn't

17   produced.

18           So if you wanted to see the requests, I could send

19   those -- I could file those after today's hearing, and you can

20   see where repeatedly they indicate this information is going to

21   be produced.

22           So if you can imagine, one of the things that we hit

23   on in, in the motion is sometimes the candor or the lack of

24   guardedness that employees may have when they communicate with

25   one another, and the one I submitted in support of our motion

8

1    between two Capital One employees is a rather candid

2    conversation outside or inside the courthouse while Paige

3    Thompson, the alleged perpetrator of this crime, is being

4    arraigned.

5          So we made the request.  The obligation was on the

6    part of AWS to produce this information.  The attempt to come

7    up with a compromise occurred because I was trying to lessen

8    the burden.  And quite frankly, I don't know how they made that

9    request.  They raise the issue of privacy, but what was less

10   private when they approached the nine individuals to search

11   those records?

12         And quite frankly, we can address that by having the

13   mailbox searched for key terms, for keywords, so we can avoid

14   perhaps any spousal communications or other relationship

15   communications which people may not want to share or have

16   exposed to the outside world.

17         So again, they did not object, and I understand the

18   Court doesn't have that, to the production of this information

19   until, again, I took the deposition on June 11 and found out

20   they hadn't produced a text message, and then later any text

21   messages.

22         THE COURT:  You had their production.  The idea that

23   you didn't know that they didn't produce any text messages

24   really isn't accurate.  You knew what they produced.  If there

25   weren't text messages in what they produced, you knew you

1  didn't have any text messages.

2          MR. YANCHUNIS:  Well, the deposition was taken on

3  June 11, Your Honor, and we were on a rolling production with a

4  substantial compliance of July 1.

5          And by the way, we're still waiting for a completion

6  of their production requirement and had Ms. Dent and an AWS

7  counsel at a communication yesterday about additional

8  production.

9          But be that as it may, if your question is, well, why

10 didn't you know that they hadn't produced it without me

11 assuming that they had found something and had honored the

12 obligation to produce it and there might not be any?  So the

13 point being if there wasn't any, why couldn't I assume that

14 there wasn't any, not that there was, until again June 11, when

15 I took Mr. Schuster's deposition as a corporate representative

16 of AWS?

17         THE COURT:  Going back to what is it that you really

18 want them to do in this motion?

19         MR. YANCHUNIS:  Well, search the text messaging

20 communications that employees have had.  And you're right,

21 there are in excess of 50 custodians.  By the way, there are

22 many more on the part of Capital One.

23         And I'm not an ESI wonk, I don't have the

24 technological background other than in cybersecurity detection

25 and breaches, but I understand those messages can be searched

1   in connection with certain key terms as compared with, you

2   know, a more onerous burden.

3          But I think, Your Honor, this is a case involving not

4   only a significant amount of consumers that information was

5   taken, but the enormity of, of the repercussions of that which

6   we advocate make this proportionality argument a little thin, I

7   think.

8          And in terms of the burdensome, let me just add that

9   again, as we point out in our reply, typically courts require

10  some articulation through declaration or affidavit of what that

11  entails.  We did not get that.

12         And while I certainly have sometimes told courts

13  certain things, I'm not a witness.  And even still, if I'm

14  going to articulate a burden, I'm going to give you detail,

15  which we didn't get as to the time and expense and the manpower

16  or person power it would take to engage in that enterprise.

17  That wasn't done either.

18         THE COURT:  All right.  Mr. Newby, let me hear from

19  you.  And good morning.  I know it's pretty early out there on

20  the West Coast.  I know you appreciated this one-hour delay

21  from ten to eleven to at least give you time to get up and have

22  breakfast.

23         MR. NEWBY:  I do, Your Honor, and I didn't, I didn't

24  presume that that was for my benefit, but I thank the Court

25  for, for making that adjustment.

11

1          Your Honor, just to address Mr. Yanchunis's

2    statements in reverse, the -- in order to search for text

3    messages of all 55 custodians, the proportionality and burden

4    is really laid out just in the math here.  We have 55

5    custodians, and you have a five-year period during which the

6    parties have agreed there is relevant information.  I should

7    say five years and a month.  And so you multiply that together,

8    and that's a tremendous amount of text message history from

9    personal devices to search through, which is highly burdensome

10   both from the privacy rights of those individuals --

11          THE COURT:  Help me understand how it is burdensome.

12   And that's, that's, that's one of the things that's really

13   missing in your opposition.  You did it, you obviously searched

14   nine custodians' text messages for responsive material.  I have

15   no information in front of me as to how long, complicated,

16   extensive, what kind of an undertaking that was.  So, I mean,

17   it is your burden to come in and convince me that it is not

18   proportional.

19          And, you know, this is, you know, thin at best, just

20   saying it's going to -- you know, I've got 55.  Well, if it's

21   55 times, you know, some very small number or something that

22   isn't very significant in the overall scheme of things, that

23   doesn't amount to much, Mr. Newby.

24          MR. NEWBY:  Well, Your Honor, the, the agreement that

25   we had tentatively reached with the plaintiffs was aimed at

1   addressing the difficulty of conducting a keyword search across

2   55 custodial phones, and here's, here's why what we did was not

3   burdensome:

4          We limited our agreement to the collection and

5   production of text messages with Capital One, and so that's a

6   very finite universe in terms of identifying the phone numbers

7   that these eight -- it's actually eight; the ninth is a former

8   employee who's, who's not under our control right now -- but

9   the -- for those eight, we could say -- we could identify the

10  specific Capital One employee phone numbers that have been

11  communicated with, and it was a very narrow universe of

12  responsive e-mail -- I mean, text messages.

13         In fact, most people did not communicate at all by

14  text message.  There is Mr. Schmidt, who is the, the chief

15  information security officer and the executive sponsor, who --

16  whose position is for Capital One to be able to contact an

17  executive when they need to escalate a matter.

18         And just to correct one, one issue here, the Capital

19  One witness -- or, I'm sorry, the Capital One CISO did not text

20  Mr. Schmidt:  We found the data breach.  He texted him on a

21  Saturday saying:  Can we get on a call?  It's important, or

22  words to that effect.  It's an important issue.  Sorry to

23  bother you on the weekend.

24         And, and then there was a further text message

25  back-and-forth between those two over a couple of months.

1          We only had one other witness of those eight that the

2    plaintiffs requested deposed that had text communications with

3    Capital One, and so when you narrow it to who is, who is being

4    spoken with, it's a pretty easy and not burdensome production,

5    but when you ask for 55 custodians, the identification of 55

6    custodians and all of their communications with every Amazon

7    employee, anyone who might have been a customer, that requires

8    imaging their entire phones, which pulls all of the, the text

9    messages of everybody off of, including sensitive personal

10   information, and then you, then you run the keyword search.

11         So that does have a significant privacy impact on

12   these individuals.  It's a dispersed workforce, where people

13   are located around the country, sometimes the world, and

14   collecting those phones and doing that imaging is substantially

15   difficult.

16         THE COURT:  Well, substantially difficult, that -- I

17   don't know what that means.  You know, and that, that's the

18   problem.  First of all, if text messages fall within the scope

19   of what was being requested by the plaintiff, so they are

20   communications, they are memorializations of communications,

21   you know, they are like e-mails to some extent in that, you

22   know, they are communications dealing with certain things.

23         So I'm, I'm a little concerned that you just

24   completely ignored the idea that text messages would be

25   something that we should look to and need to examine, just as

14

1    e-mails, I mean, people, you know, use their, I assume, Capital

2    One e-mail account to, you know, send personal information to

3    people, do certain things, checking at home, those kinds of

4    things.  That wouldn't be that uncommon.

5            So you're subjecting -- you know, when you look at a

6    custodian's complete e-mails, you're also capturing a lot of

7    information that is or may be a violation of the company

8    policy, still is using it for personal goods -- use.

9            So it seems like a misstep to some extent from the

10   get-go that you would not have thought to look to see whether

11   text messages would have been responsive to the document

12   requests that were served on Amazon.

13           And there's some vague reference in your opposition

14   to when we did the custodial interviews, that didn't come up.

15   I find that shocking that your firm, as experienced as it is in

16   these type matters, wouldn't have addressed that issue at the

17   beginning of a custodial interview and told them that they

18   needed to preserve that kind of information because if, in

19   fact, there were relevant text messages going on, they would

20   have an obligation to preserve it.

21           And so help me understand why we're in this situation

22   this far along in the discovery process.

23           MR. NEWBY:  Your Honor, when we -- so when we

24   identified and met with custodial custodians to identify

25   sources of information, we asked them:  What are -- how do you

15

1  communicate with Capital One?  How do you communicate about the

2  Capital One account?  And those -- and where are documents

3  located?

4          And there, there were four main repositories, and we

5  had collected and produced from those repositories.

6          I agree that text messages are responsive that are on

7  personal devices, that are not on a corporate e-mail account or

8  corporate chat account, which you have a lesser expectation of

9  privacy in, court you probably have no expectation of privacy

10  in, but it's different on a personal phone, where you're,

11  you're communicating with -- not about, not about work

12  information but --

13          THE COURT:  Well, the, the problem is if they're not

14  communicating about work issues on their phone, then there's

15  not going to be anything responsive on the phone.  The problem

16  is if they are communicating on their personal phones, and I

17  assume, you know, you have said these are all personal phones,

18  that these aren't phones that are issued by Capital One or

19  Capital One doesn't pay -- I'm sorry, Amazon doesn't pay for,

20  you know, their service or anything like that, and there -- I

21  don't know whether there are or aren't any Amazon restrictions

22  on you shouldn't be using personal devices to communicate about

23  clients or work on your personal devices because of security

24  concerns or whatever, but, you know, I don't know what those

25  issues are, but if, in fact, they are using their personal

1  devices to conduct Amazon business and discuss issues having to

2  do with Capital One or this data breach or those kinds of

3  things, then, you know, that really isn't something that one

4  would not be expected to produce in a business environment like

5  this.

6            So that's -- and so, you know, the idea that you just

7  asked the custodians, you know, what do you, what do you

8  remember doing, without further investigation as to, well, you

9  know, what about your cell phone?  Do you ever communicate

10 business-related matters by text message from your cell phone

11 devices?  That -- you weren't proactive in doing that when you

12 interviewed these custodians?

13           MR. NEWBY:  We have with, with some, Your Honor, but

14 not, not with all.  And we have not -- I'll just be candid

15 here.

16           For some reason, I've lost your image.

17           Okay.  We, we have not personally interviewed every

18 single custodian here.  We have interviewed many of them, but I

19 would contest the notion that text messages are proportional

20 and an appropriate source of document collection in every case.

21 In some cases, yes.  I mean, there are -- the rules of

22 discovery on proportionality don't require you to overturn

23 every stone in searching for potentially responsive

24 information.

25           In a case where it's clear employees are likely to be

1    trying to hide communications from overseers, a fraud case,

2    accounting fraud, insider trading, absolutely, but this is not

3    a case where anybody is trying to hide anything, and we

4    targeted our document collection and production to those

5    repositories that are used extensively for business purposes

6    and for communications about the Capital One account and about

7    this data security incident.

8            THE COURT:  Well, again, I'm, I'm -- I'm not fully

9    understanding why you would just take the position that text

10   messages are too hard, too difficult, too much trouble to

11   search for without some meat on those bones and providing the

12   Court with some information as to what would really be required

13   to do that.

14           And it just -- it seems to be difficult for one to

15   get their hands around that if there is responsive information

16   that is a format, you have been served with a discovery request

17   that asks for that information, even if it is in that format,

18   you haven't objected -- as far as I can tell specifically, you

19   didn't object to searching for or producing text messages.

20           You have, you know, been able to search for text

21   messages in some respects at least as to nine different

22   individuals, eight custodians and one, I guess, noncustodian

23   now, and I don't -- you know, I don't -- you had to get the

24   information from the cell phones downloaded in order to do

25   that.  You then could narrow it down by phone numbers, I guess,

1    for Capital One employees.

2              I don't understand why the same information that you

3    downloaded couldn't also be searched for keywords, as the

4    plaintiff has suggested here, to see what, if any, text

5    messages would be responsive.

6              You know, I -- and I don't know whether your, your --

7    you know, there may be some custodians who, you know, only use

8    their personal phone for personal devices and never send text

9    messages to, you know, customers, to internally having to do

10   with work-related business.  They use either e-mail or the

11   internal communication devices, which would seem to be the

12   better business practice, but that doesn't necessarily mean

13   that you don't have the obligation to at least do something to

14   find out whether responsive documents are held and should be

15   produced.

16             MR. NEWBY:  I think getting back to what I was saying

17   earlier, Your Honor, for the limited scope -- for these limited

18   number of, of custodians, eight people, just text messages with

19   Capital One, that's very narrow.  We can identify -- and most

20   of them -- well, the two of them that have had any

21   communications via text message on the topics in this case, it

22   was just one person that they communicated with, and so that's,

23   that's a very simple process.

24             But looking across --

25             THE COURT:  What, what did you do -- what did you

19

1   need to do in order to find that out from the eight custodians

2   that you have now done and got one hit on, okay?  So for the,

3   the ones who were being deposed, you agreed to provide some

4   text messages from their phones.

5            As a part of that process, how did you undertake the

6   search and production of, I guess, the one text message that

7   was subject to your agreement with Cap- -- with the plaintiffs?

8            MR. NEWBY:  All right.  So we, we worked with our

9   in-house client, with instructions to those custodians to

10  identify all text messages with Capital One employees about a

11  list of topics, and they identified the persons within Capital

12  One that they had text messages -- that they had had text

13  messages with us -- or with -- and provided the text messages

14  to in-house counsel, who provided it to us for production.

15           THE COURT:  So this was a custodian searching his or

16  own -- his or her own text messages and responding, as opposed

17  to someone getting their text messages and searching their text

18  messages?

19           MR. NEWBY:  That's correct, based on detailed

20  instructions.

21           THE COURT:  What follow-up was done to make sure that

22  they were being followed and doing what they had been

23  instructed to do?

24           MR. NEWBY:  There was a confirmation that was

25  required from them in writing on whether they had conducted the

1    search and whether they had identified any text messages with

2    Capital One.  We got written confirmations from every single

3    person.

4             THE COURT:  How many of those deponents have now

5    actually been -- or proposed deponents have actually been

6    deposed?

7             MR. NEWBY:  None of them have been deposed as

8    individuals.  One of them was deposed as a 30(b)(6) witness.

9             THE COURT:  But they're all planning to be deposed at

10   some point?

11            MR. NEWBY:  Yes, Your Honor.  These are all -- these

12   were all individuals on Capital One's requested deposition

13   list, and the caveat there is that one of them is a former

14   employee who's currently represented by separate counsel.

15            THE COURT:  For the records that were produced, the

16   Schmidt text messages, what was the process that was done in

17   order to search his cell phone and produce those text messages?

18            MR. NEWBY:  He identified to us in his communication

19   that -- he identified all text message communications with

20   Capital One about the topics that we identified in our

21   requests.

22            THE COURT:  And again --

23            MR. NEWBY:  And he -- I'm sorry.

24            THE COURT:  Was it only with Johnson?  I mean, that

25   was the only Capital One employee that he had text messages

1    with?

2            MR. NEWBY:  On the topic in our -- on the topics that

3    were in our requests, which have to do with Capital One

4    security -- I'm speaking broad-brush here -- Capital One

5    security, the incident, and remediation.

6            THE COURT:  Okay.  Anything else before I hear from

7    plaintiffs?

8            MR. NEWBY:  No.  The only thing was that Mr. Schmidt

9    confirmed to us that he provided to us all of the text messages

10   that he had that met those criteria.  We reviewed them and then

11   produced them in their entirety to the plaintiffs.  We did not

12   withhold any.

13           THE COURT:  I'll hear from plaintiffs' response to

14   what Mr. Newby has said.

15           MR. NEWBY:  And, Your Honor, if I could just

16   interject before Mr. Yanchunis speaks, we, we told the

17   plaintiffs in our meet and confer that, that it had been a

18   custodial collection.

19           THE COURT:  What do you mean by that?

20           MR. NEWBY:  Meaning that the -- we had not imaged

21   their phones.

22           THE COURT:  So it was a -- the custodians did their

23   own search of their own phones --

24           MR. NEWBY:  Right.

25           THE COURT:  -- and gave you the responses.

22

1          MR. NEWBY:  Yes.

2          THE COURT:  Okay.  Let me hear from plaintiffs.

3          Again, you've got to take the mute off.

4          MR. YANCHUNIS:  Sorry.

5          THE COURT:  There you go.

6          MR. YANCHUNIS:  Judge Anderson, I think you've hit an

7  issue which is one concern, is they left up to employees to

8  say:  I searched my phone.  I have nothing to produce.

9          That's woefully short of the obligation of the

10  defendants to engage in that search.

11          A discussion was made, and I certainly raised the

12  issue based upon a lack of knowledge, and then Mr. Newby, I

13  think, doubled down on my beliefs that you had to image the

14  phones to figure out whether or not there were text messages.

15          One of my lifelines, Mr. Webster, well known to you,

16  told me there was a search function on iPhones, that you can do

17  a search of words to ascertain whether or not there are text

18  messages with those words.  You do not need to image the entire

19  phone.  So it's a way in which you can circumvent any privacy

20  concerns that I addressed earlier, and, of course, we have a

21  protective order in this case.

22          So again, I, I don't need to go over those things

23  that the Court found problematic.  We asked for this

24  information.  It wasn't given.  I assumed it was produced to

25  us, and it wasn't, again, until the deposition of a corporate

1    representative that I found out there was a text message out

2    there.

3           So again, I tried to take it in a methodical way of

4    at least having -- and again, an agreement, which was without

5    prejudice, which means I could go back without any kind of

6    repercussions to expand that, and again, through an

7    employee-only search, without any validation, it produced only

8    one additional e-mail -- or text message.

9           THE COURT:  Again, that may or may not be surprising.

10   I mean, it may be that Amazon employees know that they

11   shouldn't be conducting Amazon business by text routinely, and

12   obviously, when you have the situation between Mr. Schmidt and

13   Mr. Johnson, that is, a high-level situation where you've got

14   individuals who are executive function, client development,

15   need to be in contact 24/7, those kinds of things, the idea

16   that they used texts to submit a -- does not necessarily mean

17   every rank-and-file Amazon employee is texting internally or

18   texting with other customers.

19          You know, again, you know, I'm, I'm trying to

20   understand why it is that you have the need -- and you have

21   gotten a lot of information relating to communications

22   internally at Amazon and (inaudible) issues, both e-mails and

23   the other messaging system that they have that I suspect is

24   probably a pretty robust system under the circumstances, and

25   why it is that you think having someone have to go through the

1   process of, you know, having their personal devices either

2   searched by someone else, which seems to be what you're now

3   saying that they would need to do, as opposed to them searching

4   it, I don't know whether the search function that Mr. Webster

5   is talking about is something that has to be done on a

6   single-word basis and so you have to then, you know, search for

7   "Capital" and then have to search for "One" and then you search

8   for "Capital One" or you do something like that, but, you know,

9   obviously, the range of search terms that were used to generate

10  responsive documents were electronic documents, the e-mails and

11  things like that, was certainly more expansive than one or two

12  terms and probably more than what an iPhone is -- system is

13  developed to generate a response to, but, you know, why is it

14  that one should have to go through this process only to confirm

15  your suspicions that there may or may not be information out

16  there?

17          Again, we're -- maybe we're muting you and --

18          MR. YANCHUNIS:  So let's not forget that we shouldn't

19  even be here.  These requests were launched.  We got responses.

20  In no way do they say:  By the way, we're not producing text

21  messages with employees about any of these subjects.

22          So the fact that we're here is because I found out

23  that it hadn't occurred.  So we ought to be talking about

24  waiver as compared with what am I trying to find?

25          Well, I'm trying to find information in discovery

1    about the issues in this case.  We're dealing with one of the

2    largest technological companies on the face of the earth.  It

3    along with Google, Facebook, and maybe another one, Microsoft,

4    are technologically advanced.

5         And here we're having a colloquy without the benefit

6    of a declaration about burdensomeness, which again, one of my

7    lifelines, regardless of whether or not Mr. Webster is correct,

8    regardless of whether or not it's as easy as Mr. Webster

9    suggests, it's not my obligation to advance that.  That's their

10   obligation to say you can't do it.

11        And in terms of again what's in it, Your Honor, I

12   don't know, but why is text messages, if it's a form of

13   communication with employees, any different from e-mails?

14   E-mails certainly are on the system of their employer, but we

15   know it is common for people to talk via text messages.

16        It's a quick communication that you know somebody's

17   going to get.  Why?  Because in this world that we live in

18   today, instead of getting letters or memos through inner office

19   correspondence, we get e-mails, and we get a bunch of them, and

20   sometimes they have a tendency to stack up.  For instance, our

21   screen is only limited, so I'm sure the Court, I know all these

22   lawyers get e-mails that sometimes slip through the cracks, but

23   a text message is right on your phone.  You see it.  You

24   respond to it.

25        So I don't want to discount and the Court shouldn't

26

1    discount the fact that there may be relevant information, but I

2    don't know.  It's -- it was their burden to engage in this,

3    they didn't do it, and it shouldn't be it now by having to try

4    to guess what's in it.

5            But again, the candid nature of those types of

6    communications cannot be underestimated in connection with

7    e-mail communications, where a company can monitor e-mail

8    traffic, preserve it even upon deletion.  People may be less

9    guarded.

10           I think the exercise needs to occur for the -- in

11   response to the request.

12           THE COURT:  Mr. Newby, what about the waiver

13   argument?

14           Again, you need to be off mute.  All right.

15           MR. NEWBY:  I won't -- we did not include a specific

16   objection to the definition of "documents," which includes

17   about every possible written type of document under the sun.

18   We did include a proportionality objection in our specific

19   objections that we posed, but it is not the case that a

20   defendant needs to search for every potential source of

21   documents in a case, and we targeted our search to custodians

22   and to document repositories that we believed through our, our

23   interviews were most likely to yield responsive information,

24   with proportionality in mind to move the case.

25           On the search issue, we have very complex search

1    terms in this case, a lot of negotiation with the, the other

2    side, with the plaintiffs on the search terms, and it was

3    challenging enough to run those search terms through a very

4    well-developed and advanced discovery platform with the aid of

5    an eDiscovery vendor experienced in search terms, Relativity

6    being one that's being used.

7              THE COURT:  Let me just break off for a minute.

8    Mr. Toro, this is -- when I do a Zoom hearing, I handle this

9    like it would be you were in court.  Leaving the screen and

10   walking around and doing those kinds of things, either you need

11   to get yourself off the video or you need to pretend like

12   you're in court.  You know, it, it is very, very distracting

13   for you to be walking around, turning around, doing those kinds

14   of things.

15             So, you know, either take yourself off the video or

16   act like you're in court, okay?

17             Okay, Mr. Newby.  Thank you.

18             MR. NEWBY:  As I was saying, that we have

19   well-developed, heavily negotiated search terms.  These are not

20   the types of search terms that can be run on an iPhone.  It's,

21   it's a complex -- it was hard enough to, to do them on

22   Relativity with a lot of, a lot of negotiation.

23             THE COURT:  Well, as hard as it may be for you to try

24   and do this, you know, I don't find that text messages

25   necessarily are a repository that one can ignore in responding

1    to discovery requests in this day and age, and that that should

2    be something that's either addressed in making your responses

3    or negotiated or worked out as to certain things.

4           You know, I think there is at least enough

5    information that's been presented that requires me to at least

6    take an effort to search those text message repositories to see

7    what, if any, responsive material may be in those text

8    messages.

9           You know, you need to -- and the idea that there are

10   55 of them and I think it's going to be tough doesn't satisfy a

11   burden.  I mean, that just, you know, at least from me, if

12   you're going to make a proportionality argument, there has to

13   be some substance behind them and not just say it's going to be

14   hard, we don't want to do it, it's difficult, you know, there

15   are a lot of people.

16          You would have made the same argument for 55

17   custodians looking for e-mails.  There are a lot of -- you

18   know, there are a lot of custodians.  We have to do this, you

19   know, for 55 different custodians.

20          Well, that's, you know, that's because this is a big

21   case and there are a lot of issues involved in it.  So adding

22   text messages to the mix of the repositories of potential

23   discoverable material is something that I think is, is

24   appropriate under the circumstances.

25          Not knowing the details of how that can be done, I

29

1    can't tell you exactly how to do that, but the idea that that

2    isn't something that should be addressed and examined and

3    looked at with each individual custodian as to whether those

4    custodians would have information that would be responsive --

5    and this is, you know, not just with Capital One.  These are

6    document requests that relate to issues that are relevant to

7    the matters in this case.

8            So the narrowing to any communications with Capital

9    One, I think, is inappropriate.  I think there has to be a

10   search for text messages that would be responsive in some

11   respects to the requests that have been done, and using that

12   repository to see whether there are responsive text messages.

13   You know, I, you know, based on the record in front of me,

14   that's, I think, the, the ruling that is appropriate under the

15   circumstances.

16           You know, again, I don't know what that's going to

17   require you to have to do.  You know, I suspect, you know, one

18   step is to talk or to interview or find out from the custodians

19   themselves, you know, what is the universe of their text

20   messages, you know, what kind of system do they have text

21   messages that were done, do they use their -- do they send text

22   messages to other employees, do they conduct any business by

23   text messages, and if the answer to that is sometimes yes,

24   then, you know, they have to have their text messages searched.

25   Either whether it's they do it themselves or you provide them

30

1    with some basis to do it or you download their text messages

2    and run it through search terms, you need to figure that out.

3            But, you know, to the extent that the motion is

4    dealing with are text messages an appropriate repository for

5    one to have to look to to see whether there are responsive

6    materials, the answer to that is yes in this case, and that I

7    haven't been shown sufficient information that that would be

8    beyond the proportionality requirements of this case.  Okay?

9            Anything else this morning for the plaintiffs?

10           MR. YANCHUNIS:  Your Honor, thank you.  Just, just

11    one other issue, and forgive me if it's been addressed already

12    in a docket entry.  We sent a communication to a member of the

13    court staff about a ruling from a previous hearing and the

14    subsequent docket entry which seemed to us to be contradictory.

15    This was regarding the number of depositions under the rule.

16           THE COURT:  I entered an order that day.

17           MR. YANCHUNIS:  Okay.  I'm sorry, Your Honor.  I

18    missed that.

19           THE COURT:  You know, my, my ruling on that was that

20    employees are not under parties, but, you know, the caveat to

21    that, plaintiffs need to understand, you know, there still is

22    an ability to file a motion for a protective order.  So if you

23    go crazy and start trying to notice every Capital One or every

24    Amazon employee because they're not counting to the limit, you

25    know, a motion for protective order is going to be heard and

31

1    very well may be granted unless there's a real reason behind

2    the need to take them.

3            But the, the ruling was that parties -- that the

4    party limit, an employee does not count towards the party

5    limit.  Former employees do but not employees, and I think I

6    made that clear in the order that I entered upon Ms. Zinsner

7    and -- noting that I had made an error in that order, and I

8    think it has been corrected.

9            Anything else from the plaintiffs?

10            MR. YANCHUNIS:  No, Your Honor.  Nothing else for the

11   plaintiffs.

12            THE COURT:  Mr. Newby, anything else from Amazon?

13            MR. NEWBY:  No, Your Honor.

14            THE COURT:  Okay.  Anything from Capital One?

15            MR. HASKINS:  No, Your Honor.

16            THE COURT:  Okay.  Well, I guess I will see you-all

17   next week.  I need to figure out what other motions that I have

18   scheduled for next Friday and then apply the timings of

19   hearings.  So I generally try and put you-all at the end of the

20   docket just so that I have plenty of time to hear what, what

21   the issues are, and I suspect that will be -- I'll end up

22   putting it at the end of the docket on next Friday as well, but

23   it depends on how many other things I've got and how long I'm

24   estimating them to take.

25            So we'll get something out on Monday or Tuesday

1    letting you know what time that we'll start next Friday, okay?

2              MR. SIEGEL:  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              MR. HASKINS:  Thank you for your time, Your Honor.

5              THE COURT:  Thank you.

6                        (Which were all the proceedings

7                         had at this time.)

8

9                   CERTIFICATE OF THE REPORTER

10        I certify that the foregoing is a correct transcript of

11   the record of proceedings in the above-entitled matter.

12

13

14                        _____/s/_____
                                    Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25