1

 1                    UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3    IN RE: CAPITAL ONE CUSTOMER   .    Civil Action No. 1:19md2915
      DATA SECURITY BREACH          .
 4    LITIGATION,                   .    Alexandria, Virginia
                                    .    August 21, 2020
 5                                  .    10:59 a.m.
                                    .
 6    .  .  .  .  .  .  .  .  .  .  .

 7                   TRANSCRIPT OF MOTIONS HEARING
               BEFORE THE HONORABLE JOHN F. ANDERSON
 8                 UNITED STATES MAGISTRATE JUDGE
                  (Via ZoomGov Video Conference)
 9
      APPEARANCES:
10
      FOR THE PLAINTIFFS:            NORMAN E. SIEGEL, ESQ.
11                                   JILLIAN R. DENT, ESQ.
                                     LINDSAY T. PERKINS, ESQ.
12                                   Stueve Siegel Hanson LLP
                                     460 Nichols Road, Suite 200
13                                   Kansas City, MO 64112

14
      FOR CAPITAL ONE DEFENDANTS:    DAVID L. BALSER, ESQ.
15                                   SUSAN M. CLARE, ESQ.
                                     King & Spalding LLP
16                                   1180 Peachtree Street, N.E.
                                     Atlanta, GA 30309-3521
17                                     and
                                     ROBERT A. ANGLE, ESQ.
18                                   Troutman Pepper Hamilton
                                     Sanders LLP
19                                   1001 Haxall Point, 15th Floor
                                     P.O. Box 1122
20                                   Richmond, VA 23219

21
      FOR AMAZON DEFENDANTS:         TYLER G. NEWBY, ESQ.
22                                   Fenwick & West LLP
                                     555 California Street, 12th Floor
23                                   San Francisco, CA 94104

24
                          (Pages 1 - 39)
25
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                    U.S. District Court, Third Floor
2                                   401 Courthouse Square
                                    Alexandria, VA 22314
3                                   (703)299-8595
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1                      P R O C E E D I N G S

2            THE COURT:  Well, good morning.  I think you can call

3    the case.  Thank you.

4            THE CLERK:  Certainly.  In re Capital One Customer

5    Data Security Breach Litigation, Civil Action No. 19md2915.

6            THE COURT:  And who do we have for the plaintiffs,

7    and who will be arguing for the plaintiffs?

8            MR. SIEGEL:  Good morning, Your Honor.  This is

9    Norman Siegel, co-lead counsel for the plaintiffs.  With me are

10   my colleagues, Lindsay Todd Perkins and Jillian Dent, and I

11   will handle the argument this morning.

12           THE COURT:  Thank you.

13           And who's here for Capital One?

14           MR. BALSER:  Good morning, Judge Anderson.  David

15   Balser on behalf of Capital One along with my partner, Susan

16   Clare, and my colleague, Robert Angle, and I'll be arguing the

17   motion on behalf of Capital One.

18           THE COURT:  Thank you, Mr. Balser.  Ms. Clare,

19   Mr. Angle.

20           And I have Mr. Newby is here for Amazon.

21           MR. NEWBY:  Yes, Your Honor.

22           THE COURT:  Okay.  I take it Amazon is not -- doesn't

23   really have a position on these matters; is that correct?

24           MR. NEWBY:  That's correct, Your Honor.

25           THE COURT:  Thank you.

4

1          Okay.  Mr. Siegel, I have had an opportunity to read

2  all the papers, the exhibits.  I obviously understand this

3  issue from our earlier dealings with the Mandiant report.  This

4  one is different, though, and I'm willing to hear any

5  additional argument that you have having to do with this

6  motion.

7          MR. SIEGEL:  Sure, Your Honor.  And I appreciate the

8  Court's time, and we'll keep it short.  It is different than

9  Mandiant in some respects.  We have the declarations, for

10  example, suggesting that at least in part, PwC was hired for

11  the litigation, but I think we all know the principles.

12          We've litigated the Mandiant issue, as you note, and

13  I think if you look at all of the evidence in front of the

14  Court, at least that, that we have and the Court has, we still

15  think that Capital One has failed to establish that the driving

16  force behind this report was, was something other than business

17  purposes.  And I'd just like to walk through at a high level

18  why and point out a couple of specifics that we think really,

19  really do bear on the ultimate resolution of this.

20          As an initial matter, obviously, I think the

21  invocation of Rule 26 and the concept that this is a retained

22  expert on its face just appears contrived to us, candidly.

23  There was nothing in the record that identifies that we are

24  hiring you as an expert in the sense you would traditionally

25  see it from a law firm, like I'm sure King & Spalding has done

1   in this case and we've done in this case, that is, hiring them

2   specifically for a piece of litigation, but I'm not sure that

3   matters at the end of the day to the Court's analysis because I

4   think whether we're looking at this as a -- as work product in

5   the traditional sense or under Rule 26 as a retained expert,

6   we're still trying to figure out whether the driving force

7   behind this report is, is for business purposes.

8           And, and again, I do think, though, the fact that PwC

9   is engaged by the Board, not by outside counsel, does bear on

10  that, and the starting point for that is the, is the scope of

11  work, the SOW, which is Exhibit 2, and I -- I'm sorry.

12          THE COURT:  By the Board and by the general counsel,

13  correct?

14          MR. SIEGEL:  Correct.  That's right.  That's right.

15          And, and, you know, part, part of the issue here is

16  we're at a -- and the Court is at a little bit of an

17  information disadvantage here.  We have the scope of work in

18  part, and, and the scope says that PwC is being retained to

19  perform an objective root cause analysis of the incident and to

20  assist Capital One's legal department, and it goes on from

21  there.

22          And so the initial purpose is the root cause

23  analysis, and I think, you know, to parse this a little bit,

24  you know, at the time this is -- that they're doing the scope

25  of work, they don't say "for the purpose of assisting of."

6

1   It's a separate, independent, in our view, secondary or

2   tertiary purpose is to assist Capital One's counsel.  In other

3   words, the primary purpose is the, the risk assessment.

4           THE COURT:  Well, how could one advise Capital One on

5   the legal issues without knowing what the root cause of the

6   problem was?  You know, that, that is what causes me some

7   concern about the way that you're, you know, it's two separate

8   things is not, you know, No. 1, and then if you get around to

9   it, you need to do No. 2.  This is you need to do 1 and 2, and

10  my reading of it is you would have to do 1 in order to properly

11  be in a position to deal with the second issue.

12          MR. SIEGEL:  It's entirely possible, but that's

13  not -- and again, I understand I'm parsing this, but they

14  didn't say "for the purpose of," and I think if they said "for

15  the purpose of," it would be entirely consistent with what Your

16  Honor just articulated, right?  We need to do a root cause

17  analysis to assist us in advising you on these legal matters.

18          I think that's different, and I -- the reason I point

19  that out is not just because it appears to be the primary

20  purpose, but if you look at the declarations, they're, they're

21  very carefully worded to say, to say the exact same thing.

22          The declarations, for example, this is the Cooper

23  declaration at 8, which is the same exact language as the Klane

24  declaration at 4, the purpose of PwC's root cause analysis was

25  to provide the Board with an independent opinion of the root

1    causes of the cyber incident and also to assist me and others

2    in providing legal advice.

3            And so the concept that they're saying "and also"

4    there versus "for the purpose of," which I think is, would be

5    more closely tethered to, to your interpretation of the SOW, I

6    think, is important.

7            THE COURT:  Well, look at paragraph 4 of the

8    Finneran --

9            MR. SIEGEL:  Okay.

10            THE COURT:  -- declaration, where he says the purpose

11    was to do the root cause analysis.

12            The Board needed such an opinion so that it could

13    properly discharge its fiduciary oversight duties following the

14    cyber incident, including its responsibility to oversee the

15    company's preparation for and defense of the pending litigation

16    and anticipatory regulatory enforcement actions.

17            MR. SIEGEL:  I was going to use that in support of

18    our argument because --

19            THE COURT:  All right.

20            MR. SIEGEL:  -- the broad language there of, of "the

21    purpose of discharging our fiduciary duties," they have these

22    broad fiduciary duties:  They're a public company, they have

23    shareholders, of course, and the way that particular paragraph

24    is worded is similar to what we think is how the others are.

25            Of course, they need this, but it's not, it's not in

1    our view the first instance being the litigation.  We

2    understand that it may also be used for that purpose in some

3    way, but the primary view is they've had a massive data breach.

4         They need to figure out -- and this is another

5    critical component, it's sort of the why-we-need-it question --

6    it's not the technical reasons why Capital One suffered this

7    data breach, which as, as the -- Capital One continues to

8    assert, you know, we've given them tons of information about

9    that, they now have the Mandiant report, but importantly for

10   our case, it's the nontechnical reasons, and the nontechnical

11   reasons are we prioritized moving to the cloud and not data

12   security.  We didn't have the right people in place.  We didn't

13   have the right vendors in place.

14        That as a, as a root cause versus here is the

15   technical, highly technical with respect to Mandiant report,

16   the way this breach happened, you know, the WAF

17   mis-configuration, the technical way that all this data was

18   compromised, versus what they characterize as the nontechnical

19   components of it, which include things like -- and again, this

20   is, this is how they characterize it -- cyber governments, risk

21   management, the talent work streams, who they had in these

22   positions making decisions about cybersecurity.

23        All of those would, of course, be necessary from a, a

24   general root cause analysis to figure out what went wrong and

25   how to remediate it, none of which are necessarily related to

1    the provision of legal services.

2              And so just -- and I think if you, if you look at the

3    contemporaneous references to the PwC report, this is clearly

4    what you see, and that's why we've attached several of those

5    references to our, to our motion.

6              And, you know, you have, for example, what we

7    attached as Exhibit 1, this is at Bates No. page ending in 547,

8    this has the chart that says "PwC Industry Perspective" at the

9    top of it, and just generally speaking there, it's saying "PwC

10   Industry Perspective," and it's talking about how similar

11   organizations are measuring their cyber risk, and they are

12   comparing sort of an industry standard with how Capital One

13   measured against that standard and how in their words, they --

14   if you look at the second sort of bullet point on the right

15   side, that Capital One expanded its technology footprint in

16   recent years through large-scale transformations, including

17   transition to the cloud.  Although the transformation initially

18   progressed faster than Capital One's cyber capabilities, the

19   maturity of Cyber One cyber program has been a top enterprise

20   priority, and they are comparing that to industry standards

21   against something called Ness, which provides these four levels

22   of security.

23             But the point as it relates to this motion is that

24   this is PwC's input.  This has nothing as far as we can see

25   related to the provision of legal services.  It's why did this

1    breach happen from again a nontechnical standpoint and how are

2    they going to fix it.

3              And similarly and maybe more directly, in Exhibit 5,

4    there's the -- I think this is the first or second page, it's

5    the executive summary of Exhibit 5 -- it's the second page,

6    under "Key Takeaways," management is developing the following

7    action plans to address the findings from several assessments

8    as an outcome of the cyber event, including the incident root

9    cause analysis conducted by PwC.

10             THE COURT:  Right.

11             MR. SIEGEL:  The cyber action plan -- I'm sorry, did

12   I cut you off, Your Honor?

13             THE COURT:  I was just going to say, you know,

14   Exhibit 1, Exhibit 5, many of these exhibits discuss the PwC

15   report in addition to multiple other investigations being used

16   to develop a plan, so, you know, it is not PwC in and of

17   itself.  And even this key takeaway talks about several

18   assessments as to the outcome.

19             Obviously, there have been discussions of not only

20   the Mandiant investigation but there were internal

21   investigations done as well which you have had access to, and

22   so this was a, you know, getting a large group of information

23   together in order to formulate an action plan, which doesn't in

24   and of itself indicate that this was the driving force or the

25   dominant reason for why the PwC report was prepared six or

1    seven weeks after the announcement, after Mandiant had already

2    been retained, after 60 lawsuits had already been filed.

3         MR. SIEGEL:  Entirely possible.  I agree it was a

4    component, but what -- what's clearly unique about the PwC

5    report and why in their own words they commissioned the PwC

6    report was in addition to these technical components is the

7    nontechnical components that I discussed, right?

8         So we, we know Mandiant and others were doing the how

9    technically did Ms. Thompson access this data, and we

10   understand that, and we, we think we are gaining a handle on

11   that based on the Mandiant report and other materials, but

12   what's far deeper and tethered very closely to the allegations

13   in this case is what were the institutional problems?  And

14   those institutional problems are ultimately what causes at the

15   end of the day the, the technical defect that goes to the

16   breach.

17        But, Judge, maybe, maybe I can get to the heart of

18   the matter here, and I think based on the Court's question, you

19   know, I'd like to mention two other things.  One is look at the

20   distribution of this report, right?  I mean, we had 50 people

21   on the Mandiant report.  Here we have three times that.

22        And, you know, if, if the primary goal here, the

23   driving force was to defend against litigation, if you just run

24   down the list of folks that they have identified that we attach

25   in Exhibit 3, there's at least a dozen different departments

1   within Capital One, cyber, software engineering, data

2   engineering, technology, all of that would make sense for

3   remediation.  All of that makes sense for organizational

4   changes in the company.

5         But if this is -- if this is specifically a work

6   product, we were doing this for purposes of litigation

7   document, why is marketing and retail getting this?  There is

8   no explanation for that.  There is no explanation for a wide

9   variety of these departments:  accounting, commercial banking,

10  financial services.

11        And the reason, we suspect, that all these

12  departments were getting it is because they, they again from a

13  nontechnical standpoint knew they had to make changes

14  throughout the organization with respect to how to address the

15  breach and make sure it did not happen again, not to defend

16  this lawsuit.

17        And -- so that's, that's point 1.  The second

18  point -- and I'll just go back to the statement of work.  We

19  have, we have this language that I read, which, you know, I

20  read as, as being in the conjunctive, in other words, they are

21  doing this risk assessment, providing that service, and then

22  separately assisting Capital One, if there's a reading that

23  it's for the purpose of, and we're reading out the word "and,"

24  you know, okay, that may have been their intent, but there's no

25  way to divine that.  It's obviously Capital One's burden.

13

1           And I, I suppose I would ask, and I'm very sensitive

2    about burdening the Court with more work than it already has in

3    this case, but I would just ask that the Court does what many

4    of these other courts have done, including the *B&C Seafood* case

5    we cited which we think is close at some point, is look at

6    these documents in camera.  I think all you would need is the

7    scope of work, and, you know, page 2 of the scope of work is

8    completely redacted, page 3 is redacted, page 4 is redacted,

9    and the top of page 5 is redacted.

10          And there's three separate sections that are redacted

11   in the scope of work because we know it picks up on page 5 with

12   No. 4, and you know what?  Maybe there's -- maybe the scope of

13   work says we want PwC to conduct an analysis -- a damages risk

14   analysis that you would see in a products liability case, a

15   failure rate analysis, a plaintiffs have alleged in the MDL

16   that they've lost valuable information as a result of the

17   breach.  We want you, PwC, to value that and, and help us with

18   our risk assessment.

19          Maybe it says that and your view of, of how that

20   initial paragraph from the SOW reads may be, you know, it may

21   be supported by that.  I suspect the -- and obviously, the

22   reason we're making this motion is because we believe in

23   reading the contextual documents that the scope of work is

24   likely very different.

25          But look, we're willing to -- we're willing to deal

14

1    with whatever the result is on an in camera analysis of the

2    scope of work and the report.  You look at those two things

3    side by side.  You have the limited information in addition

4    that we've had.  You have our arguments that this was spread

5    far and wide throughout the organization, including to scores

6    of those who have nothing to do with, with legal defense, and

7    we'll live with the Court's decision once it has full

8    information about the scope of work and what the work product

9    was from Capital One.

10            So unless the Court has other questions, I think

11   that's the most practical way to, to proceed if the Court has

12   any, any doubts about, one way or the other whether the

13   defendant has met its burden on this document.

14            THE COURT:  So the decision of *B&C Seafood* that you

15   rely heavily on and just mentioned --

16            MR. SIEGEL:  Yes.

17            THE COURT:  -- talks about the case and distinguishes

18   that case from the *JPC* case.

19            The *B&C Seafood* case involved an instance in which

20   there was a single report prepared, and it talks about this

21   case being different than the *JPC* case in which there were two

22   separate reports.

23            In this case, we're dealing with a factual situation

24   like *JPC*, where there were actually two separate, well, more

25   than two but multiple reports prepared, Intel reports and

15

1    Mandiant and PwC.

2          I mean, in reading the *B&C* decision, it seemed

3    significant to the magistrate judge in that case that there was

4    a single report prepared and it had multiple reasons for being

5    prepared.

6          Any comment on that?

7          MR. SIEGEL:  I, I think my, my first comment is I --

8    the context here, of course, is we have a single report.  We

9    have a PwC report at issue in this case, but there's a --

10   there's a closer example that I think is like JPZ -- *JPC* that

11   we talk about, which is *Target*, where you have these very

12   specific, separately delineated SOWs and reports that come back

13   from the vendor versus what we have here, which is a single PwC

14   report.  And so we, we think it's -- it is actually closer to,

15   to the *Seafood* case and unlike *Target* and, and *JPC*.

16         And again, you know, we have in this case the

17   in-house counsel, the Board, whatever it is, but just a single

18   scope of work where the first item they're doing is the root

19   cause analysis.  And again, there's no delineation between root

20   cause analysis and the separate attendant, secondary or

21   tertiary purpose of legal services or legal help, which again,

22   maybe, maybe the SOW pages that have been redacted will

23   illuminate that.

24         And final, final thought of *Target*:  The -- Verizon,

25   which was the vendor of Target, separated two teams.  They had

16

1    separate people.  And so we, we think it's very different.

2    Here it's obviously one team doing a single report.  The

3    driving or at least primary purpose in the scope of work as far

4    as we can tell is that root cause analysis, which critically

5    includes these nontechnical reasons for the breach.

6            THE COURT:  Okay.  Mr. Balser?

7            MR. BALSER:  Your Honor, I think you've put your

8    finger right on the key issue, not surprisingly.  I think the

9    context in which this motion is made is important, and I think

10   the fact that multiple internal analyses by the company

11   regarding the root causes and the impacts of the cyber incident

12   have been produced, technical analyses performed by third

13   parties such as the Mandiant report and the iDiscovery

14   Solutions assessment of the impacted PII have been produced,

15   the company's forward-looking remediation plan has been

16   produced, and tens of thousands of other documents related to

17   these analyses or other self-evaluation such as our internal

18   audits and risk assessment have been produced.

19           That's in -- and on top of that, the plaintiffs have

20   taken already six 30(b)(6) witness depositions on 29 topics,

21   including on the root cause and remediation efforts, and

22   there's another 30(b)(6) deposition to come on the post-breach

23   investigations that the company undertook.

24           It's telling that, that the plaintiffs don't even

25   attempt to make a substantial need or exceptional circumstances

1    argument for this report because they simply can't make that

2    showing given the significant volume of, of information

3    relating to the root cause and remediation that have already

4    been produced by the company in this case.

5            We agree with Mr. Siegel that the key question for

6    the Court, whether it's under Rule 26(b)(4)(D) or the work

7    product doctrine, is whether PwC was retained to perform the

8    root cause analysis in anticipation of litigation, but the only

9    evidence on this point are Capital One's uncontroverted

10   declarations which clearly establish that PwC was retained

11   because of the litigation, and that absent litigation or

12   potential regulatory enforcement action here, PwC would not

13   have been retained at all, because as Your Honor points out,

14   there were multiple other analyses, including root cause

15   analyses, being undertaken by management at the time, and we

16   knew those would be discoverable, and those have been produced.

17           I think, you know, the testimony of Matt Cooper, the

18   general counsel of Capital One, is important for the Court to

19   focus on, and Mr. Cooper is a 25-year lawyer, very

20   sophisticated.  He's the one who hired, along with

21   Mr. Finneran, PwC in this matter.

22           Paragraph 9 of his declaration said the need for PwC

23   to conduct an independent root cause analysis would not have

24   existed absent the pending litigation and risk of regulatory

25   enforcement action, and as Mr. Finneran points out -- and

18

1   Mr. Finneran was the prior general counsel, had been the

2   general counsel of Capital One for 24 years, is now secretary

3   of the company, working with the Board.

4          Your Honor pointed out paragraph 4 of his

5   declaration, which we think is very helpful to understand the

6   Board's fiduciary duties to manage this litigation, but he also

7   said in paragraph 7 that the significant litigation and

8   regulatory pressures following the cyber incident motivated the

9   Board's decision to retain an independent expert to conduct a

10  root cause analysis.

11         Plaintiffs have no evidence to contradict Capital

12  One's declarations, and so in order to find that the PwC --

13  that PwC here was not retained to special litigation, the Court

14  would essentially have to disregard the sworn testimony from

15  Capital One's senior executives, and there's really no basis to

16  do that.

17         And as Your Honor, I think, pointed out from the very

18  beginning here, you know, this is different from Mandiant in a

19  very, very important respect.  Unlike Mandiant -- unlike the

20  Mandiant situation, PwC did not have a preexisting agreement

21  with Capital One to perform a root cause analysis and had never

22  performed a root cause analysis regarding a security incident

23  for Capital One before.

24         I do want to address the plaintiffs' primary

25  arguments here.  I won't belabor the points because I think the

19

1    Court has a good handle on it, but I do want to respond to a

2    couple of the points that Mr. Siegel made.

3         The first relates to the parsing of the language in

4    the statement of work.  The, the undisputed proof, as I just

5    outlined, shows that the engagement wouldn't have occurred

6    absent litigation, and as Mr. Siegel acknowledges, the

7    statement of work is presented in the conjunctive, saying that

8    it was being done for a root cause analysis and to assist the

9    legal department, and I think importantly here, it's important

10   to understand these are two sides of the same coin, and I think

11   the Court gets this.  PwC's root cause analysis was provided in

12   order to assist with legal advice and strategy formulation

13   relating to ongoing and anticipated litigation.

14        Plaintiffs', you know -- look, the reliance on the

15   *B&C Seafood* case, we think, is misplaced.  I think Your Honor

16   put your finger on it, but the key -- there are a couple key

17   distinguishing facts in *B&C* that don't make it, I think,

18   particularly on point here.

19        First, the expert in that case was retained before

20   litigation.  The expert's report was required by the shipping

21   company for compliance with the internal -- the International

22   Safety Management Code, and I think most importantly, the court

23   found that the report was clearly designed for future risk

24   mitigation.  It proposed safety-related corrective actions to

25   be taken.

20

1          If you look at Mr. Serbee's declaration from PwC, he,

2   he states that the PwC report does not contain any

3   recommendations for remediation.

4          So you have a situation here where we've got

5   litigation all over the place.  Sixty cases have been filed.

6   The MDL proceedings are already underway.  We've got regulatory

7   proceedings down the pike, congressional investigations on the

8   doorstep, already internal investigations going on on root

9   cause analysis, and the general counsel and the Board say in

10  order to manage this litigation, in order to fulfill our

11  fiduciary duties to oversee this litigation, we need an

12  independent, unvarnished view from an expert that we're going

13  to pay a lot of money to to provide us a protected analysis

14  that we can use to guide our, our duties as legal officers and

15  as fiduciaries to the company to manage this litigation, and

16  that's what was done.

17         And that's why I think the 26(b)(4)(D) paradigm is

18  important.  There is a whole -- in addition to the, the

19  protections afforded traditional work product, the 26(b)(4)(D)

20  paradigm has an unfairness and kind of inequity element to it

21  that I think is important here; that is, you know, there is no

22  question that our able adversaries on the other side can't

23  piece together from the information that's been provided and by

24  hiring their own experts what happened here, what the root

25  causes were, including the nontechnical root causes, because

1    we've produced all that information to them.

2         They shouldn't be able to piggyback on our paid

3    expert work that we took steps to maintain confidentiality of,

4    careful steps, lawyers involved in every single one of the

5    interviews that PwC undertook, managed by the general counsel

6    and the former general counsel company to ensure protection.

7    They shouldn't get the benefit of that work.

8         They can recreate their own.  We've given them

9    everything they need both in terms of documents and access to

10   witnesses to understand the root cause here, and they shouldn't

11   be able to piggyback on our protected confidential,

12   independent, expert work here.

13        The second thing I wanted to address is the argument

14   that because PwC focused on more than just the technical root

15   cause, that somehow that reflects the business purpose.  I

16   think the Court needs to look no further than the allegations

17   in the representative complaint to understand that that doesn't

18   hold water.

19        All of these issues, issues relating to governance,

20   talent, etc., are squarely at issue in the various lawsuits

21   that have been filed against Capital One.  For example, in

22   paragraph 9 of the operative representative complaint, in this

23   MDL, the plaintiffs allege that the actions and events giving

24   rise to the plaintiffs' claims partly include, and I quote,

25   decisions made by Capital One's governance in management

1   personnel.

2            Plaintiffs also claim in their lawsuit that Capital

3   One failed to implement policies and practices consistent with

4   the requirements of the FTC Act and of the Gramm-Leach-Bliley

5   Act, which are core governance issues.  And they also further

6   allege in paragraph 123 of their complaint that Capital One

7   failed to effectively train all members of its workforce.

8            So these, these issues are squarely related to issues

9   in the litigation and are, are covered by both the work product

10  doctrine and Rule 26(b)(4)(D).

11           The, the fact that, I mean, if you think about what

12  they're saying here, so we, we get -- we pay $3.5 million for

13  PwC to undertake an independent analysis of what happened, and

14  they do a thorough job, and we have an extensive report from

15  them.  That is done to enable Matt Cooper to fulfill his duties

16  as general counsel or John Finneran, as secretary of the Board,

17  to advise the Board on their fiduciary duties to manage

18  litigation, but there are also some other things in that, that

19  report that are helpful to correct the issues that have been

20  identified.

21           There are no remedial recommendations made, as

22  Mr. Serbee testifies, but the fact that Capital One didn't just

23  put the report in the drawer but took the findings to improve

24  and map to the remediation efforts doesn't mean that this was

25  not a protected work product report from the outset.

23

1            And I would point out that the remedial efforts here

2    are intertwined with the litigation.  I mean, Mr. Siegel

3    pointed out -- they pointed out in their opening brief, I think

4    it's an important point, the plaintiffs are seeking injunctive

5    relief here.  They want to get an order from this Court

6    requiring changed practices from the business in Capital One,

7    and part of the Board's responsibility and Matt Cooper's

8    responsibility is to think about those claims for injunctive

9    relief and advise the company on remedial efforts that would

10   enable us to defeat those claims for injunctive relief.

11           So, so that's what I mean when I say there are two

12   sides of the same coin.  These are very intertwined issues

13   here.

14           And so, you know, for these reasons, we think that

15   the evidence is overwhelming and it's clear that the driving

16   purpose here was the litigation, and the fact that there were

17   some additional uses to which the findings could be used in no

18   way vitiates the, the determination at the outset that this was

19   done because of the litigation, and absent the litigation, PwC

20   wouldn't have been hired at all because we had all these other

21   work streams being undertaken, including by Mandiant, of the

22   root causes of the breach.

23           Just very briefly on Mr. Siegel's plea for an in

24   camera review, the plaintiffs haven't come close to making a

25   showing to, to obtain an in camera review here.  The, the issue

24

1    here is whether at the outset this issue -- that the report was

2    commissioned for litigation purposes, and when you look at the

3    uncontroverted testimony of, of John Finneran and of Polly

4    Klane and of Matt Cooper, senior lawyers in the legal

5    department and at Capital One, it is without dispute that this,

6    this engagement was done in anticipation of litigation.

7         So, you know, frankly, I know that the plaintiffs,

8    you know, rely heavily on, on the Mandiant order in their

9    motion, and I don't blame them for trying to get this report,

10   but as the Court noted, this is a very, very different

11   situation than the Court was faced with with Mandiant.  This

12   was done, you know, by the general counsel, by a senior lawyer

13   for the Board, with litigation all over the place swirling and

14   these other work streams on, on root cause to being undertaken.

15        THE COURT:  I do need to have you address the waiver

16   argument, Mr. Balser, and not, not so much the agency or the

17   accountant, but the 150 -- your connection is still good, I

18   hope.  It looks like you may be frozen.

19                    (No response.)

20        THE COURT:  Well, Ms. Clare, Mr. Angle, you may be

21   called into action here; I don't know.

22        MR. SIEGEL:  I'm happy to pick it up, Your Honor.

23                    (Laughter.)

24        MS. CLARE:  We can see if David -- I can see if

25   David -- it looks like he may be logging back in.

25

1          THE COURT:  Back in?  Okay.  We'll give a minute and

2  see.

3          But thank you for that opportunity, Mr. Siegel.

4          MR. SIEGEL:  I had a Ninth Circuit argument about two

5  weeks ago where my, my opposing counsel dropped off in the

6  middle of my, my argument, so I decided to wait.

7          MR. NEWBY:  I think it was my partner, Norm.

8          MR. SIEGEL:  That's right; it was your partner.  He

9  disappeared, but he resurfaced.  He came back.

10          THE COURT:  Well, we'll readmit him if he accepts our

11  invitation to return.

12          MS. CLARE:  I can take -- I can start on the waiver

13  argument, Your Honor.  So -- and specifically with respect to

14  the Capital One employees.  So as Your Honor -- or as

15  Mr. Balser was, was saying, this was a situation where we had a

16  report, a report that identified the root causes of the, of the

17  incident, and the Capital One Board of Directors then had an

18  obligation to put that into, into action.  They couldn't just

19  put it in a vault.

20          And when they are disclosing it to Capital One's

21  employees, you have to remember we're talking here about the

22  work product doctrine, so we're not -- our employees are not

23  our litigation adversaries.  There is no disclosure to

24  litigation -- our litigation adversaries.

25          The employees who received the report, it was tightly

26

1    controlled by the legal department.  Most of the employees who

2    received the report received it via a method where they had

3    read-only access, so they weren't able to distribute it

4    further.

5              Additionally, Your Honor, you know, we have

6    identified the specific purposes for which the various

7    employees received the report.  They were members of the legal

8    department.  They were senior management.  They were those

9    with enterprise-wide control or governance functions, who

10   needed to -- massive PwC findings to various remediation plans,

11   and they were doing so to ensure that those efforts were

12   comprehensive and satisfactory.

13             I think it's important, Your Honor, to also note that

14   when we talk about waiver, the waiver doctrine does not apply

15   under Rule 26(b)(4)(D).

16             THE COURT:  I don't agree with that.  Help me

17   understand, you think that there are no instances in which one

18   could waive the privilege for a retained but non-testifying

19   expert, such as I could use part of the report, but the rest of

20   the report could be protected?

21             MS. CLARE:  If you use part of the report in

22   litigation as the court, then I think you could waive it, but I

23   think the -- with respect to Rule 26(b)(4)(D), the, the rule

24   itself is grounded in fairness.  So you're looking at, as

25   Mr. Balser noted, where you have a situation where Capital One

1    has expended an extraordinary amount of money to conduct an

2    independent root cause analysis, the, the waiver argument --

3    the reason that you can't have waiver under those circumstances

4    is because it would be unfair to then provide the -- to have

5    forced Capital One to provide the report to its litigation

6    adversary.

7              So that's why whereas under the work product

8    doctrine, that's grounded generally in privacy concerns, so you

9    could have waiver in that circumstance, but there -- and courts

10   have held that there is no waiver under Rule 26(b)(4)(D).

11             It appears that Mr. Balser may have rejoined.

12             MR. BALSER:  Your Honor, I'm on the phone.  I

13   apologize, my internet connection just went kaput, but I'm now

14   back on the line.  Can you hear me?

15             THE COURT:  We can.  Thank you.

16             MR. BALSER:  I apologize for that.

17             THE COURT:  No problem.  I think Ms. Clare has

18   addressed the issues that I had with the waiver argument, and I

19   was explaining that I needed to hear some explanation and legal

20   argument as to really the employees, and I think I understand

21   Capital One's position on the regulators and the Ernst & Young

22   accountant issue.

23             I'm going to go ahead, I'm going to give Mr. Siegel

24   one last opportunity to --

25             MR. SIEGEL:  Thank you, Your Honor.  Just a few

28

1    points.  So again, I just -- I want to focus on the

2    contemporaneous documents that we have.  The other one I didn't

3    mention but I think responds directly to what Mr. Balser argued

4    is Exhibit 6, which is a memo from Rob Alexander to the risk

5    committee where -- it's page 2, where he's talking about the

6    nontechnical root causes of the event, including related to

7    governance and risk management, and then he says:  These

8    nontechnical root causes are nuanced and not as readily

9    identifiable as the technical root causes.  Therefore, our

10   identification of these root causes is very preliminary, not as

11   grounded, and subject to change based on the ongoing learnings

12   from all the root cause analyses.

13           And, and those other root cause analyses that relate

14   to what they describe as nontechnical root causes is the PwC

15   report.

16           So in that respect, it really is no different than

17   Mandiant.  It's technical versus nontechnical just in terms of,

18   of root cause.

19           So here's the other couple points I'll make, and then

20   I'll stop.  The number of people that saw this, it's not just a

21   waiver issue.  It demonstrates that the primary purpose here

22   was a business purpose.  There's no other reason you would have

23   it spread across that many people in the organization,

24   completely untethered to anything related to litigation,

25   including, like I said, marketing as being one example.

1          And I think for the Court's benefit and, and the

2     parties' benefit, you know, we, we can't divine what's in the

3     scope of work, and neither can the Court.  It's, again, with

4     the caveat that we are very cautious about burdening the Court

5     with more work in this case, that's going to tell the tale

6     here.

7          I mean, again, if the scope of work is written in a

8     way that's tethered to litigation, I can envision one outcome.

9     If it's on the other end, as we think based on these other bits

10    and pieces from other documents, it is truly a root cause

11    analysis as its primary goal here, I think it is a different

12    outcome and one in our favor.

13         And if you look at those side by side, the scope of

14    work with the PwC report, I think that's going to drive the

15    results here, and again, one we'll live with for better or

16    worse.

17         THE COURT:  Well, thank you for the briefing, I've

18    found it actually very helpful in understanding the issues, and

19    for giving me another week to be able to look at the fulsome

20    briefs that were able to get provided.  I think it helped me

21    and probably helped the parties be able to have a few extra

22    days to prepare the opposition and the reply as well.  The

23    briefing was very good.

24         This is a different issue than the Mandiant issue,

25    and I highlighted that at the beginning, and -- but it still is

30

1    a significant issue that I have considered, and I -- just so I

2    don't forget it, I don't view reviewing four pages of a

3    statement of work as being overburdening the Court when you,

4    you know, give me binders full of exhibits and things to read

5    on a motion.  Four pages is, is no big deal.

6           But the question is whether it's necessary in this

7    case, and, you know, as Mr. Balser, I think, adequately

8    explained, the issues involved in this litigation are not what

9    necessarily caused, that is, the technical issue, but there are

10   also many nontechnical issues, and so when you talk about is

11   it, you know, geared towards the litigation, then, you know,

12   that's a very broad brush that one can or can't necessarily

13   know what was in the mind of the person who was drafting the

14   statement of work at the time.

15          So I, I don't think that there is a real reason for

16   me to have to look at the statement of work before I make a

17   decision in this case on this motion.

18          Again, this is different than Mandiant.  We didn't

19   have a, a statement of work with the exact type, you know,

20   services to be done.  It was basically transferred from Capital

21   One to the law firm to do the exact, almost the exact same work

22   under the same terms and conditions.

23          The timing of this I also find to be significant, to

24   be honest with you.  You know, this is you had Mandiant

25   retained to get in there, to find things out, to take action

1   immediately, to find what actually caused the technical side of

2   things and do their report.

3          This hiring PwC was six or seven weeks after the

4   announcement, so I think the announcement was in late July.

5   They didn't retain PwC until mid-September.  This was after

6   60-some lawsuits had been filed, and I think the Board

7   responsibly decided that they needed to have an independent

8   voice to come in and tell them what happened and why, and I

9   think when you read what we've talked about, and I understand

10  why the plaintiffs want to parse it, but I think you have to

11  read it, read it in the context of what was going on at the

12  time, that one would have to know what, what -- how this issue

13  happened technically and nontechnically to be able to analyze

14  and deal with the litigation issues that were ongoing and

15  pending, and with the regulatory issues that obviously had been

16  undertaken long before they were retained.  So, you know, I

17  think that also is indicative of the Board needing to get its

18  own independent investigation.

19         The declarations from Cooper, Finneran, and Klane, I

20  think, do establish that the primary or driving force, the

21  dominant purpose, whatever language you want to use here for

22  this, was for the general counsel to get information so that

23  the general counsel could adequately advise his client, Capital

24  One, as to what, what they were facing as a result of this data

25  breach investigation.

32

1          So I do think clearly it was, you know, litigation

2   was ongoing.  I think those declarations do establish that this

3   was -- that the primary purpose, driving force, whatever,

4   was -- and I don't think, you know, this, you know, the talking

5   about the 26(b)(4)(D) and work product, you know, 26(b)(4)(D),

6   you still have to show that it was done in anticipation of

7   litigation or to prepare for trial.

8          So, you know, I think that issue of, you know, what

9   was the purpose or the primary purpose of this report, the

10  driving force, comes into play in both of those analyses, and I

11  think on that, that issue, Capital One has established that the

12  driving force was for to deal with the litigation and the legal

13  issues and provide legal advice to the Board.

14         You know, these issues come up because they're used

15  for separate purposes.  I mean, you, you wouldn't have to

16  determine what the driving force or the dominant purpose was if

17  it wasn't used for other purposes as well, so that, that sort

18  of answers the question is which one is the, the driving force.

19  That doesn't mean that it can't be used for other purposes and

20  that using it for other purposes then automatically

21  extinguishes any right that it has to protection under the work

22  product doctrine.

23         The waiver argument is an interesting one.  I think,

24  you know, I, I was convinced by the, I believe, the explanation

25  in the Williams declaration about the regulators and the

1    obligations to if you don't provide me the information, you

2    know, you're going to be fined or have some certain issues to

3    deal with.

4         Obviously, it's kind of difficult when you have to

5    provide that kind of report to your regulators, who are, you

6    know, looking into what action they are going to take and

7    impose upon you, but that's the way the system works, and I

8    don't think that there was a waiver by complying with their

9    request for that information.

10        The Ernst & Young issue, you know, accountants, you

11   know, I think it's limited in its scope.  Certainly there

12   wasn't a broad-based waiver there based on the issues having to

13   do with providing Ernst & Young some access to that report.

14        Klane, I think, adequately explains -- I wish I had a

15   little bit more information about the timing as to when these

16   people were given access to the report, you know, but I think

17   based on the overall record, you know, 150 sounds like a lot,

18   but when you're talking about 50,000 employees, it's not like

19   we sent a company-wide memo out to everybody about certain

20   things.

21        And I can see the rationale behind the we can't just

22   put this report in a drawer and ignore it.  I think they have a

23   fiduciary responsibility if they get a report and it shows

24   issues that need to be addressed, you know, even though the

25   driving force was for the litigation, if it outlines certain

1    things that need to be done, I think the Board has an

2    obligation to relay that information, whether it's in the form

3    of providing the exact report or something else.

4            So when it all comes down to it, I think Capital One

5    in this instance has -- and it does have the burden of proof --

6    has met that burden of proof in this case.  It has to me shown

7    that the primary purpose or driving force behind the retention

8    of PwC at the time period in September was to provide legal

9    advice to the Board through the general counsel and that the

10   disclosures that have been made to the regulators, the

11   accountant, and to other employees within Capital One, don't

12   constitute a waiver.  So I'm going to deny the motion to compel

13   for those reasons.

14           Before I let you-all go, though, I'm concerned a

15   little bit about the parties sealing information in the

16   memoranda that at least when I see it -- and again, this is --

17   these are quotes from exhibits that very well may be entitled

18   to be filed under seal because those exhibits have confidential

19   information in them.

20           It appears to me that in many instances, the parties

21   are filing -- or asking the Court to let material remain under

22   seal just because it was quoted in an exhibit that may be under

23   seal.  For example, you know, the statement of work has some

24   specific information in there that, you know, is protected by

25   for business purposes or whatever.

35

1            And I'm going to just sort of take a minute, and if

2    you-all could maybe look at this and help me understand why

3    some of these issues are, are -- and I'll do it in a way

4    hopefully that we can not disclose exactly the information --

5    but starting with the plaintiffs' memorandum in support of

6    their motion to compel, there are -- and I think Capital One

7    has agreed that the redactions on page 6 probably aren't

8    necessary, but the redaction on page 1, we go down to the

9    introduction paragraph, the fifth, fifth line -- fourth line

10   down, where it says, "The cyber event plan, a plan consisting

11   of," and then the description of that plan or the quote from

12   that description has been redacted.

13           I'm, I'm having a little bit of a hard time

14   understanding why that description of the plan in and of itself

15   is something that is worthy of being filed under seal, and I

16   don't know, Mr. Angle, whether you're the right person to call

17   on for this, you seem to be dealing with a lot of the sealing

18   motions, or not, or whether Mr. Balser or Ms. Clare or others,

19   but, I mean, that -- the language that appears in that quote

20   doesn't seem to me to be sensitive business information that

21   needs to be filed under seal, and I think, you know, to some

22   extent has been discussed in briefing otherwise where

23   multi-reasons and other purposes and even in the declarations,

24   I think, have had some mention of there being, you know, the

25   four different areas in which it was done and certain things

36

1    being mapped into other things.

2           So can anybody help me understand why that specific

3    information, which is also, I think, included in the redactions

4    on page 7, why that would be considered sensitive business

5    information?

6           MR. ANGLE:  Your Honor, I'm obviously on the

7    pleadings relating to sealings.  I'll try and address it, and

8    I'll just say that, you know, in looking at it at this moment,

9    I agree with your point that it does not appear to be currently

10   confidential, and we have tried to be sensitive to Your Honor's

11   concerns because I know you definitely want to make sure we're

12   not overdesignating, and I will say that we have -- we're not

13   quite perfect, and we're still working at it, but that's

14   something that we'll definitely take another look at.

15          THE COURT:  Well, and I -- let me just -- instead of

16   going through them, and I was prepared to sort of go through

17   them one by one, but I think that it probably isn't worthy of

18   these large number of people's time and efforts.  I'm sure

19   you've got more productive things to do.

20          I'll tell you that my view is that -- and I want to

21   be reasonable in this regard.  I don't think that by including

22   a quote from an exhibit that is -- I will allow to file under

23   seal, that that in some way waives the right for the entire

24   exhibit to remain under seal.

25          I don't want to force on the parties that if you're

37

1    going to file a, you know, 40-page exhibit, that you go through

2    and redact, you know, only the specific parts of that exhibit

3    that need to be under seal, that there's a lot of it.  I mean,

4    some like the Mandiant statement of work, given its

5    significance, I think we needed to do that, but in general, you

6    know, if you're, if you're going to quote from something, I

7    don't think you can determine that that's going to be a waiver

8    of any ability to keep the exhibit confidential.

9              So I'm going to ask you-all, and this only goes to

10   the specific redactions in the briefing, not to the exhibits

11   themselves, to go back and look at those redactions and let me

12   know.  In the response that was done for the initial brief, you

13   know, I think there was a comment sort of in passing that these

14   redactions are appropriate as to three of the four pages in

15   which there were redactions, but, you know, I need to go back

16   and look at those before I sign an order that says I'm finding

17   that that information should be filed under seal, and when I

18   went back and looked at those specific redactions, I was having

19   a hard time.

20             So I had the sense that it may be some concern by the

21   parties that if they allowed certain quotes to be done, that

22   they may be waiving things.  And I may just be missing

23   something that really is important, but I know it's ought to go

24   back and certainly for all of these briefs, file something and

25   let me know.  I understand the exhibits part.  I don't need any

38

1   supplementation of why you think certain exhibits should be

2   filed under seal.

3          And the reply has a few things in there that, page 16

4   is the only page in which there is a -- well, maybe not 16.   I

5   think there's only, like, one -- page 6, there are a few quotes

6   in the reply that have the same kind of issues that I'm not so

7   sure necessarily need to be filed under seal.

8          So take a look at that.   I'm going to wait until I

9   get some sort of supplemental pleading before I actually rule

10  on those motions -- three motions to seal that are pending.

11         MR. ANGLE:   Yes, Your Honor.   Your guidance is very

12  helpful.   We'll take a second look at those and get something

13  back on file early, early this coming week to clarify the

14  issues.

15         THE COURT:   Okay.   Anything else that the parties

16  want to raise before we finish for this week?

17         MR. SIEGEL:   Nothing from plaintiffs, Your Honor.

18  Thank you.

19         THE COURT:   Okay.   Last chance, Mr. Balser.

20         MR. BALSER:   Thank you, Your Honor.   I again

21  apologize for the technical difficulties at the end there.   I

22  appreciate your patience.

23         THE COURT:   Well, Ms. Clare ably stepped in and took

24  care of it for us, so okay?

25         MR. BALSER:   She's my lawyer.

39

1          THE COURT:  That's right.  I was going to put

2    Mr. Angle on the spot, but I could see he was a little worried

3    about that.

4          MR. ANGLE:  I was looking forward to it actually.

5          THE COURT:  All right.  Well, you-all have a good

6    week.

7          MS. CLARE:  Thank you, Your Honor.

8          THE COURT:  Thank you.  You too.

9          A VOICE:  Thank you.  Bye-bye.

10         MS. CLARE:  Bye-bye.

11                    (Which were all the proceedings

12                      had at this time.)

13

14              CERTIFICATE OF THE REPORTER

15      I certify that the foregoing is a correct transcript of

16   the record of proceedings in the above-entitled matter.

17

18

19         _____
                              /s/
20                     Anneliese J. Thomson

21

22

23

24

25