IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| IN RE: CAPITAL ONE CONSUMER DATA SECURITY BREACH LITIGATION | MDL No. 1:19md2915 (AJT/JFA) |

**This Document Relates to the Consumer Cases**

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DISCOVERY REGARDING USE OF CUSTOMER DATA FOR PROFIT

One of this case's most perplexing, and pivotal, facts is why Capital One kept credit card application data—including data for those whose applications had been denied—for the better part of two decades. That question strikes at the very core of this litigation; absent collection and maintenance of that consumer data—and related failure to protect it—the scope and significance of the Data Breach would be tremendously different. Accordingly, understanding why Capital One kept this information, what Capital One was using it for, and whether Capital One profited or otherwise financially benefitted from that data and by how much, has been a focus of Plaintiffs' discovery efforts from inception. Surprisingly, Capital One has provided very little in the way of clarity on the key financial benefit issue. Vague interrogatory responses, leading to slightly more concrete testimony, was thereafter walked back by Capital One. Supplemented discovery responses have fallen far short and new, targeted discovery has been rebuffed. Today, Plaintiffs are left with little better idea regarding how much Capital One benefited from this data monetarily, than when the case began. Yet, Capital One's intractability persists. Consequently, Plaintiffs move to compel information contained in various discovery requests, discussed further below, aimed at Capital One's use of customer application information for profit.

Importantly, however, Plaintiffs do not seek indiscriminate or wide-ranging discovery efforts from Capital One. Rather, Plaintiffs' seek discrete information, now shown to be readily available to Capital One. Specifically, Plaintiffs seek (1) the annual or periodic savings/performance/financial benefit of the fraud risk and credit risk modeling (which, at long last, Capital One now, for the first time, openly concedes exists (ECF No. 1123-1 at ¶ 7)), and (2) any similar annual or periodic analysis or reporting regarding the savings/performance/financial benefit related to other Artificial Intelligence-Machine Learning ("AI-ML") initiatives or uses that leverage customer application data, including the associated "white papers" for such models. These requests are pointed and relevant, and—recently—Capital One finally admitted responsive material does exist, and thus should be compelled.[1]

## I.    **BACKGROUND**

Plaintiffs' initial discovery requests, served back in January 2020, included the following:

- Plaintiffs' First Interrogatories, Interrogatory No. 18: "Describe whether You sought to or did financially benefit or profit from using customers' PII or data derived from PII for any internal or external marketing or sales, including but not limited to providing PII or data derived from PII to any outside Person(s) and Your decision to store such data in a "data lake." To the extent that You did seek to financially benefit from providing such data to any Person(s) please identify any and all such Persons and included the type and amount of data sold; the buyer of the data, and the consideration received for such data." Attached as Exhibit 1, hereinafter "Interrogatory No. 18."

---

[1] Following a final met and confer call on January 14, 2021, which began at 5:00 PM ET, Plaintiffs and Capital One agreed an impasse had been reached on this topic and Plaintiffs noted they would be filing a motion to compel. At approximately 8:15 PM Capital One, for the first time, communicated it would be filing a motion for protective order on the issue, which it did at about 8:50 AM on January 15, 2021 (ECF No. 1122). Because Plaintiffs seek affirmative relief, they are filing this motion despite the pendency of Capital One's motion for protective order. *See Bank of N.Y. Mellon v. Adams*, No. 5:13–CV–245-BO, 2014 WL 1159891 (E.D.N.C. Mar. 21, 2014) (denying motion for protective order granting motion to compel where both motions related to same discovery).

- Plaintiffs' First Document Requests, Request No. 36: "Documents relating to Your use of customers' data for profit." Attached as Exhibit 2, hereinafter RFP No. 36.

- Plaintiffs' Rule 30(b)(6) Deposition Notice, Topic No. 22: "Your use of customers' data for profit." Attached as Exhibit 3.

These requests were the subject of multiple meet and confers amongst counsel. For instance, following Capital One's objections, Plaintiffs explained that RFP No. 36 and Interrogatory No. 18 were aimed at "understand[ing] why Capital One was storing the data involved in the Data Breach (applications dating back to 2005) in the manner it was and whether it was profiting from such retention and storage." *See* Meet & Confer Letter of April 8, 2020, (ECF No. 1123-4).[2] Ultimately, Capital One agreed to produce documents related to RFP No. 36 pursuant to the parties' search term process, and to respond to Interrogatory No. 18. *See* (ECF No. 1123-5).

These seeming concessions from Capital One proved mostly hollow, however. As explained below, the search terms and custodians proffered by Capital One in early 2020 failed to cover matters that later corporate representative and other witnesses would reveal; search terms, custodians, and repositories Plaintiffs could not have possibly been aware of in early 2020 when those issues were negotiated.

On June 9, 2020, Capital One provided Supplemental Interrogatory responses, including a supplemental response regarding Interrogatory No. 18, (ECF No. 1123-6). Therein, Capital One identified that it "retains credit card application data for an indefinite period for legal, regulatory, and business reasons." As to statutory and regulatory requirements, Capital One noted various

---

[2] Given that Capital One's Motion for Protective Order references many of the same documents as Plaintiffs' Motion to Compel, Plaintiffs are citing to the exhibits in the Motion for Protective Order (ECF 1123) where possible, rather than attaching duplicative exhibits.

legal requirements including Consumer Financial Protection Bureau's ("CFPB") Regulation B, the USA PATRIOT Act, and the CFPB's Regulation Z.

The "business purposes" Capital One identified were credit modeling,[3] along with "marketing certain products and services to consumers, fraud modeling, anti-money laundering programs, credit bureau reporting, and servicing customer accounts." Capital One Supplemental Interrogatory Responses at 29–30 (ECF No. 1123-6).[4]  Capital One explained that:

> All of these purposes for retaining and using consumer credit card application data—whether they be legal, regulatory, and/or business in nature—generally "financially benefit" Capital One in some way. For example, a strong credit risk modeling program "financially benefit[s]" Capital One by lowering the Company's potential losses and minimizing the negative impact on customers (and by extension the Company) that would follow from the Company extending too much credit to customers who cannot afford it or withholding credit from customers who would otherwise qualify. However, as previously explained, it is not feasible for Capital One to reduce the overall benefit it derives from, for example, enhanced credit modeling based on specific datapoints to any precise dollar amounts.

*Id.* at 30.

Approximately one week after serving the Supplementary Responses, on June 17, 2020, Capital One proffered Kathy Kauffman as the corporate representative on, among other things, Topic No. 22.  The testimony included a discussion of each of the areas identified in the interrogatory response, including credit risk modeling and fraud risk modeling.  *See* Kauffman

---

[3] Credit risk modeling is "  "  Capital One Supplemental Interrogatory Responses at 29.

[4] ECF No. 1123-6 at 7.

Depo. Tr. 80:20–81:3, (ECF No. 1123-14).  Capital One's representative explained that credit risk modeling "█████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████"

*See* Kauffman Depo. Tr. 108:5–10.  She testified further that "██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████" Kauffman Depo. Tr.

108:12–16.   Capital One's representative testified the ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████ Kauffman Depo. Tr. 111:21–112:4.

The corporate representative explained that the credit risk model, in addition to using the

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ Kauffman Depo. Tr. 113:15–21.  The model then uses "███

███████████████████████████████████████████████████████████

█████████████████████████" Kauffman Depo. Tr. 122:9–20.

---

[5] ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████" Kauffman Depo. Tr. 114:18–21.

The credit risk model financially benefitted Capital One ██████████████████████ ████████████████████" Kauffman Depo. Tr. 116:19–25.

Capital One monitored the performance of its credit risk model, and that analysis resulted in the creation of "[m]odel governance reports." Kauffman Depo. Tr. 117:21–119:1. Capital One's representative confirmed that that reports were ████████████████████████████ ████████████████████████████████████. Kauffman Depo. Tr. 119:2–9; 120:14–121:9, 122:22–25.

Capital One's representative could not comment regarding whether the ████████████ ████████████████████████████████████████████ ███████ Kauffman Depo. Tr. 115:9–17. Fraud modeling involves "█████████████████████████ ████████████████████████████████████████████ ████████████████████" Kauffman Depo. Tr. 124:15–20. The fraud model:

Kauffman Depo. Tr. 124:22–125:6. ████████████████████████████████ ████████████████████ Kauffman Depo. Tr. 125:7–16.

Kauffman Depo. Tr. 127:21–128:1.

Like the credit risk models, the performance of the fraud models is also monitored and resulted in creation of model governance reports, ███████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████  Kauffman Depo. Tr. 129:14–19, 130:3–11, 137:9–25.  Notably, the witness further testified that the total amount of fraud that has been detected and prevented by the fraud models ████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████.

Kauffman Depo. Tr. 138:1–141:1.

The corporate representative also testified that customer data was also used for ████████

████████, she was unsure whether ████████████, but she was aware of very specific metrics related to marketing efforts that are maintained by Capital One.  Kauffman Depo. Tr. 130:18–131:14,  133:4–6,  133:15–134:18,  141:6–143:17.    For example,  Capital One's  corporate representative  testified  that "██████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████[6]

Based on this testimony, during July and August, Plaintiffs' document review team set out to find the various model governance reports or marketing profitability reports mentioned by the

_____

[6] Kauffman Depo. Tr. 141:13–142:19 ("Q. ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████").

witness amongst the hundreds of thousands of pages of documents that were being actively produced.[7]  None were found.

Plaintiffs raised this issue—the seeming lack of responsive material to RFP No. 36, including the failure to include the reports—on a call with Capital One on September 3, 2020.  In response, Capital One walked-back the importance of the model governance reports, taking the position—as set out in its pending motion for protective order—that the reports "do not contain the information that Plaintiffs are seeking through Request 36," and thus supplemented its interrogatory response instead.  (ECF No. 1123 at 5–6).  The Amended Supplemental Response (ECF No. 1123-9), while acknowledging Capital One's use of consumer application data, still fails to adequately address the financial benefits derived by Capital One from such use of customer information.

Plaintiffs discussed this continued shortcoming with Capital One during a meet and confer on October 7, 2020, during which Plaintiffs informed Capital One that new discovery requests, more precisely aimed at this issue, would be forthcoming.  Fundamentally, as Plaintiffs explained during the meet and confer, Capital One had clearly kept the 15 years-worth of credit applications because it was financially beneficial for it to do so.  Evidence elicited so far seemed to indicate that, at least, part of that reason was AI-ML and other advanced statistical modeling, and to the extent the previously propounded discovery had not captured such information, and that was why it had not been provided, the new requests would.

That new discovery—Plaintiffs' Fifth Document Requests—was issued on or about October 8, 2020, (ECF No. 1123-12).  Those requests sought, for example, documents:

---

[7] July 1, 2020, was the deadline for "substantial completion" of document production.  This deposition occurred on June 17, 2020.

- "sufficient to show the specific types of consumer data,[8] including personally identifiable information" Capital One uses in connection with its machine learning and artificial intelligence, and how Capital One uses "each specific type of consumer data in connection with [its] machine learning purposes and artificial intelligence." Request for Production No. 59.

- "sufficient to show how [Capital One] obtained the specific types of consumer data [it] use[s] . . . in connection with [its] machine learning and artificial intelligence." Request No. 60.

- "regarding the use of consumer data that [Capital One] use[s] either directly or indirectly in connection with [its] machine learning purposes or artificial intelligence." Request No. 61.

- "regarding the sources of personally identifiable information other than credit card applications that [Capital One] obtain[ed] for use in conjunction with information obtained from credit card applications in any machine learning or artificial intelligence projects or products." Request No. 62.

- "regarding the income generated, money saved, or losses prevented by machine learning and artificial intelligence activities, products, or programs that use consumer data." Request No. 67.

- "regarding valuation, including the market value, of consumer data held by You." Request No. 73.

---

[8] "Consumer data" is defined in the requests as "data obtained from the credit[ ] card applications submitted by consumers to "You" in connection with an application for credit, whether the applications are granted, rejected, or declined."

- "regarding valuation, including the market value, of consumer data." Request No. 74.[9]

Meet and confers were held on October 28 and October 29, 2020, regarding the Fifth Requests. Capital One served its formal responses and objections on November 9, 2020, attached hereto as Exhibit 4. On November 11, 2020, Capital One responded with a letter setting out its position that "Capital One has already provided Plaintiffs with documents and testimony that we believe are sufficient to show the requested information. We are identifying this responsive information to show that Capital One has already complied with its discovery obligations and in an effort to understand what, if any, specific additional information Plaintiffs believe they still need on the topics underlying the Requests." *See* Letter of Nov. 11, 2020, (ECF No. 1123-13).

On the final day of discovery, Plaintiffs deposed Zachary Hanif, a senior director of machine learning for Capital One. Mr. Hanif had not been identified by Capital One during this case, but rather was identified by Plaintiffs via independent investigation. Mr. Hanif testified that (1) Capital One's machine learning proposals are accompanied ████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████ Hanif Depo. Tr. 41:11, 47:3–48:7, (ECF No. 1123-18). He testified that the white papers include the inputs into the model, *id.* at 56:7–57:8, which would show which models used or may have used credit card application data or other data at issue in the Breach.

---

[9] Plaintiffs clarified during a meet and confer session on October 29, 2020, that the requests should be interpreted as "sufficient to show" and not "all" documents.

Notably, the white paper Capital One did produce, *see* CAPITALONE_MDL_002211822, confirms that these reports indeed do set out when application data is used (*id*. §§ 2.1, 4.3.2, 8.2), and contain financial projections (*id*. § 6.1.3), precisely as Mr. Hanif testified.[10]

This motion follows.

## II.    LEGAL STANDARD

"Parties are entitled to discover any material that is relevant to any party's claim or defense, is nonprivileged, and proportional to the needs of the case." *BASF Plant Sci., LP v. Commonwealth Sci. and Indus. Research Org.*, No. 2:17-cv-503, 2019 WL 8108060 (E.D. Va. July 3, 2019) (Morgan, J.) (citing Fed. R. Civ. P. 26(b)(1)). Relevance in this context is to be read liberally. *Id.*; Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."). Proportionality considers: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *Id.* Accordingly, the "Federal Rules contemplate the broadest discovery possible in the search for the truth." *Id.* (quoting *Doe v. Old Dominion Univ.*, 289 F. Supp. 3d 744, 749 (E.D. Va. 2018) (Morgan, J.)); *Seldowitz v. Office of Inspector Gen. U.S. Dept. of State*, 238 F.3d 414 (Table), 2000 WL 1742098, at *5 (4th Cir. Nov. 13, 2000); *Minor v. Bostwick Lab's, Inc.*, No. 3:09-cv-343, 2012 WL 13028138, at *2 (E.D. Va. July 13, 2012) (Novak, J.).

---

[10] Plaintiffs are willing to provide these documents to the Court for review if requested, but have not done so here given Capital One's avowed concern in the Motion for Protective Order that this information is "highly sensitive, proprietary, and provide a critical competitive advantage to Capital One." (ECF No. 1123-1 at ¶ 9).

"Pursuant to Federal Rule of Civil Procedure 37(a), a party may move for an order compelling disclosure or discovery. Fed. R. Civ. P. 37. Local Rule 37(A) further provides: 'After a discovery request is objected to, or not complied with, within time, and if not otherwise resolved, it is the responsibility of the party initiating discovery to place the matter before the court by a proper motion…to compel an answer, production, designation, or inspection.'" *Addax Energy SA v. M/V Yasa H. Mulla*, No. 2:17-cv-641, 2018 WL 10470917, at *3 (E.D. Va. Nov. 13, 2018) (Morgan, J.) (marks in original). The Court is afforded broad discretion in this regard. *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va.*, 43 F.3d 416, 426 (4th Cir. 1996); *Wu v. Tseng*, No. 2:06-cv-346, 2007 WL 4143077, at *3 (E.D. Va. Nov. 19, 2007) (Morgan, J.).

"[T]he party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Addax Energy*, 2018 WL 10470917, at *4 (quoting *Eramo v. Rolling Stone, LLC*, 314 F.R.D. 205, 209 (W.D. Va. 2016) (Conrad, J.) (marks in original); *Old Dominion*, 289 F. Supp. 3d at 749. Particularly when electronically stored information ("ESI") is implicated, "the party resisting its production must show that the ESI is not reasonably accessible due to burden or cost, and, even if such a showing is made, the Court may nevertheless order its production if the requesting party shows good cause, keeping in mind Rule 26(a)(2)(C)." *Id.*

### III.    ARGUMENT

#### A.  Plaintiffs Have Long Sought the Requested Information

Plaintiffs have sought to understand why Capital One retained customer application data submitted since 2005—including for applicants who had been denied—and, importantly, how Capital One derived financial benefit from retaining that data, since the outset of discovery in this matter. Interrogatory No. 18 and the associated Rule 30(b)(6) testimony revealed several fertile

areas on those issues, specifically credit risk modeling, fraud risk modeling, and marketing. Importantly, Capital One's witness and interrogatory response concede that Capital One derives significant economic benefit from credit risk modeling, fraud risk modeling, and marketing. Capital One's witness also testified that the credit and fraud risk models were subject to model governance reports, which analyzed their effectiveness, and reports or presentations setting out annual or periodic financial benefit. Capital One's witness also testified that the fraud risk model alone had benefited Capital One in excess of $███████████████████, and that amount had ██████ ████████████████████████ Capital One's witness also testified that the effectiveness of marketing campaigns are ████████████████████████████████████████████████████ ████████████████████████████████.

However, despite these known (and knowable) facts, documents, and circumstances, Plaintiffs' initial document request—RFP No. 36—failed to result in the production of the model governance reports, annual/periodic reports or presentations regarding financial benefit, or otherwise documents concerning the total amount of financial benefit. Plaintiffs spent months wading through Capital One's production on the assumption that such documents would surely be found there. Now that this turned out not to be true, Capital One argues Plaintiffs waited too long.

Plaintiffs spent further weeks questioning Capital One witnesses hoping to uncover the information they sought. When none could recall or speak to what Plaintiffs were seeking (until literally the last day of discovery and the final witness deposed), Capital One argues Plaintiffs have had ample opportunity.

Having failed to reveal the information Plaintiffs had long sought via the operative document requests and witnesses, and following months of meeting and conferring during which, ultimately, Capital One argued the operative discovery requests failed to capture what Plaintiffs

were seeking, new requests specifically targeting Capital One's use of AI-ML that leverages consumer application data were propounded and—only after Capital One's hand was forced by Mr. Hanif's testimony—have turned over precisely *three* new documents. And those documents confirm that the information regarding how Capital One financially benefits, or attempts to financially benefit, from those uses of consumer's data—the same data that Capital One failed to adequately protect during the Breach—do exist.

The Hanif testimony was revelatory. Despite Capital One's nearly year-long protestations that evidence demonstrating how Capital One financially benefits from use of its customer's data does not exist, Mr. Hanif testified that such evidence does exist, *for all Capital One models*.

What's more, the Kauffman testimony likewise unequivocally establishes that customer data—including customer application data compromised in the Data Breach—is (1) used in the credit decisioning model and in the fraud model; and (2) that annual savings attributable to the fraud model is known to Capital One. And, today, in connection with its own Motion for Protective Order on this very discovery, Capital One has unequivocally admitted that "Capital One *has sought* to understand the financial performance of certain credit risk and fraud models—e.g., to estimate the projected or actual savings from using a model . . . ." (ECF No. 1123-1 at ¶ 7). Despite this undisputed knowledge, Capital One has yet to identify, produce, or otherwise provide such annual or otherwise periodic economic benefit related to the fraud or credit risk models, other than Kauffman's extemporaneous testimony regarding the fraud model in one year.

To the extent Capital One believes it has produced and identified responsive material via the documents identified in its November 11, 2020 Letter, specifically those in Section 3 of the Letter, it would be mistaken. The documents identified there are either nonresponsive to these issues or include forward-looking or anticipated savings/revenue. For example,

CAPITALONE_MDL_000669549, Catching Bad Guys PowerPoint, speaks mostly to a ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ While some limited fraud savings are noted— for instance, ███████████████████████████████████—this is a far cry from what Plaintiffs already know Capital One realizes annually from its fraud detection; some ████████████████████ The remaining identified documents seemingly chiefly address savings attributable to the transition to AWS, which, while relevant in this case, answers none of Plaintiffs' inquiries regarding Capital One's use of customer data for profit.[11]

Accordingly, it is clear that Plaintiffs have sought to understand why Capital One retained customer application data submitted since 2005—including for applicants who had been denied— and, importantly, how Capital One derived financial benefit from retaining that data, since the very outset of discovery in this matter. Interrogatory No. 18 and the associated Rule 30(b)(6) testimony revealed several fertile areas on that issue, specifically credit risk modeling, fraud risk modeling, and marketing. Capital One's corporate representative and interrogatory response concede that Capital One derives significant economic benefit from credit risk modeling, fraud risk modeling,

---

[11] *See, e.g.*, CAPITALONE_MDL_000166368, Infrastructure Transformation (identifying anticipated savings from transition to cloud of ████████████████████"); CAPITALONE_MDL_000343683, Deal Considerations (analysis of proposed AWS and COF proposals); CAPITALONE_MDL_000281126, Email Re: ████████ (identifying anticipated savings from transition to cloud); CAPITALONE_MDL_000031984, Cloud Business Case Update (same); CAPITALONE_MDL_000045252, Cloud Security Costs and Assumptions (identifying anticipated security costs for operating in the cloud); CAPITALONE_MDL_000395980, Data Centers (identifying anticipated savings from transition to cloud, along with other expected benefits); CAPITALONE_MDL_000269837 Infrastructure Transformation: Financial Forecast Overview (identifying anticipated savings from transition to cloud); CAPITALONE_MDL_000845136 (discussing cloud benefits). Given the marginal, if any, benefit of these documents to this issue, and to avoid further burdening the Court, Plaintiffs have not provided the documents here, but will do so should the Court so desire.

and marketing, which all leverage customer application data.   Capital One's corporate representative also testified that the credit and fraud risk models were subject to model governance reports, which analyzed their effectiveness, and reports or presentations summarize annual financial benefit, and that same corporate representative testified that the fraud risk model by itself had resulted in financial benefit to Capital One in excess of $███████████, and that amount ██████████████████. And Mr. Hanif testified that all AI-ML models have associated white papers that identify the data inputs (e.g., as relevant here, card application data) and forecast (if not report) revenue/savings.

Nonetheless, despite these known (and knowable) facts, documents, and circumstances, Capital One has refused to provide documents or other discovery responses concerning (1) the annualized or periodic financial benefit attributable to the fraud and credit risk models, and (2) any similar annual or periodic analysis or reporting regarding the financial benefit related to other AI-ML initiatives or uses that leverage customer application data, including the associated "white papers" for such models, other than three exemplar documents.

Rather, Capital One continues to refuse to provide this information to Plaintiffs, having deemed, completely of its own accord, that it is "impossible to quantify the value of any particular item of data used by the models." (ECF No. 1123 at 6). But that is not Capital One's determination to make. It does not sit as the final arbiter of what Plaintiffs and Plaintiffs' experts can determine and argue from this information. Capital One's self-interest, subjective assessment of the usefulness of this information should hold no weight.

**B. The Discovery Requested Is Relevant to Plaintiffs' Unjust Enrichment and Breach of Contract Claims**

Although Capital One has claimed otherwise throughout the various meet and confers by the parties, the discovery sought by Plaintiffs is decidedly relevant to Plaintiffs' unjust enrichment

and breach of contract claims and should be produced. Second Am. Compl. (ECF 971) at Counts 3, 6 ("Complaint" or "Compl.").

*First*, the discovery is relevant to Plaintiffs' unjust enrichment claim (Count 3). Unjust enrichment involves "the receipt of a benefit and the unjust retention of the benefit at the expense of another." Order on Motion to Dismiss (ECF 879) at 43 (citing *Schmidt v. Household Finance Corp.*, 276 Va. 108, 116, 661 S.E.2d 834 (Va. 2008)). Plaintiffs allege that Capital One was unjustly enriched by taking, retaining, and using Plaintiffs' PII for its own gain without expending sufficient resources to adequately protect that PII. Compl. ¶¶ 179-193. The amount of revenue and profit Capital One derived from using Plaintiffs' PII for its own gain, while simultaneously failing to protect it, is certainly relevant to the damages under this claim. Indeed, Capital One has clearly admitted that it uses the Plaintiffs' PII for its own gain in its credit risk and fraud models and has now also admitted that it possesses the "estimated overall financial performance of a model as a whole." ECF 1123-1, John Morgan Decl. at ¶ 7. Plaintiffs are entitled to this relevant information, which quantifies Capital One's unjust gain from its use of Plaintiffs' PII.

Although Capital One has moved for judgment on the pleadings as to Plaintiffs' unjust enrichment claim, the Court has **not** dismissed this claim,[12] nor should it. Part of Capital One's argument to the Court for why its motion for judgment on the pleadings should be granted has been a stipulation entered into by the parties. *See* ECF 1098. But, as Capital One reiterated during the hearing on January 12, 2021, Capital One has *only* stipulated that it made contractual promises with respect to PII through the incorporation of the Privacy Notice into the cardholder agreement.

---

[12] In its Order on the Motion to Dismiss, the Court held: "there is a fundamental dispute between the parties concerning the scope of that contractual relationship and whether it definitively defines Capital One's obligations with respect to protecting Plaintiffs' PII" and "[f]or that reason, the Court will treat Plaintiffs' unjust enrichment claim as an alternative claim to their express breach of contract claim." Order at 43.

Capital One explicitly denied in its Answer that the Privacy Notice is a standalone agreement between Capital One and any putative class member. *See* Answer (ECF 976), ¶¶ 213, 216. This denial means that over 36 million class members never entered into a cardholder agreement, and some portion of the over 60 million class members who did enter into a cardholder agreement at some point may have had their data stolen with respect to an application that was denied (*i.e.* the data stolen in the data breach was part of an application that did not result in a cardholder agreement that would allow them to pursue breach of contract with respect to their injury). This substantial portion of the class maintains their unjust enrichment against Capital One despite Capital One's stipulation, making the discovery sought here appropriate.

And yet, Capital One seeks to dismiss on the pleadings viable claims for a large portion of the class, and it does so on the basis that – according to Capital One – none of the Named Plaintiffs nor any plaintiff with a remaining claim in the MDL was a plaintiff with a denied credit card application. But Capital One is wrong. As explained in Plaintiffs' opposition to the motion for judgment on the pleadings, by Plaintiffs' counsel at two subsequent hearings, and in Plaintiffs' follow-up submission to the Court on January 15, 2021, there *are* applicant plaintiffs who remain in the MDL whose stolen PII was not governed by a cardholder agreement, including Plaintiff Isabel DeLeon who was deposed by Capital One in this litigation. *See* ECF 1130, Plaintiffs' Notice Regarding Non-Cardholder Plaintiffs (*citing* MDL Case No. 3:19-cv-0555-JAG (ECF 1) at ¶¶ 36, 40 112, 120, 160-187). Plaintiffs informed the Court in their submission that should the Court deem it necessary, they are prepared to amend the Representative Complaint to add Plaintiff DeLeon as a Named Plaintiff, either now or at the class certification stage. *Id.*

Additionally, three of the currently Named Plaintiffs in the Second Amended Complaint initially provided Capital One with their PII to apply for credit cards, but those applications were

denied, and Capital One failed to safeguard the PII provided in the initial applications, which was also stolen in the Data Breach. *See* ECF 1032 at 10-11 & n.4. Thus, Capital One's motion for judgment on the pleadings and the parties' subsequent stipulation does not apply to these Plaintiffs for claims arising out of Capital One's pre-Cardholder Agreement conduct in taking possession of this PII for profit without providing adequate data security for it. *Id.* Therefore, the unjust enrichment claims should also not be dismissed as to these plaintiffs.

**Second**, this information is also relevant to Plaintiffs' breach of contract claim, Compl. at Count 6, ¶¶ 212-219, because the same restitution remedies available to non-cardholders also attach to cardholders' contract claims.[13] Capital One asserts a contract claim may only seek to "put the nonbreaching party in the same position, as far as money can do it, as he would have been if the contract had been performed." ECF 1123 at 18 n.4. But "broad statements such as 'there can be no unjust enrichment in contract cases'" are "'plainly erroneous.'" *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 648 (Va. 2020) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2, cmt. c, at 17). For example, rescission and restitution will lie for a substantial or material breach, as Plaintiffs allege here. *See* Williston on Contracts § 68:2 (4th ed.); *Young-Allen v. Bank of Am., N.A.*, 839 S.E.2d 897, 900-01 (Va. 2020). And under Section 39 of the Restatement (Third) of Restitution and Unjust Enrichment, profits from Defendants' opportunistic breach may be available as restitution under the contract claims. *See Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 658-60 (E.D. Pa. 2015) (applying Section 39 in data breach

---

[13] Capital One asserts the complaint does not adequately invoke restitutionary remedies in contract. ECF 1123 at 18 n.4. To the contrary, in Plaintiffs' Count 6, Plaintiffs allege they "sustained actual losses and damages as described in detail above," which includes those damages described in Plaintiffs' claim for unjust enrichment (Count 3). Compl. ¶ 219. Moreover, in their Prayer for Relief, Plaintiffs specifically request "an award of restitution or disgorgement." *Id.* at Request for Relief.

case). The Court should only address these issues of mixed law and fact on a complete record after full briefing, which is likely to occur at the class certification, expert qualification, or summary judgment stage. For purposes of this motion under Rule 26, the requested discovery is unquestionably relevant to the unjust enrichment claims, and is similarly appropriate in the context of restitutionary remedies for the contract claims.

In short, any argument by Capital One that no claims exist in the litigation for which this discovery is relevant should be rejected.

## IV. <u>CONCLUSION</u>

For all the reasons set forth above, Plaintiffs have satisfied their requirement of a *prima facie* showing that the sought-after information and related discovery requests are relevant and proportionate to the needs of this case. Plaintiffs request that the Court issue an order compelling Capital One to produce the requested information and any other relief this Court deems proper.

Dated: January 15, 2021.

Respectfully Submitted,

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
300 N. Washington Street, Suite 404
Alexandria, Virginia 22314
Tel: (888) 987-9991
swebster@websterbook.com

*Plaintiffs' Local Counsel*

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com

Karen Hanson Riebel
**LOCKRIDGE    GRINDAL    NAUEN, P.L.L.P**

100 Washington Avenue South, Suite 200
Minneapolis, MN 55401
Tel: (612) 339-6900
khriebel@locklaw.com

John A. Yanchunis
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel: (813) 223-5505
jyanchunis@ForThePeople.com

*Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ <i>Steven T. Webster</i>                         _____
Steven T. Webster (VSB No. 31975)
WEBSTER BOOK LLP
