**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| In re CAPITAL ONE DATA BREACH SECURITY LITIGATION | ) ) ) ) ) | Case No. 1:19-MD-02915-AJT-JFA |

**INTERVENOR THE OFFICE OF THE COMPTROLLER OF THE CURRENCY'S**
**OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

Intervenor, the Office of the Comptroller of the Currency ("OCC") respectfully submits

its opposition to Plaintiffs' motion to compel portions of a document, the OCC's Supervisory

Letter COF 2019-055, which was inadvertently produced to Plaintiffs by Capital One.

**INTRODUCTION**

Plaintiffs have now filed their fifth motion to compel information protected by the bank

examination privilege in this action.  And like the motions that preceded this one, the bulk of

Plaintiffs' argument seeks to overcome the privilege on a technicality.

Having unsuccessfully argued to this Court that the OCC had waived privilege over bank

examination privileged information at least *three times* previously, and having failed to appeal

this Court's detailed ruling regarding the bank examination privilege when it was released,

Plaintiffs now seek to take advantage of a human error to work another end-run around the

privilege.  Indeed, in their latest motion, Plaintiffs seize on Capital One's inadvertent production

of a portion of a document that this Court has already held to be privileged to advance an

argument that the privileged information should be produced for good cause.

At the outset, the OCC previously tried to avoid a fifth round of briefing regarding the

bank examination privilege in this matter.  As Plaintiffs moved towards their fourth motion to

1

compel bank examination privileged information, the OCC repeatedly requested that the Plaintiffs meet and confer with them on any good cause arguments in an effort to narrow the nearly 800 documents subject to Plaintiffs' privilege challenge.  But Plaintiffs emphatically declined to do so.  Accordingly, this Court should not countenance Plaintiffs' attempt to circumvent the meet-and-confer process in this way.  If allowed, Plaintiffs could continue to bring good-cause challenges on a document-by-document basis for the duration of this litigation.

Even so, Plaintiffs' argument with respect to good cause lacks merit.  Essentially, Plaintiffs seek to supplement their case with the OCC's own deliberative supervisory findings, even though the final version of those findings is publicly available in an OCC consent order issued last year.  Most strikingly, during the meet-and-confer, Plaintiffs assured the OCC that they would not advance any waiver argument against the OCC based on Capital One's inadvertent disclosure of the Supervisory Letter.  Yet, despite this assurance, Plaintiffs' motion argues a nearly identical variation of the waiver argument—that the OCC purportedly should not be able to argue against good cause because of the circumstances surrounding the inadvertent disclosure—and that argument and its supporting factual background takes up half of Plaintiffs' brief.  Finally, and of greatest concern, Plaintiffs' attempt to use the OCC's supervisory findings and the bank's response to those findings—communications that make up the absolute core of bank examination privileged material—to supplement their own expert opinions in this case, threatens to undermine the viability of the supervisory process—the informal and continuous flow of communication between the bank and the regulatory agency where "[b]ank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank."  *In re Subpoena Served upon the Comptroller of the Currency and Sec'y of Bd. of Governors of Fed. Reserve Sys.*, 967 F.2d

630, 634 (D.C. Cir. 1992) ("*In re Subpoena*"). "These conditions simply could not be met as well if communications between the bank and its regulators were not privileged." *Id.* Indeed, to allow a party in private litigation to weaponize a supervisory communication regarding a regulator's finding (as opposed, for example, to the facts underlying that finding) would upset the iterative process that is essential to the effectiveness of the OCC's supervision and examination processes.

Accordingly, the OCC respectfully requests that this Court deny Plaintiffs' motion.

## BACKGROUND

### I.   The OCC's Involvement in this Litigation

The OCC, together with the Board of Governors of the Federal Reserve System ("FRB") (collectively, the "Agencies"), intervened in this action on June 1, 2020 (*see* Dkt. No. 521) for the limited purpose of asserting the bank examination privilege, a common law privilege protecting information that arises out of federal regulators' supervision of banking institutions. Specifically, the privilege "accords agency opinions and recommendations and banks' responses thereto protection from disclosure." *In re Bankers Trust Co.*, 61 F.3d 465, 471 (6th Cir. 1995).

Since then, in accordance with this Court's orders, the Agencies have reviewed tens of thousands of documents for bank examination privileged information. Where a responsive document in Capital One's possession appeared to contain bank examination privileged information, Capital One, the producing party, made the document available for the Agencies' review. The Agencies' counsel then reviewed those documents to determine whether each document should be released, withheld, or redacted, and in the case of documents needing redaction, the Agencies' counsel directed exactly what information would need to be redacted from each document. By necessity, because Capital One was the producing party, had

3

possession of the documents, and was reviewing and redacting the documents for a host of other privileges not related to the bank examination privilege, the Agencies charged the Bank with executing the Agencies' instructions, processing documents for production, and producing them to Plaintiffs.

## II.    April 29, 2021 Clawback

On April 29, 2021, the OCC discovered that Plaintiffs had attached a document—specifically, a copy of OCC Supervisory Letter COF 2019-55 that had been improperly redacted—to their motion for class certification.  Dkt. No. 1260-15 (Pls.' Mot. for Class Cert., Ex. 14).

During its review over the summer of 2020, the OCC had originally withheld three duplicate versions of this Supervisory Letter in full.  After Plaintiffs challenged the OCC's assertion of privilege as to nearly 800 documents, this Court agreed to review a subset of the challenged documents *in camera*.  During this *in camera* inspection, the Court reviewed the three duplicates of the Supervisory Letter.  Dkt. No. 1094 at 7-8 (December 10, 2020 Order).  The Court provided specific instructions that the Supervisory Letter must be produced in redacted form to the Plaintiffs and provided detailed, page-by-page instructions as to the portions of the letter that would have to be produced to Plaintiffs.  *Id.*  Importantly, this Court ruled that the OCC properly asserted the bank examination privilege over pages one through three of the Supervisory Letter under the heading "Conclusions."  *See* Dkt. No. 1094 at 7.  Specifically, these portions summarize the supervisory conclusions reached by the OCC's examination team after its examination of Capital One's cloud operations.  These non-public communications relate to the core of the OCC's supervisory process—its onsite examination of a national bank's

activities—and form an essential vehicle for providing supervisory opinion to a national bank on its safety and soundness.

As required by the Court's December 10, 2020 Order, the OCC directed Capital One to produce the documents, including the Supervisory Letter, with the exact redactions specified by the Court.  While executing the purely ministerial task of applying those Court-ordered redactions and preparing the documents for production to Plaintiffs, Capital One inadvertently omitted redactions under the "Conclusions" heading on pages one through three of the Supervisory Letter.  At no time did the OCC authorize Capital One to release any information that the Court held was privileged, including the inadvertently disclosed information on pages one through three of the Supervisory Letter.

Neither Capital One nor Plaintiffs informed the OCC of the error before Plaintiffs filed their motion for class certification.  The OCC discovered the inadvertent disclosure on April 29, 2021, the day after Plaintiffs filed their class certification motion and included the inadvertently produced version of the Supervisory Letter as an exhibit.  That same day—and consistent with the parties' Stipulated Protective Order and past practice—the OCC requested that Defendant Capital One, as the producing party, claw back the inadvertently unredacted information.  *See* Dkt. No. 313 § XIII; Pl. Br., Exhibit 1 (clawback letter).  Despite these efforts, the Court's prior ruling, and their decision not to challenge the OCC's assertion of privilege over the document, Plaintiffs have chosen to retain copies of the inadvertently produced information to supplement their good-cause challenge, and the inadvertently produced version of the Supervisory Letter remains attached to their motion for class certification.

On May 3, 2021, Plaintiffs provided Capital One with a letter challenging Capital One's ability to claw back a document on the OCC's behalf.  *See* Pl. Br., Exhibit 2 (Plaintiff's Letter).

Plaintiffs also claimed that the OCC had waived the bank examination privilege over the inadvertently revealed portions of the OCC Supervisory Letter and that, in any event, good cause existed to overturn the OCC's assertion of the bank examination privilege over that information. *Id*. On May 4, 2021, the OCC, through the undersigned counsel, provided Capital One counsel with a letter reaffirming its intent to pursue a clawback of the inadvertently produced information, disputing Plaintiffs' assertion that the OCC had waived the bank examination privilege, and asserting that Plaintiffs were precluded from raising any related good-cause arguments at this stage of the litigation. *See* Exhibit 4 at 8-10 (OCC's Letter).

Plaintiffs sent the OCC another letter on Sunday, May 9, 2021, setting forth numerous questions regarding the OCC's review process with respect to the documents, as well as an argument that the already established bank examination privilege should be overcome for good cause. Pl. Br., Exhibit 5.

### III.   Meet and Confer

The parties met and conferred by phone on the morning of May 10, 2021. Plaintiffs reiterated the points in their May 2021 letter, and the Agencies explained why they disagreed. Plaintiffs asked the Agencies to confirm their positions in a follow-up letter, which the Agencies provided that same day. Pl. Br., Exhibit 6.

Having exchanged multiple letters, and having participated in a more than hour-long meet-and-confer conference by phone, the Agencies requested that Plaintiffs confirm by May 11 whether the parties had reached an impasse in light of their respective positions. *Id.* Plaintiffs' counsel informed the OCC that they would not be able to respond until Friday, May 14, the day on which the parties understood that any motion for a protective order would be filed. Plaintiffs wrote the OCC's counsel on May 13, 2021, again asking for additional information about the

OCC's review process, suggesting that Plaintiffs were still considering whether to challenge the clawback on a waiver theory, and asking for more information about the OCC's review of the inadvertently produced document.  In an effort to resolve the issue, despite its position that the Stipulated Protective Order foreclosed a clawback challenge based on a privilege review procedure, the OCC provided Plaintiffs with the information they requested.  On May 14, 2021, Plaintiffs informed the OCC that they would not be challenging the clawback for waiver, agreed that the OCC need not seek a protective order to obtain a ruling from this Court that the inadvertently produced document was privileged, and explained that they would be seeking to compel the inadvertently produced portions of the document for good cause.  Exhibit A.[1]

## ARGUMENT

At the outset, it is worth noting the unusual posture of this motion.  Although Plaintiffs have purportedly agreed that the portion of the Supervisory Letter that the OCC sought to claw back was privileged—and despite the fact that the Protective Order plainly *requires* the receiving party to comply with a clawback request unless it challenges the assertion of privilege over the document—Plaintiffs have continued to retain and use copies of the inadvertently produced Supervisory Letter for their own purposes.  Specifically, in connection with their motion to compel, Plaintiffs submitted copies of the Supervisory Letter to this Court for its review *in camera*, retained the copy appended to their motion for class certification, and relied almost exclusively on the Supervisory Letter's privileged contents to support their good cause

---

[1] Plaintiffs' Exhibit 7, which was filed under seal, omits several subsequent emails in the chain, in which Plaintiffs confirmed that they would not challenge the OCC's assertion of privilege on waiver grounds.  Because those emails directly follow the chain in Exhibit 7, which is already in the record, and in an effort to reduce the number of sealed filings on the docket, the OCC is appending only the subsequent emails in the chain (which do not need to be sealed) to this memorandum.

challenge.  Such uses are inconsistent with the terms of the Protective Order.  *See* Dkt. No. 313 § XIII(B) (authorizing a party to sequester the discovery item only if the receiving party intends to move the Court that the document "was never privileged or protected").  Indeed, it is unclear under what authority Plaintiffs can seek to compel information that it has in its possession and on which its motion for class certification already relies.

Anticipating these issues, Plaintiffs incorrectly claim that this Court's meticulous December 10, 2020 Order is ambiguous as to whether the information at issue here is privileged. *See* Pl. Br. at 3 n.2, 5.  The Court, however, expressly stated in the December 10, 2020 Order that it would "designate those limited portions of th[e Supervisory Letter] that should be produced."  Order at 7.  This Court then carefully excised the information *preceding* the "Conclusions" heading on page 1, and headings *following* the "Conclusions" section at page 3. *Id.*  Given the Court's clear language, there can be no doubt that the Court upheld the OCC's assertion of the bank examination privilege with respect to the portions of the document, including the inadvertently produced information, that the Court did not order produced. Plaintiffs' own agreement not to challenge whether the inadvertently produced material was privileged in the first instance only underscores this point.

Accordingly, in light of their decision not to challenge the OCC's assertion that the inadvertently produced information is privileged, Plaintiffs should not have retained that information and there is nothing to compel.  In any event, although it is unclear whether this motion is ripe, there are several additional reasons why this Court should deny Plaintiffs' motion.

## I.    Plaintiffs Should Be Precluded from Raising Any Good Cause Argument After Expressly Declining to Make Such Arguments Earlier in the Case

Plaintiffs' motion amounts to a backdoor attempt to use Capital One's inadvertent production of privileged material to relitigate this Court's December 10, 2020 Order upholding

the Agencies' assertions of the bank examination privilege—an order which Plaintiffs never appealed.  During meet-and-confer discussions concerning Plaintiffs' earlier attempts to overcome the privilege, the OCC expressly invited Plaintiffs to present any arguments that good cause existed for overturning the bank examination privilege in this case.  *See* Dkt. No. 983-4, Pls.' Ex. 4 (Oct. 22, 2020 Email from R. Levenson to J. Dent) (asking whether Plaintiffs were "foregoing any argument that there is good cause to overcome the bank examination privilege" and explaining that "the Agencies are waiting on Plaintiffs to articulate any good cause argument that they might have so that the Agencies may consider that argument").  The Agencies also stated that "unless . . . Plaintiffs [were] foregoing any argument that there is good cause to overcome the bank examination privilege," the parties were "not at an impasse."  *Id.*  But Plaintiffs declined to meet and confer on the good cause issue at that time, *id.* (Oct. 28, 2020 Email from J. Dent to R. Levenson), declined to make a good cause argument to the Agencies or in their subsequent motion to compel, Dkt. Nos. 982-83, 1015.[2]  The purpose of the meet-and-confer requirement is "to decrease, in every way possible the filing of unnecessary discovery motions."  E.D. Va. Local Rule 37(E).  Here, Plaintiffs' past refusal to genuinely meet and confer on the good cause issue raised the possibility of—and has now resulted in—yet more briefing on the bank examination privilege.  *Cf. Kolon Indus. v. E.I. Du Pont De Nemours & Co.*, No. 3:11-cv-622, 2012 WL 13036259, at *4 (E.D. Va. Feb. 22, 2012) (finding that party waived its right to move to compel certain discovery materials where it failed to raise the issue at an earlier date); *William Beaumont Hosp. v. Medtronic, Inc.*, No. 09-cv-11941, 2010 WL 2534207,

---

[2] Plaintiffs' argument that they sought a limited production of information in their October 30, 2020 motion to compel mischaracterizes the scope of that motion, in which they argued, first and foremost, that the Agencies had waived the privilege wholesale, and also that bank examination privileged information could be produced because of the existence of the Stipulated Protective Order in this matter.  *See* Dkt. No. 983.

at *5 (E.D. Mich. June 18, 2010) (denying motion for protective order as untimely where objecting party sat on its rights and had been aware of the dispute for significant period of time). Accordingly, Plaintiffs' untimely circumvention of Local Rule 37(E) should preclude them from bringing a good cause argument based on inadvertently produced—but nevertheless privileged—information.

Nor can Plaintiffs argue that the type of information revealed in the documents was novel or unknown.  Concerning the OCC document, Plaintiffs received a privilege log from the Agencies that included, among other information, the document's file name and search-term hit results.  Plaintiffs specifically requested this information to assess the OCC's assertion of the bank examination privilege over documents listed on the privilege log.  Dkt. No. 739.  The privilege log gave enough information to Plaintiffs to include all three versions of the Supervisory Letter in their October 30, 2020 challenge.  Moreover, descriptions of the OCC's supervisory process—and the essential role that supervisory letters play in that process—is publicly available.  Armed with this information, Plaintiffs had ample opportunity to raise a good cause argument *before* the Agencies reviewed tens of thousands of documents for privileged material and certainly before this Court undertook its exhaustive *in camera* review.  Plaintiffs declined to raise these arguments then; they should not be allowed to make them belatedly now.

Finally, Plaintiffs' efforts to make good-cause arguments at this late stage—namely, *after* receiving the privileged information due to an administrative mistake—flips the good-cause inquiry on its head.  When assessing objections to discovery based on the bank examination privilege, courts must first determine whether the privilege applies at all.  *See, e.g.*, *In re Subpoena*, 967 F.2d at 634; *Syron v. Fed. Hous. Fin. Agency*, No. 1:14-mc-359, 2014 WL 12623047, at *4 (D.D.C. Dec. 31, 2014).  Reflecting this, the Court has concluded that the bank

examination privilege applies on multiple occasions; first, when the Court granted the Agencies'
motion to intervene in the case, Dkt. No. 521, and second, when the Court issued the December
10, 2020 Order summarizing the results of its *in-camera* inspection—including the document at
issue here, Dkt. No. 1094.  Once the privilege applies, receiving parties can choose to pursue
arguments that good cause exists to override the privilege.  *See, e.g.*, *In re Providian Fin. Corp.
Sec. Litig.*, 222 F.R.D. 22, 26 (D.D.C. 2004).  But even if a receiving party pursues that
challenge, the information at issue remains privileged—and outside the receiving parties'
possession—unless and until a court concludes that good cause exists.

Accordingly, Plaintiffs' efforts to make a good-cause challenge based on the content of
privileged materials—materials in their possession solely because of an administrative error—
turns an *ex-ante* inquiry designed to protect privileged information into an *ex-post* ratification
undermining the Agencies' rights to assert the bank examination privilege in the first instance.
Allowing Plaintiffs to use inadvertently disclosed and privileged material in this way creates a
perverse incentive for future litigants to sidestep protective orders, court orders, and local meet-
and-confer rules to bolster their good-cause challenges.  For these reasons, Plaintiffs should be
precluded from bringing a good-cause challenge based on privileged information they would not
otherwise possess but for an administrative mistake by a non-Agency employee.

## II.        Plaintiffs' Good Cause Arguments Fail on Their Merits

Even if the Court were to consider Plaintiffs' good-cause argument, Plaintiffs have not—
and cannot—show any substantive reason why the OCC's assertions of the bank examination
privilege should be overridden.  Their attempts to show "good cause" for disclosure of these
materials based on the non-exhaustive factors identified in the caselaw—relevance, availability
of other evidence, the seriousness of the litigation, the role of the government in the litigation,

and the possibility of future timidity by government employees—are meritless.[3]  *See In re Subpoena*, 967 F.2d at 634 (summarizing factors); *see generally* Pl. Br. (Dkt. No. 1320).  Although courts weigh the particular facts in deciding whether the bank examination privilege bars discovery of specific documents, a litigant must still identify a particularized need that outweighs the strong policy reasons supporting the privilege.  *See In re Subpoena*, 967 F.2d at 634-35.  Plaintiffs cannot make that showing here.[4]

### A.  Plaintiffs Do Not Have a Particularized Need for the Information, and Have Other Adequate Information

While the OCC takes no position as to the claims or defenses of either party in this litigation, its review of the non-privileged information already authorized for release to Plaintiffs supports a conclusion that the Supervisory Letter is not sufficiently relevant to warrant overriding the bank examination privilege.  Plaintiffs are entitled to discovery appropriate to vigorously pursue their claims.  The Federal Rules of Civil Procedure, however, recognize that

---

[3] These factors parallel regulations outlining the OCC's administrative processes for authorizing the use of non-public OCC information.  *See* 12 C.F.R. §§ 4.33(a)(3), 4.35(a).

[4] Although Plaintiffs rely heavily on *Principe v. Crossland Savs., FSB*, 149 F.R.D. 444 (E.D.N.Y. 1993), that case is far from applicable.  That case involved a "scheme" by the defendant "to issue materially false and misleading statements . . . regarding almost every aspect of [the bank's] operations in order to inflate the price of CrossLand securities," leading to a federal government-mandated closure of the bank.  *Id.* at 445.  The Federal Deposit Insurance Corporation was set to act as a receiver and a conservator for a new bank that would be established in its place.  *Id.* at 446.  In assessing whether the bank examination privilege could be overcome for good cause, the Court found that the "failure of a major bank such as CrossLand threatens the health of the nation[al] and international economic community."  *Id.* at 449.  Plaintiffs' claims in this case do not have the same reach.  As to the fourth factor, it was not simply FDIC's regulatory duties to the bank which sufficed to meet this factor; rather, FDIC was also set to become the receiver of the bank and the conservator of its successor, and it would directly "benefit if defendant prevails in this action."  *Id.* at 449.  The OCC, by contrast, will not be affected by the outcome of this litigation.  In short, the factual circumstances in *Principe* are in stark contrast to those presented here.

this entitlement is not unlimited and that a court should not order production of information

sought by a litigant unless it bears a sufficiently strong relation to the issues in the case.  *See* Fed.

R. Civ. P. 26(b)(1) (permitting discovery as to any nonprivileged matter that is "relevant to any

party's claim or defense").

With respect to the second factor, the availability of other evidence, Plaintiffs have not

specified any particularized need for these materials.  Plaintiffs' argument amounts to seeking

the OCC's supervisory conclusions to support their legal theories in this case, and an effort to

contradict Capital One's arguments in this action using the Supervisory Letter's description of an

exit meeting.  As to the latter piece of information, in its December 10, 2020 Order, the Court

ordered that the summary of the exit meeting be produced.  Dkt. No. 1094 at 8.  That information

is already available to Plaintiffs and does not justify the disclosure of the inadvertently produced

information.[5]

Similarly, Plaintiffs have not explained why they need the conclusions set out in the

Supervisory Letter when the OCC's final supervisory conclusions have been made publicly

available.  Specifically, the OCC found in a Consent Order that "the Bank failed to establish

effective risk assessment processes prior to migrating its information technology operations to

the cloud operating environment . . . [and] the Bank's internal audit failed to identify numerous

control weaknesses and gaps in the cloud operating environment."  OCC Consent Order #2020-

036, AA-EC-20-51 (Aug. 5, 2020).  Given the availability of a public document describing the

OCC's summary conclusions on Capital One's cloud-related processes, management, and

internal audit to be deficient, Plaintiffs cannot meaningfully show why they need the information

---

[5] As a non-party to this action, the OCC does not take a position on whether the Supervisory Letter supports the proposition that Plaintiffs believe it does, nor on whether the inadvertently produced material is admissible for the purposes that Plaintiffs seek to introduce it.

contained in the "Conclusions" section of the OCC Supervisory Letter—a section which this Court has already held is privileged and therefore protected from disclosure. *See* Dkt. No. 1094 at 7-8. And while Plaintiffs have broadly stated that this section "strongly supports Plaintiffs' claims that Capital One is liable," *see* Pl. Br. at 6, Plaintiffs do not explain how this factor alone justifies overcoming the bank examination privilege—especially when the privileged material at issue strikes at the heart of what the privilege is meant to protect.

Importantly, other comparable information is available to Plaintiffs through other materials produced during discovery. Capital One has produced tens of thousands of documents either in full or in redacted form that the Agencies have reviewed, and which address the regulatory process surrounding the data breach. The OCC understands that Capital One has produced many more documents, including the factual material on which the OCC's examination relied. Where a party has been provided with the "materials underlying" a regulator's opinion and "can use their own expertise to render opinions on these facts," they have "adequate forms of alternative information and fail to meet the second prong" of the test for good cause. *See, e.g.*, *In re Bank One Securities Litig.*, 209 F.R.D. 418, 427 (N.D. Ill. 2002). Plaintiffs have retained their own expert witnesses, who should be able to analyze the materials and reach their own conclusions about the applicable issues in this case. Given their retention of their own experts, Plaintiffs have not made the requisite showing as to why the highly privileged opinions of the OCC's examiners should be disclosed. More importantly, Plaintiffs seek to establish a dangerous precedent by using the core privileged information at issue to support their belated good-cause challenge. Plaintiffs are required to make a good-cause challenge without use of the privileged information at issue, not the other way around.

### B.  This Litigation Does Not Meet the High Bar Required for the Third Factor

Although the Agencies acknowledge the seriousness of Plaintiffs' factual allegations,
courts have imposed a very high bar as to the kind of case in which the privilege should succumb
to a good-cause challenge.  *See In re Providian*, 222 F.R.D. at 29 (holding that alleged violations
of federal securities laws was not sufficiently serious to find good cause, even where first and
second factors had been met); *Shirk v. Fifth Third Bancorp*, No. 1:05-CV-049, 2008 WL
2661955, at *3 (S.D. Ohio July 2, 2008) (finding that "an ERISA action between private
litigants, where money damages . . . are the remedy, does not rise to the level of seriousness
which would require production of confidential bank examination materials"); *Principe*, 149
F.R.D. at 445 (finding third prong of good-cause analysis met where bank's collapse "threatens
the health of the nation[al] and international economic community").  Indeed, this is not a case
where the Agencies' examination process, internal deliberations, or opinions and conclusions are
the subject of the claims in the case, further supporting a finding that the seriousness of this case
does not support disclosure.

In response to this factor, Plaintiffs emphasize their efforts to ensure the safety of the
personally identifiable information involved in the data breach.  While the OCC does not seek to
minimize that goal, as the *Providian* court cogently stated in the context of securities litigation,
"the policies underlying the bank examination privilege are not necessarily eclipsed whenever
the policy in favor of securities disclosure surfaces."  *See Providian*, 222 F.R.D. at 29 ("While
the importance of policies underlying the federal securities laws cannot be overstated, those
policies do not presumptively preempt the policies underlying the bank examination privilege.").
So too here.

### C.  The OCC Has No Interest in the Outcome of This Litigation

The fourth factor strongly favors the OCC.  The OCC is not a party to the underlying litigation.  Where federal agencies are not accused of any wrongdoing, there is no need to grant access to illuminate their activities.  *See In re Franklin*, 478 F. Supp. at 587.

Nor does denial of Plaintiffs' good-cause argument give the OCC any litigation-related advantage since it has no interest in the outcome of this matter.  *See, e.g.*, *Lincoln Sav. & Loan Ass'n v. UN Fin. Corp.*, 120 F.R.D. 3, 5-6 (D.D.C. 1988) (observing that Congress never intended bank regulatory agencies to serve as "clearinghouse for third parties suing financial institutions").  The OCC, as a non-party, is only interested in protecting its privilege and preserving the necessary level of candor between it and its regulated institutions, towards whom the OCC's supervision will extend long past the conclusion of this action.  Indeed, because the "OCC is not a party to the instant litigation," "does not have a direct interest in the outcome of this litigation," has "fulfilled its duty as a bank regulator with respect to the practices" of Capital One and "continues to serve in a regulatory capacity outside this case," the fourth prong of the good cause test "is not met."  *See In re Bank One*, 209 F.R.D. at 428.  Plaintiffs' searching efforts to meet this factor come up short.

1.      Plaintiffs attempt to impugn the OCC's regulatory actions and suggest that OCC is seeking to "shield" its communications with Capital One for some nefarious purpose.  Pl. Br. at 9.  This argument amounts to nothing more than a wholesale misreading of the OCC's supervisory role and its role in this litigation.  Plaintiffs' suggestion that the OCC is attempting to conceal its post-breach findings falls flat in the face of the publicly available OCC Consent Order regarding the breach that the OCC issued while this litigation was pending and after the OCC intervened in the case.  *See* https://www.occ.gov/static/enforcement-actions/ea2020-

16

036.pdf.  This Court should not countenance Plaintiffs' suggestion—for which they have

provided nothing but speculation—that the OCC's assertion of a well-established privilege over

its deliberative communications with the bank leading up to that Consent Order is entitled to

skepticism or should somehow count against the agency.[6]

2.      Plaintiffs next present a thinly veiled attempt to revive their privilege waiver

arguments from the parties' meet-and-confer discussions to argue that the OCC "should not now

be able to assert that the Supervisory Letter is of such crucial importance to the bank

examination privilege to rebut an assertion of good cause" because of the circumstances

surrounding the inadvertent disclosure.  Pl. Br. at 9.[7]  This remarkable argument not only lacks

merit, but subverts the lengthy meet-and-confer process leading up to this motion.

Specifically, Plaintiffs opted not to challenge the OCC's privilege assertion on waiver

grounds and assured the OCC that the agency need not seek a protective order on the waiver

issue.  *See* Exhibit 1.  Nevertheless, in choosing to file their own motion, Plaintiffs shoehorn

their waiver arguments into the wholly irrelevant analysis of the government's interest in this

---

[6] Nor can Plaintiffs claim that the public consent order obviates concerns related to the
preservation of candid communications between the OCC and the institutions it supervises.
While consent orders are public, nonconfidential documents, 12 U.S.C. § 1818(u)(1), "the
examination reports and communications leading up to [consent orders]" remain confidential and
non-public, *see Shirk*, 2008 WL 2661955, at *1; *see also Fed. Hous. Fin. Agency v. JPMorgan
Chase & Co.*, 978 F. Supp. 2d 267, 276 (S.D.N.Y. 2013) ("noting that the release of public "high
level reports" from regulating officials regarding their supervision of financial institutions
"simply do[es] not pose the same chilling effect on communication" between the regulator and
the financial institution "as would be created by disclosure of individual communications" by the
regulator or by the employees of financial institutions).

[7] Plaintiffs' own motion is internally inconsistent on this score.  Plaintiffs at times describe the
redactions on the Supervisory Letter as indicating that "care had been taken" in making those
redactions (*see* Pl. Br. at 2), perhaps to suggest that their good faith obligation to inform Capital
One and the OCC of the apparent production of privileged information had not been triggered,
but then, in an about-face, accuse the OCC of irresponsibly directing Capital One to produce the
Supervisory Letter in strict accordance with the Court's December 10, 2020 Order.  Pl. Br. at 9.

litigation.  Plaintiffs' assurances that they would not argue waiver only to turn around and make essentially the same argument undermines the spirit of E.D. Va. Local Rule 37(E).

And although Plaintiffs attempt to use the circumstances of the inadvertent production as a sword against the OCC in the wholly separate analysis of whether the privilege should succumb for good cause, their arguments are meritless.  Plaintiffs have repeatedly asserted, to the OCC and to this Court, that the Stipulated Protective Order would protect the Agencies' documents in this matter, which states that the "production or disclosure of Privileged Material shall not be deemed to waive—in this litigation or in any other federal or state proceeding—any applicable privilege or immunity . . . that would otherwise attach to the disclosed material or their subject matter."  Dkt. No. 313 § XII(B).  And the parties, including Plaintiffs, agreed that they "shall not argue, in this forum or any other, that any privilege or protection was waived as a result of disclosure in this action, *regardless of the procedures used to identify Privileged Material prior to production*."  *Id.* (emphasis added).  It is therefore beyond dispute that the parties intended to protect themselves from exactly the kind of arguments that Plaintiffs are seeking to employ here.[8]

And Plaintiffs' unsupported assertion that the OCC did not take "any steps" to protect the privileged information in the Supervisory Letter ignores reality.  Pl. Br. at 9.  By contrast, the OCC reviewed the Supervisory Letter for privilege, along with tens of thousands of other

---

[8] Federal Rule 502(d) also makes clear that, as the Court did here, "a federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court."  Fed. R. Evid. 502(d).  The parties *expressly* invoked Rule 502(d) in the Stipulated Protective Order and agreed that it would govern the production of information in this action.  Stipulated Protective Order § XII(A); *see, e.g.*, *Rajala v. McGuire Woods, LLP*, No. 08-2638, 2013 WL 50200, at *5 (D. Kan. Jan. 3, 2013) (rejecting receiving party's argument that the plaintiff had not taken reasonable steps to prevent disclosure of a privileged document where the court had entered an order under Federal Rule of Evidence 502(d)).

documents, withheld it in full, and defended against Plaintiffs' repeated motions to compel its production. That the OCC defended its assertion of privilege over the Supervisory Letter is also apparent from the fact that it was one of the documents the Court selected for *in camera* review. When the Court issued an order upholding the OCC's assertion of privilege as to the inadvertently disclosed information (that is, the paragraphs on pages one through three under the "Conclusions" heading), but ordering that other portions of the documents be disclosed, the OCC directed Capital One, the producing party, to perform the purely ministerial task of producing the document with the exact redactions that the Court had ordered. This redaction took place in the context of OCC reviewing thousands of other documents, including documents affected, but not addressed by, the Court's order following its *in camera* review, along with new documents that Capital One identified for the Agencies to review.[9] The OCC has poured its limited resources into protecting the privilege despite the massive scope of discovery in this multi-district litigation and Plaintiffs' efforts to subvert the privilege at every turn.

### D. Weaponizing the OCC's Core Supervisory Findings, and the Bank's Response to Those Findings, Hits at the Heart of the Bank Examination Privilege

Plaintiffs' good-cause arguments raise substantial issues concerning the flow of communications animating the bank examination privilege's purpose. "[T]he bank examination privilege is firmly rooted in practical necessity. Bank safety and soundness supervision is an

---

[9] Plaintiffs originally asserted that the disclosure of the information could not have been inadvertent because, they assumed, many lawyers had repeatedly reviewed the redactions before they went out. *See* Pl. Br., Exhibit 2. When the OCC informed Plaintiffs that they had not double-checked Capital One's application of the Court's page-by-page redaction instructions as to twenty-four downgraded documents, and instead spent their limited resources reviewing documents for which the Court requested additional information and those subject to Plaintiffs' privilege challenge to which the guidance in the December 10, 2020 order needed to be applied, Plaintiffs changed course, now arguing that the OCC's procedure for protecting the privilege was insufficient, raising the question of what procedure the OCC could have followed that would have met Plaintiffs' crabbed interpretation of "inadvertent."

iterative process of comment by the regulators and response by the bank." *In re Subpoena*, 967 F.2d at 633.  Successful supervision "therefore depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency." *Id.*  This Court has acknowledged the validity of these concerns in its December 10, 2020 Order, *see* Dkt. No. 1094 at 1-3, and should do so again here.

Plaintiffs' motion is trained on making use of the OCC's core supervisory findings to support a claim for which they bear the burden of proof.  In essence, Plaintiffs' good-cause challenge amounts to an effort to weaponize the frank communications between Capital One and the OCC—effectively inserting the OCC's opinions as supplemental expert evidence in this private action—and using Capital One's responses to the OCC's opinions for atmospheric effect. As the *In re Subpoena* court explained, for supervision to be effective, "[b]ank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank."  967 F.2d at 634.  "These conditions simply could not be met as well if communications between the bank and its regulators were not privileged." *Id.*  Plaintiffs' motion simply seeks to turn the OCC and Capital One's statements, made in course of the supervisory process, against Capital One—exactly what the bank examination privilege was meant to protect.

Plaintiffs also argue that the protections that the Stipulated Protective Order affords further support for their good-cause argument.  Setting aside Plaintiffs' selective reading of the Stipulated Protective Order and its protections, as described above, Plaintiffs also misunderstand the OCC's concerns regarding how Plaintiffs' use of these materials would disrupt effective supervisory efforts and lead to future timidity by Agency employees.  Pl. Br. at 10-11.  Plaintiffs claim that "the document was produced pursuant to the strong Protective Order in this case and

has been carefully filed under seal by Plaintiffs, thus ameliorating the concerns of public discourse usually implicated by the bank examination privilege," *id.* at 11,[10] but that only addresses, albeit insufficiently, one component of this factor.  The other component, which Plaintiffs do not address at all, is the chilling effect on the candor between the OCC and its regulated entities that would occur if Plaintiffs are allowed to use the core supervisory findings against those same regulated entities in a civil case for monetary damages.  *See In re Providian*, 222 F.R.D. at 29 (finding that plaintiffs did not establish good cause in part because "disclosure may have a chilling effect on future OCC efforts").

In short, overriding the bank examination privilege in this case would unduly chill communications between the OCC and its regulated entities and undermine the OCC's supervisory process.  The OCC may best achieve its mission when examiners and bank personnel communicate openly without second-guessing how their observations, criticisms, and statements concerning efforts to address areas of concern identified by examiners (including voluntary corrective actions) will be construed and characterized in the future.  Accordingly, Plaintiffs remain unable to show how their interest in the privileged materials outweighs these significant overriding concerns.

---

[10] The cases Plaintiffs cite in this regard do little to advance their argument.  In *Schreiber v. Soc'y for Savs. Bancorp*, 11 F.3d 217 (D.C. Cir. 1993), the Court disagreed with the district court's cursory treatment of the bank examination privilege, and remanded for further consideration, but did not order that any documents should be produced or that good cause existed to overcome any of the regulator's privilege assertions.  And in *United States v. Provident National Bank*, 41 F.R.D. 209, 210 (E.D. Pa. 1966), the court *declined* to require the production of "candid opinions, good or bad, correct or incorrect, of the examiner on the bank he has examined."  *Id.*  Even with protective measures in place, the court concluded that the production of these candid opinions—exactly what Plaintiffs seek here—"would be inimical to the public interest."  *Id.*  Indeed, the court determined that it "would not chance" circumstances under which a bank "might feel it necessary to protect [itself] against any adverse observation by an examiner if such reports were to be freely disclosed.  *Id.*

## **CONCLUSION**

For the foregoing reasons, the OCC respectfully requests that this Court deny Plaintiffs' motion to compel.


Dated:  May 19, 2021

Respectfully submitted,


RAJ PAREKH
Acting United States Attorney


_____/s/_____
By: REBECCA S. LEVENSON
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3760
Fax: (703) 299-3983
E-mail: Rebecca.s.levenson@usdoj.gov

*Counsel for the Office of the Comptroller of the Currency*


Of Counsel:

Peter C. Koch
Michael K. Morelli
Juan Pablo Perez-Sangimino
*Office of the Comptroller of the Currency*