**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| IN RE: CAPITAL ONE CONSUMER DATA SECURITY BREACH LITIGATION | MDL No. 1:19md2915 (AJT/JFA) |

**This Document Relates to the Consumer Cases**

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
<u>MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF REBECCA KUEHN</u>**

In its Opposition to Plaintiffs' Motion to Exclude the Report and Testimony of Rebecca Kuehn (hereinafter, "Opposition" or "Opp."), Capital One suggests that Plaintiffs seek to exclude her report and testimony because her opinions are "fatal" to their claims and motion. Doc. 1605 at 1. This could not be further from the truth. Kuehn's opinions bear little weight in this case, especially when compared to the opinions of Plaintiffs' expert, Kevin Mitnick. Mitnick has drawn upon his decades of experience in cybersecurity to opine and explain to the jury the nature and extent of the harm class members face as a result of the Capital One Data Breach. By contrast, Kuehn, while well-credentialed in her particular field, has never been retained to offer expert opinions about whether specific incidences of identity theft can be tied to a specific data breach, and it is clear that this issue is outside the scope of her purported expertise.

Such disputes are usually left for the jury. But here, Plaintiffs seek to exclude Kuehn's testimony not because it is "fatal" to their claims, but because it will not be of assistance in helping the jury to understand and resolve the issues in this case. In its attempt to fend off Plaintiffs' motion to exclude Kuehn, Capital One has only bolstered the case for her exclusion. Based on Capital One's Opposition, it is even more apparent that, due to her lack of expertise on issues involving identity theft arising out of data breaches and Capital One's attempt to narrow the scope of her

1

opinions, those opinions are "materially incomplete" and rest on nothing more that her *ipse dixit*. The Court has a duty to keep such opinions from reaching and potentially confusing the jury, as set forth in Plaintiffs' Motion and discussed in further detail herein.

## ARGUMENT

When proffered testimony is challenged, the proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)). Capital One not only fails to meet this burden in its Opposition, but it has further highlighted her lack of qualification to testify as an expert in this case and shed new light on the unreliability of her methodology and opinions.

## I.    CAPITAL ONE HAS NOT ESTABLISHED THAT KUEHN IS QUALIFIED TO TESTIFY AS AN EXPERT IN THIS CASE.

### A.    The Court should not permit Capital One to rely upon Kuehn's newly submitted Declaration.

In apparent recognition that Kuehn's Report and deposition testimony failed to demonstrate she had the requisite experience to testify as an expert about whether the Plaintiffs experienced identity theft resulting from the Data Breach, Capital One has taken the extraordinary step of submitting a new Declaration from Kuehn (Doc. 1604-2) that purports to detail and expound on her experience addressing issues involving identity theft. Capital One relies upon the Declaration extensively to support its contention that Kuehn has "years of experience related to various aspects of preventing, identifying, and regulating identity theft." Opp. at 1.

As an initial matter, it is inappropriate for Capital One and Kuehn to rely upon this newly submitted declaration to buttress her qualifications now that they have been challenged. The declaration embellishes on credentials Kuehn listed in her Report, attempts to paint others in a

context that gives more heft to her "identity theft" experience, and includes some entirely new information that was not previously disclosed in either her Report or her deposition testimony, such as her representation that her assistance in the development of red flags policies included "root cause analyses of prior identity theft incidents." Decl., ¶ 12.

This eleventh-hour elaboration on her experience with identity theft issues—submitted only after her qualifications were challenged—comes at a point when Plaintiffs no longer have the opportunity to inquire about or challenge the statements and assertions she makes in the Declaration. These are details Kuehn was obligated to provide in either her initial or supplementary Reports or should have elaborated on at her deposition, where she was specifically asked to explain her identity theft experience but failed to provide the level of detail she now offers in her Declaration. *See* Doc. 1565-1, Ex. 1 ("Kuehn Dep.") at 34:25-35:11.

Capital One should not be permitted to rely upon this new Declaration to fill in the gaps between Kuehn's experience and the opinions she offers in this case. The newly submitted declaration runs afoul of the rules governing expert discovery. Rule 26 provides that any witness retained to provide expert testimony must submit a written report that "must contain . . . the witness's qualifications, including a list of all publications authored in the past 10 years." Fed. R. Civ. P. 26(a)(2)(B)(iv). Rule 37 states, if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). As the Ninth Circuit explains, "Rule 37 'gives teeth' to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011). On this basis, the Eleventh Circuit affirmed a district court's order striking new evidence

provided by an expert witness during and after his *Daubert* hearing that was not included in his deposition and Rule 26(a) disclosures and was not supplemented as required by Rule 26(e). *Mitchell v. Ford Motor Co.*, 318 F. App'x. 821, 825 (11th Cir. 2009).

To permit Capital One to rely on Kuehn's Declaration would not only violate Rule 26(e) but would also allow Capital One to avoid a meaningful Rule 702 challenge. *Fail–Safe, L.L. C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 878 n.7 * (E.D. Wis. 2010) (stating an expert's testimony should not be allowed to become "a moving target").

### B.    Kuehn's experience with the FCRA is not relevant to identity theft.

The assertions contained in the Declaration still do not ameliorate the fact that the opinions Kuehn offers in this case are outside the scope of her expertise. Capital One incorrectly asserts that Kuehn's experience with the FCRA renders her qualified to opine on the risks Plaintiffs face due to Capital One's Data Breach and whether the fraud they have experienced is related to the Breach.

Capital One incorrectly contends that a person with FCRA experience would necessarily be qualified to render the opinions Kuehn sets forth in her report because "the FCRA has long been entwined with identity theft." Opp. 13. But although the FCRA may include ancillary regulations related to implementing certain protections with respect to identity theft, the FCRA's predominate and overarching purpose is to ensure "accuracy and fairness of credit reporting" because the "banking system is dependent upon fair and accurate credit reporting" and there is a "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(1), (4). Therefore, the FCRA requires that consumer reporting agencies—such as Equifax, TransUnion, and Experian— "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner that is fair and equitable to the consumer, with regard

to confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements" of the statute. 15 U.S.C. § 1681(b).[1]

Kuehn herself acknowledges that her FCRA experience has little to do with the identity theft regulations. In her report, Kuehn explains that her expertise in the FCRA has been developed "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Doc. 1605, Ex. A ("Kuehn Report") p. 2 (emphasis added). For example, for the past 6 years, Kuehn has focused on counseling "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Kuehn Report, at Exhibit C, CV (Partner at Hudson Cook, April 2015 – Present). At her deposition, Kuehn testified that her experience "████████████████████████████████████████████

---

[1] Contrary to Capital One's assertions, courts have not generally recognized that "FCRA expertise goes hand-in-hand with expertise regarding identity theft." Opp. 15. Capital One cites to two inapposite cases for this proposition, both involving the same expert. In the first, the court found that the expert, Evan Hendricks, was "qualified to testify about the FCRA generally and credit reporting issues" and then found (in a footnote with no analysis) that as a result of the expert's FCRA expertise, the expert could opine on the risk of "identity theft that can result from the *unauthorized access of a credit report*." *Brown v. Vivint Solar, Inc.*, No. 8:18-CV-2838-T24-JSS, 2020 WL 1479079, at *2 (M.D. Fla. Mar. 26, 2020). Notably, *Brown* was a case specifically involving violations of the FCRA. A FCRA expert opining as to the harm that can result from the unauthorized access to a credit report, where the FCRA violations specifically pertain to credit reports, is very different from an expert opining writ large that a massive Data Breach involving the criminal exfiltration of 98 million American's PII results in no increased risk of harm to those persons. Moreover, the court held that Hendricks was not qualified to opine regarding the emotional and physical damages that generally arise from FCRA violations, demonstrating the fact that expertise and experience in a field does not qualify an expert to offer opinions as to all aspects of that field. In the second case cited by Capital One, the court mentioned in passing that Plaintiffs had offered Hendricks, as "an expert on identity theft," but the court, in granting defendant's motion for summary judgment, did not further address Hendricks and made no findings at all with respect to him. *Melancon v. Louisiana Off. of Student Fin. Assistance*, 567 F. Supp. 2d 873, 876 (E.D. La. 2008).

████████████████," and more specifically her "████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████." Kuehn Dep. 63-64. When asked whether her experience at Hudson Cook,

the law firm at which she has worked since 2015, involved "measuring the risk to individuals from

cybercrimes," Kuehn testified that she did work with "████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████." Kuehn Dep. 65-66 (emphasis added). She did *not* testify at that

time, as she now declares in her declaration, that her experience in the "development of red flags

policies" included "root cause analyses of prior identity theft incidents." Kuehn Decl. ¶ 12. Given

the question posed and thrust of her opinions, it is hard to imagine how this ostensibly relevant

experience was excluded at the time.

Indeed, Capital One relies almost *exclusively* on the late-submitted Kuehn Declaration for

its argument that Kuehn's FCRA experience is relevant to the opinions she offers. Opp. 13-15

(citing exclusively to the declaration, with one exception of a citation to her deposition testimony,

which is also paired with a citation to her declaration). For example, in support of its proposition

that Kuehn "developed a deep understanding of the type of information that would be required to

commit fraud," Capital One cites to the Declaration, which explains for the first time two

investigations that she was purportedly involved in that concerned the risk of identity theft: (1) a

data breach in 2011 (Kuehn Decl. ¶ 6); and (2) an improper disposal of physical boxes containing

consumer information in 2009 (Kuehn Decl. ¶ 7). Opp. at 13. Kuehn offers no detail on her involvement in the investigations in the declaration, which she seemingly mentioned in passing at her deposition[2] and which she did not address in her Report. At her deposition, she testified that her involvement in investigations at the FTC involved looking at companies "███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████." Kuehn Dep. 117 (emphasis added). Even if this experience were considered, and it should not be for the reasons set forth *supra*, Kuehn offers no details on her involvement in the investigations that would qualify her to offer the opinions in her report.  Nor does Kuehn explain why, for example, an investigation into the improper disposal of boxes of information over a decade ago would qualify her to opine that Plaintiffs in 2021 face no increased risk as a result of a Data Breach impacting 98 million Americans, or that instances of fraud experienced by the Plaintiffs in this case could not be the result of the Data Breach.

Capital One also cites to Kuehn's new declaration for the propositions that Kuehn "can determine … that the exposed data elements aren't sufficient to commit identity fraud" (Opp. 13, citing Kuehn Decl. ¶ 8) and for the proposition that Kuehn has experience in "identifying the root cause of incidents of identity theft, including reviewing the underlying information provided to commit the fraud" (Opp. 15, citing Kuehn Decl. ¶¶ 8, 12). But none of the explanation and detail Capital One relies on in the Kuehn Declaration was included in her report or deposition testimony. For example, Capital One asserts that Kuehn has experience with ████████████████████ ████████████████████████████████████" Opp. 15 (citing Kuehn Dep. 69:14-20 and

---

[2] For example, Kuehn mentioned at her deposition ██████████████████ but did not explain that it involved hackers accessing credit reports. *Compare* Kuehn Dep. 118 *with* Kuehn Declaration ¶ 6.

Kuehn Decl. ¶ 8) (emphasis added). But the deposition testimony Capital One relies on merely states: "████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████." Kuehn Dep. 69:14-20 (emphasis added). ████████████████

████████████████████████████████████" does not equate to experience in "████████████

████████████" or in "identifying the root cause of incidents of identity theft." Opp. 15. That is why Capital One seeks to rely on the new Kuehn Declaration for these assertions, though the Declaration itself does little but offer vague pronouncements devoid of detail. In any event, because Kuehn had a full opportunity to explain the basis and rationale for her opinions in her report and at her deposition, and was obligated to so under the Rules, Capital One should not be allowed to now submit an untimely declaration improperly seeking to plug the gaps.

**B.    Kuehn's FTC experience also does not qualify her as an expert on the kind of identity theft at issue in this case.**

Likewise, Capital One is wrong in its assertion that Kuehn's experience at the FTC, particularly her experience as Assistant Director of the Division of Privacy and Identity Theft, provides a sufficient basis for the opinions she offers in this case. At her deposition, she testified that, in that role, she was a ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. Kuehn Dep. at 112:2-21. When asked about ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████. *Id.* at 113:9-114:6. When asked to explain the ████████████████,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████. *Id.* at 119:7-120:12.

These ███████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* at 120:22-121:7; 123:3-5. ████████████████████████████████████. *Id.* at 121:8-20.

In characterizing this experience, Capital One once again attempts to embellish her testimony relying on things she did not actually say, either in her Report or her deposition testimony. Capital One contends that in her role as Director, "Kuehn had to develop extensive expertise in how identity thieves commit fraud and the specific risks of identity theft associated with certain types of consumer information." Opp. 11. Yet, the deposition testimony states, "████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████." Kuehn Dep. 57:16-20. Nowhere in her answer did she purport to have experience in "how identity thieves commit fraud and specific risks of identity theft associated with certain types of consumer information."

Similarly, Capital One tries to put a gloss on the fact that, in 2008, Kuehn helped prepare a "seminal" FTC report about Social Security Numbers that analyzed the relationship between SSNs and identity theft. Opp. at 4, 7. Capital One attempts to use this work as the basis for opinion that the ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████. Not only is this incorrect (*see* Doc. 1502, Ex. 17 ("Mitnick Rebuttal") at 10), but she admitted at her deposition ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████. Kuehn Dep. 138-39. Moreover, that report was created in 2008. The role SSNs play in identity theft is now well-recognized, particularly in data breach cases, where courts have almost uniformly recognized that the theft of SSNs is more likely to lead to identity theft than other kinds of "replaceable" information, such as credit or debit card numbers. *See*, *e.g.*, *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1253 (M.D. Fla. 2019). Kuehn's failure to acknowledge the threat resulting from theft of SSNs demonstrates that her knowledge base on this issue is outdated and unreliable.

In sum, while Capital One has attempted mightily to bolster Kuehn's identity theft *bona fides*, it does not change the fact that her experience and credentials—while likely qualifying her as an expert in cases involving certain aspects of the FCRA, the GLBA, the FTC Act, compliance with those laws, and the consequences for individuals when entities do not comply with those laws—do not qualify her to opine on the specific issue of whether the information stolen in the Date Breach could result in the identity theft Plaintiffs experienced. Although experts can have "objective credentials and experience" in certain areas, they will lack qualifications where their opinions "go beyond the scope of [their] area of expertise." *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413 (W.D. NY 2005). Such is the case here, where Kuehn testified that ████████████████████████████████████████████ ████████████████████████. Kuehn Dep. 91:23-92:2. Moreover, even if she did have the requisite qualifications, the failure of her methodology renders her opinions unreliable and inadmissible.

## II.    CAPITAL ONE HAS NOT SHOWN BY A PREPONDERANCE OF THE EVIDENCE THAT KUEHN EMPLOYED A RELIABLE METHODOLOGY.

Paradoxically, in attempting to show that Kuehn's methodology in reaching her conclusions was reliable, Capital One has only further demonstrated why her methodology is unreliable and her testimony must be excluded. To fully understand the flaws in Kuehn's methodology, it is helpful to compare her opinions to those of Plaintiffs' expert, Kevin Mitnick, whose opinions Kuehn was intended to rebut.

The Capital One dataset stolen in this Breach contains the information of approximately 98 million Americans, containing the highly valuable and essential building blocks to commit identity theft and fraud. As Mitnick explained, for the vast majority of the approximately 98 million class members, the following pieces of critical PII, ███████████████████████

████████████████████████████████████████████

███████████████. Doc. 1502, Ex. 16 ("Mitnick Report") ¶ 20. ██████████████

████████████████████████████████████████████

██████████████. *Id.* ¶ 21. █████████████████████████

████████████████████████████████████████████

███████████████. *Id.* ¶ 21-22. And the PII, by Capital One's own admission, could be "████████

████████████████████████████████████████████

██████████████████████████." Doc. 1502-7, Dep. Ex. 167, Project Star Data Summary at Slide 47.

Drawing upon his ample experience as a hacker and in the cybersecurity field, Mitnick explains in detail how fraudsters could ████████████████████████████████████

████████████████████████████████████. Mitnick Report ¶¶ 24-33. Mitnick provided examples of various, commonly used ███████████████████

███████████████████████████████████████████. *E.g.*, Doc. 1552-1, Ex. 1 ("Mitnick Dep.") 135-39, 142-43, 145, 149-53. He also ███████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████. *E.g.*, Mitnick Report ¶¶ 25, 56-60, Exs. C, O. Mitnick further testified that it is ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████. Mitnick Dep. 150-54, 162-65. Mitnick also explained how fraudsters ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████. Mitnick Report ¶¶ 22, 24, 24-29, 31-33, 34-36, Exs. C-G; Mitnick Rebuttal ¶ 13, 18, 19-24, 29; Mitnick Dep. 82, 98-101, 178-80, 220.

In light of Mitnick's explanation about the way fraudsters ███████████████ ████████████████████, one cannot determine whether the data stolen in the Capital One Data Breach was used to commit the identity theft Plaintiffs suffered without accounting for the possibility of enrichment, and any theory that fails to take the possibility of enrichment into account is not likely to assist the jury in understanding and resolving the issues in this case.

Capital One argues that Kuehn did address Mitnick's enrichment theory in her report, but "simply rejected it as a reliable basis on which to predicate her conclusions." Opp. at 17. But the way in which she addressed enrichment was cursory, based on no methodology other than her subjective opinions as a result of her "experience." She summarily dismissed the idea that the

Capstone dataset could be internally enriched with other data stolen from the Data Breach, opining

"██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████." Kuehn Report at 12. As for external enrichment, Kuehn dismissed

this as a potential cause of identity theft on the basis that ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████. *Id.* at 13-15. Later, in opining that the ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████. Kuehn Dep. 152:18-153:1.

Critically, Kuehn testified at her deposition that she ████████████████████████████████

████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

Kuehn Dep. 147:9-13. Thus, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████. Based on her assertions in her Report ████████████

██████████████████████████████████████████████████████████ (see Mot. at 4)

and that ███████████████████████████████████████████████████████████

███████████████████ (Mot. at 5), Plaintiffs attributed Kuehn's failure to fully account for

the possibility of enrichment of the data to her background in compliance and her inexperience

with identity theft in data breach cases. However, in its Opposition, Capital One makes it clear that

her failure to account for the possibility (if not probability) that the data was enriched was

intentional:

> **"The purpose of Kuehn's Report is to identify what a criminal could do with the *Capital One data* (not data that might be obtained or derived from *other sources*)."**

Opp. at 17. This statement puts a new gloss on the following answer in her deposition:



Kuehn Dep. 152:18-153:1 (emphasis added).

It is thus clear that the reason Kuehn failed to employ a reliable methodology was because

the scope of her engagement as an expert was purposely limited by Capital One. In such

circumstances, courts have held that the expert's opinions and testimony must be excluded.

A.    **Kuehn's Report and testimony is unreliable because it is "materially incomplete."**

An expert must account for "how and why" he or she reached the challenged opinion.

*General Electric Co. v. Joiner*, 522 U.S. 136, 144, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Generally, before an expert opinion on causation is allowed, the expert must be able to "take

serious account of other potential causes," and offer an explanation as to why a proffered

alternative was not the sole cause. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir.

1999); *see also* Fed. R. Evid. 702 advisory committee's note (2000) (an additional factor bearing on reliability is "[w]hether the expert has adequately accounted for obvious alternative explanations."). The failure to take alternative explanations into account requires the expert's exclusion when, as here, it is a conscious choice based on the scope of the expert's engagement.

In *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175 (D. Conn. 2009), a golf club discovered its property was contaminated with organic pollutants known as "PCBs." The golf club hired an environmental consulting firm to investigate the source of the contamination and eventually brought a civil action against the owners and operators of several nearby properties. As the case neared trial, the defendants challenged the testimony of the gold club's expert witnesses, arguing, among other things, that the experts failed to account for obvious alternative explanations regarding the source of the PCB contamination. One of the experts, Dr. Kaczmar, the chief scientist at the environmental consulting firm hired to investigate the contamination, was retained as an expert to provide an opinion on the likely source of the PCBs. Even though the consulting firm's own internal documents suggested it would be wise to sample additional properties,[3] Dr. Kaczmar determined the defendants were responsible for the contamination at the gold club, based on PCBs found in the soil of the defendants' property. In his deposition, Dr. Kaczmar acknowledged that he did not fully investigate the impact of hazardous-waste spills on nearby properties, the prevalence of PCBs in the local environment, or the possibility that the PCBs found at the gold club might be the result of the club's own activities. He stated, "that his

---

[3] This is similar to the way Capital One's internal assessment of the Data Breach determined that the PII disclosed in the Data Breach could be "█████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████" Doc. 1502-7, Dep. Ex. 167, Project Star Data Summary at Slide 47.

responsibilities as an expert did not extend to looking for other potential sources of the PCBs found on Innis Arden's property." *Id.* at 181.

The second expert engaged by the golf club, Dr. Pignatello, "was retained specifically 'to review the materials which have been generated in connection with the PCB contamination on Innis Arden's property' and to determine 'with a reasonable degree of scientific certainty [whether] some or all of the PCB contamination came on to Innis Arden's property from the adjacent property of Pitney Bowes." *Id.* at 182 (quoting his engagement letter). Like Dr. Kaczmar, Dr. Pignatello testified that although he understood the golf club PCBs could have originated on properties other than the defendants' he did not pursue that possibility in forming his opinions and did not fully consider other environmental or atmospheric sources of PCBs. *Id.* at 183.

In its *Daubert* analysis, the court concluded that Dr. Kaczmar's opinions were unreliable because he determined the defendants were responsible for the contamination "without considering any other explanations, let alone the obvious alternative causes." *Id.* at 189. The court noted his own testimony that he "'did not work through the elimination of all properties' because his opinion was limited to analyzing the PCBs on Pitney Bowes's property." *Id.*

The court found Dr. Pignatello's opinion unreliable for the same reasons but flawed in one additional respect: "he testified, supported by his engagement letter, that he was retained for the sole purpose of linking the PCB contamination to Pitney Bowes." *Id.* at 190.

The court explained that "[a]n inquiry with a preordained conclusion is neither scientific nor legally reliable." *Id.* Moreover:

> The infirmities in Kaczmar's and Pignatello's expert opinions go well beyond being merely the stuff of cross-examination. At bottom, the experts' conclusions—by the experts own admissions—were not the product of an open-minded search for the truth about the Innis Arden contamination. A scientific inquiry is one based on a "systematic pursuit" of knowledge through "testing and confirmation." Webster's Third New International Dictionary 2033 (Merriam–Webster 1993); *see also*

>*Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 (offering various definitions of the scientific method). Kaczmar's opinions, being based on a process that was *artificially narrow* and *confined to an incomplete set of data*, are not scientifically valid. Pignatello's findings, which are essentially duplicative of Kaczmar's, fare no better. To use the language of Rule 702, the opinions are neither "based on sufficient facts or data" nor "the product of reliable principles and methods." The testimony will not "assist the trier of fact to understand or determine" the "fact[s] in issue" in this matter. *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786.

*Id.* at 190-91.

Here, Kuehn's opinions are also "artificially narrow" and "confined to an incomplete set of data" at Capital One's request, by its admission in its Opposition. Kuehn did not conduct "an open-minded search" to determine if criminal actors could use the Capital One dataset to commit identity theft. Instead, she restricted her consideration to only one possibility while closing her eyes to alternative possibilities. As such, she cannot assist the jury in evaluating the risk of identity theft in this case.

*Dreyer* is also instructive on this point. In that case, a products liability action alleging a multi-vehicle autohauler was defectively designed, the court excluded the testimony of the defendant's expert, a well-credentialed mechanical engineer. 367 F. Supp. 2d at 417. The expert concluded the design of the autohauler was appropriate and therefore deemed it unnecessary to assess whether other designs might have improved the safety of the autohauler. *Id.* at 442. The court noted that the questions of whether such additional safety features could have prevented the plaintiff's fall and were feasible from a design standpoint "are precisely the issues in the case upon which the jury would benefit from qualified expert testimony." *Id.* The expert rationalized his failure to consider alternative designs by "claiming he had not been engaged by Defendants to make such an analysis." *Id.* Moreover, the defendants "did not request that he perform such an evaluation." *Id.* The court reasoned, "Defendants' conscious avoidance of such an important issue in this product liability design case cannot shield Proctor's testimony from potential exclusion,"

particularly in light of the fact that the plaintiffs' witness provided a "detailed explanation of how, in [her] opinion, alternative safety features could have been added to the autohauler. *Id.* The court further explained:

> In seeking the admissibility of expert testimony, a party cannot avoid compliance with Rule 702 and Daubert by *tailoring the witness's review of the issues amenable to expert testimony plainly raised by the claims or defenses in the case.*
>
> Here, such potential changes to reduce the risk of driver falls from the Model 3200 headramp were irrelevant to Proctor and were therefore not evaluated by him because Defendants had not engaged him to do so, and Proctor had reached the *a priori* conclusion that Dreyer could have avoided injury by simply using the Model 3200 as he had been trained and with common sense. Proctor's failure to consider the availability, potential effectiveness, and feasibility of alternative safety features renders his evaluations of the Model 3200's design *materially incomplete* and therefore unreliable under Daubert. *Blanchard*, 207 F.Supp.2d at 315–17 (failure to employ same degree of intellectual rigor as used by other experts in field to opinions at issue supports a finding of unreliability). Here, Ms. Weseman, whose expertise is unchallenged by Defendants, performed an evaluation of alternative designs. *Proctor's unwillingness to do so therefore fails this test for reliability.*

*Id.* at 443 (emphasis added) (some citations omitted).

Just as in *Dreyer*, Kuehn's opinions in this case are "materially incomplete," because, in determining whether the data disclosed in the Data Breach could have resulted in the identity theft Plaintiffs experienced, she did not consider whether enriched data would have resulted in the identity theft because Capital One requested that she consider only whether the Capstone data could have caused the identity theft. Her failure to answer this question was particularly egregious in light of the work Mitnick did to demonstrate that ███████████████████████ ████████████████████████████████████████████████ ████████████████████████.

Capital One got from Kuehn the opinions it wanted by tailoring the scope of her engagement. As a result, she has offered opinions that ignore the reality of how fraudsters use data stolen in data breaches. Kuehn could have conducted the same kinds of exercises as Mitnick and

reached different conclusions than he did. In that circumstance, while Plaintiffs may have challenged her opinions on cross-examination, there would be little reason to challenge her methodology. But she made no such effort. As such, her opinions in this case will not and cannot assist the jury in understanding how Plaintiffs' stolen PII may have been used after it was stolen and why they and the class members need ongoing credit protection. As such, her opinions are not reliable and must be excluded.

**B.      Kuehn's opinions rest on nothing but her *ipse dixit*.**

Moreover, it is clear that because she employed no actual methodology, her opinions in this case are based upon nothing more than her "say so" based on her experience. Courts have routinely held that such *ipse dixit* testimony must be kept from the jury. *See, e.g.*, *U.S. v. An Easement & Right-of-way Over 6.09 Acres of Land, More or Less, in Madison Cty., Alabama*, 140 F. Supp. 3d 1218, 1262–63 (N.D. Ala. 2015) ("while a witness may be qualified to testify as an expert based on 'experience,' when such is baldly offered as the basis for an opinion, that is nothing but *ipse dixit*.") This is particularly the case here, where Kuehn's *ipse dixit* opinions are based upon her lack of knowledge and experience with the effects of identity theft resulting from data breaches.

For instance, Capital One reiterates Kuehn's opinion in her report that "███████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████" Opp. at 8 (citing to Kuehn's Report at 17). But although Capital One *says* that Kuehn "*explains*" her opinion that this is the case, Kuehn actually does no such thing. She merely states that ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

███████████████████████. Doc. 1605 ("Opp."), Exhibit A, Kuehn Report at 17-18. Kuehn

provides no basis for her reasoning that ███████████████████████████████

████████████████████████████████. *See id.* This is yet

another example of how Kuehn's lack of qualifications for the opinions she offers in this case

result in a flawed methodology.

Indeed, Kuehn, who has ████████████████████████████████

████████████, fails to consider that if a customer is involved in multiple data breaches, then that

customer's data is for sale in multiple places to a variety of different cybercriminals, thus

*increasing* the risk that their data will be obtained and used by cybercriminals. As Mitnick

explained, there is increased risk "████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████" Doc. 1502, Ex. 17, Mitnick Rebuttal

¶ 28. In fact, even Capital One's own expert, Dr. Lorin Hitt, agreed that ████████████████

████████████████████████. *Id.* at Ex. 2, Hitt Dep. 159-160. Kuehn's

failure to appreciate how cybercriminals operate on the dark web and her lack of any explanation

underlying her opinion that being ████████████████████████████████,

is a clear example of her *ipse dixit* opinions, and but another example of why her report should be

excluded.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant their

Motion to Exclude the Report and Testimony of Rebecca Kuehn.

Dated: July 7, 2021

Respectfully Submitted,

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
300 N. Washington Street, Suite 404
Alexandria, Virginia 22314
Tel: (888) 987-9991
swebster@websterbook.com

*Plaintiffs' Local Counsel*

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com

Karen Hanson Riebel
**LOCKRIDGE    GRINDAL    NAUEN, P.L.L.P**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
khriebel@locklaw.com

John A. Yanchunis
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel: (813) 223-5505
jyanchunis@ForThePeople.com

*Plaintiffs' Co-Lead Counsel*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2021, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all

counsel of record.

/s/ *Steven T. Webster*
Steven T. Webster (VSB No. 31975)
WEBSTER BOOK LLP
