```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   IN RE: CAPITAL ONE CUSTOMER ) Case 1:19-md-2915
     DATA SECURITY BREACH        )
 4   LITIGATION                   ) July 12, 2021
                                  ) 10:08 a.m.
 5   _____) Pages 1 - 231

 6
                    TRANSCRIPT OF MOTIONS HEARING
 7
            BEFORE THE HONORABLE ANTHONY J. TRENGA
 8
               UNITED STATES DISTRICT COURT JUDGE
 9

10   APPEARANCES:

11   FOR THE PLAINTIFFS:

12       NORMAN E. SIEGEL, ESQUIRE, PRO HAC VICE
         LINDSAY TODD PERKINS, ESQUIRE, PRO HAC VICE
13       BARRETT J. VAHLE, ESQUIRE, PRO HAC VICE
         JILLIAN R. DENT, ESQUIRE, PRO HAC VICE
14       STUEVE SIEGEL HANSON, LLP
         460 Nichols Road, Suite 200
15       Kansas City, Missouri  64112
         (816) 714-7112
16
         KAREN HANSON RIEBEL, ESQUIRE, PRO HAC VICE
17       LOCKRIDGE GRINDAL NAUEN, PLLP
         100 Washington Avenue South, Suite 2200
18       Minneapolis, Minnesota  55401
         (612) 339-6900
19
         JOHN A. YANCHUNIS, SR., ESQUIRE, PRO HAC VICE
20       MORGAN & MORGAN
         COMPLEX LITIGATION GROUP
21       Seventh Floor
         201 North Franklin Street
22       Tampa, Florida  33602
         (813) 223-5505
23


24


25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1  APPEARANCES CONTINUED:

2  FOR THE CAPITAL ONE DEFENDANTS:

3       DAVID L. BALSER, ESQUIRE, *PRO HAC VICE*
        S. STEWART HASKINS, II, ESQUIRE, *PRO HAC VICE*
4       JOHN C. TORO, ESQUIRE, *PRO HAC VICE*
        ROBERT GRIEST, ESQUIRE, *PRO HAC VICE*
5       PETER STARR, ESQUIRE, *PRO HAC VICE*
        SUSAN M. CLARE, ESQUIRE, *PRO HAC VICE*
6       JULIA C. BARRETT, ESQUIRE, *PRO HAC VICE*
        KING & SPALDING, LLP
7       1180 Peachtree Street, N.E.
        Atlanta, Georgia  30309-3521
8       (404) 572-4824

9       MARY C. ZINSNER, ESQUIRE
        TROUTMAN PEPPER HAMILTON SANDERS LLP
10      401 9th Street, N.W., Suite 1000
        Washington, D.C.  20004
11      (202) 274-1932

12      ROBERT A. ANGLE, ESQUIRE
        TIMOTHY J. ST. GEORGE, ESQUIRE
13      TROUTMAN PEPPER HAMILTON SANDERS LLP
        1001 Haxall Point
14      Richmond, Virginia  23219
        (804) 697-1200

15
   FOR THE AMAZON DEFENDANTS:
16
        ROBERT R. VIETH, ESQUIRE
17      HIRSCHLER FLEISCHER, PC
        8270 Greensboro Drive, Suite 700
18      Tysons Corner, Virginia  22102
        (703) 584-8900

19
        TYLER G. NEWBY, ESQUIRE, *PRO HAC VICE*
20      FENWICK & WEST, LLP
        555 California Street, 12th Floor
21      San Francisco, California  94104
        (415) 875-2300

22

23

24

25

1           THE CLERK:  Case No. 1:19-md-2915.  *In re*

2  *Capital One Customer Data Security Breach Litigation*.

3           Counsel, will you please note your

4  appearances for the record.

5           MR. SIEGEL:  Good morning, Your Honor.

6  Norman Siegel, Stueve Siegel Hanson in Kansas City,

7  co-lead plaintiffs' counsel.  My colleagues from my

8  firm this morning, Lindsay Todd Perkins, Jillian Dent,

9  and Barry Vahle.

10           THE COURT:  Good morning.  Welcome.

11           MR. YANCHUNIS:  Good morning, Your Honor.

12  John Yanchunis, also co-lead counsel.

13           THE COURT:  All right.

14           MS. RIEBEL:  Karen Hanson Riebel, co-lead

15  counsel for the plaintiffs.  Good morning.

16           THE COURT:  All right.  Very good.  Thank

17  you.

18           Mr. Balser.

19           MR. BALSER:  Good morning, Your Honor.  David

20  Balser of King & Spalding on behalf of Capital One.

21  I've got with me at counsel table Robert Griest and

22  Peter Starr of King & Spalding.  Also, Mr. Robert Angle

23  of Troutman Pepper.  With us, and several of whom you

24  will be hearing from over the next couple of days, are

25  seated in the gallery.  We've got Ms. Mary Zinsner,

4

1   also from Troutman Pepper, Susan Clare from King &

2   Spalding, Julia Barrett from King & Spalding, John Toro

3   from King & Spalding, and Stewart Haskins from King &

4   Spalding.  We have Tim St. George, also with us from

5   Troutman Pepper.  And from Capital One, we have

6   Mr. Steve Otero, Mr. Nick Klaiber, Ms. Betsy Sochar,

7   and Mr. Thomas Hall.

8              THE COURT:  All right.  Welcome to everyone.

9              MR. NEWBY:  Good morning, Your Honor.  Tyler

10  Newby of Fenwick & West on behalf of the Amazon

11  defendants.

12             THE COURT:  All right.  Welcome.

13             MR. VIETH:  Good morning, Your Honor.  Robert

14  Vieth of Hirschler, also on behalf of Amazon.

15             THE COURT:  All right.  Welcome to everyone.

16             We're here on a number of motions.  I've

17  reviewed all of them, and I think it's been

18  disseminated that I'd like to start with the class

19  certification and also the subject matter jurisdiction

20  issues.  They're, obviously, separate motions, but

21  they're centrally bound up with each other.

22             And in that regard, with respect to the

23  presentation on the class certification motions, I

24  would like for you to start with the standing issue,

25  both under Rule 23 and also the Article III issue, as

1  we go forward.

2              All right.  Mr. Siegel.

3              MR. SIEGEL:  Thank you, Your Honor.

4              Your Honor, we have a PowerPoint to help

5  guide us today.  I'm not typically a fan, but given the

6  number of issues, I thought we'd create one.

7              THE COURT:  All right.

8              MR. SIEGEL:  This is a good reason.  We're

9  starting with a jurisdictional question, which is not

10 what I intended.  But, obviously, we'll start there.

11             THE COURT:  All right.

12             MR. SIEGEL:  Would you like a paper copy as

13 we go through today for reference?

14             THE COURT:  Please, if you would.

15             MR. SIEGEL:  Sure.

16        (Documents are passed up to the Court.)

17             MR. SIEGEL:  So, Your Honor, as you noted --

18 may it please the Court, first of all.  It's nice to be

19 in court, and we appreciate the opportunity to be here

20 maskless after the last 18 months of litigating this

21 case.

22             As I'm sure Your Honor is aware, a lot of

23 work has happened while we've all been basically --

24             THE COURT:  Right.

25             MR. SIEGEL:   -- under quarantine that has

1  allowed us to present this motion today.  And we intend

2  to walk through the evidence and the information that

3  will guide the Court on these important decisions.

4          Your Honor wanted us to start with the

5  Article III standing issues.  So my colleague, Lindsay

6  Perkins, is prepared to argue that, but I would like to

7  start because I do think, as a certification issue, the

8  Article III issues should be pretty basic.  So let me

9  start there.  And if it pleases the Court, it's

10  slide 81.  If you will, just give me a second to skip

11  ahead, and we'll get started.

12          THE COURT:  Before you get into this -- and

13  you may be getting into it -- give me your view

14  procedurally how the Court should be dealing with the

15  Article III standing issue.  We're really dealing with

16  a factual challenge to jurisdiction.  We're beyond a

17  facial pleading challenge, and the posture of the case

18  is a little bit of a hybrid.  In one hand, it's being

19  presented -- I think you view it as almost in the

20  nature of a summary judgment standard, which would

21  basically put the burden on the plaintiff.

22          I mean, the defendants have essentially

23  argued within the context of a summary judgment rubric

24  a lack of evidence.  The burden would be on the

25  plaintiffs to come forward with sufficient evidence,

1  viewed most favorably to them, to create a factual

2  issue, which is a different standard than an

3  evidentiary hearing where the Court can weigh the

4  evidence.

5          So how do you suggest the Court proceed?

6          MR. SIEGEL:  I think our presentation guides

7  and speaks to this point.

8          THE COURT:  All right.

9          MR. SIEGEL:  So let me dig in.  If I haven't

10 answered your question by the time I'm through, I know

11 you'll ask again.  I think I will.

12         Part of our anticipated presentation today,

13 if the Court thinks that it's necessary, is a rather

14 detailed factual recitation, but I think --

15         Let's just start off really, which I think is

16 the Court's sort of preliminary threshold questions

17 about jurisdiction.  And I think Your Honor kind of

18 characterized it as there's a direct Article III issue

19 as it relates to class certification and then one

20 about, well, they've also filed this motion that looks

21 very much to us like a motion for summary judgment.

22 And we believe there's many contested issues mixed up

23 with that question.

24         So I think, as a threshold matter -- and this

25 is slide 82 in front of you -- there are some important

1   sort of admissions or issues that are really not in
2   play.  So, first of all, Capital One does not dispute
3   that the Court has subject matter jurisdiction over
4   plaintiffs' claims for breach of express and implied
5   contract and unjust enrichment.
6          THE COURT:  Well, it reserved on those, as I
7   understand it.
8          MR. SIEGEL:  That's right.  I mean, as far as
9   what's before the Court as it relates to class
10  certification, we don't think there's anything as it
11  relates to an Article III matter that has not been
12  effectively conceded for purposes of finding standing
13  for class certification.
14         And there's a good reason for that.  The law
15  is well-established that a party to a breached contract
16  has standing regardless of the merits of the alleged
17  breach.  Likewise, unjust enrichment is a traditional
18  basis in American courts for standing, which is the
19  test for whether a claim is justiciable in federal
20  court.
21         So instead, we have this sort of piecemeal
22  approach where Capital One claims the negligence claim
23  and state statutory claims based on contested factual
24  issues of what happened to the data, and that's really
25  what this comes down to.  We'll demonstrate, after the

1  Article III comments here, why this sort of threshold

2  assumption or presentation that Capital One is trying

3  to make -- I know the Court understands that the --

4  from the pleadings that we pled that this information

5  was, in fact, exfiltrated.

6          Indeed, the discovery over the last 18 months

7  has supported those very factual allegations which got

8  us past the motion to dismiss.  In other words, the

9  evidence has matched our pleading with respect --

10 particularly to these questions about what happened to

11 the data.  At a minimum, we believe there's a factual

12 dispute with respect to the specific issues that

13 Capital One has raised.

14         THE COURT:  Let me just make sure I

15 understand your position.  Given the two different

16 standards, there's the evidentiary standard typically

17 applicable to an Article III determination where the

18 Court weighs the evidence and makes factual findings as

19 to whether or not there's Article III standing.

20 There's a summary judgment standard applicable to a

21 merits decision.

22         And your view is that if there is a factual

23 dispute under the summary judgment standard, the Court

24 can't resolve the Article III issue, based on the

25 evidentiary standard, by weighing evidence that

1   necessarily is a merits issue that has to be resolved

2   by the ultimate fact finder?  Is that --

3         MR. SIEGEL:  That's exactly right.  So this

4   is *Kerns*.  This is the Fourth Circuit case *Kerns*.  When

5   the jurisdictional facts and the facts central to a

6   tort claim are inextricably intertwined, the trial

7   court should ordinarily assume jurisdiction and proceed

8   to the intertwined merits issues.  So that would be --

9         It's not a question of whether we can come in

10  the courthouse door.  It's really not a question of

11  whether the Court can certify a class.  It's really the

12  next question that comes after that about, okay, what

13  are these contested factual presentations about Capital

14  One's perspective.  The genie is back in the bottle.

15  The data didn't make it past Paige Thompson.  And

16  that's meaningful versus our position, which is that

17  impacts perhaps some of our claims, not all of our

18  claims.

19        But in any event, we have strong evidence

20  that this information was -- we know it was

21  exfiltrated.  That's not contested because Ms. Thompson

22  has it.

23        But we have lots of evidence about the risks,

24  where that data could be, how it can be used to the

25  harm of the plaintiff class.  All of those are factual

1  issues that we believe are going to -- because they're

2  contested are ultimately going to be determined by a

3  jury at trial.

4           And so if you -- if the threshold question is

5  if the Court finds the jurisdictional facts are

6  intertwined with the merits, then the Court necessarily

7  has to assume jurisdiction.  And we think Capital One

8  is inviting error to come up with a different result.

9           So the Fourth Circuit cases, *Kerns*, *Vuyyuru*,

10 which is V-U-Y-Y-U-R-U, these are all cases cited in

11 our papers.  And, effectively, they are saying that we

12 are missing an essential element of the claim, which,

13 again, is a merits issue which must be determined as

14 part of the merits, and the Court should assume

15 jurisdiction.

16          And there's actually a very recent -- I'm

17 going turn to slide 88 skipping ahead a few here.

18 There's a very recent case called *Blackbaud, Inc.,*

19 *Customer Data Breach Litigation*.  This is an opinion

20 from the District of South Carolina decided on July 1.

21 So just a couple of weeks ago.  And it was a similar

22 challenge there challenging the traceability premised

23 on the cybersecurity firm's report concluding there

24 was, quote, no evidence that plaintiffs' PII was on the

25 dark web or being made -- being marketed for sale.

1           It's effectively the identical argument

2    Capital One is making here, and the court said, Look,

3    this is intertwined with the merits of the claim and

4    the causation elements of plaintiffs' tort and, in that

5    case, consumer protection claims and, therefore, said

6    it's not appropriate for an Article III challenge.   We

7    think that's on all fours.

8           And, again, the idea that when -- if the

9    Court determines, as I think it has to, that these

10   challenges to Article III standing are intertwined with

11   the merits, it has to assume jurisdiction.   And from

12   our perspective, the procedural question you asked is

13   the Court can consider class certification, in our view

14   should certify the class.

15          And I'll explain what I think the Court needs

16   to find with respect to jurisdiction to certify a

17   class, and then we can move on to the merits, which we

18   know both Capital One, Amazon, and plaintiffs are eager

19   to do.   But that's the sequence.

20          And because that merits challenge, that

21   causation challenge, they've moved for summary judgment

22   and incorporated all of these same concepts.   We've

23   moved for summary judgment on the contract claim.   Much

24   of this is going to be factually disputed, we believe,

25   through a trial, including this question about really

1   what is the risk, what is the function of the data

2   distribution, how much does Capital One know and expect

3   about this data, you know, and whether it matters if a

4   jury or the Court finds it ended with the capture of

5   Ms. Thompson.

6           We don't think that matters.  It may matter

7   to one component of our damages claim, the question of

8   whether the class would need protection prospectively.

9   But we think that's really a jury question.

10          And you will hear a lot about today, I

11  suspect, tomorrow as well, this concept of one of the

12  plaintiffs' damages theories of course, breach of

13  contract, the plaintiff should be in the position they

14  should have been in had Capital One complied with the

15  contractual obligations to protect this data.  It

16  didn't.  What is the traditional damage for that?  Put

17  the plaintiffs in the position they should have been

18  in.  That's this concept of the future value -- present

19  value of future monitoring, and we believe that is a

20  legitimate claim for damage.

21          That claim for damage might be in question if

22  Capital One can show that that risk isn't sufficient

23  enough to support a claim for that damage.  You don't

24  need monitoring because in Capital One's world, the

25  genie is back in the bottle.  There's no question that

1   nobody can get their hands on this information for

2   purposes of harming the plaintiffs.

3          And we'll explain today why, we think, we

4   have the better of that argument from a factual

5   perspective, that those arguments that Capital One is

6   making simply are not consistent with what we

7   discovered over the last 18 months.

8          So let me just walk back a little bit on the

9   jurisdictional question, and then I'll move on to the

10  facts just to make sure I've touched all the bases that

11  Your Honor inquired about.

12         So this is on slide 83, and this is really

13  where we come from in terms of questions about

14  jurisdiction.  Can we be here presenting this motion

15  for class certification, or are we off to state court

16  with these claims?  And unquestionably, we should be

17  here.

18         And it's well settled.  We know from *Hutton*,

19  the Fourth Circuit case, of course, applying long

20  Supreme Court jurisprudence, that the representative

21  plaintiffs are named plaintiffs in the complaint

22  representing the class have to meet the injury-in-fact

23  requirement that there's a causal connection between

24  the injury and defendant's conduct and the injuries

25  likely to be redressable by a successful outcome in the

1   litigation.

2            And so we pled those facts.  The Court has

3   found those facts to be sufficient for purposes of the

4   initial pleading, not in the context of Article III,

5   but in asserting our claims.  Examples are on slide 84

6   with respect to Plaintiff Zielicke, Plaintiff Gershen,

7   Plaintiff Sharp with respect to actual fraud.  Other

8   plaintiffs allege fraud as well.

9            The Court concluded in the order on the

10  motion to dismiss that plaintiffs suffered actual

11  misuse of their PII -- that was the claim -- and the

12  plausible inference that Thompson shared the

13  information with others or enabled others to receive

14  that information and plausibly connecting the data

15  breach to plaintiffs' alleged injuries.  This is

16  page 28 of Your Honor's order.

17            This Court further held, based on these

18  allegations, it is also plausibly alleged that there

19  exists, beyond the speculative level, the imminent

20  threat of identity theft.

21            This is exactly what *Hutton* said, in the

22  context of standing, was sufficient.  It's not

23  different here at the class certification stage.

24            THE COURT:  Right.  Those were the

25  allegations --

1              MR. SIEGEL:  Those were the allegations.

2              THE COURT:  -- which the Court accepted as

3    true.  Right.

4              MR. SIEGEL:  Yes, those are the allegations.

5              THE COURT:  And there were allegations that

6    there was, in fact, fraud experienced by these

7    plaintiffs that was traceable.

8              MR. SIEGEL:  That's right.  And so -- but

9    those facts -- we believe the discovery has borne out

10   those allegations, and we'll walk through that.

11             THE COURT:  All right.

12             MR. SIEGEL:  But the point is there's no

13   question that these plaintiffs have suffered fraud.

14   And the question is is it a different standard at class

15   certification, or is it a question about the merits.

16   And I think it's very important to keep in mind with

17   respect to these allegations, there's no case out

18   there, that we're aware of, that says, well, wait a

19   minute.  The class certification stage, that looks

20   different.

21             And we'll explain how it doesn't matter

22   because all plaintiffs and all class members plainly

23   have standing.  That's what I want to walk through

24   with -- for Your Honor.  Because this should not be an

25   issue at the class certification stage.  We believe

1  it's an Article III matter.

2          We can fight about what is a contested

3  material fact for purposes of a Rule 56 motion.  We

4  think Your Honor is going to conclude that there are

5  lots of contested material facts and that we'll end up

6  with the folks in that box deciding yea or nay.  But as

7  it relates to this motion, we don't think it's well

8  taken.

9          So, again, we will walk through.  We're just

10  sequencing a little different than we had intended, how

11  we were intending to approach this, but we will walk

12  through those facts.  Then we can return to the

13  standing if Your Honor still has questions.

14          And, look, as I said, we know -- as I

15  mentioned earlier, to unpack this a little bit, this is

16  slide 86 -- that the challenges at best only apply to

17  predominance questions.  Okay.  So there might be a

18  question -- they didn't present it this way, but if you

19  were being charitable to Capital One here, the question

20  of whether everybody was harmed in the same way for

21  purposes of later establishing Article III standing or

22  asserting the same claims or damage, those are

23  predominance questions that could theoretically impact

24  the Court's consideration of class certification but

25  shouldn't in this case.  Because the challenges that

1  the defendant is making here -- defendants, I should

2  say, are challenging in the first instance the

3  representative plaintiffs actual fraud, which is not

4  asserted as a classwide injury.

5         And so, Your Honor, how we intend to try this

6  case is we have -- and I'm going to go through these in

7  detail, in *Comcast* level detail, the Supreme Court case

8  that -- and you asked this question maybe a year ago:

9  What damages attach to what claims?  We're going to go

10  through that in great detail so Your Honor is

11  comfortable with what we're asserting and the basis for

12  those claims.  We are not -- the classwide claims and

13  the classwide damages apply to all class members the

14  same way, and we will walk through that in detail.

15         The second thing they're challenging, these

16  mitigation costs of individual named representatives,

17  likewise, they're not a classwide injury that

18  plaintiffs are asserting.

19         And then sort of in the end here tossed in is

20  this concept that the present value of future credit

21  monitoring cannot apply based on *TransUnion*.  That's

22  the damage I mentioned earlier, again, based on a

23  merits determination that this information cannot be

24  out there suggesting that any further monitoring is

25  necessary.  So --

1          THE COURT:  The mitigation damages really

2   just is -- the appropriateness of that as an element of

3   damages is tied, isn't it, inextricably to whether

4   there's satisfied the injury-in-fact element?  Because

5   if there's no injury-in-fact, I guess it's *Ramirez* and

6   others have said you can't establish injury by virtue

7   of even reasonable efforts to mitigate what you

8   perceive as a threat.

9          MR. SIEGEL:  Not quite right on how this

10   lines up with *Ramirez*.  So let me walk through that.

11          THE COURT:  All right.

12          MR. SIEGEL:  Because *Ramirez* is a completely

13   different case.  *Ramirez*, as a threshold matter, right,

14   is a statutory claim.

15          THE COURT:  Right.

16          MR. SIEGEL:  This is on slide --

17          THE COURT:  The analysis is the same.  It's

18   the same elements of the Article III analysis, correct?

19   Whether it's a statutory claim or a common-law claim,

20   it still comes down to the three elements of

21   injury-in-fact, traceability, and redressability.

22          MR. SIEGEL:  That's right, but it's not as

23   applied.  Because in a common-law claim -- let's take

24   the contract claim.

25          THE COURT:  Right.

1          MR. SIEGEL:  The contract claim, the

2    common-law claim, it's assumed under the law that there

3    is damage.  All elements of the claim are met once the

4    contract is breached.  That's it.

5          THE COURT:  Well, I'm not sure that's quite

6    right, actually.

7          MR. SIEGEL:  It is, and I'm happy to walk

8    through the law here on that.  Because we do think that

9    what the Supreme Court of Virginia has said is that the

10   claim is fully formed upon breach.

11         THE COURT:  Isn't it an element that you need

12   not only a contract and a material breach, you also

13   need a consequential injury?

14         MR. SIEGEL:  But the law assumes an injury.

15   Even a nominal -- even a nominal one.  So, for example,

16   the statute of limitations starts clicking away upon

17   breach, not upon injury.  It's not -- a negligence

18   claim would be different, Your Honor.  A negligence

19   claim --

20         THE COURT:  Stick with the contract claim.  I

21   know it's not involved here, but I think we're going to

22   end up getting to that eventually anyway.

23         MR. SIEGEL:  We will.  Let me walk --

24         THE COURT:  Let me just throw out a question

25   that I have.

1          MR. SIEGEL:  Yeah.

2          THE COURT:  That is, if, in fact, you're

3    right that under Virginia common law a mere breach is

4    sufficient *de facto* injury, that doesn't necessarily

5    mean that it's sufficient Article III injury; does it?

6          MR. SIEGEL:  We think it does, sure.  The

7    concept of injury is not one that you have to show I'm

8    out a million dollars or I have this broken leg.  The

9    court implies in a common-law claim -- and again,

10   there's no Supreme Court case.  In fact, the Supreme

11   Court has been very consistent about treating these

12   statutory claims -- and this is what *TransUnion* talks

13   about, that if Congress is going to go create a law

14   that says if A and B happened, you're entitled to

15   $1,000, then there needs to be something more than a

16   risk of that harm.

17          So let's just use *TransUnion* as an example.

18   Let's say there's roughly 8,000 of these folks that

19   *TransUnion* has in their records that are labeled as

20   potential terrorists and there's some number of those

21   that have credit reports issued with that information

22   on it.  That's all that happens.

23          The court had no trouble finding that those

24   people were injured for purposes of Article III.  It

25   was the people that *TransUnion* only had a record of.

1  They never communicated that information to anybody

2  else, and there was a stipulation that said it's only

3  the smaller group that actually credit reports issued

4  that suffered injury.

5          THE COURT:  Right.

6          MR. SIEGEL:  But they had no trouble once

7  that report is issued that there was injury.  And in a

8  breach of contract case, once you do have a breach, you

9  also have an injury.  We have significant claims for

10 direct injury that --

11         THE COURT:  But the thing about *Ramirez*, as I

12 reflect on it in light of what I think are going to be

13 some of the central arguments here, and that is why

14 Article III standing in *Ramirez*, with respect to the

15 people whose credit reports hadn't been yet

16 distributed, was not a jury issue?

17         MR. SIEGEL:  Oh, I think it was.  I think

18 that's what *Ramirez* was all about.  There was a verdict

19 that included those people.

20         THE COURT:  No.  But why the Supreme Court

21 wouldn't say -- I think they even admitted this --

22 there may be a substantial future risk that if another

23 creditor would request the credit report of somebody

24 whose credit report hadn't yet been distributed,

25 there's certainly a substantial threat that that might

1  happen.  Therefore, it's a merits issue.  It goes to

2  the jury.

3          MR. SIEGEL:  Well, it did go to the jury.

4  And I think what the Supreme Court says is that

5  plaintiffs failed in their proof with respect to that

6  cohort.  I think that's what -- I mean, we know from

7  *Lujan* that Article III standing kind of moves along

8  with the case.

9          THE COURT:  Right.

10         MR. SIEGEL:  Most of the law still says, at

11 the class certification standpoint, you need one

12 representative plaintiff that has standing.  That's it.

13 That's your Article III obligation, whether the claim

14 is justiciable in federal court.  That's it, and we

15 think we have that without question.

16         THE COURT:  All right.

17         MR. SIEGEL:  What *Ramirez* ultimately said was

18 it was a failure of proof.  Remember, the parties had

19 this stipulation that said, you know, we know with

20 respect to this group, the information id out.  But it

21 was clear that the harm was -- there was no risk.

22 There was no possibility of harm because the time

23 period had closed when *TransUnion* took care of it.  The

24 Supreme Court said, look, it's not in the stipulation,

25 and so we find that it's a failure of proof.

1        And I think the analogy at the oral argument
2   that comes up in the opinion is a fairly good one that
3   they talked about.  You leave the courthouse.  You're a
4   quarter of a mile ahead of a drunk driver.  You make it
5   home, and you're safe in your house.  Right.  Okay.  On
6   the way home, were you at risk?  Sure.  But once you
7   made it home and your car is in the garage and you're
8   in the house, that's cabined.  It's over.  It's finite.
9        That what's they said also in the opinion.
10  That's what the majority equated that cohort that did
11  not have this information published.  Again, held only
12  at *TransUnion*, never distributed.
13       We have the exact opposite here with respect
14  to that cohort.  The plaintiffs here are like the
15  cohort that the court found no trouble finding standing
16  and affirmed the jury's verdict with respect to that
17  group because here -- I mean, this is what Capital One
18  is trying to argue is a merits issue.  It's exactly why
19  it should be done at trial.
20       Because Capital One is trying to say, as a
21  matter of fact, we're going to show by a preponderance
22  of the evidence that this evidence could not have made
23  it past Paige Thompson under any circumstances and that
24  when Paige Thompson was caught, it was in a box.  And
25  there's no holes that box.  There's no mechanism for

1    any information to get out.  And, therefore, the class

2    is just like that cohort in *TransUnion* for which the

3    court found ultimately --

4            THE COURT:  So what are the facts that get

5    you to the jury on these?

6            MR. SIEGEL:  Yeah.  Well, let's go there

7    because that is what we think is sort of the critical

8    nuts and bolts here.

9            And if I can back up a little bit and just

10   wind up a little bit of the factual presentation.

11           THE COURT:  All right.

12           MR. SIEGEL:  Because I do think it offers

13   some context to exactly that question, Judge.  And I

14   will move through the facts quickly -- because I know

15   you know the background facts -- and focus on the exact

16   question you just asked.

17           But let me start with what is an overview of

18   what happened here.  We know back in 2015 that Capital

19   One began moving information to the cloud based on its

20   cloud-first strategy.  We'll present information about

21   the known risks with that here momentarily.

22           But just with respect to the specifics, we

23   know that in March of 2019, the attacker began scanning

24   Capital One's assets.  Now, that's exfiltration.  So it

25   immediately removes it from cases where, oh, the

1  information didn't make it out or there's no evidence

2  of it.  But they conceded that the information is out

3  and it's out by a criminal hacker.  That's on March 23,

4  2019.

5           And then there's this period of over four

6  months where Ms. Thompson is publicizing the fact she

7  has this data and, as we'll explain, threatening to

8  release it, some of the information that you asked

9  about.

10          Eventually, a white hat hacker tells Capital

11  One that the AWS data was publicly available on GitHub,

12  which is where she published instructions on how to

13  repeat the breach.  After an internal investigation,

14  Capital One identified that they had been hacked, and

15  eventually, Ms. Thompson was arrested.

16          So this ties, of course, directly to the

17  claims.  And I just want to run through this quickly

18  because I do think this goes to the standing issue as

19  well.  Your Honor knows about the privacy notice, the

20  promise to all applicants to keep this information safe

21  and confidential, and that they employ security to

22  prevent exactly what happened here.  That's the

23  promise -- they did that for everybody who applied for

24  a credit card at Capital One -- applying to all

25  customers, applicants, and former customers.

1           Then we also know that with this migration to

2    the cloud, that Capital One was one of the first major

3    banks to do it.  I know you know this from our

4    arguments last year on the motion to dismiss.  But

5    Capital One made decisions about that.  It retained

6    this data indefinitely, even for applicants who had no

7    credit card with Capital One.  And it was stored on the

8    cloud for both Capital One's benefit, but also Amazon's

9    benefit.

10          So when they did all this, they did it with

11   these known vulnerabilities.  The way we look at

12   this -- and I think in answering Your Honor's question,

13   how will this unfold to a jury, well, let's talk about

14   what was happening before the breach.  When they moved

15   this information, what were the risks they were putting

16   everybody at?  What did they know at the time?

17          There was the ModSec WAF.  I know that's a

18   term Your Honor recalls, the ModSec WAF.  It was set to

19   on.  It should have been switched to off.  They were

20   supposed to check it quarterly.  They never did, and it

21   sat that way for four years.  Once they started their

22   migration to the cloud, they did not bother to go back

23   and check the misconfiguration.

24          In fact, it was discovered prior to the

25   breach, and we know that, too.  We're on slide 14.

1  Different groups within Capital One noticed this

2  setting was incorrect.  Some fixed it.  But then

3  complaints to cyber effectively went unanswered, and

4  they went unanswered because they were transitioning to

5  another product, a Barracuda product.  But that was

6  never implemented before the breach after months and

7  months or years of delay.

8          We also know about this SSRF forgery attack

9  and how that could be used to capture this information

10  from the AWS cloud, this Capital One data.  They

11  identified that threat.  We have documents at least as

12  far back as August 2018.  That's on slide 15.

13          They also knew their roles, their

14  permissions.  Recall this fact, that part of the

15  problem, part of what Ms. Thompson compromised were

16  overpermission roles allowing her not just to look at

17  this data for this purpose.  But once she was in there,

18  she could look at the entire dataset, and that's how

19  she was able to extract what is equivalent to about a

20  billion pages of documents involving nearly 100 million

21  Capital One customers.  So this is AWS explaining how

22  Thompson accessed and used these overpermission roles

23  to complete the breach.

24          In January '19 -- still pre-breach -- they

25  identify a number of weaknesses that have been

1  identified as part of the penetration testing and,

2  again, identify the need to further restrict access

3  privileges, including enforcement of the principle of

4  least access, which our experts talk about in detail,

5  within the environment.  They failed to do it.

6          Then, finally, there was a problem of

7  detection.  Again, this is a major evidentiary point

8  that, I think, addresses Your Honor's question.

9          MR. BALSER:  Your Honor, if I may.  I'm sorry

10 to interrupt Mr. Siegel.  Before the hearing, I had

11 identified to Mr. Siegel 12 documents out of the

12 350,000-some-odd documents that have been produced in

13 the case as being particularly sensitive and documents

14 that are under seal and subject to the protective

15 order.  Because I believe we have an open line here --

16          THE COURT:  Yes.

17          MR. BALSER:  -- I wanted to be vigilant with

18 respect to those documents to the extent they were

19 going to be introduced.  This is one of them.

20          What I would suggest, if it's appropriate in

21 Your Honor's view, is that we come to sidebar and

22 discuss these with a sound muffler or otherwise just

23 mute the public line while just these very few handful

24 of highly sensitive documents are publicly aired.

25          THE COURT:  All right.  Are you going to get

1  into the substance of these at all?

2          MR. SIEGEL:  A little bit, Your Honor,

3  because they go directly to the question you asked.  So

4  I think we have to.  I mean, from our perspective, it's

5  an open hearing, but we'll do whatever the Court wants.

6  We're not trying to --

7          THE COURT:  These documents are under seal?

8          MR. BALSER:  They are.

9          MR. SIEGEL:  They are, Judge.

10         THE COURT:  All right.  I don't know if we

11  can mute the public line.

12         We can?

13         THE CLERK:  Yes, sir.

14         THE COURT:  All right.  Let's mute the public

15  line for this purpose.

16         MR. BALSER:  Thank you, Your Honor.

17         MR. SIEGEL:  I think I know when it stops,

18  but I'll get the high sign from Mr. Balser before --

19         THE COURT:  All right.  You are comfortable

20  with everyone in the courtroom?

21         MR. SIEGEL:  Your Honor, we believe there may

22  be some press in the courtroom.

23         THE COURT:  All right.  Let's do it at the

24  sidebar then.  Let's go back and open up the public

25  line.

1       (Under seal bench conference under separate

2       cover.)

3            THE COURT:  All right.

4            MR. SIEGEL:  Your Honor, I do want to talk

5  about some of the additional technical vulnerabilities

6  and how those were really a function of what were

7  significant problems at Capital One with respect to

8  their cybersecurity risk management.

9            Slide 22, again, in April of 2019.  So by

10  this date, you'll recall from the time line,

11  Ms. Thompson has exfiltrated the data of the class, the

12  98 million class members, and Mr. Holmgren, who is vice

13  president for cybersecurity risk management and interim

14  chief cyber risk officer, drafts this memo to the risk

15  committee of the board of directors.

16            And keep in mind, Capital One is completely

17  oblivious that Ms. Thompson has exfiltrated all of this

18  information.

19            And among other things, Mr. Holmgren here is

20  identifying the number of high-severity security

21  vulnerabilities for externally-facing applications

22  within the system noting that 81 percent or 1,331 being

23  past due.  It's really one of many documents in the

24  record showing unresolved issues across its systems

25  that were not timely fixed.

1          I will skip over 23 and 24, which we

2   discussed at the bench, and move to 25, and this is now

3   post-discovery.

4          And, Judge, again, in terms of what a jury

5   will hear with respect to this question of what

6   happened to the data, in large part, comes from Capital

7   One's own documents.  So, for example, we have

8   Mr. Shultz, Christopher Shultz here, communicating on

9   July 23, 2019.  His is the director of cloud

10  engineering.  He says in talking about the breach:  So

11  bad proactive scanning, bad CSOC -- which is the

12  cybersecurity operation center response -- bad

13  perimeter management and a bad response purged the data

14  events records making it more difficult to assess.  I'm

15  not finding anything they've done right.

16         Kyle Busekist, B-U-S-E-K-I-S-T, a lead

17  software engineer responds:  They saved money.

18         And that is indeed what Anthony Johnson, who

19  is the former managing vice president of cybersecurity,

20  testified in his deposition, that Capital One placed

21  profit over consumer protection.

22         And, again, the lead-in as to what was going

23  on when they -- they wanted to be at the head of the

24  curve in the banking industry of moving to the cloud.

25  When they presented their efforts to move to the cloud

1  at an AWS conference back in 2015, they said, you know,

2  we're not going to do it by sending a little bit of

3  data and trying to attack little problems.  We're going

4  to send all the data and try to attack the big

5  problems.

6         But they just did it without the adequate

7  protections in place, which unfortunately were brought

8  to bear and resulted in this breach.

9         Let me touch on AWS and what they knew, and

10  then we'll get into a little more of the specifics on

11  the exfiltration issues.  AWS knew as early as 2017 of

12  the forgery attack vulnerability that was exploited in

13  the breach.  They knew that Capital One could not

14  figure out that they were struggling with how to

15  permission these roles, these access roles, and did not

16  take action until after the breach.

17         And Your Honor knows from the order on the

18  motion to dismiss the guard duty problems, its gap in

19  coverage, including in Stockholm where the breach of

20  data is believed to have come from.  So they jointly

21  worked on these efforts to protect the data.  They know

22  it's an issue, and they fail and fail miserably.

23         So they also both knew -- this is both Amazon

24  and Capital One -- that these Amazon buckets, these

25  simple storage solution buckets accessed by Thompson

1   were Internet accessible.  In other words, it was not a

2   situation where you have to be a Capital One employee

3   trying to access the data from a Capital One computer.

4   Anybody with an Internet connection could access this

5   data.

6         We also know that there were many

7   opportunities to timely discover the breach, and we

8   talked a little bit -- there was at least three, and

9   the first one in detail is on slide 32.  Mr. Hopkins --

10  this is in a chat post-breach July 23 talking with

11  Devon Rollins, the senior director of cyber

12  intelligence.  Mr. Hopkins, who was the director of

13  cyber intelligence -- Mr. Hopkins says, there were so

14  many lessons learned.  I am devastated that CSOC didn't

15  escalate the alerts.  They were so critical and obvious

16  in hindsight.

17        In other words, it was obvious that they had

18  alerts that they didn't act on that would have flagged

19  this breach in process and immediately after, none of

20  which were followed.

21        And then Capital One engaged KPMG to do a

22  risk assessment of the Cybersecurity Operations Center

23  that Mr. Hopkins was referring to.  So again,

24  post-breach, December '19, backward looking, and KPMG

25  identifies the Cybersecurity Operations Center, which,

1  again, is tasked with identifying these alerts, which

2  misdiagnosed the alerts that related to the data breach

3  and found deficiencies across people, processes, and

4  technology.  I won't read all of these.

5            I'll point you to a couple, Your Honor.  With

6  respect to people, KPMG found that the CSOC lacked

7  sufficient staffing, resources, and technical expertise

8  to execute its core responsibilities.  With respect to

9  processes, KPMG identifies that there were gaps in the

10  intake process for threat information and undefined

11  excalation procedures.  They found that -- the third

12  bullet point -- alerts are not regularly reviewed or

13  updated for continued relevance or enriched with the

14  most current threat indicators.  And with respect to

15  technology, KPMG reported that the Cybersecurity

16  Operations Center lacks comprehensive visibility into

17  potential threats throughout the enterprise due to the

18  lack of consolidation logging from all security

19  information and event management tools and the lack of

20  deployment of decryption capabilities and gaps in

21  cloud.

22            So, again, Capital One promises to protect

23  all this data, and this is what's going on.  In fact,

24  once they promised to protect the data, we also know

25  that Amazon had an opportunity to -- at least two

1  opportunities to detect the breach.  First, in May
2  2019, someone passed an Amazon employee a note at a
3  conference -- there's a picture there on slide 36 --
4  and it stated that Capital One had an open SOCKS proxy
5  and identified the IP address.
6          This note was passed along to Capital One,
7  but there's no indication anywhere in the record that
8  any action was taken on this at the time.
9          Amazon also employed what are known as
10  honeypots, Your Honor.  These are sort of efforts to
11  create false targets.  In April 2019, that, in fact,
12  detected an attacker who was performing the same
13  activity as Paige Thompson on AWS cloud products.  AWS
14  did not notify its customers of this threat, including
15  Capital One.  It, obviously, would have shortened the
16  time, at least, that all of this information was
17  publicly available, including instructions on how to
18  repeat Ms. Thompson's efforts.
19          So let me skip ahead, Your Honor, because a
20  new document that was the source of significant
21  litigation in front of Judge Anderson came to light in
22  the discovery process that we think does several things
23  with respect to liability.  We think this is a key
24  document in the case and are sort of flagging it for
25  you for that purpose, and I'd like to go through it in

1  some detail.

2          So this is the Office of the Comptroller of

3  the Currency findings with respect to the data breach.

4  It's attached to our motion at Exhibit 14.  This, we

5  believe, will be admissible at trial.  I don't think

6  that's a determination the Court needs to make now, but

7  it is plainly a record of a public office in a civil

8  case and factual findings from an authorized

9  investigation under 803(8)(A)(iii).  There are other

10  hearsay exceptions we think apply to this document.

11  Again, it's not a determination the Court needs to make

12  now, but I do think, when Your Honor asked about

13  evidence, this is an important place to start.

14          So this is the supervisory letter that the

15  OCC sent to Capital One following the breach.  On

16  slide 42 is the first conclusion offered by the OCC,

17  and that is that the overall quality and effectiveness

18  of Capital One's cloud operations are weak.

19          Moving on from there, management's ability to

20  identify and appropriately manage technology and

21  cybersecurity risks is ineffective.  Weaknesses were

22  identified across all three lines of defense, including

23  governance and oversight, first and second line risk

24  management, network configuration, and asset management

25  processes, security processes, and internal audit.

1          They go on from there that the OCC identified
2    foundational technology and cybersecurity weaknesses
3    and control breakdowns within cloud operations that
4    contributed to the data breach, concluding that during
5    this incident, an attacker was able to penetrate
6    Capital One's cloud environment undetected on several
7    occasions and downloaded sensitive credit card
8    application data from cloud storage buckets housed at
9    Amazon Web Services on over 100 million customers in
10   the United States and Canada.  That's the first
11   conclusion of several, Your Honor.
12          The OCC goes on, in their second conclusion,
13   that the governance and oversight of cloud operations
14   are weak.  Management had several warning indicators
15   from both internal and external sources that risk
16   management activities needed improvements prior to the
17   cybersecurity incident.
18          Again, the case is premised --
19          MR. BALSER:  Your Honor, I'm sorry to
20   interrupt.  This is a document that's under seal and
21   also should not be exposed publicly.  I apologize for
22   not having flagged it.
23          THE COURT:  All right.  You can refer me to
24   the page.  I can look at it.
25          This is their assessment as of December 2019;

1    is that right?

2              MR. SIEGEL:  It is.

3              THE COURT:  All right.

4              MR. SIEGEL:  Your Honor, I would like to --

5              THE COURT:  You've underlined what I think

6    you're reading.

7              MR. SIEGEL:  I've underlined the headlines of

8    those conclusions.

9              THE COURT:  Yes, and the Court has this and

10   will review it.

11             MR. SIEGEL:  So, Your Honor, while we're here

12   then, I'll just submit the PowerPoint as an exhibit to

13   the argument so it's in the record and there's no

14   dispute about that.

15             THE COURT:  All right.  Some of the slides

16   will have to be redacted.

17             MR. SIEGEL:  It can be under seal.

18             THE COURT:  All right.  That's fine.

19             MR. SIEGEL:  I would like an intact version

20   of it as part of the record, and I have no objection to

21   the entire thing being under seal until otherwise

22   directed.

23             THE COURT:  All right.  Then portions can be

24   unsealed.

25             MR. SIEGEL:  Yes, Your Honor.

1          THE COURT:  All right.

2          MR. SIEGEL:  So I'll just refer to them by

3  number then, Your Honor.

4          THE COURT:  All right.

5          MR. SIEGEL:  So Conclusion 3, obviously,

6  we've underlined the headline to this particular

7  portion.  But it's important, we think, to read each

8  and every paragraph here.  Because, again, we think

9  this is exactly what the jury is going to hear about

10  Capital One's conduct and whether they personally

11  breached the contract; whether they breached their

12  independent duty, pursuant to our negligence claim, to

13  protect this information; and with respect to those

14  negligence claims, whether punitive damages are

15  appropriate.  It's a claim in the case, and we think

16  this is a key document that supports it.

17          THE COURT:  All right.

18          MR. SIEGEL:  Conclusion 4:  Again, you can

19  read, and we ask the Court to do that.

20          Conclusion 5, Conclusion 6, Conclusion 7, I

21  think, is particularly important, Your Honor.  This is

22  a finding that Your Honor can read.  It is underlined,

23  and I will effort not to disclose the contents of it.

24  But it is an important issue in the case.

25          One of the questions, of course, in the case,

1   that is discussed in expert testimony.  Okay.  What

2   does it mean when you say that you're going to follow

3   federal law in the privacy notice?  That is one of the

4   things that Capital One is promising to do.  We promise

5   to follow federal law.  That is their contractual

6   obligation in the privacy notice, and the OCC's

7   Conclusion No. 7 addresses that.

8              THE COURT:  All right.

9              MR. SIEGEL:  And then, Your Honor, this is

10  perhaps the key point:  At the end of the day, as

11  reflected in this letter, on page 50, there is,

12  obviously, what we view as a significant admission.

13  Your Honor can read it.  But the senior management from

14  Capital One participated in the exit meeting where

15  these conclusions were communicated to Capital One.

16  You see there's all the key folks there related to

17  cybersecurity, internal audit folks, corporate

18  secretary, chief information officer, the interim chief

19  information security officer, the chief risk officer.

20  You can read the underlined statement in this OCC

21  letter.

22             So look, again, as back to the threshold

23  question what is the jury going to hear and what are

24  they going to see, it's this.  And if the question is

25  did Capital One breach its contractual obligations, did

1  Capital One breach a duty, an independent duty to

2  protect this information, this information -- to, I

3  think, answer your question that you asked at bar a

4  little further, the reason we think this is so

5  important and the reason we're presenting it as part of

6  class certification, this applies to 98 million people

7  all the same way.

8         There is nothing in anything I've showed you

9  related to what Capital One knew before the incident,

10 while it was happening, what they said afterwards about

11 how bad they were before, none of that impacts class

12 members differently based on any criteria whatsoever.

13 All of these documents apply to everybody the same way,

14 and that is really the touchstone of what a class

15 action is:  Is the evidence going to be presented in a

16 way that is universal to the class.  And we think

17 absolutely it is.

18        And thank you for indulging me for going

19 through some of those facts.

20        THE COURT:  All right.

21        MR. SIEGEL:  So finally, where does this end

22 up?  It ends up with the identification of those

23 failures of Capital One's management and board, the

24 OCC, and the Federal Reserve Board levied an

25 $80 million fine against Capital One and issued related

1  consent orders.

2         So let's talk a little about the impact of

3  that.  We talked about just the numerical impact across

4  the class of what data was compromised at the bench.

5  Slide 54, this is an internal summary of what was

6  exfiltrated, and this is important for several reasons.

7  First of all, 54 shows this, again, Capital One's

8  Project Star report post-breach.  It identifies exactly

9  what was exfiltrated, and it identifies that it's in

10 easy-to-use data formats and that it can be used to

11 build customer profiles.

12        In other words, the different exfiltrated

13 dataset -- and our expert talks about this -- can be

14 used to collect data and create profiles about a single

15 person, typically through an account ID.  So an account

16 ID might have a piece of data in one dataset.  That

17 same account ID linked to your name, Your Honor, would

18 be searched in these other databases.  You would build

19 a profile for Your Honor's name across those databases.

20        And so the other important point of this data

21 and the data on the previous slide that I identified

22 for Your Honor at the bench is that we can slice and

23 dice the data any way we need to ensure that the

24 class -- if there's some claim that is truncated for

25 some reason or we get to a point in the case where

1   there's an issue about, well, this person ended up with

2   a card and these people didn't, we know exactly who

3   those people are.

4          And so there's this concept often overused of

5   ascertainability in class action litigation.  But the

6   real question is:  Do you know who these people are?

7   Can you identify them based on objective criteria?  And

8   the answer is yes.

9          And we know that from the way these datasets

10  were not only comprised but the way they were held by

11  Capital One.  Again, our expert looked at the datasets,

12  actually found some additional information that Capital

13  One had not.  But in any event, it's all there.  It's

14  all objective, all ascertainable.

15         The next slide I've talked about really

16  already.  This is Kevin Mitnick.  I know you will hear

17  a lot about Kevin Mitnick tomorrow.  Mr. Mitnick looked

18  at the dataset.  He confirmed the data that Capital One

19  identified in their interrogatory response.  He

20  identified these essential building blocks and how they

21  could be built upon by comparing these databases.  He

22  confirms in detail that this is exactly the kind of

23  data fraudsters would use to commit exactly the kind of

24  fraud suffered by our plaintiffs and how that data can

25  be internally enriched from those datasets but also

1  externally enriched.  And, again, I know that's the

2  subject of a motion in limine, which we'll take up

3  tomorrow.

4         And this brings me, Judge, finally, to

5  perhaps the question you asked 30 minutes ago, which is

6  what do we know about exfiltration.  So we know about

7  what we view as very bad conduct that would support a

8  claim of punitive damages in this case with respect to

9  a negligence claim, that those facts apply to everybody

10 the same way.  The question you asked, you know, is

11 this data exfiltrated, and we do know it was

12 exfiltrated.  It was exfiltrated by a hacker as a

13 result of the defendants' negligence.

14         Again, this question about whether Capital

15 One is going to be able to prove it can put the horse

16 back in the barn or the genie back in the bottle or

17 whatever analogy you want to use, we're skeptical and

18 believe it's a deeply disputed factual issue.

19         But, again -- I mentioned this in the first

20 few minutes of the discussion -- if this is something

21 that Capital One ultimately can prove, it impacts one

22 claim of damage, and that is whether this class needs

23 to have monitoring going forward.  If Capital One can

24 prove this data is not out there, there is no risk to

25 anybody anymore because the genie is back in the

1  bottle, the horse is back in the barn, then, sure, they
2  may be able to make a case that we don't need
3  prospective monitoring.

4          But all the other claims survive, and I'll
5  talk about the damages at some length as we move
6  forward here.  But what we characterize as the license
7  value for the PII survives.  The disgorgement for
8  unjust enrichment survives, and of course, the
9  alternative claim for nominal damages survive.

10         I mentioned briefly at the bench that there
11  are well-worn concepts at common law about, okay, what
12  happens -- you know, Capital One has said, well, how do
13  you even know that this fraud that your representative
14  plaintiff had was the result of our breach?  There's
15  been a lot of breaches.  That's another sort of
16  collateral attack, but it's one that Virginia law
17  speaks to about what happens when there's a single
18  injury but perhaps multiple causes, multiple negligent
19  acts, some of whom you may know, some of who you may
20  not know, and the concepts of concurring negligence.

21         We've put some significant thought into a
22  trial plan for this case, Judge, and there's little
23  doubt that under Virginia law, which will apply here,
24  under these concepts of negligence, that it's going to
25  be up to the jury to determine whether there's a

1  sufficient indication that Capital One is responsible.

2  Then it's Capital One's responsibility to say, We're

3  not.

4          And this was addressed, actually, in a data

5  breach case -- the next slide -- a Seventh Circuit

6  Case.  It took up the question in the *Neiman Marcus*

7  case about -- the defendant was raising this precise

8  issue that, well, wait a minute.  There's all kinds of

9  breaches.

10          I think you know:  Mr. Balser and I worked

11  together on the *Equifax* case on opposite sides.  They

12  have mentioned that case.  They mentioned other

13  breaches.  But if there are multiple companies that

14  could have exposed the plaintiff's private information

15  to the hackers, then the common law of torts has long

16  shifted the burden of proof to defendants to prove that

17  their negligent actions were not the but-for cause of

18  the plaintiff's injury.  It is very much a jury

19  question.  And how ultimately those burdens play out at

20  trial, obviously, will be the subject, I suspect, of

21  much.

22          THE COURT:  I think there was a first year

23  torts class on this issue, who shot the gun.

24          MR. SIEGEL:  I suspect we'll have lots of

25  briefing about who shot the gun between now and trial,

1  Judge.

2         But conceptually, these are issues that -- I

3  think the jury is going to be instructed.  We'll figure

4  it out.  But these concepts of, well, you know, having

5  established definitively that this information was out,

6  that it was hacked, you know, what comes next and what

7  the impact of that is we believe are all jury

8  instructions.  And I suspect we'll have an opportunity

9  to brief at length what those instructions should look

10  like.

11         So let's look at what Capital One is saying

12  about this exfiltration because this is really the

13  basis of the question you asked.  What they've

14  incorporated into the class certification process is

15  this idea that the genie is back in the bottle, and

16  they point primarily to what the government said in a

17  criminal case.  That's what they're pointing to.

18         They have an internal document where they do

19  a sort of psychoanalysis of Paige Thompson, and they're

20  like, well, you know, based on that -- they call it a

21  theory, and then they have this, which is the criminal

22  complaint and what the DOJ has done in a criminal case

23  about what charging decisions they're making under a

24  different proof standard in a criminal case.  That's

25  what Capital One is presenting to this Court to make a

1  finding to cut off liability in this case.

2          And the way the government characterized it

3  was, quote, We believe and hope we have recovered the

4  stolen data in the case.  We believe and hope.

5          In the same filing, they say, Regardless of

6  what Thompson might promise to the Court, she

7  previously threatened to disseminate stolen data

8  containing tens of millions of people's personal

9  identifying information.  Again, this question of

10 further exfiltration, whether other people could have

11 had it, it's very much a disputed issue.

12         And again, just even looking at Capital One's

13 own documents, the first one I'll show you on slide 61.

14 This is part of the Project Star evidence.  She

15 publicly shared the information for how to access the

16 data.  We've explained that in our papers, but this is

17 Capital One describing how this information was

18 available on Twitter, how she posted it to GitHub

19 providing the keys, if you will, to this Capital One

20 data that was available for anybody to access.

21         On the next slide, this is the hacker

22 herself.  This is what she's saying publicly and what

23 the jury will see, and the jury will decide whether

24 there's additional exfiltration.  I want to get it off

25 my server.  That's why I'm archiving all of this.  So

1  erratic is Ms. Thompson.  That's a stipulated fact in

2  the case.  So she's communicating with other people

3  publicly and publicly stating that she wants it off her

4  server and is archiving the information.

5           Slide 63, she says, I am going to give this

6  all to this desperate Chinese dude who scams people.

7  Again, a statement by the hacker indicating that she's

8  going to distribute the data.

9           The next slide, a Twitter post.  All of this

10 is public by the way, none of which Capital One saw.

11 This is in June, a month before they discovered the

12 breach.  She's posting on Twitter:  I want to

13 distribute those buckets, the data.  There are social

14 security numbers with full name and date of birth.

15          Let's look at what Capital One's view of it

16 was in slide 65.  This is Houston Hopkins again, the

17 director of cyber threat management.  So this is

18 Capital One's view of it:  I am worried she has bundled

19 away somewhere that it will be waiting for her when she

20 gets out.  I am worried that she has this bundled away

21 somewhere that it will be waiting for her when she gets

22 out.

23          And Anna McAbee responds -- she's an

24 associate, now works at AWS -- yep, same.  I bet she

25 has it hidden somewhere good.

1          This is Capital One contemporaneously

2   expressing they're willing to bet on it, right, that

3   she has stored this information away and will use it

4   for ill once she's out of prison.

5          Finally, I just want to point to the

6   superseding indictment, not because I think it's

7   particularly relevant or admissible in any way because

8   it's not.  The government recently did add Count 9

9   saying that Paige Thompson attempted to use personal

10  identifying information, including more than 15 social

11  security numbers and more than 15 bank account numbers

12  stolen during the conduct described in Count 1 to

13  create counterfeit and unauthorized credit and debit

14  cards to be used to conduct transactions in interstate

15  and foreign commerce.

16          So Capital One used that initial criminal

17  complaint that was superseded in June, which now has

18  this claim.  The No. 15 is statutory as a part of that

19  statute, Judge.  It's not an indication.  It's only 15.

20  So now the government is even saying that Thompson

21  expressly was using this information for identity theft

22  and fraud to the extent that is relevant at all.

23          The next sort of significant piece that I

24  touched on earlier was the fact that -- and what the

25  jury is going to hear is how do we know.  Well,

1   typically, the way you know is that there are very

2   strict logging requirements that anybody who is

3   promising to protect data, anybody who has a duty to

4   protect data would log what is being accessed to their

5   system.

6         So on slide 67, we know that Capital One

7   deleted critical logs, in violation of its own

8   information security standards, and that very few logs

9   were available for the post-breach investigation.  So

10  we know post-breach that Mandiant requested certain

11  logs so they could try and figure out what exactly

12  happened, whether there were other attackers.  There

13  were three logs that they asked for that Capital One

14  could not produce, the Apache Web Services events logs,

15  the Web Application Firewall event logs, and the

16  Elastic Load Balancer event logs.

17        This is the mechanism by which Ms. Thompson

18  exfiltrated 98 million customers' information, and they

19  didn't maintain any logs.  They can't prove that the

20  stuff is not further out there, and we think the weight

21  of the evidence suggests that it very, very much is.

22        These logs were deleted in 7 or 30 days when

23  their policy indicated they should have been maintained

24  for at least 120 days, if not 13 months.

25        Mr. Stuart Madnick, his seventh opinion here

1   goes through this in detail.  And just incredibly,

2   Michael Johnson, who was the chief information security

3   officer, knew that they were not maintaining these logs

4   and nevertheless -- he issued a memo about it.  It's

5   cited in our papers, and Dr. Madnick discusses it.  He

6   identified that we're not maintaining logs pre-breach;

7   yet, nobody did anything about it.

8          And so post breach, to answer Your Honor's

9   question is Capital One going to be able to prove that

10  this information isn't well past Paige Thompson, we

11  think not.

12         So what do we have?  We have the discarded

13  logs which were the ones requested by Mandiant that

14  would have detected additional malicious activity.

15  Those are gone.  The available logs would not have

16  captured the breach activity under certain

17  circumstances either, and that is explained as well by

18  Dr. Madnick.

19         The testimony on the next slide from Michael

20  Hedrick explains that even on the logs they had, they

21  could not tell under certain circumstances whether

22  there was additional attacks of exfiltration.  And

23  remember, during this entire time period, they weren't

24  maintaining logs, and they can't track it through the

25  logs they did keep, the cloud trail logs.  This

1   information is publicly available to the world, and

2   Ms. Thompson is aggressively promoting the fact that

3   she stole this information from Capital One.

4           So as a final point on this, Your Honor --

5   because it goes to part of our theory of the case and

6   damages -- how did they respond in addition to betting

7   that she has it squirreled away somewhere good and all

8   the other missions we went through?  They offer credit

9   monitoring.  This is Capital One acknowledging the risk

10  and the remedy to address that risk.

11          They are telling people in this notice

12  post-breach to beware:  You are at risk.  They are

13  offering credit monitoring.  Why are they offering

14  credit monitoring?  Because they promised to keep the

15  data secure, and they didn't.  And it's appropriate to

16  offer that, but as a remedy to a breach, it's also

17  appropriate.

18          Finally, Your Honor, we know that as late as

19  February 2021, they were still taking the same

20  position.  They say, We think it's not out there.  But

21  in this letter just uncovered in Maine, they are still

22  saying, We're offering credit monitoring.

23          And, again, it's just not consistent to say

24  on the one hand you're not at risk, we can guarantee

25  this information is secure, and on the other hand say

 1   here's credit monitoring and you are at risk.

 2          Your Honor, I am at a good stopping point if

 3   it's appropriate to take a short recess.  I can keep

 4   plowing ahead too if that's your preference.

 5          THE COURT:  That's fine.

 6          Let me just summarize what I understand

 7   you're saying.  Again, I'm still focused on the

 8   Article III issue, and the issue is whether there's

 9   sufficient injury-in-fact that's concrete and

10   particularized and is either actual or imminent.

11          As I understand your position -- and this is

12   a case where I think we're in agreement -- there's no

13   affirmative action that any of these named plaintiffs

14   at least or really anyone can actually point to any

15   actual use of their personal identification that's

16   traceable to this breach.

17          MR. SIEGEL:  I'll stop you there.  We

18   disagree.

19          THE COURT:  All right.

20          MR. SIEGEL:  We disagree.  So we've

21   identified more than a half a dozen plaintiffs that had

22   fraud following the breach that our expert says used

23   information that was compromised in the data breach.

24   Is it the same information?

25          THE COURT:  Well, that's the issue.  It has

1   to be traceable.

2           MR. SIEGEL:  Of course it does.

3           THE COURT:  Right.

4           MR. SIEGEL:  But it doesn't have to be

5   traceable from a criminal standpoint.  I mean, look at

6   *Hutton*.

7           THE COURT:  I want to hear more about that,

8   but let me just summarize what I was going to say.

9   That is, as I understand your position, this imminent

10  actual injury can be reasonably inferred by a fact

11  finder --

12          MR. SIEGEL:  Yes.

13          THE COURT:  -- based on the pre-breach

14  vulnerabilities that created the possibility of not

15  only what actually happened but other hackers, the fact

16  that anyone with an Internet connection could access

17  the data that was exfiltrated from Capital One because

18  of these vulnerabilities, Thompson's own declared

19  intentions and her own advertising of the data, the

20  post-breach vulnerabilities that were assessed as of

21  December 2019 at least, the nature of the data that was

22  exfiltrated that made it possible to use the data in a

23  way to create IDs, and Capital One's own inability to

24  establish that there was anyone else that hacked it or

25  that it has been sufficiently contained.

1          MR. SIEGEL:  I think that's a fair summary.

2          I would just conclude with going back to

3  *Hutton v. NBO*, a case Ms. Perkins and I litigated

4  through the Fourth Circuit after we were dismissed for

5  lack of Article III standing.  Because there NBO denied

6  they were even the victims of a breach.

7          THE COURT:  Right, I understand.  And then

8  you want to add to that specific instances where

9  post-breach some of these named plaintiffs actually

10  experienced use of their personal identification,

11  admittedly, without the ability to say where it came

12  from.

13          MR. SIEGEL:  That's right, and what our

14  expert says it is the type of fraud you would expect to

15  see following this kind of breach, right.  I mean, it

16  is not can you follow a piece of data out of Capital

17  One into a hacker, Paige Thompson or somebody else,

18  into another hacker that committed fraud on our named

19  plaintiffs?  The answer to that is no, but that's not

20  the standard.

21          THE COURT:  All right.

22          MR. SIEGEL:  That's not the standard.

23          I do think *Hutton* is instructive here

24  because, again, there you had a defendant who said, We

25  were not even breached.  It's not our data.

1            And yet, what the Fourth Circuit says is,

2  Well, these people did suffer fraud, as ours have, and

3  it's reasonably correlated to the data that was

4  compromised in that breach, Article III standing.

5            And that standard is not different at class

6  certification.  It's not.

7            THE COURT:  All right.

8            MR. SIEGEL:  So that's the basic threshold

9  question with respect to the representative plaintiffs.

10            THE COURT:  All right.  Why don't we take a

11  15-minute recess.

12            MR. SIEGEL:  Thank you.

13            MR. BALSER:  Your Honor?

14            THE COURT:  Yes.

15            MR. BALSER:  Would it be helpful for the

16  Court to have me respond to the standing arguments

17  before Mr. Siegel gets --

18            THE COURT:  I'm thinking about that.  What

19  other piece do you want to move into, Mr. Siegel?

20            MR. SIEGEL:  The class certification

21  elements.

22            THE COURT:  All right.  Let's continue with

23  you and then --

24            MR. SIEGEL:  I think we've covered most of

25  the facts.  I think now we're into here's what we want

1  certified and why, and I do want to walk the Court

2  through damages and make sure that you understand.

3  You've asked us before, so I want to make sure we

4  address it with sufficient specificity, the damages we

5  are claiming with respect to each claim in the case --

6          THE COURT:  All right.

7          MR. SIEGEL:  -- as to Capital One and as to

8  Amazon.

9          THE COURT:  All right.  We'll stand in

10  recess.

11      (Recess from 11:37 a.m. until 11:54 a.m.)

12          THE COURT:  For planning purposes, we'll go

13  until 1:00.  We'll break at 1:00 for lunch and resume

14  at 2:00.  I want to finish up by 5:30.

15          How much more do you have on your motion?

16          MR. SIEGEL:  Well, quite a bit, particularly

17  on damages, but it's really a function of if you have

18  questions.  I think I can move through it relatively

19  quickly.

20          THE COURT:  All right.  Well, I'd like to

21  finish up with your portion by the luncheon break.  All

22  right.

23          MR. SIEGEL:  Okay.  I will endeavor to do

24  just that, Your Honor.

25          Thank you.

1            THE COURT:  All right.

2            MR. SIEGEL:  All right.  So if I may

3   continue, Your Honor?

4            THE COURT:  Yes.

5            MR. SIEGEL:  Thank you.

6            So let's move into why we're here, which is

7   class certification.  Your Honor, the slides beginning

8   with 73 are the classes that we're seeking to certify

9   here and the representative plaintiffs for each.  These

10  are out of our papers, so I won't go through each of

11  them.  But each of them identifies the class and the

12  representative plaintiff that is representative of that

13  class, the claims for which the class is bringing those

14  claims, and then the defendants.

15           So it will say at the end Capital One and

16  AWS, the full class, which is all applicants, that's

17  the 98 million number.  We have our representative

18  plaintiffs there.  Those claims include breach of

19  contract or, in the alternative, breach of implied

20  contract against Capital One and claims of negligence,

21  unjust enrichment, and declaratory judgment against

22  both Capital One and AWS.

23           There is an alternative.  Again, this is

24  straight out of our papers.  I know we don't have all

25  the time in the world, so I won't go through each.  But

1  this tracks our briefing on the identified classes, the

2  alternatives, the California subclass beginning on

3  slide 76.

4          With respect to the CLRA, that claim is

5  bought only against Capital One and not Amazon because

6  the Court found it did not apply.

7          As to the Florida claim, that is against

8  Amazon but not Capital One because it cannot be brought

9  against banks.

10         The New York claim is against both

11 defendants.

12         The Washington state claim is against both

13 defendants.

14         So at the conclusion of that portion, you

15 will see in the original presentation I was going to

16 move into standing, but I think we've talked quite a

17 bit about that.

18         I just do want to touch on slide 84 because I

19 think this is how we finished up.  But I just want to

20 emphasize the concept here.  We've identified just

21 these examples, but there are more in the complaint.

22 With respect to these three plaintiffs, Zielicke,

23 Gershen, and Sharp, all had fraud.  They have sworn in

24 their interrogatories and have been deposed that they

25 have had fraud, and so we think there is little

1    question that those folks have standing.

2              And then the only other --

3              THE COURT:  Well, what can the Court consider

4    on the traceability issue?  Because, for example, in

5    Gershen's case, his name and his date of birth and some

6    financial information was obtained, likewise with, I

7    think, the other two.  Capital One has offered an

8    explanation for why it's not traceable.  In your view,

9    can the Court consider that?

10             MR. SIEGEL:  Not for this consideration.

11   It's a contested fact.

12             THE COURT:  What's contested?

13             MR. SIEGEL:  The question of whether the

14   fraud that those representatives have alleged, that

15   they've sworn to, it's evidence.  The jury will hear

16   that they've been defrauded in these ways.  The jury

17   will hear that the information taken in the breach can

18   be connected to the fraud that they suffered through

19   our experts.

20             THE COURT:  What evidence is that?  It's the

21   experts saying, I think that's the case.

22             MR. SIEGEL:  It's the experts saying that

23   this is the nature of data that can lead to a fraud

24   like this.  Again --

25             THE COURT:  Well, let's not get into the

1   other issue.

2          MR. SIEGEL:  Okay.

3          THE COURT:  But you have an explanation for

4   example.  I'm not sure exactly which it is but Capital

5   One has offered.  For example, he's claiming that he

6   had a credit card opened up in his name which couldn't

7   be opened unless you had a social security number,

8   which wasn't obtained from Capital One.  Is that

9   something the Court can consider?

10          MR. SIEGEL:  We don't think the Court should

11   consider that because, again, now we're talking about a

12   factual question.  Our expert has said that a social

13   security number or not, this data can be enriched and

14   how it's enriched and why it's valuable to hackers and

15   how they use it.  And so we think this is very much a

16   merits question.

17          This is exactly what this recent *Blackbaud*

18   case decided post *TransUnion*, that this concept of

19   traceability is intertwined with the facts.  But based

20   on the same exact claim that -- and, again, back to

21   *Hutton*, *Hutton* says -- again, their defendant was

22   saying, We weren't breached at all.  It's not just the

23   data isn't connected or the fraud isn't connected to

24   us.  It's we had nothing.  We weren't breached.

25          And the Fourth Circuit said, They claim a

1  fraud.  They claim a fraud that could have been, could

2  have been based on the data compromised in the breach,

3  and that's sufficient for Article III standing.

4         So if you move beyond that, if you read

5  *Blackbaud*, we think you'll come away with the same

6  conclusion as the court did there, that these

7  traceability challenges, based on whether there is

8  evidence that the breach is connected to the fraud or

9  the fraud is connected to the breach is intertwined

10 with the causation elements of the tort.

11        THE COURT:  Again, what do you think you need

12 to show factually other than having an expert say, "I

13 think it's possible," to establish traceability for the

14 purposes of Article III standing?

15        MR. SIEGEL:  I think we have to allege and

16 have sufficient facts to present to a jury --

17        THE COURT:  Right.

18        MR. SIEGEL:  -- that they suffered a fraud,

19 the type of which could be caused or contributed to

20 cause by the data compromised in the breach.

21        THE COURT:  Why is that sufficiently

22 particularized and not speculative?  It could have

23 been.  It could have been a lot of things.  I mean,

24 doesn't there have to be some concrete traceability to

25 a source?

1              MR. SIEGEL:  I think *Hutton* says no.

2              THE COURT:  Well, *Hutton* is just a -- you

3    pled enough to get past a Rule 12(b)(6) motion.

4              MR. SIEGEL:  But no.  It was an Article III

5    question.

6              THE COURT:  Right.

7              MR. SIEGEL:  That's what you're asking.

8    You're asking about an Article III question for

9    purposes of these named representatives.

10             THE COURT:  Right.

11             MR. SIEGEL:  It's the same question.  It

12   doesn't change a class certification.  There's not a

13   different standard.  At trial there might be a

14   different standard, but what you're asking about is a

15   causation question.

16             THE COURT:  No.  The standard was did -- was

17   there pled in *Hutton* --

18             MR. SIEGEL:  Say again.

19             THE COURT:  The issue was whether there was

20   pled in *Hutton* facts that made plausible that there was

21   traceability.

22             MR. SIEGEL:  Right.

23             THE COURT:  We're now at the point where you

24   need to present facts that there was, in fact,

25   traceability.

1               MR. SIEGEL:  Right.

2               THE COURT:  All right.  And what are those

3     facts?

4               MR. SIEGEL:  But we have presented facts.  We

5     have the sworn interrogatory responses that these folks

6     committed fraud.  We have a breach with information

7     that our expert could plausibly connect to the fraud,

8     but more than that is a causation question.  I think

9     where, respectfully, Your Honor is getting tripped up

10    is there's an element of our claim that's causation,

11    you know, in the negligence claim.  I mean, there's not

12    in the breach.  The breach is the breach.  They were

13    obligated to protect the data, and this is why the

14    breach claim -- they don't challenge standing because

15    once there's a breach, then the law implies harm under

16    Virginia law.  So that claim, there's standing, and no

17    one is challenging standing.  Capital One is not even

18    challenging standing with respect to unjust enrichment.

19               They are doing a very narrow argument that

20    goes to causation, and that is what we believe is

21    inextricably tied with the facts that we think the

22    Fourth Circuit has said that is a -- if that is an

23    element of the claim, whether we can establish

24    causation for purposes of our negligence claim,

25    obviously, is a question of fact.  You may conclude at

1  the summary judgment stage.  We think not, but a jury

2  will ultimately determine it.

3          In any event, for purposes of standing, it's

4  not a standing argument.  It's a causation argument.

5  It is an element of the claim and one that should not

6  be determined on an Article III basis.  We think the

7  law in the Fourth, based on the cases we've cited, is

8  clear on that.  And, again, we think the conclusion the

9  *Blackbaud* court reached is right on point as well with

10 respect to that standing question.

11          THE COURT:  All right.

12          MR. SIEGEL:  I know my partner, Lindsay

13 Perkins, can speak for a much longer time on standing,

14 but given the time, I'll move ahead unless you have

15 more additional questions.

16          THE COURT:  All right.

17          MR. SIEGEL:  Let me just turn to the final

18 points on standing.  So, again, Capital One doesn't

19 challenge plaintiffs' Article III standing on the

20 unjust enrichment claim, but Amazon does.  But, again,

21 like Capital One's challenge -- Capital One is

22 arguing -- I'm sorry.  Amazon is arguing that there's a

23 question about whether plaintiffs can demonstrate they

24 conferred a benefit on Amazon.

25          And this is, again, I think a demonstration

1  of a merits challenge, and this is explained on

2  slide 90.  And, again, as a merits challenge, it is

3  improper for consideration and should be based at trial

4  or on summary judgment and not at the class

5  certification stage.  So, again, another merits

6  question.

7       They being Amazon also make a prudential

8  standing argument.  That, too, fails.  This is the

9  concept that plaintiffs are attempting to assert a

10  claim that's really Capital One's, but of course, I

11  think the Court made clear in its order on the motion

12  to dismiss in setting out the claims that the way we

13  pled it is appropriate; that is, plaintiffs' claims are

14  premised on Amazon's failure to provide adequate data

15  security to plaintiffs and protect their data.

16  Therefore, the claim for unjust enrichment is

17  appropriate directly, and there's not a prudential

18  standing issue.

19       Final point:  When you look at the *Blackbaud*

20  case, the *Kerns* case from the Fourth Circuit regarding

21  these jurisdictional questions, if they're tied up with

22  causation, they should be treated as merits issues for

23  summary judgment or trial.  Again, we think that is

24  very clearly law in the Fourth.

25       If you go back to *Spokeo* and read what

1  Justice Thomas says about these common-law claims, they
2  trigger in instances where the state law, where the
3  common law implies a harm.  Certainly, that is, we
4  suspect, the reason that Capital One, for example, did
5  not even seek to challenge standing on the breach of
6  contract claim.  Those damages, even if they're
7  nominal, are implied.
8        So let's move on to the Rule 23 standards
9  here.  These are well-worn, and I don't think they're
10  in dispute.  The first concepts are those of
11  numerosity, commonality, whether the claims are typical
12  of the class, and whether the representative plaintiffs
13  and the lawyers are adequate.
14        This is a rudimentary pie chart of the size
15  of class against the adult U.S. population.  It's a big
16  class.  Obviously, numerosity is not an issue.  It's
17  like, I think, 12 Virginias.  There's about 8.5 million
18  people in this state, Your Honor.  It is a large class.
19  Again, the reason I went through that evidence is to
20  demonstrate that the facts underlying plaintiffs'
21  claims apply to these rather large classes all the same
22  way.
23        At the bench I went through on slide 98
24  the -- maybe I didn't go through 98 at the bench,
25  David, but I think you've identified this document.

1          In any event, Your Honor, on page 98 is the

2    numbers that fall into the various classes and

3    subclasses.  I think Capital One has asked that that be

4    under seal.

5          MR. BALSER:  (Nods head up and down.)

6          MR. SIEGEL:  I think the common questions are

7    apparent to the Court.  Examples abound.  We've listed

8    many on page 21 of our brief, including things like did

9    Capital One have a contractual obligation to protect

10   plaintiffs' data, right.  There's sort of cross-motions

11   on this issue now.  We've, obviously, moved for summary

12   judgment on this very issue.  It applies to all

13   98 million people the same way.

14         Did they breach?  We think that's also

15   apparent from the evidence and can't be disputed.

16         Likewise, did Capital One and Amazon have a

17   common-law duty to protect plaintiffs' data and, if so,

18   did they breach that duty?

19         The challenges to commonality are themselves

20   common.  And so, for example, the question that Capital

21   One continues to pursue for reasons that we don't quite

22   understand -- but the question of whether

23   noncardholders -- despite Capital One acknowledging the

24   privacy notice applies to applicants, the question of

25   whether noncardholders can assert contract claims under

1   the privacy notice, they are contesting that.  Well, we

2   know who those people are who are applicants, not

3   cardholders, and that's going to rise or fall for all

4   of that cohort of this class.  It is a challenge that

5   creates more common issues, not less.

6           Likewise, the factual question that we

7   discussed at length already, whether there's a risk or

8   whether, in fact, the data was disseminated.  We think

9   there's no question that it was disseminated and will

10  be answered the same way from -- we know it was

11  disseminated because they admit that Paige Thompson

12  hacked their systems.

13          THE COURT:  So your view is that there's no

14  need for you to prove anything beyond breach?  You

15  don't have to prove any injury beyond breach?

16          MR. SIEGEL:  For standing.  For the claim, we

17  do, sure.

18          THE COURT:  So for the claim you need to?

19          MR. SIEGEL:  Yes, and I'm going to get to

20  that.

21          THE COURT:  All right.

22          MR. SIEGEL:  I'm gearing up.  I promise.

23          THE COURT:  All right.

24          MR. SIEGEL:  Again, I don't think commonality

25  is seriously in dispute.  I would like to just pause on

1    slide 102.  I have about a nine-minute video that I'd

2    like to present.  And, Your Honor, look, I mean,

3    there's a lot of lawyers here, dozens.  We represent

4    these representative plaintiffs, the putative class

5    here.  We have a very short video with respect to the

6    Rule 23(a)(3) adequacy provisions about whether our

7    clients are adequate.  We don't believe there's any

8    question about that.  If you prefer, I can play it

9    later or just submit it.

10          THE COURT:  If you would, just submit it.

11   This relates to the fourth element, whether they're

12   adequately represented?

13          MR. SIEGEL:  Whether they're adequate and

14   their -- we would like the Court to listen to it.

15          THE COURT:  All right.  I'll listen to it.

16          MR. SIEGEL:  They are short clips from their

17   depositions.

18          THE COURT:  All right.  Why don't you submit

19   it.  I'll listen to it.

20          MR. SIEGEL:  They are Americans from all

21   across the country who have stepped up to serve as

22   representative plaintiffs.  It is a diverse group.  We

23   have disabled vets from Washington state.  We have a

24   retired deputy sheriff from Wisconsin, really a

25   cross-section of, not surprisingly given the class

1  size, folks all across the country.

2          THE COURT:  All right.

3          MR. SIEGEL:  So let me move to predominance.

4  So in most certification motions, this is where the

5  fight is.  It's not Article III standing.  It's whether

6  the claims -- the common claims, the common issues

7  predominate.  This is perhaps why Capital One is so

8  focused on standing, because there's little question

9  here, despite the class size, that these common issues

10 do predominate.

11         THE COURT:  I mean, the issue is not just

12 whether they're common issues.  The question is whether

13 there are common answers to the issues.

14         MR. SIEGEL:  That's right, exactly.  We

15 agree.  We agree.

16         Those questions that I posed, does Capital

17 One have an obligation under the --

18         THE COURT:  Right, I understand those.

19 That's why I asked about your view on consequential

20 injury with respect to the breach of contract claim.

21         MR. SIEGEL:  Okay.  But here's where that's

22 important.  Let me pause there.  So I'm going to get to

23 our damages theory quickly -- theories quickly here,

24 but I want to be clear.  Our classwide damages

25 theories, how we propose to try this case, we have very

1   specific classwide damages theories.  Those damages

2   theories apply to the class as a whole.

3           We also recognize, consistent with Supreme

4   Court jurisprudence, like *Tyson*, that there may need to

5   be follow-on proceedings with respect to either unique

6   defenses or unique damages.  So, for example, if a

7   plaintiff claims that they have a $1,000 fraud as a

8   result of the breach, we're not proposing that as a

9   classwide damage.  That individual -- we would plan to

10  prove up our class representatives, our representative

11  plaintiffs' individual damages with respect to that,

12  but our separate classwide theories of relief apply to

13  the class all the same way.

14          And I do think that is a critical question

15  you've asked and one I'd like to turn to because I

16  think -- I'm going to move quickly through predominance

17  and then get to the damages.

18          THE COURT:  All right.

19          MR. SIEGEL:  So I think the sort of easiest

20  one to conceptualize under this predominance standard

21  of whether these common issues are more prevalent than

22  noncommon or aggregation defeating issues, in the words

23  of *Tyson*.  And again, *Tyson* provides for these -- you

24  can have these separate follow-on proceedings with

25  respect to specific defenses and damages without

1   impairing predominance.

2           And so the question at the end of the day,

3   the Fourth Circuit's spin on what the Supreme Court has

4   said about this, is that if common questions represent

5   a significant aspect of the case and can be resolved

6   for all members of a class as a single adjudication,

7   then they predominate over individual questions.  And,

8   again, each plaintiffs' claim would not be identical to

9   satisfy that requirement.

10          So we have the live claims in the case.

11  Count 1 is negligence.  Unjust enrichment is 3.  Breach

12  of contract is 6.  Breach of implied contract is

13  Count 7.  I'd like to start with the contract claim.

14  So traditional -- this is slide 108.  The traditional

15  elements of a contract claim, you need a legally

16  enforceable obligation.  You need a defendant's

17  violation or breach of that obligation.  You need

18  injury or damage caused be the breach.  Right.

19          And so, as I said, this question about this

20  promise to protect your personal information from

21  unauthorized access and use and whether they used

22  adequate security measures, Your Honor, both a common

23  question and a common answer, that will be answered the

24  same for all with respect to this promise Capital One

25  made to all 98 million class members.

1          We can go through chapter and verse on why

2    that's the case and what our proof will be at trial,

3    including our expert, Mr. Kelley, who explains why

4    these standards are required under federal law and why

5    a violation of federal law is violating the obligations

6    under the contract.

7          So Capital One says a couple of things in

8    response to that.  First, they say you can't ascertain

9    the class because there are differences in the privacy

10   notice.  There's two privacy notices.  We say they say

11   the exact same thing.  They say they don't.

12         Again, if they don't, we know who is in which

13   class.  We know who had pre-2010 privacy notices,

14   post-2010 privacy notices.  Capital One has that

15   information.  And the law is quite clear, as long as

16   you can identify those folks, they do not defeat

17   predominance.

18         They also raise in sort of a kitchen sink

19   approach this idea that some class members would be

20   subject to a claim that the class member materially

21   breached the contract first.  This is an affirmative

22   defense that was not raised, and so we don't think it

23   should be considered at all.  In any event, it's clear

24   under *Tyson* that if they have these defenses as to

25   particular plaintiffs, that could be dealt with

1   posttrial.

2            Setoff and recoupment, likewise, do not

3   defeat predominance of the contract claim.  Setoff is a

4   counterclaim, not a defense, and was not brought.  And

5   like first material breach, to the extent the Court

6   would even consider setoff or recoupment, those can be

7   dealt with under *Tyson* in a posttrial proceeding.

8            Obviously, we have a claim for implied

9   contract that the Court has endorsed to the extent that

10  there is a finding that there's no actual contract,

11  which we think there should be at this point and have

12  moved for summary judgment on that basis.

13           Similarly, with respect to the unjust

14  enrichment claim, the elements there are the receipt of

15  the benefit and the unjust retention of the benefit at

16  the expense of another.

17           THE COURT:  What slide are you on?

18           MR. SIEGEL:  I'm on slide 117.

19           We cited in our papers, Your Honor, numerous

20  cases.  The *In re Checking Account Overdraft Litigation*

21  cite on slide 118 actually has other cases there.  The

22  concept of unjust enrichment claims, given the

23  simplicity of the elements involved, that is, the

24  conferring of the receipt of a benefit and the unjust

25  retention of the benefit, are particularly suitable for

1   class treatment.  And we think here -- if you skip

2   ahead to 119, we -- again, one dataset, all 98 million

3   people.  That data was conferred on Capital One.  It

4   was conferred on Amazon.  Capital One aggregated and

5   mined the data and benefited from its use through its

6   various fraud monitoring programs.

7           Likewise, AWS, Amazon, used Capital One's

8   data of plaintiffs' PII to generate significant

9   profits.  So these are all global questions that can be

10  resolved in one fell swoop for the class.

11          With respect to the unjust enrichment claim,

12  the finding that this Court made on page 44 in

13  characterizing the claim, we think, you know, again,

14  still applies.  This is just a statement of the claim.

15  And whether it is an equitable and unconscionable to

16  prevent the defendants to retain these benefits will be

17  a classwide issue resolved one way or the other, based

18  on the evidence, for all plaintiffs and all class

19  members.

20          Amazon raises a specific defense or challenge

21  to predominance with respect to unjust enrichment.

22  They have sort of a laundry list, including whether

23  plaintiffs were aware that Amazon was providing any

24  security for the data.  We don't think that is an

25  element of the claim and, therefore, should not be

1    considered.

2           Likewise -- now on slide 121 -- whether any

3    particular plaintiff had heard of Amazon, not relevant,

4    not an element of the claim.  And we've outlined in our

5    papers why the other defenses, we think, are not well

6    taken to predominance of that claim as to Amazon.

7           There are two cases related to unjust

8    enrichment.  One is a Florida case where Florida law

9    specifically requires sort of an examination of each

10   individual circumstances, something that Virginia law

11   does not apply.  That would be the *Vega* case, and then

12   defendants also cite this *Grandalski v. Quest* case, a

13   Third Circuit case.  But in that case, plaintiffs were

14   refunded overbillings and, therefore, the court found

15   that there was not sufficient predominance in that

16   case, given the individualized nature of these

17   transactions and refunds, to support class

18   certification of an unjust enrichment claim.

19           Finally, although pled first, our common --

20   our negligence claim.  Obviously, duty, breach, injury

21   are the elements of that claim.  We will explain here

22   in a minute why we think we satisfy all of those and

23   what we will present on a classwide basis.  Like the

24   contract claim, we think the breach element discussed

25   on page 124 of the presentation is common to the class

1   and applies classwide.  They were aware of the
2   vulnerabilities and risks associated with their
3   systems.  They didn't do anything about it, and
4   plaintiffs suffered the harm and resulting damage from
5   that.

6          The statute of limitations defense, this is a
7   whole separate motion, Judge.  This is another item
8   that was raised belatedly.  This is part of the Rule 72
9   appeal, this Capital One notion of adding an additional
10  affirmative defense after the close of discovery on the
11  day we filed our class certification motion.  I do not
12  want to get into that.  I think that is a separate
13  motion Your Honor is planning to hear tomorrow.

14         In any event, the timing of when the
15  retention of that benefit became unjust, because of the
16  failure to secure it properly, that's going to be the
17  same for everybody.  So, again, we don't think the
18  defense should be in there.  If it is in there, the
19  question about timing, there will be a date, and then
20  we will know, based on Capital One's records, who was
21  in and who was out for purposes of recovery for that
22  claim.  Therefore, it does not defeat predominance.

23         There's sort of, again, another kitchen sink
24  effort to suggest that online applications, despite the
25  stated applicability to all applicants, whether, you

1  know, mitigation can be a defense.  These are all

2  issues that, I think, *Tyson* makes quite clear cannot

3  defeat predominance.  Therefore, we think this is

4  perhaps, despite the size of the class, the great

5  weight of the predominant common issues really should

6  be not in question, including many of the common issues

7  we talked about with respect to liability.  Those will

8  go one way or the other, positive or negative, for the

9  class as a whole.  Of course, we're standing here

10  believing they will be positive at the end of the day

11  once heard by a jury.

12        So, Your Honor, there's a similar analysis

13  with the statutory claims.  I would just ask the Court

14  to review our presentation on that.  It is consistent

15  with our papers.  I was just highlighting the arguments

16  with respect to the statutory claims.

17        I think the key point there, the damages

18  elements that we will be presenting, the actual damages

19  elements are the same.  The statutory claims are not

20  dependent on any misrepresentations.  Some cases get

21  tripped up -- I'm on slide 129 now -- around the idea

22  that a state statutory claim or statutory fraud claim

23  is based on a misrepresentation.  That is not what the

24  plaintiffs have argued here.

25        There was certainly a classwide omission, and

1   that omission is not disclosing that there was

2   inadequate security both at Capital One and Amazon.

3          Okay.  So I've rushed through that so I can

4   bring you to 132, Your Honor, and I think this is kind

5   of where the rubber meets the road.  So Your Honor

6   asked about this, as I said, months ago, about what

7   damages are attached to which claim.  This chart

8   includes that.  So 133 is the Capital One chart, and

9   134 is the Amazon chart.

10          And what *Comcast* says, the Supreme Court

11   case, is that as part of the Rule 23 analysis, the

12   Court should consider what damages are applying to what

13   claim.  You should avoid sort of the ball of wax

14   approach.  So here's what we have.  We have this chart

15   and then significant detail behind it, as the basis for

16   each of these damages claims, that will apply to the

17   class as a whole.

18          So there are -- with respect to Capital One,

19   there are really five categories of damages, the

20   concept of present value of identity theft production

21   is one.  The value of access to PII is two.  The

22   disgorgement of gains is three.  Nominal damages, four,

23   as an alternative to those.  And then, of course, if we

24   are successful on a tort, we believe punitive damages

25   are appropriate as well, not listed in your chart but

1   would apply to at least the negligence claim.

2          And so the questions that will -- and

3   likewise with respect to Amazon.  Obviously, there's no

4   contract on slide 134, so there is no contract claim.

5   And so the claims are limited to unjust enrichment and

6   negligence and, again, we think a punitive basis.  The

7   same four categories of damages in addition to the

8   punitives on the negligence claim, the value of the ID

9   protection, the value of access to the PII,

10  disgorgement of gains from the benefit conferred from

11  the PII, and nominal damages apply.

12         So let me walk the Court, first, through the

13  first theory of damages here, which is the concept of

14  the present value of identify theft protection.  So

15  this is the concept, Your Honor, that we were talking

16  about earlier:  Will the jury conclude that Capital

17  One's failure to protect this data is such that under

18  the contract claim -- let's just start there -- the

19  jury should award or put the plaintiff class back in

20  the position they would have been but for the breach,

21  that is, their data is protected.

22         So we have two components of that.  One is

23  Mr. Mitnick, who we've talked about, that explains why

24  the class is at current and ongoing risk.  And then we

25  have Mr. Long, who is merely presenting an actuarial

1  exercise of taking the very specific individual class
2  member data about when they were borne and figuring out
3  what it would cost to protect somebody for a lifetime
4  because Capital One failed to fulfill its obligation to
5  do it under the contract.  Those numbers are aggregated
6  on page 136.

7          So, look, we get it.  These are big numbers.
8  So -- but I'd like you to look at the top of the chart
9  here where it says average per class member.  So if --
10  Mr. Long explains and provides multiple periods of
11  time.  If the jury concludes that class members only
12  need three years of protection, it's $995 per class
13  member.  Then if they decide five years, ten years --
14  and there's a high range, of course, for a lifetime of
15  protection.  These are average numbers based on the
16  life expectancy of each class member on the right side.

17          And so the aggregated classwide damages on
18  the bottom row -- so for all class members to get three
19  years of present value of the monitoring that -- to put
20  them back where they should have been but for the
21  breach, that is a $97 billion price tag.

22          We recognize, again, it's a big number, but
23  it's very important here to understand, Your Honor,
24  that the big number is a function of the number of
25  victims.  And this is a theme we've heard from Capital

1  One throughout the litigation, certainly in response to

2  the motions before Your Honor today and tomorrow, is

3  that plaintiffs are asking for huge damages.

4         You know, if there are 50 people in this

5  courtroom, maybe 50 lawyers in this courtroom, and we

6  were here presenting the damages on a classwide basis

7  and instead of 97 million it was 50,000 to provide

8  three years of credit monitoring to put this class,

9  this smaller class in a position plaintiffs should have

10 been in but for the breach, I don't think anybody would

11 be the least bit concerned about that.

12        And so it is not the $995 or even the $8,369

13 figure.  It's the 98 million people who are in the

14 class, and the reason they're in the class is because

15 Capital One and Amazon breached their obligations to

16 keep this information protected.  And this is the way

17 to put them back where they should have been.  If they

18 had made like remittitur arguments in response to class

19 certification, which we think should come at the close

20 of trial, not as opposition to class certification.

21        So the next category of damages is the value

22 of access to class members' PII.  Your Honor, in the

23 motion to dismiss phase, rejected the notion that there

24 was a concept of loss of value of PII but this is

25 different.  This is the idea -- you will hear a lot

1   about this tomorrow.  Mr. Olsen explains that

2   essentially the plaintiffs here are effectively the

3   equivalent of a patent holder where there is a use of

4   the patent by a noncompeting company, and the relief

5   offered in those cases is a license.  And so that is

6   the equivalent of what we have here, and Mr. Olsen

7   calculates that using a standard market approach.

8          So it is not a diminution in value theory.

9   It's correlated to the value of a license, and I'll

10  explain that in a little more detail here in the final

11  half an hour.

12         The value of that, again, is quite granular

13  to class members.  So this is in his report if you look

14  at Tables 1 and 2 and 9 of Mr. Olsen's report.  If you

15  look at the top there, it says range for each class

16  member.  That's actually range for each class

17  representative plaintiff.  So the range for each

18  representative plaintiff is $14.55 to $30.30.

19         And what Mr. Olsen did using a lot of data

20  was looked at what the value of this information trades

21  for to come up with a correlated license value for the

22  data that was compromised in the breach.  If you look

23  at the range for all class members, it's wider.  It's

24  as little as $1.41 per head to as high as close to $300

25  where all of that data, social security number, bank

1    account information, was consolidated.

2            Those tables -- I was going to pop them up on

3    the ELMO, but I think we're running low on time for

4    that -- and walk the Court through it.  But those

5    tables show, if the Court looks at table 9, for

6    example, very specifically how those numbers aggregate

7    to the $1,048,130,903 number you see here.

8            But that's not the result of taking some

9    average or impermissible sampling in the Duke spirit.

10   This is a very specific -- each of those 98 million

11   plaintiffs, we're going to figure out the license value

12   for each of their information.  Sometimes it's $1.41;

13   sometimes it's more.  If we get a verdict for this

14   claim in this amount, we can distribute that money to

15   those plaintiffs in the amount identified in

16   Mr. Olsen's report.

17           Finally, we have the disgorgement of gains

18   from the benefit from using the PII.  We've already

19   talked about this a little bit in terms of the unjust

20   enrichment claim, but Mr. Olsen calculates both the

21   benefit to Capital One and the benefit to Amazon as a

22   result of using plaintiffs' PII without protecting it.

23           Your Honor, Mr. Newby told me he believes the

24   next page, 140, is under seal.  So I'll just reference

25   it here.  Those are the totals -- oh, I'm sorry.  Those

1   are the totals reflected for both Capital One and

2   Amazon.

3           The Capital One numbers, you will see, are

4   divided between those former and current customers that

5   entered into a cardholder agreement and those that were

6   not.  Remember, Capital One used all of that data

7   whether or not they were cardholders ultimately.

8           On the Amazon side, you will see the

9   calculation that Mr. Olsen undertook with respect to

10  the revenue and then the profit margins enjoyed by AWS

11  as a benefit from using and housing plaintiffs' PII

12  while not maintaining adequate data security.

13          So what is the test here?  On page 141, I

14  mentioned the *Comcast* case.  The important thing is

15  that the models measure damages to each class member

16  resulting from the defendants' conduct, and that's

17  exactly what we've done here.  And we believe we've met

18  the standard perfectly.  We've spent a lot of time on

19  it.  We think it meets the standard set forth by

20  *Comcast*.  Our damages theories are attached to our

21  claims, and we're prepared to present these at trial.

22  It's all math at the end of the day.

23          Now, how are those claims tethered to these

24  damages theories?  So I started to talk about

25  slide 142, which is this present value of the identity

1    protection services as contract damages.   So Virginia

2    law applies to restatement of contracts.   And, again,

3    it's the concept found in Section 344 of the

4    restatement, which has been cited numerous times by

5    Virginia courts, that the goal of remedy for a breach

6    of contract case is to put the class in as good a

7    position as they would have been in had the contract

8    been performed, that is, had there been no breach.

9            Obviously, plaintiffs here are in the class.

10   The expectation, the contractual expectation was that

11   Capital One would protect their PII and not increase

12   their risk, which I don't think is in dispute here as

13   to whether the risk is increased.   In any event, it's a

14   triable issue.

15           And then, of course, how to restore that

16   contractual expectation.   We believe the appropriate

17   way to do it is provide the protection that Capital One

18   promised and then failed on, which is protecting this

19   information going forward through this monitoring

20   product for which we've taken to a present value for

21   damages purposes.

22           Your Honor, starting at slide 143, we do a

23   deeper dive into the restatement.   As I said, we've

24   spent substantial time, and I would like to go through

25   this with you.

1            THE COURT:  Well, this is what we're going to

2    talk about tomorrow; isn't it?

3            MR. SIEGEL:  I'm sorry?

4            THE COURT:  This is what we're going to talk

5    about tomorrow?

6            MR. SIEGEL:  I don't know how much this is

7    going to come up tomorrow.  So let me just walk through

8    it.  I think I can get through most of it in about 20

9    minutes here.

10           THE COURT:  All right.

11           MR. SIEGEL:  I just -- what I want to do, at

12   least for purposes of this argument and how it relates

13   to class certification and these damages theories being

14   grounded in solid Virginia law tethered to our claims

15   on behalf of the whole class, for purposes of

16   certifying the class, that's really the goal for today.

17           So we add a little more detail here on 143

18   about there's two ways to conceptualize this, the value

19   to the plaintiffs or the cost of remedy, the breach of

20   Capital One's failed performance.  These, again, are

21   concepts under the restatement, Sections 347 and

22   348(2)(b).  We believe that a court -- I'm sorry -- a

23   jury can easily find that those are appropriate

24   mechanisms to determine that this relief is

25   appropriate.

1          So under that first one, under 347, the
2    concept of this present value of credit monitoring, as
3    a measure of the value of Capital One's contractual
4    performance, that is one way to think about it.
5    Buyers, you know, willingly purchase products and
6    services that safeguard PII.  I mean, those are
7    open-market products, so we're able to value those.  We
8    think that is exactly what the restatement says about
9    using that value as a fiat for Capital One's
10   performance of its promise to protect the data.
11         The next concept is just a little different
12   under 348.  That is the -- the concept of this credit
13   monitoring is a measure of the cost to remedy Capital
14   One's defective performance.  You can either -- you can
15   do two things with this data.  You cannot disclose it,
16   which is what Capital One promised or -- now once
17   disclosed, now that the cat is out of the bag -- and
18   Mr. Mitnick is quite clear about this part, that the
19   only way to protect it at this point is to actively
20   monitor.  So because it can't be undisclosed under
21   348(2)(b), we think this is a second basis to support a
22   contract theory applying the concept of present value
23   of future monitoring.
24         We also think, as we -- on those initial
25   boxes, you will see a checkmark for these damages as it

1  relates to negligence as to both Amazon and Capital

2  One.  We walk through in these slides, Your Honor, the

3  concept of medical monitoring.  The defendants have

4  argued that medical monitoring concepts are

5  inapplicable because there's no present injury.  We

6  believe that is not the case here because we can show

7  that, unlike medical monitoring cases that the

8  defendants have raised, here we have the value of

9  identity theft protection is accompanied -- it's not

10  sitting out there naked.  It's accompanied by a

11  presently compensable injury in the form of this value

12  of access to plaintiffs' PII, the concept of this

13  royalty that I'll talk about here shortly and,

14  therefore, we think is well supported by established

15  Virginia common law.

16         So to do a little bit of a deeper dive as it

17  relates to using this value identity protection

18  services as a theory of damages for the negligence

19  claim as to both defendants -- so this perhaps gets to

20  an earlier question on standing, but I just -- the

21  concept held in restatement of torts, again, frequently

22  cited in Virginia law, this specific section, 910,

23  says, One injured by the tort of another is entitled to

24  recover damages from the other for all harm, past,

25  present, and prospective, legally caused by the tort.

1              And so the concept of this credit monitoring
2    cost to repair the confidentiality of the PII are these
3    future mitigation costs referred to in the restatement,
4    and these include expenditures reasonably made in an
5    effort to avert the harm threatened by the defendants'
6    conduct.  And we think that applies to both Capital One
7    and Amazon.

8              Alternatively, under Section 928, you will
9    see there's a basis under Virginia law for cost to
10   repair.  When diminution in value is not available, as
11   it's not here, the alternative under Virginia law is to
12   measure damages as the reasonable cost of repair under
13   a negligence theory.

14             So that's, in a nutshell, the value of
15   identity protection services, the present value of that
16   and how that is captured by our claims.

17             Let me turn to the value of access to PII.
18   This begins on slide 149.  This is Mr. Olsen's report.
19   He walks through in great detail the concept of this,
20   of the nonpracticing patent owner who's been damaged
21   through the unauthorized use of the patent.  So this is
22   a concept where, in this instance, when you have this
23   type of patent infringement by a noncompetitor, the
24   damages are a reasonable royalty.  We think that can
25   correlate precisely, precisely to the facts we have

1    here.

2          The threshold for that, beginning on 150, is

3    accepting, Judge, the threshold question of whether

4    there is a protectable property interest in personal

5    information.  I think -- I don't think there's anything

6    in your order that sort of decided that issue one way

7    or the other even though it was discussed at the motion

8    to dismiss phase.

9          But the concept of a protectable property

10   interest is certainly well supported in data breach

11   cases, *Marriott* being one of the most recent that Your

12   Honor cited for a different proposition in the order on

13   the motion to dismiss.  In that case, Judge Grimm

14   collects the cases for the, quote, growing trend across

15   courts that have considered the issue to conclude that

16   individuals have property interest in their personal

17   information.

18         And so that is a threshold question.

19   Obviously, it applies to the class as a whole.  Either

20   it is or it isn't.  We think the Court will ultimately

21   conclude that is a protectable property interest.

22         So the concept of a reasonable rental value

23   for damages associated with unauthorized use of

24   personal property, which is what we have here, that is

25   contained under a statement of torts at 931, at

1    Comment A.  And that rental value is the market value.

2    They have similar transactions.  That's exactly the

3    exercise that Mr. Olsen took here.

4            This can also be applied to a contract theory

5    as to Capital One, the concept of value of an

6    unauthorized access as a measure of restitutionary

7    recovery for a breach of contract.  This is Section 42

8    of the restatement of restitution that recognizes these

9    patent-like damages, measures for unauthorized use

10   beyond the traditional IP categories.  They are

11   comparable to rights that control the use of any idea,

12   expression, or information.  Again, really consistent

13   with what Justice Thomas has said throughout his

14   jurisprudence about these common-law claims and

15   personal privacy rights and interest in your own

16   information.  We identify the specific comments to the

17   restatement that provide for these restitutionary type

18   values as relief for a breach of contract claim.

19           Finally, disgorgement.  Obviously, it's

20   tethered, in the first instance, to unjust enrichment.

21   The concept of disgorgement is measured by the benefit

22   realized and retained by the defendant.  That is the

23   Virginia Supreme Court.  And that benefit is quite

24   broad.  The restatement provides it can be profits, but

25   it can also be things like savings and other

1  consequential gains from retention, in this case, of

2  plaintiffs' PII unjustly.

3         So with respect to Capital One, on slide 153,

4  we -- they were certainly enriched by the use of class

5  members' PII as a nonreturnable benefit.  We have

6  specific dollar values associated with that benefit

7  that are in the summary chart under seal I referred to

8  earlier.  And it can be measured by the value of --

9  that harm, that damage can be measured by the value of

10 the benefit in advancing the purposes of the defendant,

11 and that's what Mr. Olsen has done here.

12        And the fraud loss is avoided through

13 modeling using class members' PII, including people who

14 were never cardholders.  They were just applicants.

15 They're using all this data.  We believe that is an

16 appropriate theory of damages for unjust enrichment.

17        THE COURT:  One question I had about the

18 unjust enrichment.  As I understand the theory, it's

19 that somebody provided a benefit for which they have

20 not been compensated.  Correct?

21        MR. SIEGEL:  No.  It's provided a benefit,

22 the retention of which, under the circumstances, is

23 unjust.

24        THE COURT:  Right.

25        MR. SIEGEL:  So that's a little different

1    than looking at the benefit conferred to the plaintiff.
2    It is a -- it's, obviously, a broad spectrum of factual
3    scenarios that may fall under that.  But if the
4    plaintiffs conferred their personal information and the
5    defendants retained that under circumstances for
6    long-term --
7              THE COURT:  That are unjust.
8              MR. SIEGEL:  That are unjust.
9              THE COURT:  In assessing the circumstances,
10   though, you need to consider what the person providing
11   the information received in return.
12             MR. SIEGEL:  I can --
13             THE COURT:  How would you otherwise measure
14   unjustness?
15             MR. SIEGEL:  Yeah.  Well, I think that is a
16   circumstance, sure.  I think that may be in the panoply
17   of circumstances a jury can consider on whether it's
18   just or unjust.  Sure.  And I think, obviously, we
19   think the facts here are going to suggest that that
20   retention is unjust.
21             Disgorgement, it can also be an alternative
22   to the contract remedy.  So where a breach is
23   deliberate -- this is citing a Pennsylvania case, but
24   this refers to the restatement.  If there is a
25   deliberate breach of a contract that results in profit

1  to a defaulting promisor -- in this case, Capital

2  One -- the available remedy -- again, only Capital One

3  has the contract.  So the available remedy -- this

4  would only apply to Capital One -- affords inadequate

5  protection to the promisees' contractual entitlement.

6          So if for some reason there is not a finding

7  of damages with respect to the contract claim, the jury

8  can consider this disgorgement theory as an

9  alternative.  And I do believe it would be an

10 alternative under this particular theory of damages

11 under the contract claim.

12         We provide there the concept of cost savings

13 under the restatement, which is what certainly we have

14 in the case of Capital One in support for our unjust

15 enrichment claim, and how they used plaintiffs' PII for

16 fraud modeling conferring this benefit that was

17 retained unjustly.

18         With respect to this claim against Amazon,

19 the unjust enrichment claim, the Court touched on this.

20 This is slide 156.  Plaintiffs, obviously, directly

21 transacted business with Capital One, but I think the

22 Court understood the claim here that ultimately there

23 was a benefit conferred on Amazon by Amazon's use of

24 that PII.  And, again, Amazon profited, and we have

25 Mr. Olsen providing the profit calculations based on

1  Amazon's retained benefits from retaining plaintiffs'

2  PII and, obviously, a function of its contracts with

3  Capital One.

4          Finally, Your Honor, nominal damages.  So the

5  case I was searching for earlier is *Paulette*, among

6  others.  *Kerns v. Wells Fargo* is probably the key one,

7  818 S.E. 2d 779, which is a Virginia Supreme Court

8  case.  This is the concept that once there is breach,

9  the law infers damage.

10          And so this touches on the standing question,

11  but clearly, if there is a legal threshold to damage,

12  there's Article III standing.  But I don't want to

13  rehash that argument.

14          THE COURT:  All right.

15          MR. SIEGEL:  It is the case I was searching

16  for earlier that I could not come up with when we were

17  talking about this.  So here it is.  It's *Kerns*.

18          The concept here is nominal damages as to the

19  breach of contract claim initially.  This is the

20  minimum recovery if the jury does not accept our other

21  theories of damage but finds breach.  In other words,

22  if they find breach -- if they find we've met the

23  elements but did not -- if they find we've lacked proof

24  in quantifying the damage, we're entitled to nominal

25  damage.

```
 1              THE COURT:  Well, I mean, nominal damages --
 2   and I understand these cases are a little unclear about
 3   exactly what they're talking about.  But as I read
 4   them, I understand nominal damages to essentially be a
 5   default measure of damages in a breach of contract case
 6   for a proven injury.  It doesn't mean you get nominal
 7   damages where there's no injury.  It's where you have
 8   injury that can't be measured or people chose not to
 9   measure.  It's the default measure of an injury.
10              MR. SIEGEL:  Of damage.
11              THE COURT:  Of damage, yes.
12              MR. SIEGEL:  Yes, agreed.
13              THE COURT:  Flowing from an injury.
14              MR. SIEGEL:  Correct.
15              THE COURT:  All right.
16              MR. SIEGEL:  So the concept of nominal
17   damages, again, in this Kerns case where there's a
18   legal right to be vindicated where there has been no
19   actual present or loss of any kind where from the
20   nature of the case some injury has been done but the
21   proof fails to show the amount, which I think is
22   exactly what Your Honor just said --
23              THE COURT:  Right.
24              MR. SIEGEL:  -- that's Kerns.
25              And so, again, we think, you know, this is a
```

1  jury question:  Is there an injury?  And the jury may

2  find, yes, injury, but reject our damages theories.  We

3  hope not.  But if that's the case, we would be entitled

4  to nominal damages at that point as an alternative

5  remedy.

6          And so just the concepts here.  Because this

7  has come up in various arguments on unrelated issues

8  and certainly has been injected as part of the

9  certification question.  The concept of nominal damages

10  in a class action cannot be diminished because there's

11  98 million people.  That would be a plain violation of

12  the Rules Enabling Act, which can't increase or

13  decrease the rights of individuals, and Rule 23

14  wouldn't permit Capital One to attempt to subvert that

15  right, individual right, through Rule 23.

16          So each individual would be entitled to -- if

17  we prove the elements of our contract claim but not

18  this damage to specificity -- a nominal damages for

19  breach of contract -- there are cases all over the map.

20  It's our view -- and we'll ask for $100 per class

21  member.  Again, I think Capital One has objected to

22  that as being somehow outrageous.

23          Again, Your Honor, I would just put it to the

24  Court this way:  $100 per head of people in this room,

25  you know, we're talking about $5,000.  The function of

1  the large numbers, if it's $100 a head and we're at

2  $9.8 billion, that is a function of Capital One's

3  failure to protect this data for this massive group of

4  people.  That's not the plaintiffs' fault.

5          And so individually, even for a nominal

6  damage, $100, which has been accepted by Virginia

7  courts, we would think would be appropriate as an

8  alternative remedy, again, not something that needs to

9  be determined as part of the class certification but

10  something that is surely going to be briefed down the

11  pike.

12          So there are -- there is a basis for nominal

13  damages as well for unjust enrichment.  We've cited

14  cases on slide 159 where, again, if we meet the

15  elements, damages are unproved, then we are in the

16  nominal damages territory with respect to the unjust

17  enrichment claim.

18          Slide 160 provides a similar basis to

19  consider nominal damages with respect to the negligence

20  claim.  Again, I would just ask the Court to look at

21  the *Kerns* case, *Kerns v. Wells Fargo*, the Virginia

22  Supreme Court case, which talks about the concept of

23  nominal damages to vindicate a right where there's --

24  in negligence where no actual loss occurred.  Here,

25  again, we think there has been an actual loss that has

1    occurred, and that's the concept of this royalty value,

2    this rental value that Mr. Olsen has put on behalf of

3    the plaintiff class that makes that injury or damage

4    current and, therefore, appropriate for a negligence

5    theory.

6            I will -- because actual damages are

7    available, all of these damages theories I've just

8    described are available under the state statutory

9    claims -- I won't go through them -- and that begins on

10   161 for detail.

11           The actual damages are available under New

12   York, Washington, California, and CLRA.  All the

13   theories, the theories of loss market value of access

14   to PII, the actuarial present value of the identity

15   theft protection are -- the rental value, I should say,

16   and the actuarial present value of identity theft

17   protection are actual damages available under these

18   state statutory claims and satisfy as well

19   restitutionary claims under California's UCL and CLRA.

20           Finally, the next slide is the same with

21   respect to Amazon.  It includes a Florida statute which

22   was not included in the prior slide.  It excludes the

23   CLRA which was included as to Capital One but otherwise

24   identical with respect to what damages are available

25   under those state statutory claims.

1       So I think I've addressed the predominance

2  issues, as I've gone through here, that defendants have

3  raised.

4       And in my final two minutes, as I'm going to

5  dutifully stay to the Court's limitation here, is the

6  concept of superiority.  So this is under

7  Rule 23(b)(3).  This is a critically important idea,

8  and that is that a class action is the right tool to

9  resolve these issues.

10       So I think the -- and there's elements under

11  Rule 23(b)(3) which should be considered by the Court.

12  But the concept that a class action is superior to

13  having 98 million people come through your doors or

14  even a tiny percentage of that, we think it's

15  unquestionably the right way to resolve these issues

16  for good or ill as to the plaintiff class.  Maybe the

17  defendants will win, but they'll win as to the entire

18  class.  And we just think that is the appropriate way

19  to deal with a case that has this many common issues

20  that will transfer across all 98 million class members.

21       It is also quite clear that under 23(b)(3)(A)

22  that the realistic alternative to a class action is no

23  recovery for these plaintiffs, and we think that is an

24  important consideration.  You can see what is lined up

25  to my right back here.  They have an incredible legal

105

1  team that is fighting this case tooth and nail, and for

2  an individual to do battle against Capital One and

3  their lawyers, it really means there is no alternative

4  to a class action.  That is a consideration under

5  Rule 23(b)(3)(A) and one that the *TD Bank* case we cite

6  on slide 171 talks about.

7          We also satisfy (3)(b) and (3)(c) as

8  superiority concerns.  I think if you look at *TD Bank*,

9  that goes actually through superiority.  It's very

10 similar.  You have a common contract, a form contract,

11 and the issues in *TD Bank* are very similar -- in the

12 certified case, very similar to the issues present

13 here.

14         Finally, certification under 23(b)(2), this

15 is Count 4 for declaratory relief.  That is appropriate

16 under (b)(2) when a party opposing the class has acted

17 or refused to act on grounds that apply generally to

18 the class making final injunctive relief appropriate.

19         The relief here is definite and concrete we

20 are seeking, the injunction we're seeking regarding the

21 protection of this data as to both Capital One and

22 Amazon.  The injunction is not seeking damages.  So

23 there's no question that we're not trying to jam a

24 damages theory into a (b)(2) certification, which

25 sometimes has gotten plaintiffs into trouble.  But it

1  is purely a separate injunctive relief with respect to

2  ensuring the protection of this data on a prospective

3  basis.

4            And our expert describes in great detail what

5  is necessary to satisfy a reasonable security standard,

6  included -- summarized in slide 178 where Professor

7  Madnick explains what is necessary to ensure that this

8  data is protected.

9            Finally, issue certification.  Really

10  finally, I think.  We're close to really finally.

11            Issue certification, we don't -- you know,

12  Rule 23(c)(4) is something we moved under.  We think

13  it's appropriate to certify --

14            THE COURT:  I've seen that.

15            All right.  We're going to go ahead and break

16  for lunch.

17            MR. SIEGEL:  Thank you, Your Honor.

18            THE COURT:  We will start at 2:00 with

19  Mr. Balser.

20            MR. BALSER:  Thank you, Your Honor.

21            THE COURT:  The Court will stand in recess.

22       (Recess from 1:03 p.m. until 2:03 p.m.)

23            THE COURT:  Mr. Balser.

24            MR. BALSER:  Thank you, Your Honor.  David

25  Balser on behalf of Capital One.

 1           I would like to take the Court up on its

 2    invitation to begin argument with a focus on standing,

 3    and I agree with the Court that the issue with standing

 4    is imminently bound up with the class certification

 5    issue.  So I do think it makes sense to spend some time

 6    working our way through the standing issues.

 7           And like Mr. Siegel, we have prepared a

 8    PowerPoint that we think will assist or hope will

 9    assist the Court as we go through the argument.

10           THE COURT:  All right.

11        (Documents are passed up to the Court.)

12           MR. BALSER:  And I'd like to do a deep dive

13    into standing before we turn to the Rule 23

14    predominance arguments and the other Rule 23 arguments

15    that we have.

16           To begin, the eight representative plaintiffs

17    -- and that's really all the Court can focus on here.

18    There's 98 million absent class members, but there's 8

19    representative plaintiffs whose claims are at issue

20    here.  Not one of them has suffered an injury that's

21    sufficient to confer standing for this Court to hear

22    their negligence, statutory and injunctive relief

23    claims under Article III.

24           Plaintiffs' standing is foreclosed by two

25    Fourth Circuit cases, which this Court is now very

1   familiar with.   The *Beck* and *Hutton* cases, as well as

2   the Supreme Court's recent decision in *TransUnion v.*

3   *Ramirez*.   The Court must resolve this challenge to its

4   jurisdiction to hear those claims before addressing any

5   of the other pending motions, including plaintiffs'

6   motion for class certification, because plaintiffs who

7   lack standing cannot pursue claims on behalf of an

8   alleged class.   That's just black-letter law, and

9   plaintiffs' invitation to delay the consideration of

10  the standing issues is inviting error.

11          Fortunately, deciding this jurisdictional

12  question at this stage of the proceedings is a

13  straightforward matter because the record evidence is

14  now established, and it clearly shows that these eight

15  representative plaintiffs have not been injured by the

16  cyber incident.

17          THE COURT:   How does the Court do that?

18  Under a summary judgment standard?

19          MR. BALSER:   It is a summary judgment

20  standard, Your Honor, absolutely.   Could a reasonable

21  juror conclude, based on the evidence, that the

22  plaintiff has shown that it has suffered an

23  injury-in-fact that is traceable to the data breach?

24  That's the standard.

25          THE COURT:   Okay.

1          MR. BALSER:  And it's not a jury question.

2     It's a question for the Court to decide.  The jury

3     doesn't get to decide Article III issues.  It's the

4     Court --

5          THE COURT:  Well, under the summary judgment

6     standard, the issue is whether there's a factual issue

7     or whether there's no genuine issues of disputed fact.

8          MR. BALSER:  No genuine issue of disputed

9     fact from which a jury can conclude the standing.

10         THE COURT:  Right.

11         MR. BALSER:  And I think we all agree on what

12    the summary judgment standard is, and we agree that

13    that is the standard that the Court should apply.

14         THE COURT:  Right.  But those facts under the

15    summary judgment standard are to be viewed most

16    favorably to the plaintiff with all reasonable

17    inferences drawn in their favor.  So if the Court were

18    to conclude, based on that standard, that there's a

19    genuine factual issue, then that would go to the jury?

20         MR. BALSER:  Well, the Court would then have

21    established that the plaintiffs have standing.  We

22    still would have our arguments under Rule 23, and we

23    have a summary judgment motion that's pending.  So we

24    would say, no, it's never going to get to the jury, you

25    know, once the Court takes up our summary judgment

1    issue, but it would have passed the --

2              THE COURT:  All right.  I understand, the

3    standing issue.

4              MR. BALSER:  It would have passed the

5    standing threshold.

6              THE COURT:  All right.

7              MR. BALSER:  So let's be clear what claims

8    we're asking the Court to dismiss under Article III.

9    It's three sets of claims, the negligence claim, the

10   state statutory violations, and the injunctive relief

11   claim.

12             As Your Honor well knows, Article III

13   requires plaintiffs to invoke the jurisdiction of a

14   federal court to establish standing.  Much of the

15   argument that I heard this morning from Mr. Siegel

16   attempts to shift the burden to the defendants to prove

17   that the plaintiffs don't have standing, but that's not

18   the standard.  It's the plaintiffs who have the burden

19   to show standing, and to establish standing, they have

20   to show that they suffered an injury-in-fact that's

21   fairly traceable to the challenged conduct of the

22   defendant and it's likely to be redressed by favorable

23   judicial decision.  We don't contest redressability

24   here.

25             Because discovery has closed, plaintiffs must

1  prove their standing with evidence.  The Fourth

2  Circuit's cases are clear about this fundamental

3  requirement, which descends from the Supreme Court's

4  decision in *Lujan*.  In *Beck*, the Fourth Circuit held

5  that because the plaintiffs had developed a summary

6  judgment record, they were required to prove their

7  standing with evidence and specific facts.

8      We cited the *Libertarian Party of Virginia v.*

9  *Judd* case, which is another Fourth Circuit case that

10 held that following the close of discovery, plaintiffs

11 were required to establish their standing with

12 evidence.  And as Your Honor properly noted, the proper

13 evidentiary standard resembles summary judgment.

14     In the *Department of Commerce v. U.S. House*

15 *of Representatives* case, the Supreme Court held that to

16 proceed to trial, plaintiffs must establish at least a

17 genuine issue of material fact as to each element of

18 their standing.  And as I said before, importantly,

19 this is a threshold consideration that the Court needs

20 to take up.  This means that plaintiffs here are

21 required to make this evidentiary showing at this

22 juncture before this Court considers whether to certify

23 a class.

24     Under the Supreme Court's decision in *Steel*

25 *Company v. Citizens for a Better Environment* , it's not

1    appropriate for district courts to exercise

2    hypothetical jurisdiction over actions where as a

3    matter of fact standing has not been established.

4    Indeed, in the *Rivera v. Wyeth*, this Fifth Circuit case

5    that we've cited in our motion for leave to file

6    supplemental brief on *Ramirez*, the Fifth Circuit held

7    that it was reversible error to certify a class where

8    the named plaintiffs clearly lack standing.  We cited

9    both of those cases, both *Rivera* and the *Steel Company*

10   case in our papers.

11          As I'm going to discuss in a little more

12   detail here in a minute, no class should be certified

13   in this case in any event, but the Court shouldn't even

14   reach that issue and inquiry until it assures itself

15   that it has jurisdiction over the claims of the named

16   plaintiffs.

17          So how does the Court make that

18   determination?  Fortunately, the Fourth Circuit has

19   provided ample guidance on this.  It is twice

20   considered in the context of claimed data breaches

21   whether plaintiffs have standing.  *Beck* and *Hutton* both

22   make clear that the mere compromise or theft of data

23   fails to satisfy the injury-in-fact requirement of

24   Article III.  I'll get into the facts of those cases in

25   a little more detail in a minute, but the upshot of

1   *Beck* and *Hutton* is that plaintiffs cannot establish

2   standing based on the mere fact of a data breach.

3        As the Court well knows and we briefed, the

4   Supreme Court recently considered standing in the

5   *TransUnion* v. *Ramirez* case.  There the court affirmed

6   the fundamental requirement that plaintiffs must prove

7   a concrete injury-in-fact to invoke the jurisdiction of

8   a federal court.  Justice Kavanaugh writing for the

9   court said not once but twice, no concrete harm, no

10   standing.

11        The Supreme Court held in that case that

12   plaintiffs do not have Article III standing to seek

13   damages based only on a future risk of harm.  That is

14   clear from *Ramirez*.  The court recognized as persuasive

15   *TransUnion*'s argument that in a damages suit -- and I

16   quote -- The mere risk of future harm, standing alone,

17   cannot qualify as a concrete harm.

18        The court adopted that reasoning as the basis

19   for its decision when it said, Here the 6,332

20   plaintiffs did not demonstrate that the risk of future

21   harm materialized.  Therefore, their damages claims,

22   based on an unasserted risk of future harm, is

23   unavailing.

24        Thus, the real risk of harm under *Ramirez* --

25   the risk of real harm must either materialize into an

1   actual harm or cause some independent harm to occur in

2   order to confer standing.

3           THE COURT:  The Court in *Hutton* distinguished

4   *Beck* on the grounds that in *Beck* all there was was the

5   theft of a computer that happened to have personal

6   information on it and distinguished *Beck* from the

7   allegations in *Hutton* that there was a targeted hack

8   for the purposes of obtaining personal information.

9   The court, I believe, said for the purposes of

10  establishing plausibility, you could reasonably infer

11  that somebody who targeted personal identification did

12  so with the intent to use it in some fashion.  It was

13  really on the basis of that, I think, that they said

14  you can infer plausibly actual harm for the purposes of

15  Article III standing.

16          What's unclear to me is whether the

17  reasonable inference is still reasonable in light of

18  what *Ramirez* has to say.

19          MR. BALSER:  It may not be, and I think it's

20  a really good question.  I think that, you know, there

21  are a couple of differences between *Hutton* and *Ramirez.*

22  *Hutton* was decided on pleadings.  It was a facial

23  challenge, not a factual challenge.  And *Ramirez*

24  certainly occurred after a full evidentiary hearing.

25          But I do think, you know, in *Ramirez*, even

1  if -- like, to take the facts of our case, I mean, even

2  if the plaintiffs could prove there is dissemination of

3  the data, which they haven't, I don't think that gets

4  them far enough under *Ramirez*.  Whereas under *Hutton*,

5  it might have.  So I think there may be some curtailing

6  of the rationale in *Hutton* by *Ramirez*.  I think *Hutton*

7  actually helps our case, even though the Court found

8  standing there, because I think it shows what a

9  plaintiff would have to show to satisfy traceability.

10 The facts of that case were really pretty compelling at

11 least as alleged.

12          In that case, there were members of an

13 optometry association who over a course of years had

14 provided PII, including name, date of birth, social

15 security number, in order to take the optometry exam to

16 get licensed.  And what started happening is a number

17 of these people, all of whom were members of this

18 association who had provided that information, all

19 started getting false Visa cards opened in their own

20 names.  Some of those names were maiden names that had

21 been provided only to the optometry association 20

22 years ago.

23          And so when you look at the facts as alleged

24 there, the court, I think, correctly found that

25 traceability had been met.  That's a far cry from the

1    circumstances that we have here, and I'm going to go

2    through the individual plaintiffs in a little bit of

3    detail here to show the differences.

4         But I do agree with Your Honor that I think

5    *Ramirez* is a game changer, and I do think that fairly

6    read, the rationale in *Hutton* may no longer hold up

7    under *Ramirez* where future risk of harm is just clearly

8    insufficient to support standing.

9         THE COURT:  Well, that's the issue.  Can you

10   establish Article III standing in the absence of

11   materialized harm based on the threat no matter how

12   substantial?

13        MR. BALSER:  I think the answer is clearly no

14   after *Ramirez*.  I just think the answer is no.  And I

15   think there's other *indicia* in *Ramirez* that supports

16   that conclusion.  For example, the court in *Ramirez*

17   made clear that courts are not permitted to redress

18   legal violations absent concrete harm.  There was that

19   great quote that Justice Kavanaugh used from the

20   *Casillas* case that Justice Barrett had written when she

21   was on the Seventh Circuit which said that Article III

22   grants federal courts the power to redress harms that

23   defendants cause plaintiffs, not a freewheeling power

24   to hold defendants accountable for legal infractions.

25        Without proof of an injury-in-fact, this

1    Court cannot award plaintiffs damages here by holding

2    Capital One accountable for some legal infraction that

3    caused no harm.  I mean, I think they're absolutely

4    clear.  You have got -- it has to be a concrete

5    particularized materialized harm in order to meet the

6    standard for Article III.

7           So I think the key takeaways under *Ramirez*

8    are a plaintiff has to have suffered concrete harm to

9    have standing to seek damages.  The mere risk of harm

10   is not concrete under *Ramirez*, and federal courts don't

11   have some freewheeling power to correct a violation of

12   law divorced from actual injuries.  That's what the

13   court says.

14          So before I get further into the core

15   Article III arguments and apply them to the facts here,

16   I do want to address the plaintiffs' arguments on

17   *Ramirez*, some of which Mr. Siegel made this morning,

18   some of which were in the briefs.

19          THE COURT:  All right.

20          MR. BALSER:  In a recently filed supplement

21   brief and some this morning, the plaintiffs have tried

22   the gloss over *Ramirez* with three incorrect arguments

23   that are unsupported by that opinion.  This is what

24   they rely on to try to get by *Ramirez*.

25          First, they argue that they have standing --

1   this is their argument -- that they have standing to

2   assert their negligence claim because it arises under

3   common law.  That's their argument.  The second one is

4   they have standing because they seek damages.  And

5   their third argument -- and I want to spend some time

6   on this because Mr. Siegel spent quite a bit of time on

7   it -- they say that this Court should assume standing

8   because the issue is intertwined with the merits.  Each

9   of these arguments is wrong, and I want to just briefly

10  address each of them in turn.

11          So let's start with this theory about

12  common-law right.  First, the plaintiffs incorrectly

13  argue that they've established standing by merely

14  alleging the violation of a common-law right as opposed

15  to a statutory right.  Asserting a common-law right

16  does not automatically grant standing.  *Ramirez* did not

17  hold that, and no other Supreme Court case has either.

18          In fact, *Ramirez* states an injury-in-law is

19  not an injury-in-fact, and they go on to say that in a

20  suit for damages, the mere risk of future harm,

21  standing alone, cannot qualify as a concrete harm.

22  *Ramirez* simply does not limit the concrete harm

23  requirement to statutory violations.  Plaintiffs'

24  negligence claim here alleges only an injury-in-law.

25  That is not sufficient for standing.

1                Now, plaintiffs have not cited a single case,

2       not one, applying this theory of standing, which would

3       mean that plaintiffs would always have standing to

4       assert any tort claim.   *Hutton* forecloses that theory.

5       There the Fourth Circuit held that plaintiffs had

6       standing to sue for negligence but only after

7       painstakingly analyzing whether they had, in fact,

8       alleged an injury-in-fact.

9                In fact, if we put up on the slide here the

10      entire opinion in *Hutton*, two pages of that opinion

11      were devoted to analyzing whether there was an

12      injury-in-fact sufficient to support standing.   In

13      plaintiffs' view of standing, that was an unnecessary

14      analysis.

15               And as we talked about a minute ago, the

16      plaintiffs in *Hutton* had standing or were found to have

17      standing because they had alleged actual fraud and had

18      tied that fraud to the only common source of the

19      plaintiffs' data; that is, they alleged that the injury

20      was traceable to the defendant.

21               I think it's just worth noting that this

22      argument would apply only to the negligence claims in

23      any event and not to the state statutory claims, which,

24      of course, are not common-law rights.

25               I think it's also important to note on this

120

1   theory of, you know, because we've alleged negligence,

2   we get into federal court, courts in data breach cases,

3   both within the Fourth Circuit and outside, routinely

4   dismiss negligence claims for lack of standing.  On

5   this slide here that we have, we've listed ten cases,

6   all of which are data breach cases, that were dismissed

7   by courts for failure to plead or prove standing in

8   data breach cases.  At least two of those cases were

9   affirmed on appeal by the Eighth Circuit and the Third

10  Circuit.

11          In contrast, plaintiffs have not cited a

12  single case adopting their novel theory of standing

13  under which a plaintiff can always assert any

14  common-law claim in federal court even if they were

15  uninjured.  They rely on a couple of cases, each of

16  which is in apposite.  The one I like the most is the

17  *Whittemore v. Cutter* case.  That's a 208-year-old

18  patent case.

19          Even if that case suggests that legal

20  violations are injuries -- and I invite the Court to

21  read that opinion and see whether the Court can find

22  that inference anywhere in there -- *Ramirez* says the

23  opposite.  *Ramirez* is clear that an injury-in-law is

24  not an injury-in-fact.

25          They rely on the *FMC Corp. v. Boesky* case,

1   which is a Seventh Circuit case.  That was a case that

2   dealt with common-law actions that do not require a

3   proof of injury, like fiduciary duty claims, and they

4   say so in that decision.  That case does not hold that

5   plaintiffs can seek compensatory damages under a

6   negligence theory without proving that they've been

7   harmed.

8          Plaintiffs also rely on Justice Thomas'

9   concurrence in *Spokeo*.  Of course, a concurrence is not

10  the law.  The *Spokeo* majority held that to establish an

11  injury-in-fact, a plaintiff must show that he or she

12  suffered an invasion of a legally protected interest

13  that is concrete and particularized.  That's two

14  separate inquiries.  The law asked whether there's been

15  a legal invasion, and the second question is whether

16  that invasion is concrete.  The upshot is that legal

17  invasions are not always concrete.

18         They cite the *Servicios* case, which is a

19  breach of contract case, and it does not hold that

20  negligence claims can proceed without proof of injury.

21  They cite the Supreme Court's decision in the

22  *Uzuegbunam* case.

23         Easy for me to say.  Good luck with spelling

24  that one, Ms. Montgomery.

25         That case involved a constitutional violation

1  which is clearly an injury-in-fact.  The court's

2  opinion in that case was limited to nominal damages and

3  redressability.  It says nothing about whether

4  uninjured plaintiffs have standing to claim

5  compensatory damages for negligence.

6         They mention in a footnote in their *Ramirez*

7  brief that they would still have standing

8  notwithstanding *Ramirez* because the harm they allege is

9  similar to disclosure of private information, which the

10  Supreme Court recognized in *Ramirez* as a common-law

11  harm.  There's a reason that one is in the footnote,

12  not in the text of their brief.  Capital One did not

13  disclose plaintiffs' information here.  The information

14  was stolen from Capital One, and much of the

15  information at issue here was already public anyway, as

16  the Court knows.  There is no common-law liability and

17  analogous circumstances, and *Ramirez* does not suggest

18  otherwise.

19         This theory is also foreclosed by *Beck* and

20  *Hutton*.  *Ramirez* does not overrule or abrogate those

21  cases except, I think, as Your Honor pointed, that some

22  of the reasoning in *Hutton* about traceability might not

23  still be good law after *Ramirez*.  I think *Ramirez* does

24  go farther than *Hutton* did, but those cases clearly

25  hold that mere exposure of data does not create

1  standing.  Certainly, those holdings have only been

2  reinforced by *Ramirez*, not stirred by it.

3         The next argument is a really interesting

4  one.  They argue that because they allege damages, they

5  automatically get into federal court.  But a claim for

6  money damages does not mean that plaintiffs have

7  suffered a monetary injury.  Plaintiffs cite no case

8  adopting that extreme position.  Although *Ramirez* did

9  recognize that monetary injuries are classic harms in

10  common law, it does not follow that a mere allegation

11  of money damages is enough to establish standing.

12         Plaintiffs' argument conflates damages, which

13  is an element of their negligence claim, with injury,

14  which is what Article III requires.  The fact that a

15  plaintiff seeks money damages for a noninjury does not

16  morph the noninjury into an injury-in-fact, and *Ramirez*

17  suggests as much when the court said the mere risk of

18  future harm, without more, cannot qualify as a concrete

19  harm in a suit for damages.  The allegation of damages

20  itself is not a concrete harm.  Otherwise, plaintiffs

21  could get into federal court with only frivolous

22  damages allegations, and that's not the law.

23         They argue quickly and briefly about

24  mitigation expenses.  They argue that the claim for

25  mitigation expenses saves the risk of harm theory, but

1    mitigation expenses are not analogous to the separate
2    concrete harms identified by the Supreme Court in
3    *Ramirez*.   They simply don't have a common-law cause of
4    action based only on mitigation expenses, let alone
5    mitigation expenses that are incurred in response to a
6    nonimminent risk, which have clearly been foreclosed by
7    both *Clapper* and *Beck*.

8            Here is the argument I want to spend the most
9    time on that they made, which is this argument about
10   the standing issue being intertwined with the merits.
11   Basically, what plaintiffs are asking the Court to do
12   is kick the can down the road on standing because these
13   issues are intertwined.   But if plaintiffs cannot show
14   a genuine issue of material fact as to their
15   standing -- and they cannot -- then dismissal for lack
16   of jurisdiction is required and plaintiffs cannot
17   proceed to trial on those claims.   That's the teaching
18   of the Supreme Court's *Department of Commerce* case.

19           Plaintiffs' argument that this Court can
20   assume jurisdiction is not the law in a case that is
21   proceeded through discovery where plaintiffs must prove
22   their standing with evidence.   In addition to *Beck* and
23   *Libertarian Party of Virginia*, which we discussed a few
24   minutes ago, the Fourth Circuit in this *Baehr v. Creig*
25   *Northrop Team* case quoted the Supreme Court's decision

1   in *Lujan* for the proposition that plaintiffs -- and I
2   quote -- are obliged to set forth by affidavit or other
3   evidence specific facts that when taken as true
4   establish each element of Article III standing.
5           This next slide, Your Honor, I think is the
6   most important one.  Tellingly, the only cases that
7   plaintiff cite are cases that were decided at the
8   pleading stage, which we are far past.  You asked
9   Mr. Siegel, and I wrote it down:  Can I consider these
10  issues, these fact issues now?
11          And Mr. Siegel said:  No, you can't
12  because -- and he cited you to the *Blackbaud* case.  The
13  *Blackbaud* case is dispositive, he said.
14          That's a Rule 12(b)(1) case that was decided
15  on the pleadings.  There's not one case that they cite
16  that is not a facial challenge at the 12(b)(1) stage.
17  The time to decide whether the Court has jurisdiction
18  is now, not sometime in the future.
19          Plaintiffs have had two years of discovery to
20  come up with evidence that they've been harmed, and
21  they haven't been able to do it.  Discovery is closed.
22  Cross-motions for summary judgment are on file, and the
23  law is clear that plaintiffs have to prove their
24  standing with evidence.  Plaintiffs argument to the
25  contrary is just incorrect.

1            Having taken the *Ramirez* issues off the

2    table, I want to just quickly address the core

3    Article III arguments.  And the Court is familiar with

4    *Beck* and *Hutton*.  I'm not going to belabor the cases,

5    but you know, the Fourth Circuit in *Beck* clearly held

6    that the mere theft of plaintiffs' data, without more,

7    cannot confer Article III standing.

8            And I know Your Honor knows this, but I think

9    it's worth pointing out here that unlike in the vast

10   majority of data breach cases Mr. Siegel has been

11   involved in and I've been involved in and others in

12   this room have been involved in, the perpetrator here

13   is in custody.  Her electronic devices have been

14   seized.  The stolen Capital One data has been recovered

15   and remains in the custody of the FBI.  Critically,

16   there's no evidence that the stolen information has

17   been disseminated or misused in any way.

18           I think maybe the most important -- I mean,

19   just a key, key fact is, you know, they rely on this

20   purported expert, Kevin Mitnick, the former criminal

21   hacker who -- I don't know if they knew this or not

22   before his deposition, but he blurted out in his

23   deposition that he had looked for the Capital One data

24   on the dark web but couldn't find it.  And you don't

25   have to take my word for it.  We have the clip, and

1  it's really worth watching.  It's two minutes at the

2  most.

3           THE COURT:  Go ahead and play it.  I've read

4  the transcript.  Go ahead.

5       (A video is played.)

6           MR. BALSER:  That's their expert, not ours.

7  They looked.  They couldn't find it.  The evidence here

8  shows nothing more than a mere compromise of the data,

9  which under *Beck* is insufficient to afford standing.

10 If plaintiffs' data was not disseminated, it could not

11 have been used to commit a fraud.

12          But I think to Your Honor's point, you know,

13 a few minutes ago, even if the plaintiffs had evidence

14 that Thompson disseminated the stolen data, plaintiffs

15 could not establish standing based on some unspecified

16 risk of fraud in the future.  I think that's what

17 *Ramirez* holds.  That risk-based theory of standing is

18 out after *Ramirez*.

19          Plaintiffs' only avenue for establishing

20 standing would be to prove that they suffered identity

21 theft traceable to the cyber incident, and the record

22 conclusively shows that the frauds that the plaintiffs

23 alleged were not committed with Capital One data.

24          The second standard -- and I know the Court

25 is familiar --

1          THE COURT:  Mr. Siegel centrally disputes

2   that.  He says that there is sufficient evidence from

3   which the inference of traceability can be made.

4          MR. BALSER:  We'll look at it.  We'll look at

5   it for each plaintiff very quickly.

6          THE COURT:  All right.

7          MR. BALSER:  I don't want to belabor it, but

8   we'll go through them one by one.

9          THE COURT:  All right.

10          MR. BALSER:  The second thing that

11  Article III requires is traceability.  The traceability

12  inquiry here completely debunks the plaintiffs' claims

13  of actual identity fraud.

14          The Fourth Circuit held in *David v. Alphin*

15  that Article III requires a fairly traceable connection

16  between the alleged injury-in-fact and the alleged

17  conduct of the defendant.  We've already talked about

18  *Hutton*.  I'm not going to rehash the facts there, but I

19  think the most important part of the *Hutton* holding is

20  the traceability portion of that opinion where the

21  court permitted standing on the 12(b)(1) challenge

22  because the allegations were that the defendant was the

23  only common source that collected and continued to

24  store the exact information that was required to commit

25  the fraud that the plaintiffs experienced.

1          Thus, here, to prove that actual fraud was

2     traceable to the cyber incident, which post *Ramirez* is

3     the only way plaintiffs could have standing to seek

4     damages, plaintiffs must show that the stolen data has

5     already been misused and that the instances of fraud

6     that they claim to have suffered could have been

7     committed using the data stolen in the cyber incident.

8          Seven of the eight representative plaintiffs

9     here claim to have suffered actual fraud as a result of

10    the cyber incident.  As an initial matter, for the

11    reasons I've already discussed, these frauds are not

12    traceable to the cyber incident because the data was

13    not disseminated.  If Thompson herself didn't commit

14    fraud and there was no dissemination, then the data,

15    obviously, cannot be used to commit fraud.

16         Moreover, as we explained in our motion and

17    I'm going to go through in a minute, Your Honor --

18         THE COURT:  The one that hasn't is Hausauer?

19         MR. BALSER:  I'm sorry?

20         THE COURT:  The plaintiff that hasn't claimed

21    actual fraud is Hausauer?

22         MR. BALSER:  Correct.

23         Each specific instance of fraud alleged by

24    plaintiffs would have required data that was not

25    exfiltrated in the breach.

1              So I promised you we would do this.  Let's

2    look at each plaintiff:

3              So Brandi Edmondson alleged that there were

4    Amazon charges placed on her Capital One card and that

5    she had unemployment benefits filed with the Texas

6    Workforce Commission.  In order for those frauds to

7    have occurred, she would have needed to have credit

8    card information and a social security number

9    exfiltrated in the breach, but that information was not

10   stolen as to Ms. Edmondson.

11             Next, Plaintiff Emily Gershen.  Her alleged

12   fraud was attempted account openings at various banks

13   and an attempt to transfer money from her Charles

14   Schwab account.  Again, social security number and

15   Charles Schwab information which were required to

16   commit that fraud were not stolen in the cyber

17   incident.

18             THE COURT:  So what establishes the need for

19   the social security number in the record?

20             MR. BALSER:  I'm sorry, Your Honor.  Oh,

21   that's identity fraud.  So in order for someone to take

22   over someone's identity and attempt to open a new

23   account, you would have to have their social security

24   number.

25             THE COURT:  That's reflected where in the

 1  record?  Is that in an affidavit, or is that in

 2  testimony?

 3          MR. BALSER:  I can find a cite for Your

 4  Honor.  My team will help me do that.

 5          THE COURT:  All right.

 6          MR. BALSER:  Sara Sharp, she alleged that she

 7  had a $100 debit against her account and that a Kohl's

 8  account was opened in her name.  Again, the information

 9  necessary to commit those frauds was not stolen in the

10  cyber incident.

11          Mr. Spacek alleged fraudulent activity on his

12  BB&T account.  That activity occurred prior to the

13  cyber incident and, of course, could not be traceable

14  to the incident since it occurred before the cyber

15  incident.

16          Caralyn Tada, she alleges attempted and

17  successful fraudulent charges on her credit union

18  account and accounts opened at various retailers.

19  Again, the information necessary to commit those frauds

20  was not taken in the data breach, not stolen as to

21  Ms. Tada.

22          Gary Zielecke alleged a problem with his

23  phone number, attempted charges on his Capital One

24  card, and a line of credit opened in his name at

25  Synchrony Bank.  Again, the information necessary to

132

1    commit these frauds was not stolen in the cyber

2    incident.

3            And as Your Honor noted, Brandon Hausauer

4    does not even claim identity fraud that would be

5    traceable to the breach.

6            So, again, when you look at this, the only

7    people you can look at are people who sued us, the

8    eight people who are representative plaintiffs here,

9    and none of these people has suffered a fraud that's

10   attributable, directly traceable to the cyber incident.

11    Accordingly, they cannot show injury or traceability,

12   and they have no standing.

13           So facing these headwinds, plaintiffs offer

14   several legal arguments and factual arguments, none of

15   which is persuasive.  I want to start with the legal

16   arguments, and I'm going to briefly address the factual

17   arguments.  Your Honor picked up on several of those

18   earlier today.

19           The first argument -- they argue four things.

20   They argue that Olsen's access theory of injury does

21   not depend on dissemination.  So it doesn't matter if

22   the data wasn't disseminated under Olsen's theory.

23   They argue that they have standing because the data

24   could have been enriched, and that's Mitnick's opinion.

25   They say they have standing based on incurrence of

1    their mitigation expenses, and they argue that they've

2    shown a risk of imminent harm sufficient for injunctive

3    relief.

4            So let's start with this access theory of

5    Olsen.  What plaintiffs argue is that, based on

6    Mr. Olsen's opinion, plaintiffs should be awarded the

7    value of Paige Thompson's access to their data.  They

8    argue that -- and I quote, this is from their brief --

9    that the plaintiffs were injured the moment the hacker

10   exfiltrated their PII.

11           But equating access with injury is no

12   different than equating the mere compromise of

13   plaintiffs' personal information with injury, which the

14   Fourth Circuit has squarely rejected in *Beck* and

15   *Hutton*, which we've discussed extensively.  To

16   reiterate, those cases hold that mere compromise of

17   data is not an injury-in-fact.  This forecloses

18   plaintiffs' argument that they were injured at the

19   moment of Thompson's access.

20           The logical extension of plaintiffs' argument

21   about Olsen's theory is that plaintiff would always

22   have standing to sue for a data breach.  No court has

23   accepted that position.

24           Their second argument is that the possible

25   enrichment of plaintiffs' data can confer standing.

1  But as a matter of law, Mr. Mitnick's enrichment theory

2  is not traceable to the cyber incident because it

3  relies on data that's not stolen from Capital One.

4  That theory requires several compounding speculative

5  assumptions.

6          There's really four of them.  The first

7  assumption is that the stolen data is available to bad

8  actors, but that's contrary to all record evidence.

9  The second assumption is that a bad actor would target

10  one of these eight plaintiffs as opposed to one of the

11  98 million other putative class members, and then that

12  the bad actor would commit an intermediate criminal

13  offense to enrich that plaintiffs' data and then that

14  the bad actor would misuse the enriched data to commit

15  fraud that causes harm to these plaintiffs.

16          The *Clapper* court had a great quote I think

17  is apt here.  They said that this is a highly

18  attenuated chain of possibilities that the Supreme

19  Court held in *Clapper* fails to establish standing.

20          There's a great quote in the Third Circuit

21  case of *Reilly v. Ceridian Corporation* -- this is a

22  data breach case -- where the Third Circuit found that

23  there was no standing.  And what they said in that case

24  was similarly, we cannot now describe how appellants

25  will be injured in this case without beginning our

1   explanation with the word "if."  If the hacker read,

2   copied, and understood the hacked information and if

3   the hacker attempts to use the information and if he

4   does so successfully, only then will appellants have

5   suffered an injury.

6            So too here.  It's impossible to trace

7   plaintiffs' allegations f actual fraud to Thompson's

8   stolen data without a similar string of hypothetical

9   ifs.  As a result, plaintiffs' enrichment theory cannot

10  meet the traceability test.  Moreover, enrichment would

11  show, at most, that plaintiffs were at risk of identity

12  fraud in the future, which, as we discussed, is

13  insufficient for standing after *Ramirez*.

14           We've talked about mitigation expenses some,

15  but we haven't talked about their new theory about

16  mitigation expenses, which is they argue that

17  mitigation expenses alone can constitute an

18  injury-in-fact as long as the perceived risk of harm

19  was objectively high at the time they were incurred.

20  That is a construct created by the plaintiffs.  That's

21  not the law.

22           In *Clapper*, the Supreme Court held that where

23  the harmed plaintiffs seek to avoid is not certainly

24  impending, any cost incurred as a reasonable reaction

25  of that risk of harm cannot confer Article III

1   standing.  No court has adopted plaintiffs' hindsight

2   theory of mitigation damages, and the theory is further

3   undermined by *Ramirez*, which limited *Clapper* to the

4   context of injunctive relief only.

5          THE COURT:  This gets back to my earlier

6   comment and question; that is, from your perspective

7   there's no level of future risk absent materialized

8   harm that would satisfy standing after *Ramirez*?

9          MR. BALSER:  I don't think so.  I think the

10  answer is no.  I think that it has to materialize or it

11  has to create another harm that was identified in

12  *Ramirez* as a common-law harm that could support

13  standing.

14         THE COURT:  But what if in this case -- and

15  this is making up facts that's not in the record.  But

16  let's say the evidence was Paige Thompson, instead of

17  saying what she did, she said, Before you got me, I was

18  able to exfiltrate it out.  There are any number of

19  people that have it out there, people who I know want

20  this information.  I would expect they're going to use

21  this information.

22         Instead of Mitnick saying his people couldn't

23  find anything, he says, I went on the dark web.  It's

24  out there.  I can find it.  If I wanted to use it

25  malevolently, it would be an easy thing to do.

1            Do you think those kinds of facts in the

2  absence of an actual materialized harm would be enough?

3            MR. BALSER:  I don't think for a damages

4  claim it would.

5            THE COURT:  Well, for standing.

6            MR. BALSER:  I don't think it would -- I

7  don't think that would rise to the level of standing

8  for a damages claim.  It might change the calculus on

9  imminent risk of harm for injunctive relief.  I think

10  if you read *Ramirez*, just the plain language of

11  *Ramirez*, I think a risk of harm has to materialize and

12  become concrete before it can support a claim for

13  damages.

14            Again, it's -- of course, those aren't our

15  facts, and I think your hypothetical is certainly, you

16  know, different.  It would be a little more

17  challenging, but those aren't our facts.  But even

18  under those facts, unless the harm is concrete and

19  particularized and it's materialized, that wouldn't be

20  enough.

21            Now, in your hypothetical, if, for example --

22            THE COURT:  Let me ask:  During that interim

23  situation from the risk until something has

24  materialized, are the statutes even operating, the

25  statute of limitations?  So that if somebody five years

1  out can prove -- ten years out can prove that their

2  identity was stolen and it's reasonably traceable back

3  to this data breach in 2019 --

4          MR. BALSER:  It's a great question.  It would

5  depend on each state.  I think accrual statutes on when

6  a statute begins to run, whether it's first notice of

7  potential harm or whether actual injury, would create

8  the accrual.  So I don't -- I think it would depend.

9          Coming back to your hypothetical, I think

10  there are ways, for example, that standing for damages

11  could occur in your counter-factual hypothetical on

12  this -- it's out there and everybody knows it's out

13  there, but nothing has happened yet.  If someone, for

14  example, alleged some kind of emotional distress as a

15  result of that, which isn't alleged here, I think that

16  is the kind of harm that could support standing under

17  *Ramirez*.  But for a claim for damages for misuse of the

18  information, I don't think the fact that it's out there

19  but not yet misused would support standing for a claim

20  for damages under *Ramirez*.

21          THE COURT:  All right.

22          MR. BALSER:  So let's talk about injunctive

23  relief.  Post *Ramirez* plaintiffs' risk of future harm

24  argument can, as a matter of law, only support standing

25  to seek injunctive relief.  This is what we were just

1    talking about.  But they can't meet that standard here.

2              Under *Griffin v. Department of Labor*, which

3    is a Fourth Circuit case from 2019 that we cite, the

4    Fourth Circuit said that an injury should be certainly

5    impending to serve as the basis for standing and to sue

6    for injunctive relief.

7              In *Beck*, interestingly, the Fourth Circuit

8    held that there was no standing to seek an injunction

9    even though the defendant hospital in that case had

10   suffered at least 17 data breaches after the 1 that

11   gave rise to the plaintiffs' lawsuit.  The court there

12   said that the most that can be reasonably inferred is

13   that plaintiffs could be victimized by a future data

14   breach.

15             To get an injunction, plaintiffs have to show

16   a sufficient likelihood that they will, again, be

17   wronged in a similar way.  Plaintiffs can't even prove

18   that they've been harmed by this breach, let alone that

19   they're at imminent risk of suffering harm from another

20   one.  And so they shouldn't -- the Court should find

21   that they don't have standing to assert an injunction

22   claim.

23             So none of plaintiffs' legal arguments hold

24   up.  So now what do the plaintiffs resort to?  With the

25   law clearly against them, they've attempted to create

1  several factual disputes based on things like

2  Thompson's social media posts, these grassy knoll

3  second shooter theories, and other outlandish

4  speculation.

5          They try to create several factual disputes.

6  I would start -- I do want to touch on them because

7  Your Honor had focused on those and asked Mr. Siegel

8  some questions about them this morning.  But I will

9  note at the outset:  Based on the charts that we looked

10 at with respect to each of those plaintiffs, it doesn't

11 matter.  I mean, they could have a factual dispute on

12 some of these, but it wouldn't be one from which a jury

13 could conclude that any of these plaintiffs suffered a

14 harm that's directly traceable to the data breach for

15 all the reasons we looked at with respect to each of

16 those.

17         My team has given me the answer to Your

18 Honor's question.  Exhibit 11 to our standing motion,

19 which is the supplemental report of Rebecca Kuehn,

20 K-U-E-H-N, at pages 20-23 goes through each plaintiff

21 and addresses the data that would be needed for those

22 harms to have been committed.

23         THE COURT:  All right.

24         MR. BALSER:  So let's talk just very briefly

25 about these factual disputes.

1              Thanks, Guys.

2              So the first is she shared information on

3    Twitter.  I do want to correct one misstatement that

4    Mr. Siegel made this morning.  She did not put the

5    exfiltrating information on GitHub.  What she put on

6    GitHub were purported instructions on ways to attack

7    our website, not the data itself was loaded there.

8              So she made all of these statements about

9    what she might do and what she could do.

10             THE COURT:  So it wasn't instructions on how

11   to access the data that she had taken separate and

12   apart from hacking the system again?

13             MR. BALSER:  She shared the instruction on

14   how to download the S3 buckets from Capital One's

15   cloud.

16             First, I'd say all the statements are

17   inadmissible hearsay.  But in any event, those

18   statements show, at most, that Thompson thought about

19   disseminating the data, had ideas about disseminating

20   the data, but no jury could reasonably conclude from

21   only those statements that Thompson did, in fact,

22   disseminate the data.

23             THE COURT:  This is between March and July,

24   right?

25             MR. BALSER:  That's right.

142

1            Let's talk about the criminal case.
2    Plaintiffs point to several facts that, at best, invite
3    speculation into what Thompson might have done or might
4    do.  They say that the data was in a format that was
5    easily searched and readable.  They say her trial has
6    been continued five times.  The government's
7    investigation is continuing.  She's got a cell phone,
8    and she's out on bail.  And they point to the
9    superseding indictment, which we'll talk about in a
10   minute.  But none of this shows that Thompson used the
11   data for fraud or that plaintiffs are at imminent risk
12   of harm, which post *Ramirez* can only give standing for
13   injunctive relief anyway for the reasons we've talked
14   about.
15           So let's talk about the superseding
16   indictment because Mr. Siegel mentioned that this
17   morning and alluded to it.  I think it is important and
18   interesting to look at:  What did happen in the
19   superseding indictment?  We have this on the slide.
20   The superseding indictment actually underscores that
21   plaintiffs lack standing.
22           So they've now been investigating her crimes
23   for nearly two years, and they've charged her only with
24   possession and attempted use.  They have not charged
25   her with actual use, only possession, and we knew that

1  from the beginning, that she possessed it.  But if the

2  government could have proven that she used it or

3  transferred it, they would've, and they only allege

4  that she possessed it, again, which we've known.  So

5  there's nothing new there other than they brought

6  enhanced charges, but they didn't charge her with use

7  or transfer, which would have given them enhanced

8  penalties if they had been able to prove it.

9          So let's talk for a second about Mr. Mitnick

10  and the burden.  I heard Mr. Siegel say today, this

11  morning, that plaintiffs said we can't prove that the

12  data wasn't disseminated, but it's not our burden to

13  show that.  It's their burden to show that they have

14  standing.

15          You know, they now try to characterize

16  Mr. Mitnick's search as inconclusive or superficial,

17  but no matter how they characterize his search, he

18  didn't find any evidence of it on the dark web.  And

19  plaintiffs, in their own words, can only speculate that

20  others may have the data even if it's not on the dark

21  web.  And under *Ramirez*, that's just not enough to

22  confer standing for a damages claim.

23          In addition, I heard Mr. Siegel say something

24  this morning about Mr. Mitnick opining that the

25  plaintiffs here had been injured.  But in addition to

1    lacking any evidence of dissemination, Mitnick also

2    made clear in his deposition that he is not offering

3    any opinions on whether any of the representative

4    plaintiffs suffered any specific incident of fraud or

5    identity theft as a result of the cyber incident.

6             Again, as Your Honor has repeatedly

7    questioned today, the issue isn't just injury.  It's

8    also traceability, and they have no evidence of either.

9             I am not going to spend a lot of time on this

10   second intruder theory, but they assert this, what we

11   call the grassy knoll theory.  It's a disputed issue of

12   fact as to whether Thompson was the sole attacker.

13   They have absolutely no evidence, zero evidence, that

14   there was a second intruder.  They haven't even

15   conducted their own forensic investigation.  Rather,

16   the so-called disputed evidence that they point to is

17   actually the absence of evidence.  They say there's no

18   way to be certain that there wasn't another intruder

19   given the absence of some of the ModSec WAF logs.  But

20   this is based on plaintiffs' and Dr. Madnick's

21   misunderstanding of logs with which he admitted he had

22   no experience.

23            In fact, Capital One maintained a

24   comprehensive set of logs, which are called the Cloud

25   Trail logs.  Capital One indefinitely retained those

 1   Cloud Trail logs, and they are duplicative of the

 2   ModSec WAF logs.  The ModSec WAF logs would not have

 3   shown any additional exfiltration activity that's not

 4   reflected in the Cloud Trail logs.  The Cloud Trail

 5   logs were sufficient for both Capital One and Mandiant

 6   to conduct a forensic investigation, and that

 7   investigation showed that Paige Thompson was the only

 8   intruder.  Plaintiffs cannot create a fact issue by

 9   speculating about what the evidence does not show.

10           They also suggested earlier this morning that

11   this data was openly accessible to anyone from the

12   Internet.  That's not true.  I will point the Court to

13   the expert report of Mr. Art Euhan, E-U-H-A-N.  The

14   data was not open to the Internet.

15           They didn't say much this morning --

16   although, they did in their papers -- about some theory

17   that this was an inside job as opposed to Paige

18   Thompson.  But there's no evidence that there was a

19   second intruder either inside or outside of Capital

20   One.  And, again, it's not our burden to prove that

21   there wasn't a second attacker.  Plaintiffs have no

22   evidence from which a jury can conclude that anyone

23   other than Paige Thompson accessed the data.

24           We've already talked about enrichment.  I'm

25   not going to repeat the arguments that I've made.  I'll

146

1    only note that Mitnick also admitted in his deposition

2    that there's no evidence that any plaintiffs' data

3    actually was enriched here.  There's no evidence that

4    Thompson or anyone else actually enriched the data.

5    It's pure speculation that's insufficient to support

6    standing.

7            They raise factual issues about remediation.

8    The plaintiffs say that there are hotly contested

9    factual disputes, but they don't say what those are.

10    But the uncontroverted record evidence shows that

11    Capital One immediately remediated the root causes of

12    the cyber incident.  And in addition, they

13    comprehensively improved its security practices under

14    the continuing oversight of its regulators.

15            In any event, under *Beck*, *Beck* requires an

16    imminent risk of a similar harm, which plaintiffs here

17    cannot show.  And it's undisputed that the

18    misconfigured WAF that led to the breach has been

19    remediated.  So none of plaintiffs' factual arguments

20    have any merits.

21            Even if there were -- again, back to this

22    *Ramirez* problem.  Even if there were a kernel of truth

23    to these disputes -- and there's not -- there's still

24    not enough to give plaintiffs standing.  These factual

25    disputes would show, at most, that there's a future

1 risk of fraud, which after *Ramirez* is gone as a theory

2 of standing.

3          Plaintiffs would still be required to

4 demonstrate that they have suffered actual fraud that's

5 traceable to the cyber incident, and they just can't do

6 that.  None of the eight representatives plaintiffs can

7 show with evidence that they suffered an actual fraud

8 as a result of the cyber incident.

9          So in conclusion, when you read *Ramirez*,

10 *Beck*, and *Hutton* together, it's clear that Article III

11 requires a concrete, nonspeculative injury that's

12 traceable to conduct of the defendant in order to

13 confer standing.  Risk of harm is insufficient.

14 Speculative inferences are insufficient.

15          And because plaintiffs have not provided

16 evidence of concrete, nonspeculative injury, this Court

17 should dismiss plaintiffs' negligence claim, the state

18 statutory claims, and their claims for injunctive

19 relief for lack of Article III standing.

20          I think that provides a really good framework

21 for us to dive into the class cert arguments.  I mean,

22 unless the Court has further questions about standing,

23 I would like to turn now to responding to plaintiffs'

24 motion for class certification.

25          I think the standing arguments -- and I'll

1 explain how right upfront -- can and should, should the

2 Court agree with us on our standing arguments, makes

3 the Rule 23 job much, much easier.  I'll kind of walk

4 the Court through why I say that.

5        I think the place to start, Your Honor, on

6 plaintiffs' motion for class certification is to look

7 at where the plaintiffs started and where they are now.

8 Plaintiffs filed their complaint in this case primarily

9 pursuing claims of negligence which they alleged

10 resulted in monitory damages that would flow from the

11 misuse of their personal information that was stolen in

12 the cyber incident.  That's how the complaint is framed

13 up.

14        After nearly two years of litigation and

15 extensive discovery showing that no such injuries

16 materialized, plaintiffs have pivoted to a claim that

17 Capital One somehow breached a contract, based upon

18 statements in its privacy notices, causing alleged

19 damages to the class that are untethered to any misuse

20 of the stolen information or in the data breach itself.

21        Plaintiffs' new theories of injury fair no

22 better than the ones that they've abandoned.  Their

23 claims are legally deficient.  They're based upon

24 speculative and inadmissible expert testimony.  And for

25 the reasons I'm going to talk about now, they're wholly

1  unsuitable for class certification.

2          We struggled mightily to figure out the best

3  way, the most efficient way to present these arguments

4  to Your Honor.  It's -- you know, their motion covers a

5  lot of ground.  Mr. Siegel had 170-plus slides.  We

6  think the best way to approach it is to really focus on

7  their theories of injury.

8          To set things up, I think it makes sense to

9  just remind the Court what it is the plaintiffs are

10 seeking to certify.  So they're seeking certification

11 of a nationwide 23(b)(3) damages class under claims for

12 breach of contract, negligence, and unjust enrichment.

13 They're seeking certification of four state

14 statute-specific subclasses under the California Unfair

15 Competition Law, under the California Consumers Legal

16 Remedies Act, under the New York General Business Law,

17 and under the Washington Consumer Protection Act.

18 They're seeking certification of a nationwide 23(b)(2)

19 injunctive relief class and, alternatively, they're

20 seeking issue certification on elements of duty and

21 breach.

22          I want to start by orienting the Court to the

23 standards which I know the Court is familiar with, but

24 I think it does make sense to think about first

25 principles here and what we're doing.

1          Class actions are an exception to the general
2   rule that a party in federal court may vindicate only
3   his own interest.  That's the *Thorn v. Jefferson-Pilot*
4   case.  Plaintiffs bear the burden to affirmatively
5   demonstrate their compliance with Rule 23.  That's the
6   *Wal-Mart* case.  Plaintiffs also bear the burden of
7   establishing that damages are capable of measurement on
8   a classwide basis.  That's *Comcast*.  The Court must
9   conduct a rigorous analysis of plaintiffs' motion.
10  That's *Thorn*.  As part of that rigorous analysis, the
11  Court has to make findings on whether the plaintiffs
12  carried their burden of demonstrating compliance with
13  Rule 23.  And *Wal-Mart* also teaches that a class cannot
14  be certified on the premise that a defendant will not
15  be entitled to litigate its defenses to individual
16  claims.
17          Now, before I jump in to the Rule 23 morass,
18  the rubric that we have to work our way through, I want
19  to explain upfront the relevance of the other pending
20  motions to the question of class certification.
21  Plaintiffs' motion for class certification does not
22  exist in a vacuum.  There are several other pending
23  motions that relate to and inform the Court's analysis
24  here.  The Court, I think, correctly noted that when
25  asking us to address standing in tandem with the class

1   certification inquiry.  It's appropriate.

2          And the way the Court rules on those other

3   motions may greatly simplify the work that's necessary

4   to conduct the rigorous analysis that's required under

5   Rule 23.  For example, let's take a look at what -- so

6   this is a list of all -- what I've got on this chart,

7   Your Honor, is a list on the left side of all the

8   claims that the plaintiffs are seeking to certify, and

9   on the right a list of the alleged harms that they say

10  correspond to those claims.

11         THE COURT:  Before we get to that, tell me

12  what's your position and where we are on Article III

13  standing with respect to the breach of contract claim.

14         MR. BALSER:  As I'm going to explain in a few

15  minutes, I think the -- and we'll see this as I go

16  through this chart.  I think where we are is that the

17  Court agrees with us on our standing arguments.  The

18  theories --

19         THE COURT:  On the Article III standing with

20  respect to negligence, statutory claims, and unjust

21  enrichment?

22         MR. BALSER:  Right.  But part of our argument

23  on standing is that these claims for increased risk --

24  like submitting this claim of increased risk is not a

25  viable theory.  And the market value theory that

1   measures a noninjury is not a viable theory that can

2   confer standing.  We think that if you agree with us on

3   those and that those theories of damages are out of the

4   case either on standing analysis or under *Daubert*,

5   which we'll talk about in a minute, then I think what

6   you're left with on breach of contract --

7          THE COURT:  But those are damages

8   methodologies, correct?  Those aren't injury

9   methodologies.

10          MR. BALSER:  That's right.  I think on injury

11   they've alleged that -- and we don't think they can

12   prove, but they have alleged that they've suffered

13   these harms of, you know, disgorgement, increased risk

14   of harm and market value, for example, to support their

15   breach of contract claim.  They claim those are

16   injuries.  We don't think those are requisite injuries.

17          So we think, really, everything would be -- I

18   mean, if the Court accepts our argument, as I think it

19   should, that you need a real injury to support a claim

20   for nominal damages, then I think the breach of

21   contract claim would also be gone for certification

22   purposes.  Because absent injury, you can't have

23   nominal damages.  And we say these speculative theories

24   of increased risk in market value are not injuries that

25   are cognizable for purposes of standing.  So I think

153

1  that's where we would be left if the Court accepts our

2  arguments on standing.

3            THE COURT:  But isn't that the same as

4  arguing that there's no Article III standing as to the

5  breach of contract claim?

6            MR. BALSER:  It is.  I think it is.  In

7  effect, it is.  The only difference is that when --

8  when we raised this motion, you know, we didn't have

9  before the Court all of these arguments we have on

10 market -- we didn't have *Ramirez*, and we didn't have

11 the market value and disgorgement theories completely

12 teed up.  But I think the logical extension of the

13 arguments that we make is that without injury, there's

14 no standing.  You've got to have injury to get even

15 nominal damages.

16           THE COURT:  All right.

17           MR. BALSER:  So that's kind of where I was

18 going, right.  So if the Court finds that there's no

19 standing, then I think the negligence injunctive relief

20 and the state statutory claims are gone.  If the Court

21 grants our *Daubert* motions, that would provide

22 additional independent bases to eliminate the theories

23 of injury that underlie these claims both from Olsen

24 and from Mitnick and Long, which are based on, you

25 know, the increased risk theory.

1          Then you would be left with the question of

2   in the absence of injury, can you award nominal

3   damages?  And the answer to that is no, and that's the

4   basis of our summary judgment motion that's pending --

5   part of the basis for our summary judgment motion

6   that's pending.

7          THE COURT:  Right.  Doesn't that go to the

8   merits rather than certification in the sense that --

9          MR. BALSER:  It does.

10         THE COURT:  -- the issue is whether there's a

11  common damages methodology that plaintiffs want to

12  apply classwide that can be adjudicated on a classwide

13  basis that has a common answer as to all members of the

14  class?  Now, it may prove that the damages theory

15  doesn't hold up on the merits.

16         MR. BALSER:  There are many reasons --

17         THE COURT:  That could be decided within the

18  context of a certified class if we get that far.

19         MR. BALSER:  Well, there are many reasons

20  that we'll talk about why these damages theories can't

21  satisfy Rule 23.  So I think it's not just a merits

22  issue.  It's whether these theories -- and really,

23  they're traveling under three main theories, the market

24  value theory, this increased risk of harm theory, and

25  disgorgement.

1          THE COURT:  Right.

2          MR. BALSER:  And that's how we've really

3  tried to organize the argument because I think that's

4  really the organizing principle here, to look at what

5  they're claiming, what relief they're seeking.  And

6  when you pull those apart and analyze them, I think

7  they have -- there are a host of gating and threshold

8  problems with them.  But just on a pure Rule 23

9  predominance analysis, they fail, and I'll explain why.

10          THE COURT:  All right.

11          MR. BALSER:  Okay.  So the point I'm trying

12  to make is that there are numerous gating issues that

13  are raised in our other motions that have the potential

14  to significantly narrow the claims and the injuries

15  that are relevant to class certification.  That's the

16  point.

17          And those motions should be decided before

18  the Court rules on class certification.  Of course, we

19  haven't argued the *Daubert* motions yet.  So I'm going

20  to proceed today under the assumption that these claims

21  and injuries are all properly considered for purposes

22  of certification even though for the reasons I've

23  explained in the standing argument, I think, you know,

24  most of them should be out, the vast majority of them.

25          So I will touch on those other issues that

156

1   are raised by the other pending motions as appropriate

2   in the course of my argument.  And again, I'm happy to

3   focus on and address any issue the Court has an

4   interest in, but I plan to cover the following points.

5           I want to start with a very brief summary of

6   the relevant facts.  I know the Court is very familiar

7   with the record.  I want to talk just briefly about

8   standing through the lens of Rule 23.  We talked about

9   essentially the merits of the standing problems, but

10  there's some Rule 23 issues as well.  I want to address

11  each of the plaintiffs' injury theories, the increased

12  risk theory, the market value theory, and disgorgement

13  primarily to explain how they fail to satisfy the

14  predominance requirement of Rule 23(b)(3).  Then I want

15  to have a very brief discussion of nominal damages

16  since Mr. Siegel spent some time on that this morning.

17  Then I want to briefly cover some additional barriers

18  to class certification for plaintiffs' claims for

19  breach of contract, unjust enrichment, and violations

20  of the state consumer protection statutes.  Then very,

21  very briefly I wanted to hit on injunctive relief,

22  issue certification, and superiority.

23          So real quickly on the facts, this Court

24  knows the data stolen in the cyber incident largely

25  consists of nonsensitive information that consumers

1  submitted to Capital One when applying for credit

2  cards.  There are 98 million putative class members.

3  The putative nationwide class includes both applicants

4  and cardholders -- we'll talk about that -- who applied

5  for credit over a 15-year period from 2005 to 2019.

6          Importantly, Your Honor -- and we tried to

7  explain this in our papers.  I'm not sure, but I hope

8  we did a good job of it.  But during this 15-year

9  period, consumers applied for different Capital One

10  credit cards using many, many different applicant

11  channels, and they received a variety of different

12  documents along the way doing that.  And those

13  differences in the methods of applications are

14  significant here.

15          Plaintiffs have asserted that each applicant

16  was provided with Capital One's privacy notice when

17  they applied, but that's not true.  The disclosures,

18  notices, and information provided to applicants varied

19  over time and by channel.  If you look at this slide

20  that we have up, this is a description of the

21  application channels for Capital One branded cards.

22  It's all the different channels through which someone

23  could apply on the left and then the manner in which

24  the privacy notice was or was not delivered with

25  respect to each of those Capital One branded cards.

1           And then another layer of complexity here is

2  that some of the putative class members did not apply

3  to Capital One for credit at all.  They, instead,

4  applied through other entities that were later acquired

5  by Capital One, or they applied to our retail partners.

6  So if you look at the slide that's up here, this is the

7  application channels for our partnership cards.  So not

8  Capital One branded cards but partnership cards.  And

9  again, there are different channels.  And the privacy

10  notice was either not provided or provided optionally

11  through a request to click, but all in different

12  manners through the different channels.

13           Now, look, as the Court knows -- I'm not

14  going to belabor this on the privacy notice, but of

15  course, the Court is aware that the content of the

16  privacy notice itself changed during the putative class

17  period.  Before 2010 -- after 2010, it included the

18  language that says security -- we have security

19  measures that comply with federal law.  The privacy

20  notice before 2010 did not include that language.

21           Turning to the cyber incident itself, the

22  Court knows we discovered Paige Thompson's theft of the

23  impacted data in July of 2019.  Capital One worked with

24  law enforcement to identify her and aid in her arrest.

25  Since that cyber incident occurred, Capital One has

1    remediated all of the factors that led to it and made

2    comprehensive improvements to its cybersecurity

3    defenses.

4            Capital One also offered free credit

5    monitoring to anyone whose information was stolen.

6    Mr. Siegel asked why did we do that:  Why would Capital

7    One have done that?  There are a couple of reasons.

8    One is several states data breach notification statutes

9    require a company that's a victim of a data breach to

10   provide credit monitoring.  And also, Capital One

11   wanted to let its customers know that even though,

12   under the best evidence that we had, the data was not

13   out there, we wanted them to have this service and show

14   that we were concerned about them and cared about them.

15           THE COURT:  So all 98 million were offered

16   the data monitoring?

17           MR. BALSER:  Yes.

18           THE COURT:  For how long?

19           MR. BALSER:  Yeah.  They didn't all get an

20   invitation in the mail.  But, yes, it was open -- in

21   fact, not only was it open to the 98 million people, it

22   was actually open to any U.S. citizen.  So even if you

23   were not a victim of the data breach, you could have

24   signed up for free credit monitoring through --

25           THE COURT:  How many people signed up?

1           MR. BALSER:  I don't know if I have the exact

2    number.  It may be in our papers, but that's, you know,

3    really kind of an interesting issue.  Not very many,

4    and that kind of goes to -- that actually bears on some

5    of our arguments on the claim for unjust enrichment,

6    whether plaintiffs really -- you know, how much they

7    care about the fact that there was a data breach,

8    especially when the data hasn't been disseminated.  But

9    there was not a huge uptake.  A very small percentage

10   of --

11          THE COURT:  How long was the monitoring

12   offered?

13          MR. BALSER:  At least two years.

14          Is it still in place?

15          It's still open.  I mean, you can still

16   enroll.  You can enroll today.

17          THE COURT:  All right.

18          MR. BALSER:  So as I mentioned before, the

19   vast majority of the stolen data was nonsensitive

20   information, like names, addresses, phone numbers,

21   dates of birth, self-reported income that could not be

22   used to commit fraud or identity theft.  Less than

23   .2 percent of the putative class had social security

24   numbers or bank account numbers taken.  So 99.8 percent

25   of the class did not have social security numbers or

1  bank account numbers taken.

2         And we point this out in our papers, and this

3  is important.  I'm going to come back to it.  The data

4  combinations that were stolen by Paige Thompson are

5  extremely diverse.  There are over 724 different unique

6  combinations of data elements presented with respect to

7  the 98 million people in the class.

8         Look, the representative plaintiffs

9  themselves illustrate the variation across the impacted

10 data elements.  For example, Plaintiff Brandi Edmondson

11 did not have any identifying information stolen, such

12 as her name, address, or date of birth.  Rather, her

13 anatomized credit information was stolen, and Capital

14 One was only able to link that information to her based

15 on her own internal account ID number.

16        On the other hand, Plaintiff Hausauer is part

17 of the .1 percent of the putative class who had his

18 social security number stolen.  His name and date of

19 birth were also stolen, but he doesn't allege identity

20 theft.  So, you know, the harms alleged, you know, also

21 vary.  Ms. Edmondson and four other plaintiffs claim

22 they had an unauthorized charge on their credit or

23 debit card after the cyber incident even though no card

24 numbers were impacted in the breach at all, none, zero

25 credit card numbers.  But Mr. Hausauer and another

162

1   plaintiff, John Spacek, don't allege any misuse of

2   their information at all after the data breach.

3          Okay.  I've got the answer on the credit

4   monitoring.

5          THE COURT:  All right.

6          MR. BALSER:  Two years credit monitoring was

7   offered.  It's still open, but you would get two years

8   if you signed up.  Less than 1 percent of the class

9   signed up for credit monitoring.

10          In addition, every single named plaintiff was

11   impacted by at least one data breach before the cyber

12   incident.  This is a chart that shows that fact.  So

13   when you look at this, John Spacek was the victim of

14   six different data breaches; Brandi Edmondson, six

15   different data breaches.

16          THE COURT:  These are all before March 2019?

17          MR. BALSER:  All before March 2019.

18          You know, many of them were victims of *the*

19   *Equifax* data breach, several of Yahoo and Marriott.

20          And so the point is that -- you know, kind of

21   getting back to this traceability issue, you can see --

22   and this kind of goes to this -- the slide that

23   Mr. Siegel showed you earlier on the concurrent cause.

24   You know, jury charge under Virginia law.  I mean, in

25   order for there to be a concurrent cause, both causes

1   have to have been shown to be potential proximate

2   causes.  As we looked at when we went through each of

3   the named plaintiffs, none of their fraudulent charges

4   are traceable to this data breach.  But you look at the

5   fact that there's all of these other data breaches that

6   affected their data, and you can understand how fraud

7   could occur.  It's just not traceable to our breach

8   such that a concurrent cause kind of -- a jury

9   instruction would be appropriate here.

10          Beyond that, beyond just the named

11   plaintiffs, we sought discovery from plaintiffs named

12   in the member complaints that are consolidated in this

13   MDL.  And of the 99 member plaintiffs who answered --

14   most of them dismissed their complaint when we asked

15   them for discovery -- nearly half were impacted in

16   prior data breaches, and nearly 20 percent of those

17   were victims of identity theft before the cyber

18   incident.

19          So these findings, when you apply them to the

20   putative class more broadly, suggests that the vast

21   majority of the proposed class has also been the

22   subject of at least one prior data breach.

23          Finally, discovery also revealed ways in

24   which plaintiffs' data is accessible to third parties

25   completely unrelated to the cyber incident, including

1  by voluntarily making their information available in

2  the public domain, generally for free on social media,

3  Facebook, LinkedIn, and the like, public record

4  searches, and the like.

5          So that's just a real brief overview of the

6  facts.  I know the Court is familiar with them, but I

7  wanted to just kind of set the stage here.

8          I want to talk just real briefly about the

9  Rule 23 implications of the Article III standing

10  discussion that we had.  Article III standing issues

11  create serious problems for the plaintiffs on class

12  certification completely apart from the merits issues

13  that we discussed in two key respects.

14          As I'm going to talk about in some detail,

15  plaintiffs' market value and increased risk theories of

16  injury fail under Article III.  *Beck* and *Hutton*

17  foreclosed Olsen's market value theory, which is mere

18  access, which is just like mere compromise of data

19  provides some injury.  That's the claim.  That's

20  foreclosed by *Beck* and *Hutton*.

21          And *Ramirez* clearly forecloses Mr. Mitnick's

22  increased risk theory, which is the basis of Mr. Long's

23  exorbitant $838 billion calculation present value of

24  damages to guard against that increased risk, which is

25  not a theory of damages that's now cognizable under

1   Article III and, therefore, certainly couldn't support

2   class certification.

3           So, you know, where does that leave us?   I

4   think it means that the negligence and state statutory

5   claims are out.   We do need to talk about disgorgement

6   damages, and we need to talk about nominal damages,

7   which we will.   But I think this highlights the

8   importance of the Court ruling first on Capital One's

9   standing challenge because I do believe it could, if

10  the Court agrees with us, and would significantly

11  narrow the class certification issues.

12          Setting aside -- like even if the Court

13  didn't agree with us on what *Beck* and *Hutton* hold and

14  require as to this market value theory or with our

15  arguments that *Ramirez* forecloses the increased risk

16  theory, the Article III standing issues also impact the

17  Rule 23 analysis because *Ramirez* made clear that every

18  class member, every class member has to have

19  Article III standing in order to recover individual

20  damages.

21          And *Ramirez* also confirmed that the Court

22  can't simply presume concrete harm to absent class

23  members.   Plaintiffs have to present evidence to

24  factually establish each class members' harm, which was

25  totally lacking for the approximately 6,000 class

1   members in *Ramirez* found not to have standing.

2           So that means to get a claim for damages

3   certified, plaintiffs have the burden of showing how

4   they will establish with common evidence concrete harm

5   for each of the 98 million class members, and they

6   can't do that.  They have completely failed to meet

7   their burden in that respect.

8           But even if you accepted those injuries, that

9   is, the market value injury and the increased risk

10  injury as legally viable, plaintiffs have put forth no

11  method for proving those injuries for each class member

12  using common classwide evidence.  Rather, proving each

13  of plaintiffs' theories of recovery across the putative

14  class would require millions of individual mini-trials.

15          Why do I say that?  Let's just think about a

16  couple of examples.  Plaintiffs have no way of

17  determining on a classwide basis which class members'

18  PII was already exposed or publicly available.

19  Plaintiffs have no way of determining on a classwide

20  basis which class members' application data was used by

21  Capital One's models to prevent fraud, and plaintiffs

22  have no way of determining on a classwide basis whether

23  any risk of harm from the stolen Capital One data

24  materialized into actual harm using that data.

25          There's not a shred of evidence for any

167

1  putative class member to prove those points, and

2  plaintiffs haven't even tried to show otherwise.  There

3  are numerous other individualized issues that we will

4  discuss.

5          So we will get into those issues in more

6  detail, but the critical point to keep in mind is that

7  plaintiffs have not met their burden of showing that

8  they'll be able to prove with common admissible

9  evidence the claims and damages of each of the 98

10 million class members.

11         And this is important.  Because if any claims

12 are certified, the Court will preside over a trial

13 where plaintiffs will have to factually establish with

14 common evidence the alleged injuries of each class

15 member.  *Ramirez* made that clear.

16         In other words, I think the Court should be

17 thinking about what a trial on these claims would look

18 like and whether plaintiffs have demonstrated that they

19 can prove their claims with common evidence or whether

20 individualized issues would make a trial practicable or

21 really more realistically impossible.

22         So before discussing the numerous reasons why

23 plaintiffs' theories of classwide injury fail to meet

24 the requirements of Rule 23, it is important to note

25 that the Court cannot certify any claims based upon

1  damages theories that are supported only by an expert,

2  and his opinion should being excluded.

3         To recap, as the Court knows, we have moved

4  to exclude all three of plaintiffs' classwide injury

5  theories, the market value theory espoused by Olsen,

6  the increased risk theory espoused by Mitnick and Long,

7  and the disgorgement theory put forth by Olsen.  And

8  because the plaintiffs rely on these expert opinions in

9  support of class certification, the Court must decide

10 whether those opinions are admissible under *Daubert*.

11        And, again, I would remind the Court that our

12 standing and *Daubert* motions have the potential to

13 significantly narrow the claims and theories that must

14 be analyzed for class certification, as does our motion

15 for summary judgment which is pending.  And this slide

16 that we put up earlier, I think, shows what -- you

17 know, if the Court rules in our favor, how simple the

18 class certification analysis becomes if the Court goes

19 with us on standing and *Daubert*.

20        So I now would like to just dive into a

21 discussion of why the theories of injury that the

22 plaintiffs advance can't be certified.  First, I think

23 it's important to note -- I touched on this briefly,

24 but I think it's worthy of a little bit of focus --

25 plaintiffs have abandoned any chance of classwide

1  discovery for the vast majority of the harms that

2  they've alleged in their complaint, including actual

3  fraud, identity theft, lower credit scores, time spent

4  mitigating the consequences of the cyber incident,

5  mitigation expenses, etc.  None of that is being

6  requested as a theory of damages to be asserted

7  classwide.

8          Aside from nominal damages and injunctive

9  relief, plaintiffs now assert only three primary

10  theories of classwide injury, which are increased risk

11  of harm, the market value of PII, and disgorgement.  So

12  in order to obtain class certification, plaintiffs have

13  to satisfy the Court that they can prove these theories

14  of injury with common classwide evidence, and they fail

15  to do so.

16          Now, plaintiffs have tried to reframe our

17  opposition to these theories as involving only

18  individualized damages calculations or challenging only

19  whether their damages models satisfy *Comcast*, but

20  that's not correct.  We are challenging that plaintiffs

21  can prove an injury that is proximately caused by the

22  cyber incident under these theories.

23          Injury and causation are essential elements

24  that plaintiffs must prove for all their claims, and

25  certification depends on the plaintiffs demonstrating

1 that common questions of law and fact predominate over

2 the individual questions with respect to each theory of

3 injury that they are seeking to certify.

4          Let's start with the increased risk theory of

5 harm.  So just as an overview of that theory, the

6 plaintiffs claim that all class members face increased

7 risk of identity theft and other fraud because the

8 stolen PII can be used to commit identity theft in the

9 future.  Plaintiffs rely entirely on their experts,

10 Mitnick and Long, to show this purported increased risk

11 injury.

12          Mitnick's opinion rests on speculation, as

13 we've already discussed, about how bad actors can

14 theoretically misuse the stolen data if they had access

15 to it, including by enriching the stolen data with

16 information available from other sources.  Even though

17 Mitnick and the plaintiffs have no evidence that the

18 stolen data was enriched, disseminated, or otherwise

19 misused, Mitnick concludes that all putative class

20 members are at, his words, serious risk of ID theft,

21 fraud, such that all of them need the same credit

22 monitoring product, which is LifeLock Ultimate Plus, at

23 $29.99 a month.

24          Then Mr. Long takes Mr. Mitnick's

25 recommendation regarding LifeLock Ultimate Plus and

1  calculates the present value of purchasing that product

2  for all putative class members leading to absurdly high

3  damages figures ranging from $97.5 billion on the low

4  end to $832.2 billion on the high end, sums far in

5  excess of the net worth of the entire company.

6        Plaintiffs say this theory applies to breach

7  of contract and negligence claims.  We've explained in

8  our motion for summary judgment why that theory of harm

9  does not apply to the contract claim.  But even if

10 these were a viable measure of damages in the abstract,

11 this theory doesn't satisfy Rule 23.  So kind of

12 putting aside whether it can survive the Article III

13 challenge and the other merits-based problems, they've

14 got predominance problems that can't be overcome.

15       As an initial matter, the theory is untenable

16 because Mitnick's and Long's opinions are predicated on

17 the notion that the stolen data was disseminated, but

18 plaintiffs lack any proof that that occurred.  Without

19 dissemination, their increased risk theory is directly

20 foreclosed by *Beck* and *Ramirez*.

21       Again, I don't know how many times I need to

22 say it, but *Beck* said the mere theft of PII, without

23 more, cannot converse Article III standing.  And

24 *Ramirez* upheld that a mere risk of future harm that

25 never materializes cannot establish even Article III

1    standing; thus, it certainly cannot support

2    certification of class.

3            So Mitnick does not claim that any risk is

4    actually materialized into concrete harm.  And as we've

5    pointed out, each plaintiffs' contention of actual

6    fraud has been disproven.  But again, setting those

7    issue aside and even assuming dissemination, plaintiffs

8    can't prove with common classwide evidence that they

9    suffered an increased risk of harm as a result of the

10   cyber incident.

11           Why do I say that?  Well, the critical thing

12   to keep in mind here is that this theory of injury is

13   premised on increased risk.  So meaning for any given

14   individual, the Court must first consider that

15   individual's baseline level of risk and then assess

16   whether the cyber incident, in fact, increased that

17   baseline level above what it was before.

18           Determining whether any individual class

19   member's baseline level of risk has increased depends

20   on a host of individual factors, including, one,

21   whether that individual's information has been exposed

22   to bad actors previously; two, which specific data

23   elements were stolen in the breach out of over 700

24   possible unique combinations; and, three, whether that

25   data either on its own or in conjunction with other

1  data could be used to commit identity theft or fraud

2  due to its nature, its accuracy, how old it is, etc.

3  In addition, plaintiffs would have to show that the

4  increase in risk is uniform across the 98 million

5  person putative class.

6          These individual issues are not merely

7  hypothetical as the facts developed in this case show.

8  The issue of prior exposure is a huge problem for

9  plaintiffs that they don't meaningfully address.  That

10 encompasses not only prior data breaches, as I've

11 discussed, but the voluntary disclosures on social

12 media, involuntary disclosures, like stolen wallets or

13 laptops, and other forms of public available

14 information, like public records.

15         Then there's the problem with the variation

16 in the impacted data.  Our expert, Professor Lorin

17 Hitt, went through chapter and verse about the 724

18 unique combinations of exfiltrated data.  Of course,

19 different data elements have different sensitivity.

20 For example, stealing someone's name and address, when

21 for many of us are available on our Facebook accounts

22 or Instagram accounts or LinkedIn, is much different

23 than having a social security number taken.  And,

24 again, as our expert, Rebecca Kuehn, makes clear, the

25 vast majority of impacted data here cannot have been

1    used to commit fraud in the first place.

2              So when you look at all of these issues about

3    the data, including how old it is, the likelihood that

4    some of it's not accurate anymore, it requires an

5    individualized inquiry that's just not susceptible to

6    class treatment.  All of these factors I just discussed

7    are specific to each individual in this 98 million

8    person putative class.

9              So in order for the Court to determine

10   whether any given class member suffered an increased

11   risk of future harm -- that's their theory -- increased

12   risk of future harm because of the cyber incident

13   requires analyzing the number of prior exposures or

14   breaches that he or she was involved in, what

15   information had been exposed, whether that same or

16   different information was exposed in this cyber

17   incident, whether the information exposed in the cyber

18   incident could be used to commit identity theft or

19   fraud.  And these inquiries go not only to damages but

20   to the elements of injury and causation.

21             Another problem, despite all those

22   individualized questions I just went through,

23   plaintiffs propose a one-size-fits-all remedy for the

24   entire class, which is this $29.99 a month LifeLock

25   Ultimate Plus credit monitoring.  They just completely

1    ignore the substantial variation I just discussed.  In
2    fact, they didn't even address the prior exposures of
3    plaintiffs' and class members' data in their papers.
4    They don't respond to our arguments on them.
5            Instead, in their reply, what they say is,
6    Mitnick's thorough opinion concludes that all class
7    members have been injured such that they need this
8    remedy.  And, thus, in plaintiffs' view, the extent to
9    which plaintiffs and class members vary is irrelevant,
10   their word.
11           Their reply doesn't even mention Mitnick's
12   speculative enrichment opinion, but that's critical to
13   their increased risk theory.  So, again -- and we'll
14   talk about this more tomorrow.  I won't, thankfully,
15   for you and for me.  Somebody else will.  But if
16   Mitnick's opinion is excluded, as it should be under
17   *Ramirez*, this theory of injury necessarily fails.
18           But even if you don't exclude Mitnick's
19   opinion, plaintiffs cannot prove with common evidence
20   that all class members, in fact, suffered the same
21   increased risk injury in light of all of these
22   variations that I just discussed.  And as we noted in
23   our brief, other courts considering whether to certify
24   claims arising from data breaches reached the same
25   conclusion.

1          Now, plaintiffs like to cite *Tyson Foods* for

2     the argument that the existence of individualized

3     damages issues don't preclude certification, but that's

4     not the argument that we're making here.  That argument

5     is unavailing because we're challenging not just the

6     calculations that were made, but also the injury and

7     causation that are required elements of their claim.

8          So, in any event, the damages issue in *Tyson*,

9     which centered on time spent by workers donning and

10    doffing protective gear, is much more susceptible to a

11    reasonable average than the raft of the individualized

12    issues that I just went through here.  And *Wal-Mart*

13    stands for the proposition that class certification is

14    improper where individualized determinations regarding

15    the existence and extent of each plaintiffs' injury are

16    required.

17         So unless Your Honor has any question about

18    the increased risk of harm theory, I now would like to

19    turn to the market value.

20         THE COURT:  All right.  Why don't we take a

21    recess at this point.  We'll take about a 10- or

22    15-minute recess.

23         I'd like to give Mr. Newby time to speak

24    today.  I don't know if you two have coordinated your

25    time.

1          MR. BALSER:  I'll make sure he has time, Your

2   Honor.

3          THE COURT:  All right.  Very good.

4          The Court stands in recess.

5       (Recess from 3:37 p.m. until 3:53 p.m.)

6          THE COURT:  Mr. Balser.

7          MR. BALSER:  So, Your Honor, before I jump

8   into the market value theory of harm discussion, I do

9   want to make sure that we're on the same page about

10  these theories of injury that I'm talking about.

11         So Your Honor referenced -- you asked me a

12  question about whether these are just damages

13  calculations that can be dealt with in some other way

14  or down the road.  The point that, I think, is

15  important for the Court to keep in mind is this is the

16  evidence that they are presenting of their injury.  So

17  they say, Our injury that not only gets us in the

18  courthouse door under Article III but that can be

19  certified is this access theory of damages or this

20  increased risk of harm.

21         That's the evidence of injury that they rely

22  on.  And so the point that I was trying to make when I

23  was talking about -- when you asked me a question,

24  well, what's the effect, like what's left if I grant

25  the standing motion?

1           THE COURT:  Right.

2           MR. BALSER:  My point about these theories of

3   damages are that the Court can find that these are just

4   not cognizable, not even sufficient to get them in the

5   courthouse door, as a matter of law, just these

6   theories themselves, which I think is the right answer,

7   in which case you don't even have to get to the

8   predominance arguments that I'm making.  That's the

9   point I was trying to make.

10          THE COURT:  All right.

11          MR. BALSER:  So it's not just an issue of

12  calculations.  It's whether these theories that

13  they're -- this evidence of injury is all they have,

14  whether these amount to enough to even get you in the

15  courthouse door, much less certify class based on the

16  theories.

17          THE COURT:  All right.  I understand.

18          MR. BALSER:  So let's talk about the market

19  value, the market value theory of harm.  So plaintiffs

20  have proffered the opinion of Gary Olsen, who purports

21  to measure the market value of the hacker's

22  unauthorized access to the PII.  And he does this by

23  comparing the stolen data to average list prices for

24  PII that's offered for sale by criminals on the dark

25  web and then aggregating those values across the class.

1          I took his deposition.  Frankly, it's unclear

2    exactly what he's measuring.  But what he testified

3    that he's measuring is -- and I'm quoting here -- the

4    value of a one-time nonexclusive access to the PII.

5    And that's what they say is injured.  Plaintiffs say

6    that this theory of harm applies to the breach of

7    contract, negligence, and unjust enrichment claims.

8          There are a few threshold problems before we

9    get to the predominance problems.  The first problem is

10   the Court has already rejected this theory.  The

11   plaintiffs struggle mightily to distinguish Olsen's

12   market value opinion from their already rejected theory

13   of harm based on the inherent value of their PII.  The

14   Court in its motion to dismiss order at page 29 said

15   that plaintiffs do not allege any facts explaining how

16   their PII became less valuable as a result of the

17   breach.  That was the basis upon which Your Honor

18   dismissed the claim, but this is essentially the same

19   theory.  And plaintiffs still do not claim that class

20   members unsuccessfully attempted to sell the data or

21   receive less than they would have absent the cyber

22   incident.  Indeed, no plaintiff even individually makes

23   that claim.

24          The second problem -- and it won't surprise

25   you to hear me say this -- this theory is also

1   foreclosed by *Beck* and *Hutton*, which made clear that a

2   mere compromise of personal information, without more,

3   fails to satisfy the injury-in-fact element in the

4   absence of identity theft.

5           So, regardless, this repackaged market value

6   theory that plaintiffs now advance is rife with

7   individual issues that affect the purported value of

8   Thompson's unauthorized access, whether any class

9   member in fact lost that value, and whether the loss is

10  causally linked to the cyber incident.  Those

11  individual issues include whether a given individual's

12  data was already accessible to actors, and much of the

13  stolen data was.

14          It includes whether the market value of a

15  given individual's data varies drastically depending on

16  characteristics specific to that individual, for

17  example, based on net worth, their credit score,

18  occupation.  There's substantial variation in the types

19  and combination of the data elements that were stolen

20  in the data breach.  And the stolen data, much of it is

21  outdated given that it goes back to 2005 rendering much

22  of it now inaccurate.

23          So, again, these individual issues go to the

24  core elements of injury and causation.  Let's just

25  think about a couple of examples.  So if a class

1  members' information that was accessed by Paige

2  Thompson was already publicly available, then that

3  class member cannot have lost the value of unauthorized

4  access to it as a result of the breach because it was

5  already accessible.

6          To take another example, suppose that a class

7  member applied for a credit card in 2005 but has since

8  moved and changed her name.  If Thompson accessed only

9  her old address and former name, those data elements no

10  longer have market value because they're no longer

11  accurate.  Plaintiffs do not even attempt to account

12  for these kinds of individualized differences.

13          Olsen did not attempt to check whether any of

14  the personal information underlying the market value

15  theory of injury was already in the public domain or

16  for sale on the dark web.  Nor did he account for many

17  other individual factors that affect market value

18  despite admitting in his deposition that these were all

19  relevant factual inquiries.

20          For example, Olsen didn't control for

21  characteristics specific to each consumer such as age,

22  occupation, creditworthiness, etc. even though he

23  admitted in his deposition that those affect the value

24  of the PII.

25          Indeed, Olsen attempts to calculate damages

1  by grouping the vast array of different impacted data

2  elements -- these 724 unique combinations I've talked

3  about -- into just four categories.  He also averages

4  the prices for which this type of data is offered

5  despite acknowledging that prices on the dark web vary

6  substantially.  And he admits that he has no idea what

7  the data on the dark web that he uses for his damages

8  calculations actually sell for.  There are no sale

9  prices reflected on the dark web for stolen data, only

10  offering prices.

11         So in this sense, plaintiffs' market value

12  theory is quite similar to the approach that the

13  Supreme Court rejected in *Wal-Mart*.  Plaintiffs,

14  essentially, are asking this Court to discard

15  individual differences among class members and certify

16  a class based on a statistically insignificant random,

17  cherry-picked sampling of dark web prices offered by

18  criminals that are averaged, grouped into categories,

19  and then multiplied across the class.

20         But a class cannot be certified on the

21  premise that a defendant will not be entitled to

22  litigate its defenses to individual claims.  That's

23  what *Wal-Mart* tells us.

24         Now, plaintiffs claim that despite all of

25  this individual variation that's inherent in this

1   theory, Olsen's market value analysis damages can be

2   applied mechanistically across the data elements

3   impacted for each class member.  This argument misses

4   our point.

5          Capital One contends that Olsen's formula

6   itself is defective because it does not consider

7   individualized factors that affect the market value, if

8   any, of Thompson's unauthorized access to PII.  For

9   example, because Olsen does not control for information

10  already in the public domain, he would award damages

11  for information, like name and data of birth, that are

12  already publicly available.  And that's not

13  hypothetical.  In fact, he awards $55 million in

14  damages to the putative class for those data elements

15  which are available on people's Facebook page.

16         Not only have plaintiffs not suffered an

17  injury based on information that's already publicly

18  accessible, but Olsen's model independently violates

19  the Supreme Court's *Comcast* decision by failing to

20  measure only those damages that are attributable to

21  their theory of liability.  The theory of liability is

22  it's unauthorized access.  But if I voluntarily put my

23  information out in the world, how is accessing that

24  same information providing entitlement for $55 million

25  in damages?

1    Plaintiffs also fail to explain how this

2    cyber incident caused them to suffer their supposed

3    market value injury.  And this is where I think this

4    theory really breaks down.  The plaintiffs state that

5    the market value theory does not depend on individual

6    proof that class members would or did sell their PII.

7    They also say that the question of whether their PII

8    lost value is completely irrelevant to their market

9    value theory.  If that's the case, then how were

10   plaintiffs economically damaged by Thompson's

11   unauthorized access?  They simply don't say.

12          I mean, this is an uneconomic harm.  This is

13   a made-up harm created out of whole cloth that they

14   claim constitutes injury sufficient not only to get

15   them into the courthouse door on Article III, but

16   certify a class.

17          Like, what do they do?  How do they try to

18   get around that?  They analogize their damages to

19   reasonable royalties for patent infringement, but that

20   analogy is inapt and has been rejected.  The only court

21   that has considered this same precise theory in a data

22   breach case rejected it out of hand, and that's the

23   *Adkins v. Facebook* case.

24          And my friends here, Mr. Yanchunis and

25   Ms. Riebel, were plaintiffs' counsel in that case.

1    They used the same expert firm as Olsen here.  They

2    didn't use Olsen.  They used his partner, Ian Ratner.

3    And in that case, Mr. Ratner proposed the same theory

4    that Olsen proposes here; namely, that Plaintiff Adkins

5    was injured when unauthorized third parties got access

6    to his personal information for free without

7    compensation to the plaintiff.  Judge Alsup in that

8    case rejected the theory as -- and I quote -- too

9    speculative to assert a claim for negligence.  Faced

10   with that adverse decision, plaintiffs' only response

11   is that the *Adkins* court was simply incorrect in its

12   ultimate conclusion.  But plaintiffs are wrong, and the

13   *Adkins* court is right.

14          For all those reasons, the Court cannot

15   certify any of the claims premised on the market value

16   theory of harm.

17          So now I'd like to turn to their third theory

18   of harm that they rely on to certify a class, and

19   that's disgorgement.  This is a theory that was also

20   concocted by Gary Olsen.  As a recap, this theory

21   proposes alleged damages of approximately $300 million

22   to compensate plaintiffs in the putative class for

23   Capital One's use of their application data in models

24   to prevent fraud between 2015 and 2020.

25          According to the plaintiffs, Capital One

186

1    should have to disgorge the amount of fraud it

2    prevented, that is, the benefit it allegedly obtained,

3    by using the application data because Capital One

4    allegedly was not adequately protecting that data.

5             As an initial matter, I'll just note it's

6    somewhat odd for plaintiffs to seek disgorgement for

7    fraud prevention which is intended to protect customers

8    like the plaintiffs.  But there are three threshold

9    problems that I think the Court needs to consider

10   before we get to the serious predominance problems with

11   this damages claim:

12            First, as my colleagues will explain when we

13   argue the motion to exclude Olsen, his disgorgement

14   theory falls apart.  It's neither relevant nor

15   reliable, and the Court should exclude under *Daubert*.

16            The second threshold issue is -- and this is,

17   I think, a fatal blow that the Court needs to consider,

18   and that is that none of these eight plaintiffs can

19   recover disgorgement damages as a matter of law.  All

20   eight of the representative plaintiffs here have

21   entered into a cardholder agreement with Capital One,

22   and each of those plaintiffs is asserting a breach of

23   their express contracts related to the cyber incident.

24   It's black-letter law that plaintiffs' express

25   contracts with Capital One preclude an unjust

1    enrichment claim based on the same subject matter, and
2    the Court held in its motion to dismiss order that this
3    unjust enrichment claim is just an alternative to the
4    express contract claim.
5            And, you know, plaintiffs' answer to that is,
6    well, they can seek leave to add a new applicant-only
7    plaintiff.  But they haven't done that, and the time to
8    do so is long past.  They've amended twice, including
9    to add new plaintiffs.  And plaintiffs chose to proceed
10   by representative complaint, rather than consolidated
11   complaint.  And they're the ones that chose these
12   cardholders as their representative plaintiffs.  We
13   didn't choose them.  They did.
14           Third and finally, plaintiffs keep saying
15   that they can recover disgorgement damages under breach
16   of contract claim, but they can't cite any Virginia
17   authority to support that position.  We explain in our
18   summary judgment motion why that's wrong.  But in sum,
19   the Court should first decide whether, as a matter of
20   law, any of these plaintiffs can recover disgorgement
21   damages before it goes through the trouble of analyzing
22   whether this theory of injury satisfies Rule 23, which
23   for the reasons I'm going to explain now it doesn't.
24           So even if Olsen's disgorgement theory could
25   survive these threshold challenges, the Court should

1  reject the plaintiffs' request to certify class claims

2  based on this opinion.

3          You know, there's a lot of remarkable things

4  that have kind of come through in the briefing here,

5  but to me, one of the most significant ones is that the

6  plaintiffs have conceded that their disgorgement theory

7  is completely untethered to the cyber incident.  So

8  what do I mean by that?  Their theory is premised on

9  the remarkable notion that consumers can disgorge the

10 profits of a company just because that company

11 allegedly had deficient data security measures in place

12 at some time, regardless of whether a breach occurred

13 or any other harm was caused to those consumers.

14 That's their theory.

15          If the Court were to recognize this novel

16 theory, it would open the door to an untold number of

17 class actions alleging that businesses that keep

18 consumer data, like banks, healthcare companies,

19 airlines, etc., may have at some point in time employed

20 deficient data security measures irrespective of any

21 harm.  Setting aside that no court has accepted that

22 theory of liability, plaintiffs fail to show how they

23 can prove that each class member is entitled to

24 disgorgement damages using common evidence.

25          To start, Olsen incorrectly assumed that all

1  98 million class members had their application data

2  used in a fraud model between 2015 and '20 and that

3  each class members' application data prevented the same

4  exact amount of fraud, 56 cents per year.  That's

5  wrong.  This fictional average of 56 cents per

6  application is untethered to the facts of any putative

7  class member, which fails under *Ramirez* and *Wal-Mart*.

8  There's no record evidence to support this simplistic

9  and incorrect assumption.  Rather, not surprisingly,

10 some data is more useful in preventing fraud than other

11 data, and some class members' data wasn't even used in

12 fraud models during the time period relevant to Olsen's

13 calculation.

14        Determining whether any given class members'

15 data was actually used by a model to prevent fraud

16 during the relevant time period and, if so, how much,

17 would require a highly-individualized inquiry, and

18 plaintiffs don't show otherwise.

19        But under plaintiffs' theories, class members

20 would be awarded damages when there's nothing to

21 disgorge, and their data was never used in any fraud

22 model, let alone used successfully, to prevent fraud.

23 Plaintiffs try to dodge this issue by saying there's no

24 evidence in the record that Capital One's fraud models

25 couldn't function without any one individual's PII, but

1   that's factually untrue.  As the record shows, Capital

2   One has fraud models that function without using any

3   application data.  And it's plaintiffs' burden to prove

4   that their damages can be established on a classwide

5   basis and not our burden to disprove it.

6         And plaintiffs' position makes no sense.  If

7   a given class member's data did not result in actual

8   fraud savings, then that class member conferred no

9   benefit on Capital One and plainly is not entitled to

10  disgorgement damages.  Rule 23 does not permit the

11  Court to award damages to uninjured class members.  And

12  if *Ramirez* teaches us anything, it teaches us that,

13  because those 6,200 uninjured class members couldn't

14  recover.

15        Finally, in short, Olsen's incorrect

16  assumption that each of the 98 million class members'

17  application data prevented the same amount of fraud is

18  just a transparent attempt to paper over the

19  individualized inquiries that make this theory of

20  recovery improper for classwide treatment.

21        But there's another problem, and that is that

22  the disgorgement theory fails to consider benefits

23  obtained by the putative class, and Your Honor asked

24  about this.  You asked -- it was a perceptive question

25  to Mr. Siegel.  The law of disgorgement requires an

1 offset of any benefits that are received by the

2 plaintiffs in exchange for providing their data to

3 Capital One.

4          And plaintiffs try to confuse that issue by

5 suggesting that the question is whether class members

6 would have received benefits regardless of whether

7 Capital One obtained fraud savings, but that's not the

8 right question.  The correct question is what benefits

9 did class members receive in exchange for providing

10 their data to Capital One, and the answer is that all

11 class members received at a minimum -- and Your Honor

12 has noted this more than once -- the benefit of having

13 their application considered.  Most class members and

14 all the plaintiffs who are cardholders also received

15 additional benefits in the form of credit, credit card

16 services, and the like.

17          And then there's an additional question about

18 whether any given class member benefited from Capital

19 One's fraud prevention program specifically.  So what

20 if somebody tried to misuse your card and Capital One

21 caught the hacker -- I mean, the fraudulent person and

22 prevented the fraud on your account?  That's some

23 benefit.  That's an individualized -- one of hundreds

24 individualized inquires that would need to be made to

25 figure out the offsetting benefits to calculate the

1    disgorgement damages that would need to be run against

2    the 98 million person class.

3            But plaintiffs fail to even acknowledge these

4    indisputable benefits, much less proposed method for

5    determining the value of these benefits for each of the

6    98 million proposed class members using common

7    evidence.

8            Plaintiffs testified in their depositions

9    here of these eight named plaintiffs that they applied

10   for Capital One credit cards for a variety of reasons

11   proving that the value of having their application

12   considered and a card issued would be an inherently

13   individualized issue.  Some people like the rewards

14   program.  Some people had lower credit scores, and this

15   was the only credit card they could get.  I mean,

16   there's a wide variety of reasons and benefits that

17   different people experience in applying for these

18   cards, all of which would need to be taken into account

19   to try to calculate the disgorgement theory.

20           In sum, plaintiffs' disgorgement theory is

21   not capable of being proven on a classwide basis using

22   common evidence.  Suggesting otherwise, plaintiffs rely

23   on unsupported assumptions and they ignore highly

24   individualized inquiries that would be necessary to

25   undertake to determine whether any given class member

1  can recover disgorgement damages.  And while it would

2  be convenient for the plaintiffs if each of the 98

3  million class members' application data benefited

4  Capital One in the same amount of 56 cents, it's simply

5  not the case.

6          And because the disgorgement theory flunks

7  Rule 23 scrutiny, it cannot provide a basis to certify

8  plaintiffs' unjust enrichment or breach of contract

9  claims.

10         All right.  So those are the three primary

11  horses that they're trying to ride to prove injury both

12  for Article III purposes and for certification

13  purposes.  I now want to turn to their theory of

14  nominal damages, which plaintiffs assert is supportive

15  of the breach of contract.

16         The prospect of the class recovering nominal

17  damages for their breach of contract claim has been a

18  hot topic throughout this litigation.  Plaintiffs have

19  suggested and they suggested again today that even if

20  they can prove no actual harm to themselves or any of

21  the 98 million putative class members, they could still

22  walk away from trial with an up to $9.8 billion

23  recovery, that is, $100 in nominal damages per class

24  member.  Mr. Siegel said it again this morning.

25         This issue bears on several aspects of

1   Rule 23, most notably the superiority requirement under

2   23(b)(3)(D).  So it's important to understand why

3   plaintiffs' position on nominal damages is wrong.

4          First -- and Your Honor was right on this

5   this morning -- plaintiffs are wrong that the

6   availability of nominal damages for a breach of

7   contract relieves them of proving an injury.  I think I

8   actually heard Mr. Siegel agree with Your Honor on that

9   this morning.

10          Our contracts professors in law school taught

11  us that an essential element of breach of contract

12  claim is actual injury, and I don't think the law has

13  changed.  It's been a while since I've been in law

14  school, but I don't think the law has changed.

15          And the *Bailey v. Potter* case in the Eastern

16  District of Virginia, I think, said it nicely.  They

17  said it therefore follows that a claim for nominal

18  damages does not eviscerate the consequential injury or

19  damage element of a claim for breach of contract.

20          Now, plaintiffs mischaracterize our argument

21  as saying that plaintiffs have to prove compensatory

22  damages to obtain nominal damages.  That's not what

23  we're saying.  The point is that plaintiffs can't rely

24  on a mere breach of the privacy notice standing alone

25  to obtain nominal damages, and plaintiffs have failed

195

1   to show that they can establish an actual injury caused

2   by Capital One's alleged breach of the privacy notice

3   across the 98 million person class using common

4   evidence; thus, nominal damages do not fix plaintiffs'

5   predominance problems.

6          Second, plaintiffs don't dispute that they

7   cannot recover both compensatory and nominal damages

8   for the breach of contract claim.  So if the Court

9   rejects the classwide injury theories that plaintiffs

10  advance and only their claim for nominal damages

11  remains, the Court should decline to certify the breach

12  of contract claim altogether.

13         And that's so for a couple of reasons.  The

14  first is, as I mentioned, these classwide damages

15  theories are their theories of injury.  That's their

16  evidence.  So if they don't have evidence of actual

17  injury that can satisfy the Court's scrutiny that's not

18  cognizable, then they haven't made a case for actual

19  injury that would support an award of nominal damages.

20  That's point one.

21         The second is the Court shouldn't certify a

22  breach of contract claim under those circumstances

23  because a favorable classwide judgment on nominal

24  damages would preclude absent class members from

25  pursuing claims for any actual damages under *res*

1   *judicata.*

2        Now, while we dispute vigorously that any

3 class members suffered actual damages, as I mentioned

4 before, plaintiffs allege a host of them in their

5 complaint, including actual fraud, which they concede

6 can't be resolved on a classwide basis and don't seek

7 to certify for classwide treatment.

8        In other words, proceeding with a class claim

9 for solely nominal damages would not be the superior

10 method because it's inconsistent with the case that

11 plaintiffs have brought.  If the Court declines

12 certification of plaintiffs' classwide injuries, these

13 classwide injury theories that we've talked about, it

14 should decline certification for the breach of contract

15 claim altogether.

16        Plaintiffs' incorrect view of how nominal

17 damages would be awarded confirms that certification of

18 a nominal damages only claim is not the superior method

19 of adjudication here.  As we explained in our

20 opposition brief, the Fourth Circuit has not condoned

21 awarding nominal damages in a class action to each

22 class member.  Rather, in the *Norwood v. Bain* case that

23 we cited, the Fourth Circuit followed the typical

24 practice of awarding one dollar in nominal damages to

25 the class as a whole.  Similarly, other courts have

awarded nominal damages only to the named plaintiffs in cases.  Virginia courts routinely describe nominal damages as, quote, token or, quote, trivial.  There's nothing token or trivial about a $9.8 billion nominal damages award.

Plaintiffs have no good answer to *Norwood*. They just repeat the same Ninth Circuit case, *Cummings v. Connell*, which, in addition to being an outlier, expressly noted that its ruling was contrary to *Norwood*.  Plaintiffs also fail to meaningfully engage with the authorities that we cite showing an award of $9.8 billion where no class member has suffered actual harm would violate due process.

Finally, plaintiffs complain that Capital One shouldn't be let off the hook just because we got lucky that Paige Thompson was caught before the data could be misused.  But this just proves that plaintiffs are trying to use nominal damages which were meant to be a symbolic, trivial award to impose punitive damages on Capital One even in the absence of actual harm to any plaintiff.

Plaintiffs' argument does call to mind the Supreme Court's analogy in *Ramirez* that if a reckless driver exposes another motorist to a risk of harm but no accident occurs, that would ordinarily be cause for

1    celebration, not a lawsuit, and certainly not a lawsuit

2    seeking $9.8 billion in nominal damages.

3         Two final points on nominal damages, Your

4    Honor.  Plaintiffs suggest that the Court need not

5    decide now whether nominal damages can be awarded to

6    each class member saying this should be determined at

7    the damages phase of the case.  But while the amount of

8    nominal damages is properly considered later, the Court

9    should decide the gating legal question of whether each

10   class member can recover nominal damages because it is

11   critical to the Rule 23 analysis.

12        Plaintiffs say in a footnote also that

13   nominal damages may be available for their negligence

14   and unjust enrichment claims.  We vigorously disagree

15   with that.  But in any event, that's just further proof

16   of plaintiffs' singular focus on obtaining class

17   certification irrespective of whether it can result in

18   any meaningful relief for the class.  In short, class

19   claims for solely nominal damages do not meet Rule 23

20   superiority requirement under the facts of this case.

21        That concludes my remarks on nominal damages.

22   Unless the Court has any questions, I now want to just

23   quickly turn to several of plaintiffs' causes of action

24   and discuss them in a little bit more detail.

25        THE COURT:  All right.

1          MR. BALSER:  And specifically, I want to

2    touch on their breach of contract, unjust enrichment,

3    and statutory claims through the Rule 23 lens.  Our

4    arguments, again, are going to focus primarily on

5    predominance, but I'm also going to discuss typicality

6    and adequacy under Rule 23(a)(3) and (a)(4).

7          Let's start with their breach of contract

8    claim.  In short, there are three reasons that

9    plaintiffs can't satisfy predominance as to this claim:

10         The first is that the relevant contractual

11   obligations, that is, those that are contained in the

12   privacy notice, differ across the putative class.

13         Second, the applicants who are not

14   represented by this, in our view -- represented by

15   these eights plaintiffs -- would have to present

16   individual proof regarding contract formation.

17         And third, resolving contract requirements

18   and defenses requires consideration of facts specific

19   to each class member such that classwide relief would

20   be inappropriate.

21         Plaintiffs have seized on a phrase in the

22   privacy notice that states that Capital One's security

23   measures comply with federal law.  But because that

24   privacy notice did not contain that language before

25   2010, a breach of contract claim premised on the

1  pre-2010 privacy notice differs significantly from a

2  claim premised on a post-2010 privacy notice.

3  And it's not as simple a question as

4  Mr. Siegel would like the Court to think about whether

5  that's something that can just be figured out with the

6  press of a button by Capital One.  Individualized

7  determinations would be required to determine when any

8  particular class member applied for a credit card,

9  which version of the privacy notice was then in effect,

10 whether Capital One approved the application, and, if

11 so, whether any updated version of the privacy notice,

12 that is, for example, a version including plaintiffs'

13 favored "comply with federal law" language applies to

14 that putative class members' information that was

15 stolen in the cyber incident.

16 Plaintiffs' primary response to this argument

17 is that some automated review of our files would show

18 which privacy notice applies, but that's not right.

19 Plaintiffs overlook that many plaintiffs and class

20 members -- I mean their named plaintiffs and additional

21 class members -- submitted multiple different

22 applications at different points in time.  Some of

23 which were granted, some of which were not.

24 If an application were granted, the Court

25 would have to determine how long the account remained

1   open and if an updated post-2010 privacy notice applied

2   to the account.   The Court would then have to determine

3   whether the information that was impacted in the cyber

4   incident pertained to an application or an account that

5   was governed by the pre-2010 or post-2010 version of

6   the privacy notice, an issue that itself might be

7   contested.   In short, Capital One cannot just press a

8   button to generate a straightforward answer to these

9   questions.

10            Similar predominance issues exist with

11  respect to the applicants only.   In their opening

12  brief, plaintiffs asserted that all applicants are

13  provided with the privacy notice during the application

14  process.   We disproved that assertion in our response

15  showing that some applicants were not provided with a

16  copy of the privacy notice at the time that they

17  applied.   Other applicants had access to the privacy

18  notice but were not required to read it, and some

19  plaintiffs testified that they never look at privacy

20  notices before applying for credit.   Plaintiffs do not

21  address any of this evidence in their reply brief, and

22  they indisputably have not developed classwide evidence

23  that applicants were presented with, read, or relied on

24  the privacy notice.

25            For applicants to be able to enforce the

1   privacy notice, they must present evidence that that

2   notice formed part of the bargain that they struck with

3   Capital One.

4         We've cited in our brief the just

5   black-letter law *Giordano v. Atria Assisted Living*, an

6   Eastern District of Virginia case that says in order

7   for a valid contract to be formed, the axiomatic

8   meeting of the minds must occur.  There can be no

9   mutual assent where one party is not even aware of the

10  existence of the contract.

11        And we cited this case from the Western

12  District of New York that's an interesting case.  It's

13  the *Fero v. Excellus Health Plan* case.  In that case,

14  it's very similar to this issue that we're talking

15  about now, and that case involved a health plan.  Some

16  health plan members were provided a copy of the privacy

17  policy while others were only provided a link where

18  they could access the document, which is the case here

19  with respect to many of the channels.  We looked at

20  that chart earlier and the different ways people can

21  apply.  The court there held that there was no

22  predominance because of the need for individual inquiry

23  into whether a given class member received a paper copy

24  of the privacy or a link thereto.  That is, the court

25  denied certification of a Rule 23(b)(3) class on the

1   very issue presented in this case, that is, the lack of

2   common proof that all applicants received the privacy

3   notice.

4          Plaintiffs don't dispute and, therefore,

5   concede that many applicants were not given the privacy

6   notice at the time of application.  So if the Court

7   agrees with us that applicants cannot enforce a

8   contract that they didn't know existed, then it should

9   also find that these questions of contract formation

10  defeat predominance.

11         Very quickly, Your Honor, I want to mention

12  the defenses we have to the contract claims.  We've

13  explained in our briefs why determining which class

14  members are subject to the defenses of first material

15  breach -- and the related doctrines of setoff and

16  recoupment -- require individualized inquiries.

17  Plaintiffs argue that we waived that defense by not

18  explicitly pleading it, but we did plead setoff.

19         This court in the *Dowell v. G&G Motorcycles*

20  case, which is an Eastern District of Virginia 2014

21  case, said that an affirmative defense may be pleaded

22  in general terms and will be held to be sufficient as

23  long as it gives fair notice to the nature of the

24  defense.

25         In any event, Capital One can raise an

1  affirmative defense as to absent class members even if

2  that defense does not apply to the named plaintiffs.

3  That's a well-established point of law.  We cited the

4  *Gunnells v. Healthplan* case, a Fourth Circuit case from

5  2003, for that proposition.

6         And finally, plaintiffs repeat their refrain

7  that resolving this defense merely involves automated

8  review of Capital One's customer files, but that's not

9  true.  In fact, we don't need to look any further than

10 the representative plaintiffs to see why automated

11 review of Capital One's files would not resolve Capital

12 One's first material breach defense.

13        If we could, just take a look at Sara Sharp.

14 We've got a slide up that shows her circumstances.

15 Ms. Sharp, who is one of their named plaintiffs,

16 applied for credit from Capital One four times.  Some

17 were denied.  Some were approved.  She had multiple

18 Capital One-issued credit cards.  She's filed for

19 bankruptcy twice, once in 2000 and once in 2017.  She

20 also routinely carried a balance on her Capital One

21 account and left Capital One with nearly $1,000 in debt

22 to charge off on at least one card.

23        Thus, determining whether her claims are

24 barred by the first material breach doctrine would

25 require analysis of whether the data of hers that was

1    impacted in the breach related to one of the accounts

2    that was charged off, whether Capital One did anything

3    that could be construed as waiving her breach, for

4    example, by issuing her another card, whether that

5    breach was material or partial, etc.

6           She's only one of the 98 million people in

7    this putative class, but she provides a nice example of

8    the highly individualized inquiry that would be

9    necessary for us to be able to assert defenses

10   available to us for this breach of contract claim.  And

11   there's just no automated review of our files that

12   could resolve these and other similar issues for 98

13   million individuals.

14          I want to switch gears and address

15   plaintiffs' unjust enrichment claim.

16          THE COURT:  All right.

17          MR. BALSER:  I want to first discuss why the

18   plaintiffs, who are all cardholders, are neither

19   typical or adequate to assert this claim on behalf of

20   the applicants.  Then I'll explain why the unjust

21   enrichment claim independently fails the predominance

22   test.

23          So I know Your Honor is familiar with the

24   standards for typicality and adequacy.  Rule 23(a)(3)

25   provides the standard for typicality.  The claims or

1    defenses of the representative parties must be typical

2    of the claims or defenses of the class.   Rule 23(a)(4)

3    is the adequacy test.   Plaintiffs must demonstrate that

4    they will fairly and adequately protect the interest of

5    the class.   It's black-letter law that a unique defense

6    precludes a finding of typicality because of the danger

7    that the unique defense will preoccupy the class

8    representative to the detriment of the interest of the

9    absent class members.

10            So let's talk about typicality.   Plaintiffs

11   here fail the typicality requirement with respect to

12   their unjust enrichment claim because they cannot

13   assert such a claim.   They don't have the claim in

14   light of their express contracts with Capital One.   The

15   alleged class includes 33.8 million applicants, but no

16   plaintiff is an applicant.   They're all Capital One

17   cardholders.

18            Plaintiffs have conceded on the record that

19   there's no unjust enrichment claim as to plaintiffs who

20   entered into a cardholder agreement and have express

21   contractual rights under the privacy notice.   And a

22   long line of cases establishes that to satisfy the

23   typicality requirement, a class representative must be

24   part of the class and possess the same claims and

25   injuries as the class.   A class representative also

1  cannot be subject to a unique trial defense that would

2  result in dismissal of the claim asserted on behalf of

3  the class.  Plaintiffs' unjust enrichment claim and

4  implied contract claims, therefore, cannot be

5  certified.

6          And there's another problem, and that's

7  adequacy.  For similar reasons, plaintiffs are

8  inadequate to pursue the quasi-contractual claims on

9  behalf of the applicants.  As cardholders, plaintiffs

10  are incentivized to pursue their breach of express

11  contract claim.  The applicants who would not benefit

12  from that claim, because they don't have it, are

13  incentivized to pursue quasi-contractual claims, such

14  as unjust enrichment.  Plaintiffs do not share those

15  incentives because they do not have and cannot pursue

16  an unjust enrichment claim.

17          For example, plaintiffs are already pressing

18  a nominal damages express contract claim that would

19  negate the unjust enrichment claim for what, in our

20  view, should be, at most, a $1 recovery to the entire

21  class.

22          Now, in their reply, the plaintiffs make the

23  predictable argument that their contractual and

24  quasi-contractual claims all rise from the same data

25  breach and security failures; thus, Capital One's

1   challenges can be discarded.  But that position ignores

2   black-letter law holding that a named plaintiff must

3   possess the same claim as absent class members and be a

4   member of the class that he or she seeks to represent.

5   Plaintiffs are not members of a class that can assert

6   quasi-contractual claims, and this creates a

7   fundamental conflict of interest.

8          So in addition to those threshold problems,

9   fatal threshold issues, they fail to meet their burden

10  of showing that they can prove their unjust enrichment

11  claim on a classwide basis using common evidence.  So

12  this is the predominance argument.

13         On reply -- this is kind of amazing, and I

14  think Your Honor touched on this this morning.  In

15  their reply brief, the plaintiffs are now trying to

16  distance themselves from the causal basis on which

17  their claim is premised, that is, that no class member

18  would have applied for a Capital One credit card had

19  they known about Capital One's allegedly deficient data

20  security practices, such that monetary benefits should

21  be disgorged back to the plaintiffs.

22         But the premise of disgorgement is to restore

23  the *status quo ante*, and courts often look to whether

24  the plaintiff would have acted differently absent

25  expectation of payment in assessing unjust enrichment

1  claims.

2        And this causal connection has also been the

3  basis for the plaintiffs' claim since the outset of the

4  case.  In their complaint -- we have this allegation up

5  here in this chart -- plaintiffs allege that but for

6  Capital One's willingness and commitment to maintain

7  their data's privacy and confidentiality, that PII

8  would not have been transferred and entrusted with

9  Capital One.

10        And Gary Olsen, their expert, testified that

11  this was the but-for world underpinning his

12  disgorgement analysis.  Plaintiffs and Olsen have

13  simply assumed this but-for causation across the entire

14  putative class, but they fail to show how they will be

15  able to prove it with common evidence.  In fact, they

16  haven't even tried.

17        The record evidence showed that this

18  assumption is wrong.  For example, six out of the eight

19  plaintiffs here have testified that they intended to

20  continue using their Capital One credit cards after

21  they learned of the cyber incident.

22        And this is the point, Your Honor -- this is

23  the point I was hinting at when Your Honor asked me

24  what the uptake on the credit monitoring was.  Seven

25  out of the eight plaintiffs did not sign up for credit

1  monitoring that Capital One offered after announcing

2  the cyber incident, which undermines Olsen's assumption

3  that data security is so important to them that it

4  would drive their consumer behavior.

5          And putative class members continue to apply

6  for Capital One cards at similar rates after the

7  announcement of the cyber incident as they did before

8  the cyber incident.  Neither plaintiffs nor the Court

9  can simply assume that the behavior of 98 million

10 putative class members would be the same, especially in

11 the face of contrary record evidence.

12         Plaintiffs cite no authority for their new

13 position that they're relieved of proving the causal

14 basis for their unjust enrichment claim.  Allowing

15 plaintiffs to ignore a fundamental premise for their

16 claim would lead to absurd results.  For example, under

17 this new theory that they put forth in their reply

18 brief, it would be irrelevant to them if Capital One

19 had expressly told the putative class that it would not

20 protect their data, if we had said it wouldn't matter

21 to their claim as they now frame it.

22         In sum, plaintiffs were required to show that

23 they will be able to prove that no class member would

24 have applied for a Capital One card had they known

25 about its alleged deficient data security.  They didn't

1  conduct a conjoint analysis or put forth any other

2  method to meet their burden.  Rather, when we pointed

3  out those problems, they ran from some of the

4  allegations they made in their complaint and that Olsen

5  relied on for his theory and say causation is now no

6  longer an element.

7           So, for these reasons, their unjust

8  enrichment claim can't be certified.

9           There's another problem with the unjust

10 enrichment claim, and Your Honor is going to hear more

11 about this tomorrow.  But the unjust enrichment claim

12 is also improper for class treatment in light of

13 Capital One's statute of limitations defense.  We cite

14 *Broussard*, a Fourth Circuit case, that holds that

15 resolution of statute of limitations defense would

16 depend on facts peculiar to each plaintiffs' case,

17 which defeats predominance.

18          We've got, I think, a nice little graphic

19 here that illustrates the problem.  In Virginia, an

20 unjust enrichment claim must be brought within three

21 years, but here plaintiffs seek disgorgement damages

22 going back to 2015.  To determine whether a given class

23 members' claim is barred, the Court would have to

24 determine, at a minimum, when that class member applied

25 for a card, and they could have applied many times.

1           When Capital One migrated their application

2   data to the AWS cloud and when Capital One used their

3   application data to prevent fraud, if at all,

4   plaintiffs, again, suggest this would require simple

5   automated review of Capital One's files.  But that's

6   not so.  Even assuming all application dates could be

7   collected and analyzed for 98 million consumers

8   spanning a 15-year period, plaintiffs do not even

9   respond to our point that determining when a specific

10  data element was used to prevent fraud, if at all,

11  would be an inherently individualized inquiry.

12          Until Capital One used specific application

13  data to actually prevent fraud, Capital One

14  undisputedly obtained no benefit from having that data

15  under plaintiffs' own theory; thus, the date on which

16  Capital One prevented fraud using a particular data

17  element is critical to the statute of limitations

18  inquiry.

19          So, in conclusion, Your Honor, plaintiffs'

20  failure to address individualized issues related to

21  causation and our statute of limitations defense

22  preclude certification for their unjust enrichment

23  claim.

24          I want to talk for just one minute,

25  literally, about other individual defenses that we've

1  raised.  The Fourth Circuit has held that predominance

2  may be defeated if the resolution of individual

3  defenses depends on facts peculiar to each plaintiffs'

4  case.  That's the *Broussard* case.  And even in the

5  context of potential affirmative defenses, it's the

6  plaintiffs who have to show that the defenses can be

7  resolved under Rule 23 with common proof.

8        We explained in our brief why Capital One's

9  defenses have limitation of liability.  Failure to

10 mitigate and contributory negligence cannot be resolved

11 with common proof.  Plaintiffs misunderstand our

12 argument.  We're not contending that any one of these

13 defenses standing alone defeats predominance.  Our

14 point is that all of the individualized issues

15 presented by plaintiffs' theories of injury and their

16 substantive claims and Capital One's defenses to those

17 claims taken together defeat predominance.  The

18 defenses raised here merely highlight the extent of

19 individualized inquiries that would be required to

20 adjudicate plaintiffs' claims.

21        We want to now turn -- and I'll do this

22 briefly also, Your Honor -- to plaintiffs' statutory

23 claims.  And these claims under the UCL the CLRA and

24 the GBL and the WCPA also fail under the predominance

25 test under Rule 23.  All of those claims require common

1   proof of causation and damages, which is lacking for

2   the reasons we've been discussing today.

3           There are some complicated issues raised by

4   those claims, and we've addressed most of them in full

5   in our brief.  But I do want to hit the key points and

6   respond briefly to a few new arguments that the

7   plaintiffs made for the first time in their reply

8   brief.

9           To start, if you look at their initial

10  motion, if you look at plaintiffs' opening brief, they

11  gave very short shrift to these claims.  In fact,

12  plaintiffs did not even mention in their opening brief

13  what injuries could support those proposed statutory

14  claims.  On that basis alone, the Court can and should

15  decline certification because it's plaintiffs' burden

16  to meet the requirements of Rule 23.  And by clarifying

17  those injury theories for the first time in their

18  reply, they waive those arguments.

19          But had they timely asserted the injuries

20  that they now seek to certify under the statutory

21  claims, we would have explained how none of the

22  plaintiffs can pursue those claims.  We explain in our

23  motion for summary judgment why the claims fail on

24  their merits.  I'm not going to get into that here.

25          But here's the point:  The plaintiffs made

1   clear for the first time in their reply brief that

2   they're relying on the market value theory and the

3   increased risk of harm theories of injury to support

4   their statutory claims.  Those injury theories fail for

5   the reasons we've been discussing almost all day today,

6   meaning that the plaintiffs' statutory claims can't be

7   certified because the damages theories under which

8   they're traveling are not certifiable.

9         But even if the claims weren't doomed on the

10  merits, plaintiffs have failed to meet their burden by

11  showing that they can prove the claims on a classwide

12  basis with common evidence.

13        It's unclear.  I heard Mr. Siegel say, I

14  think, earlier today that the plaintiffs are not

15  relying on alleged misrepresentations by Capital One

16  regarding the status security practice to support these

17  claims.  Their brief suggests otherwise.  But whether

18  they are or aren't or whether they're relying on

19  purported omissions, plaintiffs can't point to any

20  common misrepresentation or omission that all

21  98 million of the putative class members were exposed

22  to before they applied for credit cards, as would be

23  required to show causation and damages under those

24  claims.

25        They also suggest that we had some duty to

1   disclose to the class allegedly deficient data security

2   practices.  That's a fraudulent concealment claim which

3   plaintiffs expressly disavow that they were asserting

4   in their motion to dismiss briefing.  And they haven't

5   pointed to any duty that Capital One had to

6   affirmatively disclose anything to the class.

7           So before moving on, I just would note that

8   the claims suffer from specific problems with respect

9   to each of those statutes as well.  The WCPA, the

10  Washington statute that they're traveling under,

11  permits recovery for injuries to business or property,

12  which plaintiffs don't even assert here.

13          The CLRA can only apply to those class

14  members who applied for a card for personal, family, or

15  household purposes, and plaintiffs fail to show how

16  they can prove that condition across the class using

17  common evidence.

18          Also, the CLRA by its terms does not apply to

19  the extension of credit.  So plaintiffs would have to

20  prove a violation of the statute with respect to an

21  ancillary service used by each class member.

22  Plaintiffs cannot make that showing across the class

23  with common evidence.

24          Finally, plaintiffs ask the Court to certify

25  statutory claims for injunctive relief.  The Court

1   should reject that request for the same reason it

2   should reject plaintiffs' request to certify a

3   Rule 23(b)(2) class, which is what I'd like to turn to

4   now.

5            Plaintiffs have failed to meet their burden

6   of showing that certification of an injunctive relief

7   class under Rule 23(b)(2) is warranted.  As I explained

8   in connection with our standing motion, none of the

9   named plaintiffs has Article III standing to pursue

10  injunctive relief against Capital One because they

11  cannot show that they face a real and imminent risk of

12  being harmed by another similar breach of Capital One's

13  systems.  Because no plaintiff has standing to seek

14  injunctive relief, no Rule 23(b)(2) class can be

15  certified.

16           But even if they did have standing,

17  plaintiffs have failed to rebut all the reasons that we

18  explained in our opposition as to why a 23(b)(2) class

19  should not be certified here.  Plaintiffs don't

20  distinguish the Fourth Circuit case that we've cited,

21  the *Berry* case, that holds that where monetary relief

22  predominates, Rule 23(b)(2) certification is

23  inappropriate.

24           Plaintiffs here are asking for an award of

25  hundreds of billions of dollars.  Monetary relief

218

1   clearly predominates.  Plaintiffs cite a single case

2   from the Western District of Texas permitting, so

3   called, divided certification, but plaintiffs cite no

4   authority suggesting the Fourth Circuit would follow

5   that approach, nor do they explain why divided

6   certification is warranted on the facts here.

7             Plaintiffs also make much of *Adkins v.*

8   *Facebook* -- that's the case we talked about earlier --

9   where Mr. Ratner's theory of access was rejected by

10  Judge Alsup as a basis for a negligence claim.  But

11  Judge Alsup did certify a (b)(2) class in that case.

12            But given plaintiffs' heavy reliance on the

13  case, I think it's worth taking a minute to explain

14  what happened there.  To begin, the *Facebook* court

15  denied plaintiffs' request for a (b)(3) damages class.

16  So the rule barring injunctive relief where monetary

17  relief predominates didn't apply.  But the court also

18  explicitly based certification of the (b)(2) injunctive

19  class on evidence of -- and I quote -- Facebook's

20  repetitive losses of user's privacy, closed quote.

21            By contrast, plaintiffs here point to a

22  single breach, the root causes of which have already

23  been fixed.  So this Court should take a dim view of

24  plaintiffs' heavy reliance on *Facebook*.

25            In their reply, the plaintiffs fail to take

1   on our argument that injunctive relief is unwarranted

2   because there's no evidence of dissemination, and

3   Capital One has already completed extensive remediation

4   of the issues that led to the cyber incident.

5          They likewise fail to address our arguments

6   that the Court can't order us to engage with criminals

7   on the dark web, which is part of the relief they seek.

8   And many of the measures that the plaintiffs seek, like

9   deletion of data, are unrelated to the causes of the

10  cyber incident.

11         For all of these reasons, the Court should

12  not certify a Rule 23(b)(2) injunctive relief class.

13         Plaintiffs wave at an issue, a certification

14  argument, under Rule 23.  I think it's fairly obvious

15  to the Court by now that certifying -- I mean,

16  certifying an issue class on duty and breach alone

17  leaves the hardest issues of causation and injury still

18  undecided.  So if the Court were to certify an issue on

19  duty and breach and send the cases back to the

20  98 million people for trial, they still would have to

21  prove causation and injury, which are the real issues,

22  the hardest real issues to grapple with here.  So even

23  if the Court went through the trouble of resolving duty

24  and breach on a class basis, it would still be left

25  with 98 million individual trials on the most complex

220

1  issues we have, and that's not material advancement.

2           So given the complexity and difficulty in

3  proving causation and damages, few, if any, class

4  members would actually benefit from a ruling on duty

5  and breach.

6           So, to wrap up, Your Honor, to conclude here,

7  just a quick trip of where we've been.  I've explained

8  or tried to how all the claims that plaintiffs ask to

9  certify are plagued with individualized issues.  I've

10 also explained, with respect to the unjust enrichment

11 claim, that the named plaintiffs aren't typical or

12 adequate class representatives.  And I've just

13 discussed why certification of a Rule 23(b)(2)

14 injunctive relief class and certification of limited

15 issues is unwarranted.

16          Again, it's the plaintiffs' burden to prove

17 that they meet the requirements of Rule 23.  It's not

18 Capital One's job to disprove it.  Plaintiffs have not

19 carried their burden.

20          In closing, I would like to draw the Court's

21 attention back to Rule 23(b)(3)(D)'s superiority

22 requirement.  Rule 23(b)(3)(D) provides that in

23 determining whether a class action would be the

24 superior method for adjudication, the Court should

25 consider the likely difficulties in managing a class

1  action, and the advisory committee notes state that a

2  critical need is to determine how the case will be

3  tried.

4       I know Your Honor is a very experienced trial

5  judge; thus, when considering plaintiffs' motion for

6  class certification, I urge the Court to think about

7  what a trial would actually look like in this case

8  based on all of these individualized issues that I've

9  outlined today.

10      As I mentioned earlier, the Supreme Court in

11 *Ramirez* confirmed that in a class action, plaintiffs

12 must factually establish with evidence each absent

13 class member's alleged harms.  The Court cannot simply

14 presume that an absent class member suffered the harms

15 alleged by the named plaintiffs.  Plaintiffs have

16 failed to show how they can prove the alleged harms of

17 each of the 98 million class members in an efficient

18 manner using common evidence.  Rather, the jury would

19 be required to preside over literally tens of millions

20 of individual trials to prove plaintiffs' classwide

21 injury theories.

22      And these individualized inquiries would

23 include, for example, on the increased risk of harm

24 theory, the jury would have to consider broad variation

25 in individual class members' risk profiles and whether

1  the cyber incident uniformly increased the risk levels

2  across a range of 724 different combinations of stolen

3  data, many of which pose no risk of harm at all.

4          On the market value theory, the same

5  complications would infect the trial, and Capital One

6  would be entitled to dispute the value assigned to any

7  given class members' stolen data, including by

8  presenting evidence that the data was exposed in a

9  prior breach or publically available online or the data

10 was obsolete or inadequate.

11         On the disgorgement theory, evidence would

12 have to be presented on whether any given class

13 members' application data was used in a fraud model

14 during the relevant time frame, whether it actually

15 prevented any fraud, and whether that class member

16 received any benefits in exchange for providing that

17 PII to Capital One.

18         And on nominal damages, individualized

19 inquiries would be required to prove causation and

20 harm, even to recover just nominal damages, and to

21 resolve the contract defenses and requirements Capital

22 One has identified.

23         Plaintiffs have failed entirely to show how a

24 trial could feasibly be conducted on these facts.  It's

25 clear it cannot be.  Telling evidence of how

1  unmanageable a trial would be is plaintiffs' failure to

2  submit a trial plan to the Court explaining how this

3  case could be efficiently tried.   Mr. Siegel said he's

4  thought about one, but I haven't seen one.   I don't

5  think the Court has either.   Indeed, no data breach

6  class action has ever gone to trial and for good

7  reason.

8          In closing, Your Honor, this case is not

9  conducive to classwide resolution, and envisioning what

10  a trial would look like proves that point.   Because

11  plaintiffs have failed to carry their burden to

12  establish compliance with Rule 23, the Court should

13  deny their motion for class certification in its

14  entirety.

15          THE COURT:  All right.   Thank you.

16          MR. BALSER:   Thank you.

17          THE COURT:  Mr. Newby.

18          MR. NEWBY:  May it please the Court.   I will

19  be concise here.   Mr. Balser very comprehensively

20  argued and effectively argued the reasons why this

21  Court should not certify the class.   I just want to --

22  and Amazon has joined in the arguments that Capital One

23  has made both on Article III standing, as well as in

24  its opposition to the motion for class certification.

25          I do want to address just a couple of gaps

1   that are different in both claims that are asserted

2   against Capital One and Amazon, as well as one

3   difference with respect to unjust enrichment.

4            First of all, as Mr. Siegel pointed out this

5   morning, the plaintiffs are seeking class certification

6   on their Florida deceptive practices claim against

7   Amazon but not against Capital One.  And the reasons

8   why class certification is not appropriate for that

9   claim is very similar to the arguments that Mr. Balser

10  was making as to the other statutory claims.

11           First of all, the plaintiffs here have not

12  shown standing.  Under the Florida statute, plaintiff

13  is only entitled to recover actual damages, and actual

14  damages are fairly narrowly construed under Florida

15  law.

16           We cited the In re Brinker Data Incident

17  Litigation case -- that's a Middle District of Florida

18  case -- on this proposition.  That was a case that

19  involved a breach involving credit card information for

20  consumers at a restaurant chain, and the court there

21  noted that unauthorized charges, lost time, and lost

22  cash back rewards are all consequential damages, not

23  actual damages.

24           And what's required to show actual damages

25  and actual injury, standing to bring a claim under the

1  Florida statute, is some damage to the diminished value

2  of the goods or services that are received by a

3  consumer in a consumer transaction, and that's not what

4  the plaintiffs are seeking here.  They're seeking

5  either some disgorgement, or they're seeking this lost

6  value type remedy.  They're not seeking any kind of

7  injury related to the lost value of the credit card

8  services that they received from Capital One.

9          So, in sum, they don't have standing to bring

10  the Florida claim.  They haven't alleged actual

11  damages, and they can't prove actual damages.

12  Certainly, they can't do so on a classwide basis.

13          Secondly, just one other finer point in

14  response to Mr. Siegel's argument this morning on this

15  omission theory that all of their state statutory

16  claims are not really based on an actual

17  misrepresentation but on an omission.  And I agree with

18  Mr. Balser that the complaint doesn't really read quite

19  that way.  But even to the extent that they are

20  presenting an omission theory, individualized issues

21  are going to predominate over common ones as to Amazon

22  as the testimony that we obtained from the

23  representative plaintiffs shows.

24          None of these plaintiffs, none of the

25  representative plaintiffs, had any idea or any

1  awareness of Amazon's relationship with Capital One

2  when they applied for or when they used their cards.

3  None of them -- or I should said every one of them

4  confirmed that it was not a factor.  The fact that

5  Capital One used Amazon Web Services to host and

6  process information and to run its back-end information

7  technology was not a factor in their decision to apply

8  for or use a Capital One card.

9          And what's more, most of them -- I believe

10 all but one -- had never even heard of Amazon Web

11 Services before this lawsuit.  Some of them hadn't

12 heard of it until just weeks before their depositions.

13          So even if there were an omission that the

14 plaintiffs could identify -- and they haven't

15 identified one throughout the course of discovery, an

16 omission of fact that Amazon should have made --

17 there's no evidence that any of the representative

18 plaintiffs would have had exposure to that omitted

19 statement, that they would have considered it.

20          And certainly, perhaps somewhere out there in

21 the 98 million class members there could be somebody,

22 but that's a highly individualized issue based on what

23 they were aware of based on the information -- you

24 know, their individualized knowledge and understanding

25 of Amazon Web Services.

1           I'd like to turn to unjust enrichment.  The

2    plaintiffs do have a slightly different -- well, I

3    should say it's more than slightly different.  It's a

4    different unjust enrichment theory as to Amazon versus

5    Capital One.

6           For Capital One, they're seeking the unjust

7    enrichment in some value that they allege Capital One

8    received from their personal information and preventing

9    against fraud loss.

10          With respect to Amazon, they're simply

11   seeking that Amazon disgorge the entirety of the

12   profits that Amazon earned from five years and a month

13   of Capital One paying Amazon for providing a range of

14   cloud services, cloud computing services.  And we have

15   addressed these claims in our motion for summary

16   judgment, which are not before the Court right now.

17   But two points on this theory:  One is -- well, I

18   should say three points.  One is this theory is based

19   entirely on Mr. Olsen's testimony.  As we'll get

20   through tomorrow, that testimony and that opinion is

21   unreliable.  And if that goes away, then the position

22   is that this theory of injury falls away as well.

23          Secondly, the unjust enrichment theory

24   suffers from the same Article III standing challenges

25   and problems that Mr. Balser very comprehensively

1    explained earlier this afternoon.  Just the mere

2    assertion of an unjust enrichment cause of action,

3    common-law cause of cause, even thought it's a cause of

4    action that has been recognized at common law, the mere

5    assertion of that cause of action is not enough in and

6    of itself to establish standing.

7           This was addressed in the *Baehr v. Creig*

8    *Northrop Team* case.  Mr. Balser mentioned it earlier in

9    his argument.  That's a Fourth Circuit case.  This is a

10   case in which unjust enrichment was considered as a

11   remedy for a statutory violation.  And in that case, it

12   was a violation of the Real Estate Settlement

13   Procedures Act where the plaintiffs had alleged that

14   the defendants had received kickbacks for doing

15   closings of real estate.  And there were no other types

16   of actual damages that the plaintiffs could identify,

17   but what they did say was, well, we're seeking unjust

18   enrichment for the kickbacks that these defendants

19   received.  And the court affirmed that unjust

20   enrichment, because it in and of itself as a cause of

21   action does not require a plaintiff to prove injury to

22   themselves, that is, that the defendants were unjustly

23   enriched at the detriment of the plaintiffs, then just

24   merely asserting that cause of action is not sufficient

25   to establish standing.

1            But that's the exact problem that we're in

2    and what Mr. Balser covered this afternoon, that the

3    plaintiffs here have not identified how Capital One's

4    payment over five years of fees to Amazon under their

5    contracts to provide cloud computing services to

6    Capital One over that period of time, how that has

7    worked to the detriment of the plaintiffs.  They

8    haven't identified any of that because they haven't

9    identified any injury.  And for that reason, they don't

10   have standing to bring the unjust enrichment claim.

11           Secondly, as Mr. Balser pointed out, in their

12   unjust enrichment claim -- and this is paragraph 183.

13   And I believe on the slide that Mr. Balser used these

14   brackets for this allegation for Capital One instead of

15   defendants.  But the way that the plaintiffs have pled

16   this case is that they would not have provided their

17   personal information to Capital One and by extension to

18   Amazon, but for certain promises that were made about

19   protecting the security and privacy of their person

20   information.

21           That's the way they pleaded the case.  That's

22   not the way that the evidence has come out.  And as I

23   said earlier, on the statutory causes of action, none

24   of these plaintiffs was aware of any statements by

25   Amazon, certainly, about the privacy and security of

1  their information.  They weren't even aware of the

2  company.

3           Just to close out on unjust enrichment, there

4  are individualized issues that would predominate on

5  this theory that the plaintiffs have that Amazon should

6  disgorge all of its profits from Capital One, and the

7  data that Capital One had stored on Amazon Web

8  Services, the way that they've processed it, as

9  Mr. Balser explained, is a high degree of variability

10 here.  We have 700-plus different variations of data

11 for each plaintiff.  The ways in which Capital One has

12 used that data, the amount of data per class member,

13 it's all going to vary substantially, and that's not

14 something that can be addressed on a classwide basis.

15          So, for that reason, we support the position

16 that Capital One has taken, that class certification is

17 not appropriate and that the claims against Amazon are

18 similarly not appropriate for class certification and

19 that the plaintiffs lack standing here to assert those

20 claims.

21          THE COURT:  All right.  Thank you.

22          MR. SIEGEL:  Your Honor, I know you've heard

23 a lot.  If I could just have a brief few minutes to

24 just touch on a few points.  I know we have the burden,

25 and I'd like to close it out, if I could.

```
 1              THE COURT:  All right.  I'll tell you what
 2   I'd like to do, just so you can deliver some very well
 3   thought out focused thoughts, is to adjourn for today,
 4   meet at 9:00 tomorrow, and I'll give everybody 15
 5   minutes to wrap up their position.  Then we'll take up
 6   the balance of the motions.  Given the number of
 7   motions, I'd like to allocate roughly 20 minutes per
 8   motion for each person to respond and then reply.  So
 9   we've gotten into a lot of the merits, I think, already
10   of a lot of the Daubert motions.  So I think we'll be
11   able to do that.
12              MR. SIEGEL:  Thank you, Your Honor.
13              THE COURT:  All right.
14              So everyone can get a good night's sleep, and
15   we'll see you-all tomorrow morning at 9:00.
16              MR. BALSER:  Thank you, Your Honor.
17              THE COURT:  All right.  The Court will stand
18   in recess.
19          ------------------------------------
                         Time:  5:06 p.m.
20
21
22
           I certify that the foregoing is a true and
23
        accurate transcription of my stenographic notes.
24
                              _____
                                          /s/
25                              Rhonda F. Montgomery, CCR, RPR
```