**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

IN RE: CAPITAL ONE CONSUMER DATA
SECURITY BREACH LITIGATION

MDL No. 1:19md2915 (AJT/JFA)

**PLAINTIFFS' RULE 72(A) OBJECTIONS TO ORDER DENYING PLAINTIFFS'**
**MOTION TO COMPEL DISCOVERY REGARDING CAPITAL ONE'S STATUTE OF**
**LIMITATIONS AND TERMS & CONDITIONS DEFENSES**

Pursuant to Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b)(1)(A), Plaintiffs

respectfully ask this Court to set aside the Magistrate Judge's order denying (the "Order") (Doc.

2130), Plaintiffs' Motion to Compel Discovery Regarding Capital One's Statute of Limitations

and Terms & Conditions Defenses (Doc's 2059 & 2060) (hereinafter "the Motion" or the "Motion

to Compel").

## I.      INTRODUCTION

Plaintiffs' objections address whether they should have been permitted to take discovery

related to new factual issues prompted by the filing of Capital One's Amended Answer—and other

written submissions—which came months after the close of fact discovery and thus could not have

been sought prior to the close of discovery. In allowing Capital One to file the Amended Answer

over Plaintiffs' objections, the Court recognized that additional discovery may be necessary.

Subsequent events—most notably Capital One's Opposition to Plaintiffs' Motion for Class

Certification (Doc. 1440), its Motion for Summary Judgment (Doc. 1461), and arguments on those

motions—demonstrate the necessity of discovery on two issues: the statute of limitations defense

raised for the first time in the Amended Answer and a new *unpled* defense concerning its website's Terms & Conditions.[1]

Despite Plaintiffs' facial inability to take discovery on either issue during the discovery period—given that both defenses were first raised months after the discovery period closed—the Order found that Plaintiffs had failed to establish "good cause to reopen discovery" related to the new, belated defenses.  (Doc. 2130 at 3). This was error.

Plaintiffs could not have been aware of the new factual issues injected by the tardy defenses during the discovery period. And the Motion to Compel itself was not dilatory; Plaintiffs engaged in an extensive meet and confer process—as required by the local rules and local practice—and that engagement is now be using as a sword against them. For those reasons, and the others set out below, the Order should be set aside and the Motion to Compel granted.

## II.   <u>BACKGROUND</u>

Plaintiffs filed their Representative Complaint on March 2, 2020 (Doc. 332), their Corrected Representative Complaint on March 13, 2020 (Doc. 354), and their Amended Representative Complaint—to substitute a new Texas plaintiff—on September 7, 2020 (Doc. 836). This Court entered its Order on Defendants' Motions to Dismiss on September 18, 2020 (Doc. 879). Capital One filed its Answer on October 16, 2020, which asserted over two dozen affirmative defenses, (Doc. 955). The Court granted Plaintiffs' leave to file a second amended complaint (Doc. 970), also to replace a class representative, which was filed on October 23, 2020 (Doc. 971), and Capital One filed its related Answer on October 28, 2020 (Doc. 976) but did not modify its affirmative defenses. *Compare* (Docs. 955 & 976).

---

[1] Pinpoint citations to material on the Court's docket refers to the CM/ECF System's pagination in the upper, right-hand corner of the document(s).

## A. Statute of Limitations Defense

### 1. Briefing and Other Matters of Record Related to the Motion

On November 20, 2020, discovery closed. (Doc. 448). Consistent with the operative scheduling order (Doc. 1119), on March 1, 2021, Plaintiffs served their expert reports, including the report of Dr. Stuart Madnick. On April 7, 2021, Capital One then served its expert reports, including an expert report countering Dr. Madnick's report. Finally, on April 28, 2021, Plaintiffs filed their motion for class certification and expert rebuttal reports. At no time during any of the preceding events did Capital One seek to amend its Answer. Instead, on April 30, 2021, Capital One filed its Motion to Amend, asserting that Dr. Madnick's March 1, 2021, report prompted Capital One to consider a statute of limitations defense because, according to Capital One, Dr. Madnick's report "for the first time, lays out specific allegations that Capital One was unjustly enriched by acts occurring before, and independent of, the data breach . . . ." (Doc. 1263 at 1).

The motion to amend did not mention that Capital One intended to assert the affirmative defense as part of its opposition to class certification, a concept raised for first time in Capital One's reply in support of its motion filed on May 6, 2021 (Doc. 1282 at 4 n.1); *see also* (5/7/2021 Hearing Tran. at 20:24–21:3). In other words, Capital One waited two months from the time it purportedly learned of the need to raise the defense and then waited until after Plaintiffs filed their class certification motion, and did not disclose its intended use of the defense as to class certification until it filed its Reply in support of its Motion to Amend.[2]

To the extent it was not clear before, Capital One's arguments in opposition to class certification (*see* Doc. 1440 at 41-42) and in seeking summary judgment against four of Plaintiffs'

---

[2] The Motion to Amend was ultimately granted by Judge Anderson, (Doc. 1295), and affirmed by this Court following Plaintiffs' Rule 72 objection, (Doc. 1748).

claims (Doc. 1463 at 42, 45-46) based on its statute of limitations defense clearly result in prejudice to Plaintiffs because Plaintiffs do not have, and never had a reason to seek, information needed to fully respond to Capital One's statute of limitations defense. In Capital One's opposition to class certification, Capital One argues its statute of limitations defense defeats Rule 23(b)(3) predominance, contending that Capital One's defense implicates "when [class members] provided their data to Capital One" and "when Capital One migrated their data to the cloud," as, according to Capital One, these events go to when class members' unjust enrichment claims accrued. (Doc. 1440 at 42). But Plaintiffs had not sought information as to the date when each class member provided their data to Capital One, or when Capital One migrated each class member's data to the cloud, because this information was not necessary for Plaintiffs to prove class members' unjust enrichment claims. *See* Declaration of Norman E. Siegel in Support of Plaintiffs' Rule 72 Objection Reply ("Siegel Rule 72 Decl.") (Doc. 1507-1 at ¶¶ 2–4). And Capital One still has not produced that data, even though it continues to rely on it. *Id.* ¶ 2.

Similarly, Capital One argues in its Motion for Summary Judgment that Plaintiffs "Edmondson's, Gershen's, Hausauer's, and Tada's unjust enrichment claims are barred by the statute of limitations," as, according to Capital One:

> Plaintiffs' claims . . . accrued once Capital One "benefited" from their information while failing to protect it—all of which had happened (in Plaintiffs' own telling) by the beginning of 2015. Plaintiffs' claims thus accrued on the later of January 1, 2015 or the date they gave Capital One their PII. Accordingly, because Edmondson, Gershen, Hausauer, and Tada applied on or before January 2015, their claims accrued more than three years before the first suit in this MDL was filed on July 30, 2019 and are time barred.

(Doc. 1461 at 55) (citations omitted).

Yet, the movement to the cloud was a process that occurred over time and Plaintiffs had no reason to specifically seek discovery to pin down the exact chronology of Capital One's

migration of class members' personal information to Capital One's AWS Card Production Account—the account compromised in the Breach—however, because Capital One was not asserting a statute of limitations defense that depended on this chronology. Siegel Rule 72 Decl., Doc. 1507-1 at ¶ 3.

Furthermore, Capital One's briefing also suggests that it did not migrate all class members' PII at one time, but potentially that class members' PII was moved at different points. *See* (Doc. 1440 at 53). When Capital One migrated each class member's PII to the AWS Card Production Account is thus an important issue on which Plaintiffs need discovery to respond fully to Capital One's new arguments, discovery they do not have because of Capital One's untimely assertion of this defense. Siegel Rule 72 Decl., Doc. 1507-1 at ¶ 4.

Moreover, while Capital One contended there is no basis for tolling the accrual of the class's unjust enrichment claims (Doc. 1440 at 42), that is not true. In Virginia, "a statute of limitations is tolled until a person intentionally misled by a putative defendant could reasonably discover the wrongdoing and bring action to redress it." *F.D.I.C. v. Cocke*, 7 F.3d 396, 402 (4th Cir. 1993) (concluding Virginia's equitable tolling doctrine could apply if the defendant officers, directors, and attorneys for a corporation intentionally concealed improper business transactions); *see also Healy v. Chesapeake Appalachia, LLC*, No. 1:10CV00023, 2011 WL 24261, at *8-9 (W.D. Va. Jan. 5, 2011) (same, surveying Virginia case law on bases for tolling of the statute of limitations).[3] While Plaintiffs sought discovery on Capital One's misrepresentations and omissions related to the *adequacy of its data security* (*see* Doc. 1474 at 11-12), they did not need, and

---

[3] Contrary to Capital One's suggestion that no tolling doctrines apply to a claim for unjust enrichment (Doc. 1474 at 11), Plaintiffs have not found any Virginia authority stating tolling doctrines, which, after all, are equitable in nature, do not apply to the equitable claim of unjust enrichment.

therefore did not seek, discovery regarding Capital One's *intent to conceal* the inadequacy of its data security that would toll any asserted statute of limitations defense. Siegel Rule 72 Decl., ¶ 5. Plaintiffs are thus clearly prejudiced by not having the discovery necessary to fully respond to Capital One's late-asserted statute of limitations defense.

### 2.   Meet and Confer Background

Amid the above-described briefing, and in accord with the Siegel Rule 72 Declaration (Doc. 1507-1 at ¶ 6), Plaintiffs requested Capital One produce discovery pertinent to the statute of limitations defense, specifically:

> [Category] 1. The date(s) on which each class member applied for a Capital One credit card.
>
>> a. Whether that application was granted or declined.
>>
>> b. The date the credit card was terminated, if applicable.
>
> [Category] 2. The date on which each class member's PII was migrated to Capital One's AWS Card Production Account that was accessed by Paige Thompson in the Data Breach.
>
> [Category] 3. Information related to the intent to conceal Capital One's cloud vulnerabilities including:
>
>> a. Protocols and scripts for responding to consumer complaints and inquiries related to data security, including any instructions or reasoning behind the chosen responses or scripts as well as all drafts and rejected responses or scripts.
>>
>> b. Board and management documents and correspondence regarding what to disclose or not disclose, including any reasons why, in outside communications and press releases related to data security.
>>
>> c. Board and management documents and correspondence regarding what to disclose or not disclose, including any reasons why, in customer facing literature related to data security.
>>
>> d. Board and management documents and correspondence regarding disclosure or concealment of data security deficiencies on the AWS cloud.

*See* Letter of June 10, 2021, filed in support of Motion as its Exhibit 1 (Doc. 2066-1).

In response, Capital One pointed to its Supplemental Response to Interrogatory No. 7, which it maintained established that "Capital One moved its historical credit card application data to the AWS cloud in 2019." Letter of June 18, 2021, filed in support of Motion as its Exhibit 2, at p. 2 (Doc. 2066-2). The letter contended further that Capital One "can confirm that Capital One began moving the application data in question to the Card Production Account in January 2019; thus, January 2019 is the earliest time that any of the application data would have been stored in the Card Production Account in the AWS cloud." *Id.*

In reply, Plaintiffs described why this explanation (1) seemingly undermined Capital One's request for judgment as a matter of law on its statute of limitations defense as to *any* Plaintiff or class member—given that, based on Capital One's version of events, no claim may have accrued until January 2019; and (2) was insufficient, in that it (a) failed to address Categories 1 and 3, (b) as to Category 2, was limited to solely application data, despite other PII having been taken in the Breach, and (c) the representations raised as many questions as they answered, including where the application "data sets were stored prior to, and following, this conversion process . . . ." Letter of June 30, 2021, filed in support of Motion as its Exhibit 3 (Doc. 2066-3). Plaintiffs also explained that "the interrogatory response does not specify what 'the AWS S3 buckets' are—for example, is this referring to the old Capstone S3 buckets, the transition buckets, or any S3 bucket at all?—or where such S3 buckets were (or are) located." *Id.*

In response, Capital One took the position that it would not provide any response or material regarding non-application data taken in the Breach because, in its view, application data "is indisputably the only data relevant to Plaintiffs' unjust enrichment claim," as "Plaintiffs' theory of unjust enrichment has . . . always been premised on the fact that 'each member of the proposed class conferred their PII' on Capital One, and that Capital One was unjustly enriched as a result.

The only data that all members of the putative class—including the tens of millions of class members who applied for but were denied a Capital One card—conferred on Capital One was the data they provided at the time they applied for credit from Capital One (i.e., credit card application data)." Letter of July 6, 2021, filed in support of Motion as its Exhibit 4 (Doc. 2066-4).  Thus, "the fact that the Supplemental Response and June 18 Letter are confined to addressing 'application related' information is entirely appropriate. Capital One will not produce information that has no relevance to its statute of limitations defense to Plaintiffs' unjust enrichment claim." *Id*. And, despite expressly acknowledging the non-viability of its limitations defense based on its own understanding of the facts, Capital One refused to withdraw the defense.  *Id*.

On or about July 30, 2021, Capital One provided an Amended Supplemental Response to Plaintiffs' Interrogatory No. 7, filed in support of Motion as its Exhibit 5 (hereinafter "Amended Supplemental Response") (Doc. 2066-5). Therein, Capital One formalized and adopted the factual positions it took in the letters regarding the migration of application data, expressly affirming that "January 2019 was the earliest time that any of the credit card application data impacted in the Data Breach was stored in the Card Prod Account or in the AWS cloud more broadly." *Id.* at 5.

However, the Amended Supplemental Response remained inadequate, for the reasons described below and articulated to Capital One in the extensive meet and confer process culminating in the Motion. Specifically, following receipt of the Amended Supplemental Response and Capital One's August 23, 2021, Reply in Support of Its Motion for Summary Judgment (Doc. 1913), which again asserted the statute of limitations defense—including stating that Plaintiffs' "application data was indisputably migrated to the cloud no earlier than January 2019," and seeking summary judgment on that basis for Plaintiffs' disgorgement calculation predating January 2019 (Doc. 1913 at 35–36, 38, 38 n.26)—Plaintiffs again engaged Capital One regarding providing

discovery. *See* Letter of September 2, 2021, filed in support of Motion as its Exhibit 6. Plaintiffs reiterated their need for discovery in order to understand and answer the many questions Capital One's new factual representations raised.

For example, prior discovery established that (1) Capital One's PONG application was live in the AWS cloud beginning in or around April 2015,[4] (2) PONG was the software application through which third-party, retailer-specific credit card applications were received, and, yet, (3) Capital One now maintained "January 2019 was the earliest time that any of the credit card application data impacted in the Data Breach was stored in the Card Prod Account or in the AWS cloud more broadly." Motion Ex. 6 at 2 (quoting Amended Supplemental Response at 5) (Doc. 2066-6). These facts cannot be reconciled given that PONG's entire purpose is to receive credit card applications and it had been active for years prior to the Breach, yet Capital One has now sworn that no application data was in the AWS cloud until January 2019.

Likewise, the Amended Supplemental Response "," and Plaintiffs are entitled to understand when Plaintiffs' stolen data was being used or temporarily stored and analyzed in the cloud if it pre-dated January 2019, (Motion Ex. 6 at 2), because if Plaintiffs' data was inadequately protected while being cloud accessible, the official migration date might not be the sole point in time when the enrichment became unjust. Moreover, the Amended Supplemental Response only addressed

---

[4] *See, e.g.*, CAPITALONE_MDL_000050741 at 743 ("                                          "), filed in support of Motion as its Exhibit 7 (Doc. 2066-7).

the transition of the Capstone Decisioning dataset, failing to specify whether the migration in January 2019 included the transition of the *other* 20 datasets stolen in the Breach.

Further, as Plaintiffs have consistently requested, they require information regarding when each class member provided their PII to Capital One, which Capital One argues in its opposition to Plaintiffs' motion for class certification is the point at which each class member's unjust enrichment claim accrued if the class member provided their PII to Capital One after Capital One began migrating customer data to the cloud. (Doc. 1440 at 42). Capital One has not produced that data, even though it relies on it.

And, based on Capital One's new arguments, Plaintiffs require information regarding when Capital One migrated *each individual* class member's PII to the cloud. Capital One suggests in its opposition to Plaintiffs' motion for class certification that it may have moved portions of class member data to the cloud at different points. (Doc. 1440 at 53). In the Amended Supplemental Response, however, Capital One contends that it moved all class member data to the Card Production Account after January 2019. Plaintiffs are entitled to understand which of these representations is accurate and explore the discrepancies in Capital One's positions.

Capital One's last gasp explanation of these issues provided no greater clarity but did cement its refusal to provide additional discovery. *See* Letter of September 15, 2021, filed in support of Motion as its Exhibit 8 (Doc. 2066-8). For example, Capital One maintained that "███████ ████████████████████████████████████████████████████████████████████████████████" and thus "████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████" *Id* at 2–3. However, that does not at all explain how a software application (PONG) that's sole purpose is to

accept credit card applications, does not render such applications "██████████ ████" and thus contradicts the Amended Supplemental Response.

A final meet and confer call was held on October 11th, at which both sides agreed an impasse had been reached on the issues. The Motion to Compel followed.

During the meet and confer process related to the Motion, Capital One's counsel first urged Plaintiffs to defer presenting this issue until after the hearing on summary judgment and, during the final meet and confer call, requested that Plaintiffs further delay filing it until after the Court ruled on class certification and summary judgment. Plaintiffs feared such delay would potentially fuel denial of the Motion—precisely as did happen—and thus declined to postpone.

**B.  Terms and Conditions Defense**

On May 28, 2021, Capital One filed its Opposition to Class Certification relying on its "forthcoming" motion for summary judgment to assert for the first time that the claims of Plaintiffs Gershen, Hausauer, Sharp, Spacek, and Tada are barred by a limitation of liability clause of the Terms and Conditions on Capital One's website (the "Terms & Conditions"). (Doc. 1440 at 26, 54-55).[5] In other words, Capital One waited over six months after the close of discovery to first raise this defense, which Capital One now concedes is based on language that may have only been available through "a hyperlink in the footer of the relevant webpage." (Doc. 1913 at 41). During this period, Capital One failed to seek to amend its answer or to provide notice that it intended to rely on this defense. *See* Declaration of Norman Siegel in Opposition to Capital One's Motion for Summary Judgment, Doc. 1806-40 at ¶ 9–11 (hereinafter "Siegel MSJ Decl.").

---

[5] To support this contention, Capital One attached un-Bates-stamped, never-produced pages from the Wayback Machine that purport to be the website's Terms & Conditions from July 2015. (Doc. 1440 at 54 n.21; Doc. 1440-21.)

On June 3, 2021, Capital One again asserted this defense in its Motion for Summary Judgment stating that Plaintiffs Gershen, Hausauer, Sharp, Spacek, and Tada's claims are barred simply by the fact that a hyperlink to the Terms & Conditions was "available on Capital One's website or in their credit card applications," they "accessed Capital One's Site" and "[i]n doing so, they agreed that Capital One would not be liable for any damages whatsoever…." (Doc. 1461 at 63) (internal punctuation omitted)).

On August 8, 2021, Plaintiffs filed their Opposition to Capital One's Motion for Summary Judgment noting Capital One's improper reliance on this foregone defense and its inapplicability as "Plaintiffs' claims do not 'aris[e] out of or in connection with the use, copying, or display of, or the interaction or any other form of communication with, [Capital One's website] and the information contained at the Site,'" but rather from its storage of Plaintiffs' PII without regard to how it was provided to Capital One. (Doc. 1806 at 59-60). Plaintiffs also filed a supporting declaration and requested additional discovery—in the event the Court permitted Capital One to pursue this belated defense—due to the "fact-intensive" inquiry necessary to determine the enforceability of a website's terms. (Doc. 1806 at 59; Siegel MSJ Decl., Doc. 1806-40 at ¶ 11).

On August 23, 2021, Capital One filed its Reply in Support of its Motion for Summary Judgment and asserted this defense again—although it retreated to the theory that "Plaintiffs had *constructive notice* of the T&Cs ... because they were disclosed either in a hyperlink in the footer of the relevant webpage or in the application itself," (Doc. 1913 at 41) (emphasis added)—making it clear that Capital One intends to fully pursue this extremely late (and unpled) defense even in the face of the arguments Plaintiffs raised in opposition.

As noted above, in connection with the statute of limitations issue, from June 10, 2021, onward, Plaintiffs and Capital One engaged in parallel meet and confer efforts to address these

discovery issues, and, specifically, with respect to the Terms and Conditions issues, the letters of September 2 and 15, 2021, attached to the Motion as its Exhibits 6 and 8 (Doc. 2066-6 & 2066-8).

Therein, Plaintiffs explained:

> Capital One's exhibit Terms and Conditions (SJ at Ex. U) are nothing more than a smattering of un-Bates-stamped, never-produced pages from the Wayback Machine that purport to be the website Terms and Conditions from 2011, 2012, 2015, 2017, and 2018. These exhibits are insufficient to show their authenticity, let alone their conspicuousness, the placement of the hyperlink to them in relation to any button a website user is required to click to gain access to website services or products, how often the hyperlink or Terms appeared to a user, or the overall design elements of the website, such as font size, color, and other visual components that might hinder a user's reasonable notice of the website terms.
>
> Accordingly, Plaintiffs demand discovery on each of the above issues for each year during the class period that Capital One used the website Terms and Conditions, including electronic versions of the website during the relevant period that clearly show the placement of the Terms and interaction required by an applicant with the Terms (if any).

Motion Exh. 6, Letter of Sept. 2, 2021, at 3 (Doc. 2066-6).

In response, Capital One doubled down on its reliance upon the Wayback Machine, and also referenced certain screenshots it had produced in discovery. Motion Exh. 8, Sept. 15, 2021 Letter at 6–7 (Doc. 2066-8). Those screenshots, however, are equally unspecific, failing to reveal the details needed to make the factual determination at issue here; including the applicable time period or sequencing of pertinent screenshots, which applications the screenshots relate to, how the applicant's attention was drawn to (or agreement was made to) the "TERMS & CONDITIONS" (if at all), etc. *See* CAPITALONE_MDL_002211299-428, filed in support of Motion as its Exhibit 9 (Doc. 2066-9).[6]

---

[6] Indeed, while "TERMS & CONDITIONS" is displayed at the bottom of several of the screenshots, it is not clear from this production what clicking that button would have done during any portion of

For example, while one screenshot denotes the requirement to "read and agree" to "the Important Disclosures and Privacy and Opt Out Notice," it does not reveal what those "Important Disclosures and Privacy and Opt Out Notice" were, whether the bolded material is a link to them, how they were previously presented, the applicable time period or sequencing of the screenshot, to which applications the screenshot relates, and the like. *See* Motion Exh. 9, CAPITALONE_MDL_002211351 (Doc. 2066-9). Many of the screenshots contain no notation or reference to "Terms & Conditions" whatsoever. *See, e.g.*, *id.* at bates pages ending in 299–305, 307–311, 313–14, 316, 320. And, for the vast majority that do contain some reference to "TERMS & CONDITIONS," it is nothing more than an utterly unremarkable link, buried in the footer of the webpage. *See, e.g.*, *id.* at bates pages ending in 306, 312, 315, 317–19, 321–24. This is insufficient to put Plaintiffs on notice of an unpled, contract-based defense premised on a limitation of liability clause buried within the "TERMS & CONDITIONS" link.

## C.  The Order Ignored the Meet and Confer History

Notably, the Order ignores the entire history of meet and confers, the incremental additional information provided by Capital One pursuant thereto, and the additional questions raised by that incremental new information. Contrary to the clear implications of this record, the Order faults Plaintiffs for being dilatory, stating that the Motion was filed "more than five months after Capital One's amended answer was filed and five months after the terms & conditions defense was raised in the opposition to the motion for class certification," and that "plaintiffs have not been diligent in filing this motion . . . ." (Doc. 2130 at 1, 2).

---

the class period, and it remains equally opaque whether reviewing or manifesting agreement to such terms was part of the application process.

Yet, there is no dispute Plaintiffs were engaged in a meaningful meet and confer process with Capital One for months, and Capital One was providing incrementally new information in response to the inquiries Plaintiffs raised within that process, which of course could have eliminated the need for the Motion entirely. However, it was the additional information Capital One was providing that raised further questions. Pursuant to the required meet and confer process, Plaintiffs could not move to compel this discovery until after the process reached impasse, on or about October 11th, 2021. The Order ignores this practical reality.

### III.   LEGAL STANDARDS

#### A.   Standard of Review

Under Rule 72(a), a party may submit objections to a magistrate judge's ruling on non-dispositive matters, including discovery orders. *See* Doc. 641 at 3 (citing Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A)). Upon objection, this Court reviews "the objected-to order under the 'clearly erroneous or contrary to law' standard." *Id.* at 4 (quoting 28 U.S.C. § 636(b)(1)(A); citing *Malletier v. Haute Diggity Dog, LLC*, 2007 WL 676222, at *1 (E.D. Va. Feb. 28, 2007)). Under the "clearly erroneous" standard, the magistrate judge's findings of fact must be rejected if "review of the entire record leaves the reviewing court with 'the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir. 1985)). A magistrate judge's "decision is considered 'contrary to law' 'when it fails to apply or misapplies relevant statu[t]es, case law, or rules of procedure." *Id.* (quoting *Attard Industries, Inc. v. U.S. Fire Ins. Co.*, 2010 WL 3069799, at *1 (E.D. Va. Aug. 5, 2010)). "[F]or questions of law, 'there is no practical difference between review under Rule 72(a)'s contrary to law standard and [a] *de novo* standard.'" *Id.* (quoting *Bruce v. Hartford*, 21 F. Supp. 3d 590, 594 (E.D. Va. 2014)).

### B.        Standard for Motion to Compel

"Parties are entitled to discover any material that is relevant to any party's claim or defense, is nonprivileged, and proportional to the needs of the case." *BASF Plant Sci., LP v. Commonwealth Sci. and Indus. Research Org.*, No. 2:17-cv-503, 2019 WL 8108060 (E.D. Va. July 3, 2019) (Morgan, J.) (citing Fed. R. Civ. P. 26(b)(1)). Relevance in this context is to be read liberally. *Id.*; Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."). Proportionality considers: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Accordingly, the "Federal Rules contemplate the broadest discovery possible in the search for the truth." *Id.* (quoting *Doe v. Old Dominion Univ.*, 289 F. Supp. 3d 744, 749 (E.D. Va. 2018) (Morgan, J.)); *Seldowitz v. Office of Inspector Gen. U.S. Dept. of State*, 238 F.3d 414 (Table), 2000 WL 1742098, at *5 (4th Cir. Nov. 13, 2000); *Minor v. Bostwick Lab's, Inc.*, No. 3:09-cv-343, 2012 WL 13028138, at *2 (E.D. Va. July 13, 2012) (Novak, J.).

"Pursuant to Federal Rule of Civil Procedure 37(a), a party may move for an order compelling disclosure or discovery. Fed. R. Civ. P. 37. Local Rule 37(A) further provides: 'After a discovery request is objected to, or not complied with, within time, and if not otherwise resolved, it is the responsibility of the party initiating discovery to place the matter before the court by a proper motion…to compel an answer, production, designation, or inspection.'" *Addax Energy SA v. M/V Yasa H. Mulla*, No. 2:17-cv-641, 2018 WL 10470917, at *3 (E.D. Va. Nov. 13, 2018) (Morgan, J.) (marks in original). The Court is afforded broad discretion in this regard. *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003); *Lone Star Steakhouse & Saloon, Inc. v.*

16

*Alpha of Va.*, 43 F.3d 416, 426 (4th Cir. 1996); *Wu v. Tseng*, No. 2:06-cv-346, 2007 WL 4143077, at *3 (E.D. Va. Nov. 19, 2007) (Morgan, J.).

"[T]he party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Addax Energy*, 2018 WL 10470917, at *4 (quoting *Eramo v. Rolling Stone, LLC*, 314 F.R.D. 205, 209 (W.D. Va. 2016) (Conrad, J.) (marks in original); *Old Dominion*, 289 F. Supp. 3d at 749. Particularly when electronically stored information ("ESI") is implicated, "the party resisting its production must show that the ESI is not reasonably accessible due to burden or cost, and, even if such a showing is made, the Court may nevertheless order its production if the requesting party shows good cause, keeping in mind Rule 26(a)(2)(C)." *Id.*

Under Local Civil Rule 37(E), "Counsel shall confer to decrease, in every way possible the filing of unnecessary discovery motions." As demonstrated above, Plaintiffs scrupulously adhered to this requirement.

### C.    Good Cause to Re-open Discovery

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The good cause provision of Rule 16(b)(4) does not focus on the prejudice to the non-movant or bad faith of the moving party, but rather on the moving party's diligence." *Certusview Techs., LLC v. S & N Locatings Servs., LLC*, No. 2:13cv346, 2014 WL 4930803 at *5 (E.D. Va. Oct. 1, 2014).

Good cause is found, particularly, when the movant has been diligent in pursuing the requested discovery, delays were due to meet and confer efforts, or the respondent's actions caused the motion to be filed after the close of discovery. *See, e.g.*, *Eshelman v. Puma Biotechnology, Inc.*, No. 7:16-CV-18-D, 2018 WL 1702773, at *3 (E.D.N.C. Apr. 6, 2018) (motion to compel granted after close of discovery "given [movant's] diligence in attempting to resolve the issues prior to filing the instant motion"); *Ayers v. Cont'l Cas. Co.*, 240 F.R.D. 216, 225 (N.D. W. Va.

2007) (motion to compel granted after deadline set by local rule where "facts reveal a [dilatory] pattern of behavior by defense counsel" and the "delay in filing the Motion was due to negotiations with opposing counsel"); *see also Marshall v. Univ. of Maryland Med. Ctr.*, No. CV TDC-17-2779, 2018 WL 3727947, at *2 (D. Md. Aug. 6, 2018) (same); *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 198 (N.D. W. Va. 2000) (same). Here, all three such scenarios apply.

## IV.   ARGUMENT

### A. The Magistrate Judge Erred in Denying Plaintiffs Statute of Limitations Discovery

When Capital One first sought to amend its answer to assert the statute of limitations defense, Plaintiffs opposed on various grounds including because of the additional discovery the late defense would necessitate. Notably, however, Capital One adamantly advised the Court to the contrary: "Importantly, the amendment will not require any new discovery. The universe of information the defense relies upon includes (1) the date Plaintiffs allege Capital One was unjustly enriched, and (2) the dates Plaintiffs filed the relevant complaints." (Doc. 1263 at 6).

As shown above, Capital One almost immediately reneged on that representation in the ways in which it asserted the defense—basing it on "when [class members] provided their data to Capital One" and "when Capital One migrated their data to the cloud" (Doc. 1440 at 42)—and by injecting brand new factual issues never before revealed nor tested, such as contending all AWS Cloud related application migration occurred only in or after January 2019. This heel-turn in application of the defense alone justifies the requested discovery.

Plaintiffs provided declarations to support their need for additional discovery in support of their Rule 72 Objection (Doc. 1507-1), and in opposition to Capital One's Motion for Summary Judgment (Doc. 1806-40), and incorporate those declarations by this reference. Plaintiffs brought the Motion following completion of the meet and confer process as Capital One refused to provide

further explanation of questions raised by its new factual assertions or provide the requested discovery absent compulsion. Given the defenses at issue were first raised long after discovery closed, Plaintiffs could not have engaged in the requested discovery prior to the discovery deadline. And, while Rule 56(d) requests are pending which may or may not be granted, Plaintiffs should be permitted to obtain the discovery requested in the Motion in order to prepare for trial.

In the Order, the Magistrate Judge found that Plaintiffs failed to establish good cause to re-open discovery. This was error. Indeed, courts in similar contexts—seeking to reopen discovery in light of defenses asserted after discovery closed—have found it be an abuse of discretion not to find the good cause standard to be met.

For example, in *Morgan v. Gandalf, Ltd*., 165 Fed. Appx. 425 (6th Cir. 2006), the Sixth Circuit held that the district court abused its discretion in refusing to reopen discovery where it had permitted the defendant to plead affirmative defenses after discovery closed. *Id.* at 427 ("Plaintiff opposed defendants' motion for leave to file their answer out of time, contending that defendants had shown neither good cause nor excusable neglect, and that plaintiff would be prejudiced if defendants were allowed to assert affirmative defenses after discovery had already closed. The district court allowed the late filing of the answer . . . .").

The Sixth Circuit stated:

> [Plaintiff] demonstrated good cause for reopening discovery. Although the district court rightly observed that plaintiff had reason to believe defendants intended to assert the MCA defense, plaintiff can hardly be deemed to have been under a legal obligation to anticipate it in discovery.
>
> Second, the need for additional discovery was precipitated by defendants' counsel's admitted neglect, not plaintiff's. After indulging defendants' pleading tardiness, the court, in fairness, ought to have extended corresponding lenity to plaintiff.

*Id.* at 431.

So too here. Capital One argued—and the Magistrate Judge apparently agreed—that Plaintiffs should have anticipated these new defenses and preemptively sought discovery regarding them. But, as explained in *Morgan*, that is an improper basis for refusing to reopen discovery related to defenses first raised after discovery closed, as happened here.

Moreover, this discovery is pertinent to genuinely disputed issues of fact. When Plaintiffs and class members provided their PII to Capital One, and when Capital One migrated that PII to the cloud could be determinative of the statute of limitations defense (although other points in time may apply as well, as described below). Likewise, if, in fact, "January 2019 was the earliest time that any of the credit card application data impacted in the Data Breach was stored in the Card Prod Account or in the AWS cloud more broadly," Amended Supplemental Response at 5 (Doc. 2066-5), as Capital One maintains, this will (a) undermine any statute of limitations defense, but also (b) potentially significantly impact the calculation of the disgorgement remedy for the unjust enrichment claim. Such a significant issue should not be left solely to Capital One's belated amended interrogatory response, served months after discovery closed—and, notably, as part of the meet and confer process leading to the Motion—which is subject to bias and otherwise wholly untested in the crucible of discovery.

Capital One argued in response to the Motion that it has provided the only relevant data point: "when Capital One migrated credit card application data to the Card Production Account in the AWS cloud." (Doc. 2081 at 19). Critically, however, contrary to what Capital One represented to this Court in seeking permission to assert the statute of limitations defense in the first place, it has chosen to pursue that defense in ways that require additional discovery. Specifically, while Capital One told this Court "the amendment will not require any new discovery," because the "universe of information the defense relies upon includes (1) the date Plaintiffs allege Capital One

was unjustly enriched, and (2) the dates Plaintiffs filed the relevant complaints," (Doc. 1263 at 6), in practice the statute of limitations defense as Capital One expressly deployed it implicates "when [class members] provided their data to Capital One" and "when Capital One migrated their data to the cloud," as, according to Capital One, these events go to when class members' unjust enrichment claims accrued. (Doc. 1440 at 42).

Capital One—to this day—refuses to provide discovery regarding "when [class members] provided their data to Capital One" even though Capital One's own opposition to class certification argues such facts are required.

Likewise, Capital One's explanations as to the questions raised by its Amended Interrogatory Response remain inadequate, and only highlight the need for discovery on these issues, rather than undermining it. Indeed, the fact that Capital One argues that "[e]ach of these 'questions,' however, is answered by Capital One's Amended Response, is based on a misunderstanding of the technologies at issue, or both" demonstrates why discovery is needed. Perhaps Plaintiffs do misunderstand some factual nuance here, but they should be permitted to obtain that explanation via record evidence, rather than *ipse dixit* of counsel in filings or letters.

For instance, it is becoming increasingly clear that Capital One is playing semantics regarding whether credit card applications were "stored" in the AWS Cloud. Capital One admits that PONG is "'the software application through which third-party, retailer-specific credit card applications were received,'" (Doc. 2081 at 21 n.8), and it does not dispute that PONG was active in the AWS Cloud beginning in April 2015. Yet, Capital One argues this is of no moment because the PONG application "itself did not store credit card application data." (Doc. 2018 at 21). But that just begs the question—if PONG is on the AWS Cloud, and PONG's purpose is to accept credit card applications, how are those credit card applications not also in the cloud, at least at

some point? Hence the need for discovery, and specifically a deposition, to answer that very question, which Plaintiffs have posed repeatedly, and Capital One refuses to answer.

Notably, the Order fails to address this critical issue—the required meet and confer process raised factual issues not before known, and that Capital One, now, refuses to answer. Yet, the Order faults Plaintiffs for not filing the Motion quicker, at a point in time before these unresolved issues even existed. That is anathema to the purpose of the Local Rule's meet and confer requirements.

Similarly, Capital One took aim at whether the application data was cloud-accessible as being irrelevant. (Doc. 2081 at 21–23). However, if that information was cloud-accessible, and unprotected or otherwise vulnerable to attack, it would be relevant to the unjust enrichment theory. In other words, if an attacker could have stolen the application data because it was cloud-accessible by exploiting Capital One's vulnerabilities at issue in this case, even though the application data was technically "stored" (however Capital One is now opaquely defining that word) on Capital One's on-premises network, the unjust enrichment could be triggered. The extra step of extracting the application data through the cloud from the on-premises network would not undermine Plaintiffs' unjust enrichment theory. Again, discovery is needed to determine such facts.

Likewise, the timeline of migration of the other data sets taken in the Breach is relevant, contrary to Capital One's argument. (Doc. 2081 at 22–23). Plaintiffs allege Capital One was unjustly enriched by its use of its customers' data for profit without providing adequate protection for it. While Plaintiffs' class wide disgorgement model relates to Capital One's unjustly earned profits from the use of one particular type of data—credit card application data—the claim itself is broader. Thus, when Capital One migrated other data sets to the cloud, to the extent that this

migration is part of the chronology of when those data sets became at risk of theft due to Capital One's inadequate data security measures, is in fact relevant to Plaintiffs' unjust enrichment claim.[7]

There are also errors of law that go to the very elements of Plaintiffs' claims. For example, contrary to the Magistrate Judge's suggestion that Plaintiffs have the burden to prove "damages" related to their unjust enrichment claim (Order at 2-3), damages are not an element of Plaintiffs' claim for unjust enrichment. *E.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 1 ("While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss."); *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244 (4th Cir. 2020) (for a common law unjust enrichment claim, "[t]he plaintiff need not show that she suffered any harm from the defendant's gain"). Instead, Plaintiffs must prove that Capital One "accept[ed] the benefits accompanying plaintiff's data and [did] so at the plaintiff's expense by not implementing adequate safeguards." (Doc. 879 (Order denying motions to dismiss Plaintiffs' unjust enrichment claim) at 44). Capital One has never even purported to dispute that it benefits from its possession and use of PII. And Plaintiffs will present substantial evidence that Capital One did not "implement[] adequate safeguards," and that Capital One's failure to do so came at

---

[7] Notably, Capital One has not demonstrated by affidavit or otherwise that preparing a witness to describe when the other data sets were migrated would be the least bit burdensome. That failure alone should end the inquiry. *Cf. Stoney Glen, LLC v. Southern Bank and Trust Co.*, 2013 WL 5514293, at *3 (E.D. Va. Oct. 2, 2013) ("To prevail on the grounds of burdensomeness or breadth, the objecting party must do more to carry its burden than make conclusory and unsubstantiated arguments.") (citing *Converting v. United States Dep't of Justice*, 565 F. Supp. 2d 10, 14 (D.D.C. 2008); *Cory v. Aztec Steel Bldg., Inc.*, 225 F.R.D. 667, 672 (D. Kan. 2005) (the party opposing discovery on the ground of burdensomeness must submit detailed facts regarding the anticipated time and expense involved in responding to the discovery which justifies the objection)).

Plaintiffs' expense in the form of Plaintiffs' PII being vulnerable to theft and the resulting massive Data Breach in which Plaintiffs' PII was stolen.

Capital One challenges how Plaintiffs are calculating Capital One's benefit—Capital One's profits from its fraud models, which use and rely on the PII Capital One failed to safeguard, which, according to Plaintiffs, "thereby mak[es] it 'inequitable and unconscionable' to permit [Capital One] to retain the benefit of the data (*and any benefits received therefrom*), while leaving the [Plaintiffs] to live with the consequences." (Doc. 879 at 44) (emphasis added). But even if the Court ultimately agrees with Capital One that its fraud modeling profits are not the appropriate remedy for Capital One's unjust gain, that would not entitle Capital One to judgment on Plaintiffs' unjust enrichment claim. And to the extent the Court concludes Capital One's fraud modeling profits *are* an appropriate measure of the benefits Capital One received from the use of the PII, it will be Plaintiffs' burden to show a "reasonabl[e] approximat[ion] of the amount of [Capital One's] unjust enrichment," which is satisfied by showing Capital One's profits. *See Kemp v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc.*, 790 F. Supp. 1275, 1280 (W.D. Va. 1992), *aff'd sub nom. U.S. Dep't of Hous. & Urb. Dev. v. Cost Control Mktg. & Sales Mgmt. of Virginia*, Inc., 64 F.3d 920 (4th Cir. 1995). The burden will then shift to Capital One "to demonstrate that the disgorgement figure [is] not a reasonable approximation." *Id.*

Thus, Plaintiffs can establish their prima facia case on unjust enrichment without regard to *when* Capital One first began benefiting from PII unjustly. Conversely, it will be *Capital One's* burden to establish its affirmative defense of statute of limitations, and thus must prove that Plaintiffs' and putative class members' claims accrued more than three years prior to the commencement of this litigation, but that is a separate question from whether and to what extent

its profits from fraud modeling are an appropriate remedy for its unjust benefit from its retention and use of PII.

However, on the issue of accrual, there is fundamentally conflicting evidence on when Capital One first began being unjustly enriched, *i.e.*, when it both (1) benefitted from customer PII; and (2) was "not implementing adequate safeguards" for that PII. *See* (Doc. 879 at 44). That evidence became particularly conflicting over six months after the close of discovery when Capital One first indicated, contrary to other record evidence it produced during the discovery period, that the PII was not stored on the AWS cloud until 2019. Because a reasonable fact-finder could conclude that this was the point in time Capital One first became unjustly enriched and Plaintiffs did not learn of this new conflicting evidence until after Capital One belatedly asserted its statute of limitations defense months after Plaintiffs would have been able to obtain clarifying discovery on this issue, the Magistrate Judge manifestly erred in not permitting Plaintiffs to engage in formal discovery on this issue, which goes to both claim accrual and potential challenges by Capital One to the profits subject to disgorgement. While it is Capital One's burden to establish claim accrual and whether Plaintiffs' proposed disgorgement figure is a reasonable approximation of Capital One's unjust gain, the Magistrate Judge erred in not allowing Plaintiffs to understand the basis for Capital One's belated factual assertions regarding these issues.

### B.  The Magistrate Judge Erred in Denying Plaintiffs Terms & Conditions Discovery

Likewise, the Terms and Conditions related discovery should also be provided. In its Motion for Summary Judgment Capital One asserted that its website's Terms & Conditions bar certain Plaintiffs' claims because they applied for their credit cards online. (Doc. 1440 at 54-55). Capital One did not plead this defense in its Answer, did not seek leave to amend its Answer to add this defense, nor did it otherwise notify Plaintiffs of its intent to rely on this defense before its

class certification opposition and summary judgment filing.[8] Apart from the obvious waiver implications,[9] this also means Plaintiffs were not previously apprised of the necessity to take discovery on this issue. And given that Capital One waited over six months after the close of discovery to assert its contractual limitation of liability defense, Plaintiffs have been left without the means to dispute Capital One's factual claims related to this defense.

The Order relied upon "Capital One question[ing] some of the representative plaintiffs concerning their awareness of the terms & conditions during the discovery period," (Order at 3), as the sole reed upon which Plaintiffs should have preemptively discerned Capital One would—months after discovery closed—raise this defense.  Yet, even if it were enough to put Plaintiffs on notice of the defense (and it was not) that is insufficient to preclude discovery. *Morgan*, 165 Fed. Appx. at 431–32.

Importantly, whether Capital One's website terms are enforceable is a fact-intensive inquiry including matters such as the conspicuousness of the terms or the hyperlink to them, "the placement" of the hyperlink "in relation to the button that grants a user access to the service or product," whether the hyperlink "appeared to the user on multiple occasions, even after the user signed up for the website or service," and "the overall design elements of the website, including

---

[8] Capital One's contention that it raised this defense by asserting the equitable defenses of waiver and laches in its Answer (Doc. 1913 at 41) is facially meritless. Capital One's assertion of a purported contractual limitation of liability is not an equitable waiver or laches defense.

[9] *See* Fed. R. Civ. P. 8(c); *Bank of Am., N.A. v. Old Republic Ins. Co*., 2014 WL 948495, at *3 (W.D.N.C. Mar. 11, 2014) (party had not "properly preserved its defenses" by raising them at summary judgment); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*., No. CV14MD2542VSBSLC, 2020 WL 3256871, at *3 (S.D.N.Y. June 16, 2020), *aff'd*, 336 F.R.D. 400 (S.D.N.Y. 2020) (defendant's motion to amend the complaint with defense of release 27 months after deadline was not justified and constituted undue delay); *MB Fin. Bank, N.A. v. Patel*, No. 10 C 6566, 2012 WL 346456, at *2 (N.D. Ill. Feb. 1, 2012) (potential release language in mortgage note and modification, which were subject of litigation, was not sufficient to put plaintiff on notice of "defendant's intention to assert release as an affirmative defense").

font size and color, and other visual components that might hinder a user's reasonable notice." *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 697-98 (E.D. Va. 2020); *McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc*., 501 F. Supp. 3d 965, 984 (D. Or. 2020).

Here, the supporting evidence that Capital One submitted of its Terms & Conditions is insufficient to determine their enforceability under the above factors. The evidence is nothing more than a smattering of un-Bates-stamped, never-produced (or disclosed)[10] pages from the Wayback Machine that purport to be the website Terms and Conditions from 2011, 2012, 2015, 2017, and 2018. These exhibits are insufficient to show their authenticity, let alone their conspicuousness, the placement of the hyperlink to them in relation to any button a website user is required to click to gain access to website services or products, how often the hyperlink or Terms appeared to a user, or the overall design elements of the website, such as font size, color, and other visual components that might hinder a user's reasonable notice of the website terms.

Moreover, many webpages comprising part of Capital One's credit card application process are not actually available on the Wayback Machine.[11] As such, the Wayback Machine does not allow one to determine whether the relevant hyperlink is even displayed at all to applicants during this process let alone the frequency and placement of such displays. Likewise, as noted

---

[10] Capital One's failure to properly disclose the relied upon information is further demonstration that (1) Plaintiffs were not, and could not have been, aware of this defense (nor was Capital One), and (2) the evidence should be excluded. *Quesenberry v. Volvo Group N. Am., Inc*., 267 F.R.D. 475, 480 (W.D. Va. 2010) (holding that proponents of evidence have "a duty under Rule 26(a)(1) and (e)(1) to make and supplement initial disclosures in a timely manner, and . . . four months after the close of fact discovery, is not timely"); *see also* Advisory Committee Notes to 1993 Amendment to Rule 37 (stating that sanction imposed by Rule 37(c) for not timely disclosing evidence as required under Rule 26(a) is "self-executing" and "automatic," "without need for a motion").

[11] *See* https://web.archive.org/web/20070630063330/http://www.capitalone.com/creditcards/index.php (clicking "Apply Now" leads to a HTTP 301 error and redirection to Capital One's homepage).

above, the application screenshots produced by Capital One in discovery are insufficient to conduct the required fact-intensive inquiry. *See generally* Motion Exh. 9.

Nonetheless, the Order found that "[t]hose [produced] documents, along with other material available from the Wayback Machine, are sufficient for the parties to address whether Capital One has a viable terms & conditions defense to the claims raised." (Order at 3). But while the Wayback Machine and the limited document production made available illustrate how the "Terms & Conditions" link was displayed on the home page of Capital One's website, and certain other instances, nowhere do any of these sources show (1) whether the Terms & Conditions had to be objectively assented[12] to in order to submit the application—the touchstone of the "browsewrap" versus "clickwrap" analysis—nor (2) even how the link is displayed during the actual application process, which is the relevant inquiry. For example, Capital One nakedly asserted that its "online credit card applications are more akin to 'clickwrap' agreements because the links to the Terms and Conditions were often 'available within the application itself,'" (Doc. 2081 at 26 n.12). But that describes a "browsewrap" agreement, in that Capital One does not suggest anyone was required to indicate their agreement to the Terms by clicking anything.[13] In any event, Capital One cites absolutely no evidence whatsoever in support of that statement.

---

[12] Contrary to Capital One's contention that its Terms & Conditions defense creates individualized issues, the factors relevant to determining whether such website terms are enforceable (if Capital One has not waived reliance on them entirely) go to whether a website user would be on notice of them, an objective, not subjective test. Accordingly, whether any particular version of Capital One's website terms is enforceable (if they apply at all) will have the same answer for every class member who applied during that particular time frame. And, as Plaintiffs explained in their class certification reply, Capital One itself can readily identify every class member who submitted an online application and when, as it has so identified Plaintiffs Gershen, Hausauer, Sharp, Spacek, and Tada. Conversely, if Capital One could not identify individuals who applied online, it could not possibly bind them to these Terms and Conditions anyway. (Doc. 1558 at 26).

[13] *See, e.g.*, *Card v. Wells Fargo Bank, N.A.*, 3:19-CV-1515-SI, 2020 WL 1244859, at *6 (D. Or. Mar. 16, 2020) ("A pure clickwrap agreement, however, has the terms and conditions on the same webpage, and a user is forced to scroll through them and then click 'I agree.' A 'browsewrap'

And, fundamentally, that is the question: how were the Terms & Conditions presented during the actual application process itself? Did an applicant have to click on the Terms & Conditions and agree, or were they presented simply as an utterly unremarkable link, buried in the footer of the webpage, as Capital One's document production seems to indicate. *See* Motion Exh. 9 at bates pages ending in 306, 312, 315, 317–19, 321–24 (Doc. 2066-9). Capital One—even now—refuses to answer that fundamental question, relying instead on the red herring that a link to, and the actual language of, the Terms & Conditions are available in the production and/or on the Wayback Machine. (Doc. 2081 at 28) ("Although Plaintiffs complain that the 'Apply Now' link is no longer functional, they fail to mention that the link to Capital One's Terms and Conditions works perfectly."). But Plaintiffs have never claimed that historic, static images of Capital One's homepage are not available—but that is not the inquiry nor is it particularly relevant. The question here concerns what is or was presented during the application process.[14]

Capital One also argued—and the Order seemingly agrees—that Plaintiffs waited too long to seek this discovery. *See* (Doc. 2081 at 10–11) (Plaintiffs waited "until September 2, 2021—almost a year after Capital One served its Answers and more than three months after Capital One made Plaintiffs aware of the specifics of its defense—to raise issues about that discovery with Capital One."). As noted above, Capital One's Answers did not provide notice of this defense. But as to the purported three-month delay, Capital One is also mistaken.

---

agreement, in contrast, has merely a hyperlink and the user does not have to click to indicate any agreement. . . .  Because Wells Fargo contends that its agreements and disclosures were merely linked, it was not a pure clickwrap agreement . . . .") (citation omitted) (citing *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016)).

[14] Critically, Capital One concedes it cannot carry its burden on this *affirmative defense* it raised, because "Capital One does not maintain an archive of 'stored or cached' or 'electronic' versions of its website . . ." (Doc. 2081 at 29) (quoting (Doc. 2081-1, Declaration of Tami Kottke, at ¶ 7)).

On August 8, 2021, Plaintiffs filed their Opposition to Capital One's Motion for Summary Judgment noting Capital One's improper reliance on this foregone defense and its inapplicability as "Plaintiffs' claims do not 'aris[e] out of or in connection with the use, copying, or display of, or the interaction or any other form of communication with, [Capital One's website] and the information contained at the Site,'" but rather from its storage of Plaintiffs' PII without regard to how it was provided to Capital One. (Doc. 1806 at 59-60). Plaintiffs also filed a supporting declaration *and requested additional discovery*—in the event the Court permitted Capital One to pursue this belated defense—due to the "fact-intensive" inquiry necessary to determine the enforceability of a website's terms. (Doc. 1806 at 59; Siegel MSJ Decl., Doc. 1806-40 at ¶ 11).

On August 23, 2021, Capital One filed its Reply in Support of its Motion for Summary Judgment and asserted this defense again, (Doc. 1913 at 41)—making it clear that Capital One intended to fully pursue this defense even in the face of the arguments Plaintiffs raised in opposition, and thus triggering Plaintiffs' need to further demand discovery. Plaintiffs did so just *ten days* later, on September 2nd. It strains credulity for Capital One to argue a 10-day delay should somehow function as a waiver of Plaintiffs' ability to seek this discovery, especially considering Capital One did not first expressly raise the defense until *six months* after discovery closed.

Finally, as with any purported delay concerning the statute of limitations discovery, Capital One has not—and cannot—cite a single scintilla of prejudice from this supposed delay. In fact, as noted in the Motion, Capital One's counsel implored Plaintiffs to further delay filing this Motion until after the Court ruled on class certification and summary judgment. *See* (Doc. 2060 at 17–18 n.7). Given that request, the Court should find that Capital One's cries of delay ring hollow.

## V.     <u>CONCLUSION</u>

For all the reasons set forth above, Plaintiffs respectfully request that this Court set aside the Magistrate Judge's Order denying Plaintiffs' Motion to Compel and grant the Motion.

DATED: November 29, 2021                Respectfully submitted,

                                        /s/ *Steven T. Webster*
                                        Steven T. Webster (VSB No. 31975)
                                        **WEBSTER BOOK LLP**
                                        300 N. Washington Street, Suite 404
                                        Alexandria, Virginia 22314
                                        Tel: (888) 987-9991
                                        stw@websterbook.com
                                        *Plaintiffs' Local Counsel*

                                        Norman E. Siegel
                                        **STUEVE SIEGEL HANSON LLP**
                                        460 Nichols Road, Suite 2200
                                        Kansas City, MO 64112
                                        Tel: (816) 714-7100
                                        siegel@stuevesiegel.com

                                        Karen Hanson Riebel
                                        **LOCKRIDGE GRINDAL NAUEN, P.L.L.P**
                                        100 Washington Avenue South, Suite 2200
                                        Minneapolis, MN 55401
                                        Tel: (612) 339-6900
                                        khriebel@locklaw.com

                                        John A. Yanchunis
                                        **MORGAN & MORGAN COMPLEX**
                                        **LITIGATION GROUP**
                                        201 N. Franklin Street, 7th Floor
                                        Tampa, FL 33602
                                        Tel: (813) 223-5505
                                        jyanchunis@ForThePeople.com
                                        *Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2021, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing

to all counsel of record.

                                        /s/ *Steven T. Webster*
                                        Steven T. Webster (VSB No. 31975)
                                        WEBSTER BOOK LLP